

**PROMISSORY NOTE**
(the "Note")

$9,430,000.00

El Paso, Texas

Effective ~~April 30~~, 2019

1.    <u>Amount, Obligation to Pay, Interest Rate</u>.  FOR VALUE RECEIVED, in such installments and at the times hereinafter stated, THE GATEWAY VENTURES, LLC, whose mailing address is 300 E. Main, Suite 1000, El Paso, Texas 79901 ("Borrower") hereby unconditionally promises to pay to the order of HD LENDING, LLC, a Texas limited liability company (together with any and all of its successors and assigns and/or any other holder of this Note, "Lender"), whose address is 6080 Surety Dr., Suite 101, El Paso, Texas 79905, in immediately available funds constituting legal tender of the United States of America, the principal sum of NINE MILLION FOUR HUNDRED THIRTY THOUSAND AND 00/100THS DOLLARS ($9,430,000), or so much thereof as may be advanced hereunder, with interest on the unpaid principal balance from time to time outstanding, interest to accrue from the date of each disbursement made hereunder as follows:

The rate of interest hereunder shall be a floating rate, beginning as of the effective date hereof, adjusted as it changes daily, equal to the "Prime Rate," as defined hereafter, plus five percent (5%) per annum; provided, however, that the interest rate shall never be lower than ten and one-half percent (10.50%) per annum. "Prime Rate" shall mean the prime rate reported in The Wall Street Journal (or the average prime rate if a high and a low prime rate are therein reported), and the Prime Rate hereunder shall change without notice with each change in the prime rate reported in The Wall Street Journal as of the date such change is reported. If The Wall Street Journal ceases to report such a prime rate, the Prime Rate shall thereafter be determined by such alternate method as may be reasonably selected by Lender.

The Interest Rate provided herein shall be calculated and applied on the basis of actual days elapsed and a 365-day year and shall in no event exceed the Maximum Rate, as defined in Section 11 hereof.

2.    <u>Terms</u>.  Payments under this Note shall be made as follows:

Accrued interest only as provided herein on the outstanding principal balance shall be due and payable monthly, the first of such payments shall be due and payable one month from the date hereof and a like installment shall be due and payable on the same day of each succeeding month thereafter until eighteen (18) months from the date hereof (the "Maturity Date") when the entire balance of unpaid principal and accrued interest as provided herein shall be due and payable in full.

In addition to the interest payments provided herein, payment of a monthly tax escrow shall be made to Lender pursuant to the terms of the Loan Agreement.

THIS LOAN IS PAYABLE IN FULL ON THE MATURITY DATE. ON THE MATURITY DATE, BORROWER MUST REPAY THE ENTIRE UNPAID PRINCIPAL BALANCE OF THE LOAN AND ANY UNPAID INTEREST THEN DUE. LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. BORROWER WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT BORROWER MAY OWN, OR BORROWER WILL HAVE TO FIND A LENDER WILLING TO LEND BORROWER THE MONEY. IF BORROWER REFINANCES THIS LOAN AT MATURITY, BORROWER MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF BORROWER OBTAINS REFINANCING FROM LENDER.

3. **Delinquency Charge.** If any payment hereunder is not paid on or before the tenth (10th) day after the due date thereof, a late charge equal to five percent (5%) of the amount of the late payment shall become due by Borrower to the then holder of this Note to compensate the holder hereof for the additional expense involved in handling delinquent payments. If applicable, the late charge required hereby shall be subject to the provisions of this Note regarding legal interest limitations.

4. **Return Check Charge.** Borrower agrees to pay a fee not to exceed $25.00 for each check, negotiable order of withdrawal or draft that Borrower issues in connection with this Note that is returned to the extent that the fee provided herein is within the limits set pursuant to Section 3.506 of the Texas Business and Commerce Code. At any time during the term hereof, Lender may, in its sole discretion, requirement any payment due hereunder to be in the form of a cashier's check or other form of payment acceptable to Lender.

5. **Security.** This Note is secured by all instruments heretofore, now or hereafter executed by Borrower or any Guarantors in favor of Lender and by their terms securing the payment of this Note (hereinafter collectively the "Security Documents") including, without limitation, the following:

A. A Deed of Trust, Security Agreement, Assignment of Leases, Assignment of Rents and Financing Statement (the "Deed of Trust") of even date herewith from Borrower to a Trustee as named therein, in favor of Lender, creating a security interest against the following described real property and the improvements located thereon:

Being a 19.96 acre tract of land out of a portion of Tract 4A, now known as Tract 4H, Block 2, Ascarate Grant, El Paso County, Texas, more particularly described on Exhibit A, attached hereto and made a part hereof (the "Property");

B. The Continuing Unlimited Guaranty Agreements (collectively, "Guaranties") of even date herewith from PDG PRESTIGE, INC., a Texas corporation and MICHAEL J. DIXSON in favor of Lender (collectively, "Guarantors");

C. A Loan Agreement (the "Loan Agreement") by and between Borrower, Lender and Guarantors of even date herewith; and

D. The Subordination, Non-Disturbance, Attornment and Estoppel Agreements executed by Hoy Fox Automotive Group and Titan Towers, L.P. for the benefit of Lender.

6. **Priority.** The lien or liens securing the payment of this Note shall be and remain first liens on the Property and prior to any other encumbrances thereon.

7. **Manner and Place of Payment; Holidays.** All payments on this Note shall be made in coin or currency which, at the time or times of payment, is immediately available funds constituting legal tender for public or private debts in the United States of America. All payments on this Note shall be made at the address of Lender as indicated in the first paragraph hereinabove, or at such other address as Lender shall designate in writing. If the prescribed date of payment of any of the principal of or interest hereon is a Sunday or legal holiday, such payment shall be due on the next succeeding business day.

8. **Application of Payments; Prepayment.** All sums paid hereon shall be applied first to the payment of late fees, if any, then to the payment of accrued interest due on the unpaid principal balance, and the remainder to the reduction of unpaid principal. Borrower may prepay this Note, in whole or in part, at any time without paying any additional fee. Any prepayment is to be applied toward the payment of the principal installments last maturing upon this Note, that is, in the inverse order of maturity and without reducing the amount or time of payment of the remaining obligatory installments. In the event of a default, all payments received after the default shall be applied first to pay attorney's fees and other costs and expenses of collection, if any, and then the remainder shall be applied as provided above.

9.    **Default and Acceleration.**

9.1  Events of Default.  Time is of the essence of this Note, and time is of the essence in the performance of all obligations under the Security Documents.  Any one or more of the following events or conditions shall constitute a default ("Default") hereunder: (i) failure by Borrower to timely pay any amount to Lender on or before the fifth (5th) day after the due date of any such payment; provided, however, the delinquency charge set forth in Section 3 hereof shall also apply if Borrower does not make payment to Lender on or before the tenth (10th) day after the due date of any such payment; (ii) default or other failure by Borrower to perform or comply with any non-monetary covenant, condition or obligation of Borrower under this Note or any of the Security Documents (collectively, the "Condition") within fifteen (15) days after the date such Condition is required to be met, provided, however, if the Condition cannot be cured within fifteen (15) days, Borrower shall not be deemed to be in default if the cure of such Condition is commenced within such fifteen (15) day period, Lender is promptly notified of same, and said cure is thereafter diligently pursued and completed no later than sixty (60) days after the date such Condition is required to be met; (iii) failure by Borrower to pay any other debt to Lender when due; or (iv) Lender determines that there has been a material adverse change in the financial condition of Borrower.

9.2  Remedies.  Upon a Default, Lender at its election may (but shall not be obligated to), without notice, do any one or more of the following: (i) reduce any claim to judgment; (ii) exercise any and all rights and remedies afforded by this Note, the Security Documents and any other agreements between Lender and Borrower and/or Guarantors, as well as at law, equity or otherwise, including, without limitation, obtaining appointment of a receiver (to which Borrower hereby consents) and/or foreclosure under the Deed of Trust; and/or (iii) then or at any time thereafter, without further notice and at its option, accelerate maturity and cause all of the unpaid principal balance of this Note, with interest, fees and charges accrued hereon, and all obligations in all instruments securing or collateral to it, to become immediately due and payable.

No delay or omission of Lender to exercise any right, power or remedy accruing upon the happening of a Default shall impair any such right, power or remedy or shall be construed to be a waiver of any such Default or any acquiescence therein.  No delay or omission on the part of Lender to exercise any option for acceleration of the maturity of the indebtedness, or for foreclosure or sale of any collateral given as security for the Note following any Default as aforesaid, or any other option granted to Lender hereunder in any one or more instances, or the acceptances by Lender of any partial payment on account of the indebtedness, shall constitute a waiver of any such Default, and each such option shall remain continuously in full force and effect.  No remedy herein conferred upon or reserved to Lender is intended to be exclusive of any other remedies provided for in this Note or the Security Documents, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder, or any of the Security Documents, or now or hereafter existing at law or in equity or by statute. Every right, power and remedy given to Lender by this Note or any of the Security Documents between the parties shall be concurrent, and may be pursued separately, successively or together against Borrower, any Guarantor and/or any other collateral granted as security under the Security Documents, and every right, power and remedy given by this Note or any of the Security Documents may be exercised from time to time as often as may be deemed expedient by Lender.

10.    **Annual Interest Rate Upon Default.**  All past due installments of principal and interest due and owing on this Note, shall bear interest from maturity thereof until paid at the rate of eighteen percent (18.00%) per annum (the "Default Interest Rate").  Upon acceleration or maturity of the entire outstanding principal balance of this Note, said principal amount shall bear interest from the date of acceleration or maturity until paid at the rate of eighteen percent (18%) per annum calculated and applied on the basis of actual days elapsed and a 365/366 day year, subject to paragraph 11 hereof, PROVIDED, HOWEVER, that the interest payable under this paragraph shall in no way exceed the Maximum Rate as defined herein.

11.  **Savings and Spreading**.  It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with applicable Texas law governing the maximum rate or amount of interest payable on or in connection with this Note and the loan evidenced hereby (the "Loan") (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law).  If the applicable law is ever judicially interpreted so as to render usurious any amount called for under this Note or under the Security Documents, or contracted for, charged, taken, reserved or received with respect to the Loan, or if acceleration of the maturity of this Note or if any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by law or if any contingency provided in this Note results in the contracting for, charging, taking or reserving a greater amount of interest than permissible under the applicable law, then it is Borrower's and Lender's express intent that (i) all excess amounts theretofore collected by Lender be credited on the principal balance of this Note (or, if this Note has been or would thereby be paid in full, refunded to Borrower); and (ii) the provisions of this Note and the Security Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder.  The right to accelerate maturity of this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to collect any unearned interest in the event of acceleration.  All sums paid or agreed to be paid to Lender for the use, forbearance or detention of the indebtedness evidenced hereby shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full so that the rate or amount of interest on account of such indebtedness does not exceed the applicable usury ceiling.  Notwithstanding any provision contained in this Note or in any of the Security Documents that permits the compounding of interest, including without limitation any provision by which any of the accrued interest is added to the principal amount of this Note, the total amount of interest that Borrower is obligated to pay and Lender is entitled to receive with respect to this Note shall not exceed the amount calculated on a simple (i.e., noncompounded) interest basis at the Maximum Rate (as defined hereinafter) on principal amounts actually advanced to or for the account of Borrower, including any initial funds advanced contemporaneously herewith and any advances made pursuant to any of the Security Documents (such as for the payment of taxes, insurance premiums and the like).  As used herein, the term "Maximum Rate" shall mean the maximum nonusurious rate of interest which may be lawfully contracted for, charged, taken, reserved or received by Lender from Borrower in connection with the Loan evidenced hereby under applicable Texas law (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law).  To the extent that Texas law determines the Maximum Rate, such Maximum Rate shall be determined by utilizing the "weekly ceiling" from time to time in effect pursuant to Chapter 303, as amended, of the Texas Finance Code.  In no event shall the provisions of Chapters 342, 343 or 346, as they may be amended, of the Texas Finance Code be applicable to the loan evidenced hereby.

12.  **Attorney's Fees and Expenses**.  In the event that Lender or any other holder of this Note brings suit hereon, or employs an attorney or incurs expenses to compel payment of this Note or any portion of the indebtedness evidenced hereby, or to cure any defaults under this Note or any of the Security Documents, whether through suit, probate, insolvency, reorganization, bankruptcy, or any other legal or informal proceeding, Borrower and all endorsers, guarantors and sureties agree additionally to pay all reasonable attorney's fees, court costs and other reasonable expenses incurred by Lender.

13.  **Successors/Assignment**.  This Note shall be binding upon Borrower and its legal representatives, successors and permitted assigns.  This Note may not be assigned by Borrower or otherwise assumed by any third party without Lender's prior written consent.  Lender reserves the right, exercisable in Lender's sole discretion and without notice to Borrower or any other person, to sell participations in all or any part of this Note or the debt evidenced by this Note and/or to assign its interest in all or any part of this Note or the debt evidenced by this Note and Borrower hereby agrees to same.

14.    <u>Waivers</u>. Except as otherwise provided in this Note, Borrower and all endorsers, guarantors, sureties and accommodation parties of this Note, both before and after maturity, hereby expressly (i) waive all protest, notice of protest, demand for payment, presentment for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, notice of dishonor, bringing of suit, and diligence in taking any action to collect any amounts called for hereunder and in the handling of properties, rights or collateral at any time existing in connection herewith; (ii) consent to and waive notice of any one or more renewals, extensions or modifications of this Note, whether made to or in favor of Borrower or any other person or persons, regardless whether such renewal, extension or modification modifies the terms, interest rate or time for payment of this Note and regardless of the length of term of the renewal, extension or modification; (iii) consent to and waive notice of any substitution, exchange or release of any security now or hereafter given for this Note; (iv) consent to and waive notice of the release of any party primarily or secondarily liable hereon; (v) consent to and waive notice of any other indulgences, none of which shall otherwise affect the liability of any of said parties for the indebtedness evidenced by this Note; and (vi) agree that it will not be necessary for Lender, in order to enforce payment of this Note, first to institute suit against or to exhaust Lender's remedies against Borrower or any other party liable hereunder, or to proceed against any other security for this Note.

15.    <u>Definitions; Applicable Law</u>. The terms "Borrower" and "Lender" and other nouns and pronouns include the singular and/or plural, as appropriate. The terms "Borrower" and "Lender" also include their respective heirs, executors, personal representatives, successors and assigns. This Note shall be governed by and construed in accordance with the laws of the State of Texas except where preempted by Federal law of the United States of America. Performance by the parties hereunder shall be deemed to occur exclusively in El Paso, Texas.

16.    <u>Advances</u>. The Advances allowed under this Note are subject to the terms and conditions of the Loan Agreement. The books of Lender shall be prima facie evidence of all sums due to Lender hereunder.

THIS NOTE AND THE SECURITY DOCUMENTS REFERENCED HEREIN REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

IN WITNESS WHEREOF, Borrower has executed this Note as of the date first set forth above.

<u>BORROWER</u>:

**THE GATEWAY VENTURES, LLC,**
a Texas limited liability company
By: PDG Prestige, Inc.,
    a Texas corporation
Its: Sole Manager

By: _____
     Michael J. Dixson, President

## Exhibit "A"
## Legal Description

BEING A 19.96 ACRE TRACT OF LAND OUT OF A PORTION OF TRACT 4A, NOW KNOWN AS TRACT 4H, BLOCK 2, ASCARATE GRANT, EL PASO COUNTY, TEXAS BEING THE SAME TRACT DESCRIBED IN A DOCUMENT TO MAGELLAN PIPELINE TERMINALS, L.P. ACCORDING TO THE DOCUMENT RECORDED IN DOCUMENT NUMBER 20070077714, OFFICIAL PUBLIC RECORDS EL PASO COUNTY, TEXAS (SEE BELOW "RECORD LEGAL DESCRIPTION") AND BEING COMPRISED ENTIRELY OF A 15.69 ACRE TRACT DEPICTED HEREON AS PARCEL A AND A 4.27 ACRE TRACT DEPICTED HEREON AS PARCEL B AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A FOUND 5/8-INCH IRON ROD (N:10661485.99, E:415533.47) FOR THE SOUTH CORNER OF SAID TRACT, FROM WHICH THE FOUND CITY MONUMENT NUMBER 1033 BEARS N 51°16'26" W, A DISTANCE OF 1031.01 FEET;

THENCE N 58°34'05" W, A DISTANCE OF 740.25 FEET ALONG THE SOUTHWEST LINE OF SAID MAGELLAN TRACT, TO A FOUND "X" CHISELED IN CONCRETE FOR THE MOST SOUTHERLY WEST CORNER OF SAID TRACT;

THENCE N 31°29'49" E, A DISTANCE OF 215.04 FEET ALONG THE NORTHWEST LINE OF SAID MAGELLAN TRACT, TO A SET "X" CHISELED IN ASPHALT FOR AN INTERIOR CORNER OF THIS TRACT COMMON TO THE EAST CORNER OF A LOT 1, BLOCK 1, HOWDY'S SUBDIVISION (CENTRAL) UNIT ONE, EL PASO COUNTY, AS RECORDED IN VOLUME 75, PAGE 34, PLAT RECORDS EL PASO COUNTY, TEXAS;

THENCE N 58°30'13" W, A DISTANCE OF 215.68 FEET ALONG THE SOUTHWEST LINE OF SAID MAGELLAN TRACT COMMON TO THE NORTHEAST LINE OF SAID LOT ONE TO A SET 1/2-INCH IRON ROD WITH CAP MARKED "GATEWAY MIDLAND" FOR THE MOST NORTHERLY WEST CORNER OF SAID TRACT;

THENCE N 31°30'31" E, A DISTANCE OF 749.54 FEET ALONG THE NORTHWEST LINE OF SAID MAGELLAN TRACT COMMON TO THE SOUTHEAST LINE OF THE INTERNATIONAL INDUSTRIAL CENTER, UNIT 1 SUBDIVISION AS RECORDED IN VOLUME 18, PAGE 5, PLAT RECORDS, EL PASO COUNTY, TEXAS TO A SET CHISELED "X" FOR THE MOST WESTERLY NORTH CORNER OF SAID TRACT;

THENCE N 80°43'21" E, A DISTANCE OF 50.99 FEET ALONG THE NORTH LINE OF SAID MAGELLAN TRACT COMMON TO THE SOUTH LINE OF A TRACT TO HOY FAMILY LIMITED PARTNERSHIP, ACCORDING TO THE DOCUMENT RECORDED IN DOCUMENT NUMBER 20060054513, OFFICIAL PUBLIC RECORDS, EL PASO COUNTY, TEXAS TO A FOUND PK NAIL WITH SPINNER FOR THE MOST EASTERLY NORTH CORNER OF SAID TRACT;

THENCE S 53°41'38" E, A DISTANCE OF 909.99 FEET ALONG THE NORTHEAST LINE OF SAID MAGELLAN TRACT, COMMON TO THE SOUTHWEST LINE OF VISCOUNT SUBDIVISION AS RECORDED IN VOLUME 60, PAGE 33, PLAT RECORDS EL PASO COUNTY, TEXAS TO A FOUND CHISELED "X" FOR THE MOST NORTHERLY EAST CORNER OF SAID MAGELLAN TRACT;

THENCE S 32°45'26" W, A DISTANCE OF 385.01 FEET ALONG THE SOUTHEAST LINE OF SAID MAGELLAN TRACT TO A FOUND 5/8-INCH IRON ROD FOR AN INTERIOR CORNER OF SAID MAGELLAN TRACT;

THENCE S 59°44'42" E, A DISTANCE OF 31.47 FEET ALONG THE NORTHEAST LINE OF SAID MAGELLAN TRACT TO A SET 1/2-INCH IRON ROD WITH CAP MARKED "GATEWAY MIDLAND" FOR AN EXTERIOR CORNER OF SAID TRACT;

THENCE S 32°50'26" W, A DISTANCE OF 556.86 FEET TO THE POINT OF BEGINNING AND CONTAINING 19.96 ACRES OF LAND.

AND MORE PARTICULARLY DESCRIBED IN RECORD DESCRIPTION PER INSTRUMENT NUMBER 20070077714, OFFICIAL PUBLIC RECORDS EL PASO COUNTY, TEXAS:

A PARCEL OF LAND LYING IN AND BEING A PORTION OF TRACT 4A, BLOCK 2, ASCARATE GRANT, EL PASO COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT AN X CHISELED IN A CONCRETE CURB, SAID POINT BEING THE INTERSECTION OF THE EAST RIGHT-OF-WAY LINE OF AIRWAY BLVD. AND THE NORTH RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY 10, AND ALSO BEING THE POINT OF BEGINNING OF THE PARCEL BEING DESCRIBED: THENCE NORTH 28°21'26" EAST A DISTANCE OF 130.27 FEET TO A POINT; THENCE FOLLOWING A CURVE TO THE LEFT ALONG THE EASTERLY RIGHT-OF-WAY LINE OF AIRWAY BLVD. AN ARC DISTANCE OF 222.09 FEET TO A POINT, THE CENTRAL ANGLE OF SAID CURVE BEING 15°54'11", ITS RADIUS BEING 800.15 FEET, AND THE LONG CHORD BEARING NORTH 20°24'21" EAST A DISTANCE OF 221.38 FEET; THENCE FOLLOWING A CURVE TO THE RIGHT AN ARC DISTANCE OF 36.97 FEET TO A POINT, THE CENTRAL ANGLE OF SAID CURVE BEING 105°54'40", ITS RADIUS BEING 20.00 FEET, AND THE LONG CHORD BEARING NORTH 65°24'35" EAST A DISTANCE OF 31.63 FEET; THENCE SOUTH 61°38'34" EAST A DISTANCE OF 11.40 FEET TO A POINT; THENCE NORTH 28°21'26" EAST A DISTANCE OF 826.18 FEET TO A CONCRETE NAIL WITH A DISC; THENCE SOUTH 55°48'44" EAST A DISTANCE OF 948.90 FEET TO A 5/8 INCH DIAMETER IRON REBAR; THENCE 29°22'10" WEST A DISTANCE OF 364.09 FEET TO A 5/8 INCH DIAMETER IRON REBAR; THENCE SOUTH 62°38'50" EAST A DISTANCE OF 31.47 FEET TO A 5/8 INCH IRON REBAR; THENCE SOUTH 29°55'26" WEST A DISTANCE OF 558.00 FEET TO A 5/8 INCH DIAMETER IRON REBAR LYING IN THE NORTHERLY RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY 10; THENCE NORTH 61°38'34" WEST ALONG SAID NORTHERLY RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY 10 DISTANCE OF 955.31 FEET TO THE POINT OF BEGINNING OF THE PARCEL BEING DESCRIBED AND CONTAINING 920,338.530 SQUARE FEET OR 21.128 ACRES OF LAND MORE OR LESS.

SAVE AND EXCEPT:

BEING 0.0045 OF AN ACRE OF LAND, (195.27 SQUARE FEET) MORE OR LESS, OUT OF AND A PART OF TRACT 4H, BLOCK 2, ASCARATE GRANT, CITY OF EL PASO, EL PASO COUNTY, TEXAS, SAID 0.0045 OF AN ACRE OF LAND BEING DESCRIBED BY METES AND BOUNDS AS FOLLOWS, TO-WIT: COMMENCING AT A POINT WHICH IS A CITY MONUMENT AND LOCATED AT THE CENTERLINE OF AIRWAY BOULEVARD, SAID POINT IS ALSO THE POINT OF CURVATURE ALONG SAID AIRWAY BOULEVARD CENTERLINE; THENCE, SOUTH 28°21'08" WEST, A DISTANCE OF 130.27 FEET TO THE POINT OF INTERSECTION OF SAID CENTERLINE AND THE PROJECTED NORTHERLY RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY 10 (1H-10); THENCE, ALONG SAID PROJECTED RIGHT-OF-WAY LINE OF 1H-10, SOUTH 61°38'52" EAST, A DISTANCE OF 60.00 FEET TO THE TRUE POINT OF BEGINNING; THENCE, ALONG THE EASTERLY RIGHT-OF-WAY LINE OF SAID AIRWAY BOULEVARD, NORTH 28°21'08" EAST A DISTANCE OF 19.00 FEET TO A POINT ON THE PROPOSED RIGHT-OF-WAY LINE OF 1H-10, SAID POINT IS ALSO A POINT OF CURVATURE; THENCE, 32.75 FEET ALONG THE ARC OF A CURVE TO THE LEFT, WHOSE CENTRAL ANGLE IS 37°07'07", WHOSE RADIUS IS 55.00 FEET AND WHOSE CHORD BEARS SOUTH 25°34'38" EAST, A DISTANCE OF 32.27 FEET TO A POINT OF TANGENCY; THENCE, ALONG SAID NORTHERLY EXISTING RIGHT-OF-WAY LINE OF SAID

INTERSTATE 10, NORTH 61°38'52" WEST, A DISTANCE OF 26.08 FEET TO THE TRUE POINT OF BEGINNING, CONTAINING AN AREA OF 0.0045 OF AN AREA (ACRE?) OF LAND, MORE OR LESS.

ALSO SAVE AND EXCEPT:

ALL THAT CERTAIN TRACT OF PARCEL OF LAND CONTAINING 706 SQUARE FEET LYING WITHIN THE CORPORATE LIMITS OF THE CITY OF EL PASO, EL PASO COUNTY, TEXAS, SAME BEING A PORTION OF TRACT 4H, BLOCK 2, OF THE ASCARATE GRANT AND BEING THAT SAME PARCEL OF LAND DESCRIBED IN A QUITCLAIM DEED FROM SHELL OIL COMPANY TO ROBERT H. HOY, JR., ET UX. OF RECORD IN VOLUME 2761, PAGE 1536, OF THE DEED RECORDS OF EL PASO COUNTY, TEXAS, AND ALSO BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS: BEGINNING AT A 1/2 INCH REBAR FOUND MARKING THE NORTH CENTER OF SAID TRACT 4H, SAME BEING THE WEST CORNER OF TRACT 4H2A, OF SAID BLOCK 2, AND BEING ON THE SOUTHEAST LINE OF LOT 1, BLOCK 4, OF THE INTERNATIONAL INDUSTRIAL CENTER, UNIT 1, AN ADDITION TO THE CITY OF EL PASO, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 18, PAGE 5, OF THE PLAT RECORDS OF EL PASO COUNTY, TEXAS; THENCE, SOUTH 59°39'10" EAST, WITH THE NORTHWEST LINE OF SAID TRACT 4H, SAME BEING THE SOUTHWEST LINE OF SAID TRACT 4H2A, A DISTANCE OF 38.76 FEET TO A CHAINLINK FENCE, SAME BEING ON THE SOUTH SIDE OF A CONCRETE DRAIN, AND BEING NORTH 56°39'10" WEST, 667.70 FEET, FROM A FOUND 1/2 INCH REBAR; THENCE, SOUTH 77°44'37" WEST, WITH THE SAID CHAINLINK FENCE AND ALONG THE SOUTH SIDE OF SAID CONCRETE DRAIN, SAME BEING THE SOUTH LINE OF SAID ROBERT H. HOY, JR., TRACT, A DISTANCE OF 50.92 FEET TO THE SOUTHEAST LINE OF SAID LOT 1, BLOCK 4, SAME BEING THE NORTHWEST LINE OF SAID TRACT 4H, AND BEING NORTH 28°21'26" EAST, 589.39 FEET FROM A FOUND 1/2 INCH REBAR; THENCE, NORTH 28°21'26" EAST, WITH THE SOUTH EAST LINE OF SAID LOT 1, SAME BEING THE NORTHWEST LINE OF SAID TRACT 4H, A DISTANCE OF 36.56 FEET TO THE POINT OF BEGINNING AND CONTAINING 706 SQUARE FEET OF LAND.

ALSO SAVE AND EXCEPT:

LOT 1, BLOCK 1, HOWDY'S SUBDIVISION (CENTRAL) UNIT ONE, AN ADDITION TO THE CITY OF EL PASO, EL PASO COUNTY, TEXAS, ACCORDING TO THE RECORDED PLAT OF RECORD IN THE PLAT RECORDS OF EL PASO COUNTY, TEXAS.

Doc # 20190031430
#Pages 24 #NFPages 1
05/01/2019 02:02 PM
Filed & Recorded in
Official Records of
El Paso County
Delia Briones
County Clerk
Fees $118.00


eRecorded


I hereby certify that this instrument was filed on the date and time stamped
hereon by me and was duly recorded by document number in the Official
Public Records of real Property in El Paso County.

EL PASO COUNTY, TEXAS

**EXHIBIT**



**2**

Doc # 20190031430

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## DEED OF TRUST
### (Security Agreement, Assignment of Leases, Assignment of Rents and Financing Statement)

This Deed of Trust, Security Agreement, Assignment of Leases, Assignment of Rents, and Financing Statement ("Instrument") is made effective on the date provided below among Borrower, Lender, and Trustee who are more fully described below.

**DATE:**          Effective April 30 2019

**BORROWER:**          THE GATEWAY VENTURES, LLC,
                       a Texas limited liability company

**BORROWER'S ADDRESS FOR NOTICE:**          300 E. Main, Suite 1000
                                            City of El Paso, El Paso County, Texas 79901

**LENDER:**          HD LENDING, LLC,
                     a Texas limited liability company

**LENDER'S ADDRESS:**          6080 Surety Dr., Suite 101
                               City of El Paso, El Paso County, Texas 79905

**TRUSTEE:**          PATRICIA G. JAY

**TRUSTEE'S ADDRESS:**          713 Los Miradores Dr.
                                City of El Paso, El Paso County, Texas 79912

**OBLIGATION:** $9,430,000 promissory note (the "Note") dated of even date herewith, executed by Borrower, payable to the order of Lender, and which said Note, if not sooner paid, is due and payable in full eighteen (18) months from the date hereof.

**LAND:**          The real property more particularly described as:

Being a 19.96 acre tract of land out of a portion of Tract 4A, now known as Tract 4H, Block 2, Ascarate Grant, El Paso Country, Texas, and being more particularly described by metes and bounds in Exhibit "A" attached hereto and made a part hereof for all purposes;

as well as the improvements located thereon.

## ARTICLE I-SECURITY

1.01    CONVEYANCE IN TRUST. For value received, the receipt and sufficiency of which Borrower acknowledges, and to secure the payment of the Indebtedness described in Section 2.01 and performance of the covenants and agreements of Borrower stated in this Instrument and in the Financing Documents, as herein after defined, Borrower conveys the Property described in Section 1.02, including without limitation the Land, to the Trustee in trust, with power of sale, TO HAVE AND TO HOLD the Property, together with the rights, privileges, and appurtenances thereto belonging unto the Trustee and the Trustee's substitutes or successors forever. Borrower binds itself and its heirs, executors, administrators, personal representatives, successors, and assigns to WARRANT AND FOREVER DEFEND the Property unto the Trustee, and the Trustee's substitutes or successors and assigns, against the claim or claims of all persons claiming or to claim the same or any part thereof.

**1.02    PROPERTY.** The Property covered by this Instrument includes the Land and the following items described in this Section 1.02, whether now owned or hereafter acquired, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by this Instrument, and all rights, hereditaments and appurtenances pertaining thereto, all of which along with the Land are referred to as the "Property":

(a)    Any and all buildings, improvements, and tenements now or hereafter attached to or placed, erected, constructed, or developed on the Land (the "Improvements");

(b)    all equipment, fixtures, furnishings, inventory, and articles of personal property (the "Personal Property") now or hereafter attached to or used in or about the Improvements that are necessary or useful for the complete and comfortable use and occupancy of the Improvements for the purposes for which they were or are to be attached, placed, erected, constructed or developed, or which Personal Property is or may be used in or related to the planning, development, financing or operation of the Improvements, and all renewals of or replacements or substitutions for any of the foregoing, whether or not the same are or shall be attached to the Land or Improvements, provided, however, the term Personal Property shall not include (i) any personal property owned by a tenant and not attached to the Land or Improvements; and (ii) the trade fixtures of any tenant;

(c)    all water and water rights, timber, crops, and mineral interests pertaining to the Land;

(d)    all building materials and equipment now or hereafter delivered to and intended to be installed in or on the Land or the Improvements;

(e)    all plans and specifications for the Improvements;

(f)    all Borrower's rights (but not Borrower's obligations) under any contracts relating to the Land, the Improvements or the Personal Property;

(g)    all deposits (including tenant security deposits), bank accounts, funds, instruments, notes or chattel paper arising from or by virtue of any transactions related to the Land, the Improvements or the Personal Property;

(h)    all Borrower's rights (but not Borrower's obligations) under any documents, contract rights, accounts, commitments, construction contracts, architectural contracts, engineering contracts, and general intangibles (including without limitation trademarks, trade names, and symbols) arising from or by virtue of any transactions related to the Land, the Improvements, or the Personal Property;

(i)    all permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Land, the Improvements, or the Personal Property;

(j)    all proceeds arising from or by virtue of the sale, lease or other disposition of the Land, the Improvements, or the Personal Property;

(k)    all proceeds (including premium refunds) of each policy of insurance relating to the Land, the Improvements, or the Personal Property;

(l)    all proceeds from the taking of any of the Land, the Improvements, the Personal Property or any rights appurtenant thereto by right of eminent domain or by private or other purchase in lieu thereof, including change of grade of streets, curb cuts or other rights of access, for any public or quasi-public use under any law;

(m)    all right, title, and interest of Borrower in and to all streets, roads, public places, easements, and rights-of-way, existing or proposed, public or private, adjacent to or used in connection with, belonging or pertaining to the Land;

(n)    all of the Leases (as hereafter defined), rents, royalties, bonuses, issues, profits, revenues, or other benefits of the Land, the Improvements, or the Personal Property, now or hereafter acquired, including without limitation cash or securities deposited pursuant to leases to secure performance by the tenants of their obligations thereunder (subject to the Assignment of Rents made in Article V below);

(o)    other interests of every kind and character that Borrower now has or at any time hereafter acquires in and to the Land, Improvements, and Personal Property and all property that is used or useful in connection therewith, including rights of ingress and egress and all reversionary rights or interests of Borrower with respect to such property; and

(p)    all products and proceeds of the Personal Property described in this Section 1.02.

## ARTICLE II-INDEBTEDNESS AND PAYMENTS

**2.01 INDEBTEDNESS.** The indebtedness secured by this Instrument (the "Indebtedness") shall mean and include the following:

(a) any and all sums becoming due and payable pursuant to and/or related to the Note;

(b) any and all other sums becoming due and payable by Borrower (or any one or more of them, if more than one) to Lender as a result of advancements made by Lender pursuant to the terms and conditions of this Instrument or any other documents securing or executed in connection with or otherwise relating to the Note, including without limitation the repayment of any future advances made by Lender to Borrower as provided in paragraph (c) below and the repayment of any sums advanced for the protection of Lender's security pursuant to Section 6.21;

(c) Borrower and Lender contemplate that Lender will, from time to time, engage in various transactions, and that from time to time other circumstances may arise, in which Borrower becomes obligated to Lender.  Borrower understands that some of those transactions and circumstances may be of a type that is very different from the financing transaction evidenced in part by the Note and the circumstances connected therewith.  Borrower desires and intends that Lender engage in all such transactions, and deal generally with Borrower with the assurance that any and all indebtedness and obligations now owed, and that may hereafter become owing, to Lender from Borrower will be secured by the liens arising hereunder. Therefore, the conveyance made by this Instrument, in addition to being made to secure payment of the Note, is also made in trust to secure and enforce the payment of all other indebtedness and obligations of Borrower to Lender, whether presently existing, or in any manner or means hereafter incurred by Borrower and evidenced in any manner whatsoever, either by notes, advances, overdrafts, bookkeeping entries, guaranty agreements, liens or security interest instruments, or any other method or means including any amendment of or renewal and extension of the Note, or of any part of any present or future indebtedness, or other obligations, of Borrower, and including any further loans and advancements made by Lender to Borrower. The fact of repayment of all indebtedness, and performance of all other obligations of Borrower to Lender shall not terminate the lien arising hereunder unless the same be released by Lender at the request of Borrower; but otherwise it shall remain in full force and effect to secure all future advances, indebtedness and other obligations, regardless of any additional security that may be taken as to any past or future indebtedness or other obligations; and

(d) any and all renewals, extensions, replacements, rearrangements, substitutions, rearrangements, or modifications of the Indebtedness, or any part of the Indebtedness.

2.02    OTHER DOCUMENTS.  In addition to this Instrument and the Note, Borrower and Lender may execute various other documents and agreements relating to the Indebtedness secured by this Instrument, including, without limitation, the Loan Agreement (the "Loan Agreement"), executed by and among Borrower, Lender and the Guarantors provided therein, dated of even date herewith, all of which documents and agreements, including without limitation the Loan Agreement, are referred to herein as the "Financing Documents".  This Instrument shall also secure the performance of all obligations and covenants of Borrower under this Instrument, the Note, the Loan Agreement and the other Financing Documents.

2.03    PAYMENT OF PRINCIPAL AND INTEREST.  Borrower shall promptly pay when due the principal and interest on the Indebtedness evidenced by the Note, any prepayment and late charges provided in the Note, and all other sums secured by this Instrument.

2.04    APPLICATION OF PAYMENT.  Unless applicable law provides otherwise, all payments received by Lender from Borrower under the Note or this Instrument shall be applied by Lender in the following order of priority: (a) amounts payable to Lender by Borrower under this Instrument; (b) sums payable to Lender under the Note, to be applied to principal or interest as Lender may determine in its discretion; and (c) any other sums secured by this Instrument in such order as Lender, at Lender's option, may determine.

2.05    GUARANTOR.  The term "Guarantor" shall include any person, company or entity obligated to pay or guaranteeing collection of all or any portion of the Indebtedness, directly or indirectly.

## ARTICLE III-SECURITY AGREEMENT

3.01    UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.  This Instrument is also intended to be a security agreement between Borrower, as debtor, and Lender, as secured party, pursuant to the Texas Uniform Commercial Code [Texas Business and Commerce Code Chapter 1.01, et seq. ("Texas UCC")] for any of the items specified above as part of the Property which, under applicable law, may be subject to a security interest pursuant to the Texas UCC, and Borrower hereby grants Lender a security interest in all such items.  Borrower agrees that Lender may file this Instrument, or a reproduction thereof, in the real estate records or other appropriate index, as a financing statement for any of the items specified above as part of the Property. Any reproduction of this Instrument or of any other security agreement or financing statement shall be sufficient as a financing statement.  In addition, Borrower agrees to execute and deliver to Lender, upon Lender's request, any financing statement, as well as extensions, renewals, and amendments thereof, and reproduction of this Instrument in such form as Lender may require to perfect a security interest with respect to said items. Borrower shall pay all costs of filing such financing statement and any extensions, renewals, amendments, and releases thereof and shall pay all

reasonable costs and expenses of any record searches for financing statements Lender may reasonably require. Without the prior written consent of Lender, Borrower shall not create or suffer to be created pursuant to the Texas UCC any other security interest in said items, including replacements and additions thereto. Upon the occurrence of an Event of Default (as that term is defined in Article VII below), including the covenants to pay when due all sums secured by this Instrument, Lender shall have the remedies of a secured party under the Texas UCC and, at Lender's option, may also invoke the remedies provided in Article VIII of this Instrument as to such items. In exercising any remedies, Lender may proceed against the items of real property and any items of Personal Property specified above as part of the Property separately or together and in any order whatsoever, without in any way affecting the availability of Lender's remedies under the Texas UCC or of the remedies provided in Article VIII of this Instrument.

**3.02  NOTICES OF CHANGES.** Borrower shall give advance notice in writing to Lender of any proposed change in Borrower's name, identity, or structure and shall execute and deliver to Lender, prior to or concurrently with the occurrence of any such change, all additional financing statements that Lender may require to establish and maintain the validity and priority of Lender's security interest with respect to any of the Property.

**3.03  FIXTURES.** Some of the items of the Property are goods that are or are to become fixtures related to the Land and/or the Improvements. Borrower and Lender intend that, as to those goods, this Instrument shall be effective as a financing statement filed as a fixture filing from the date of its filing for record in the real estate records of the county in which the Property is situated. Information concerning the security interest created by this Instrument may be obtained from Lender, as secured party, at the address of Lender stated above. The mailing address of the Borrower, as debtor, is as stated above.

## ARTICLE IV-ASSIGNMENT OF LEASES

**4.01  ASSIGNMENT OF LEASES.** Borrower assigns to Lender, and grants to Lender a security interest in, all of Borrower's rights, but not Borrower's obligations, under existing and future leases, including subleases, and any and all extensions, renewals, modifications, and replacements of such leases, upon any part of the Property (the "Leases"). Borrower also assigns to Lender all guaranties of tenant's performance under the Leases. Prior to an Event of Default, Borrower shall have the right, without joinder of Lender, to enforce the Leases, unless Lender directs otherwise.

**4.02  WARRANTIES CONCERNING LEASES AND RENTS.** Borrower represents and warrants that: (a) Borrower has good title to the Leases hereby assigned and authority to assign them, and no other person or entity has any right, title or interest therein; (b) all existing Leases are valid, unmodified and in full force and effect, except as expressly described in writing to Lender, and no default exists thereunder; (c) unless otherwise provided herein, no Rents (as hereafter defined) or other sums owing under the Leases have been or will be assigned, mortgaged or pledged; (d) no Rents have been or will be anticipated, waived, released, discounted, set off or compromised except in the ordinary course of business; and (e) except as indicated in the Leases, Borrower has not received any funds or deposits from any tenant that has not already been applied to the payment of accrued Rents.

**4.03  BORROWER'S COVENANTS OF PERFORMANCE.** Borrower covenants to: (a) perform all of its obligations under the Leases and give prompt notice to Lender of any failure to do so; (b) give immediate notice to Lender of any notice Borrower receives from any tenant or subtenant under any Leases, specifying any claimed default by any party under such Leases, excluding, however, notice of defaults under residential Leases; (c) enforce the tenants obligations under the Leases; (d) defend, at Borrower's expense, any proceeding pertaining to the Leases, including, if Lender so requests, any such proceeding to which Lender is a party; and (e) neither create nor permit any encumbrance upon Borrower's interest as landlord of the leases, except this Instrument and any other encumbrances permitted by this Instrument.

**4.04  PRIOR APPROVAL FOR ACTIONS AFFECTING LEASES.** Borrower shall not, without the prior written consent of Lender: (a) receive or collect Rents under any of the Leases more than one month in advance; (b) encumber or assign future Rents; (c) waive or release any obligation of any tenant under the Leases; (d) cancel, terminate or modify any of the Leases, cause, permit or accept any cancellation, termination or surrender of any of the Leases, or commence any proceedings for dispossession of any tenant under any of the Leases, except upon default by the tenant thereunder; (e) renew or extend any of the Leases, except pursuant to terms in existing Leases; (f) permit any assignment of the Leases; or (g) other than in the ordinary course of business and at fair market rental rates and terms, enter into any Leases after the date hereof.

**4.05  ATTORNMENT OF TENANTS.** All Leases of the Property executed after the date hereof, shall specifically provide that (a) such Leases are subordinate to this Instrument; (b) that the tenant attorns to Lender, such attornment to be effective upon Lender's acquisition of title to the Property; (c) that the tenant agrees to execute such further evidences of

attornment as Lender may from time to time request; (d) that the attornment of the tenant shall not be terminated by foreclosure; and (e) that Lender may, at Lender's option, accept or reject such attornments, provided that upon Borrower's request, Lender shall enter into a non-disturbance agreement with one or more tenants in form and substance reasonably acceptable to Lender, Borrower and such Tenant..

**4.06 SETTLEMENT FOR TERMINATION.** Borrower agrees that no settlement for damages for termination of any of the Leases under the United States Bankruptcy Code, or under any other federal, state, or local statute, shall be made without the prior written consent of Lender, and any check in payment of such damages shall be made payable to both Borrower and Lender. Borrower hereby assigns any such payment to Lender to be applied to the Indebtedness as Lender may elect, and Borrower agrees to endorse any check for such payment to the order of Lender.

**4.07 LENDER IN POSSESSION.** Lender's acceptance of this assignment shall not, prior to entry upon and taking possession of the Property by Lender, be deemed to constitute Lender a "mortgagee in possession", nor obligate Lender to appear in or defend any proceeding relating to any of the Leases or to the Property, take any action hereunder, expend any money, incur any expenses, or perform any obligation or liability under the Leases, or assume any obligation for any deposits delivered to Borrower by any tenant and not delivered to Lender. Lender shall not be liable for any injury or damage to person or property in or about the Property.

**4.08 APPOINTMENT OF ATTORNEY.** Borrower hereby appoints Lender its attorney-in-fact, coupled with an interest, empowering Lender to subordinate any Leases to this Instrument.

**4.09 INDEMNIFICATION; HOLD HARMLESS.** Borrower hereby indemnifies and holds Lender harmless from all liability, damage, or expense, including, without limitation, reasonable attorney's fees, incurred by Lender from any claims under the Leases, including without limitation any claims by Borrower with respect to Rents paid directly to Lender after an Event of Default and claims by tenants for security deposits or for rental payments more than one (1) month in advance and not delivered to Lender. All amounts indemnified against hereunder, including reasonable attorneys' fees, if paid by Lender, shall bear interest at the maximum lawful rate, shall be payable by Borrower immediately without demand, and shall be secured by this Instrument.

**4.10 RECORDS.** Upon request by Lender, Borrower shall deliver to Lender executed originals of all Leases and copies of all records relating thereto.

**4.11 MERGER.** There shall be no merger of the leasehold estates created by the Leases with the fee estate of the Land without the prior written consent of Lender.

**4.12 RIGHT TO RELY.** Borrower authorizes and directs the tenants under the Leases to pay Rents to Lender upon written demand by Lender after an Event of Default without further consent of Borrower and regardless of whether Lender has taken possession of any other portion of the Property, and the tenants may rely upon any written statement delivered by Lender to the tenants. Any such payment to Lender shall constitute payment to Borrower under the Leases, and Borrower appoints Lender as Borrower's lawful attorney-in-fact for giving, and is hereby empowered to give, acquittances to any tenants for such payments to Lender after an Event of Default.

## ARTICLE V-ASSIGNMENT OF RENTS

**5.01 COLLATERAL ASSIGNMENT OF RENTS.** As part of the consideration for the Indebtedness evidenced by the Note, and for other valuable consideration, the receipt and sufficiency of which Borrower acknowledges, Borrower hereby collaterally assigns and transfers to Lender all rents, issues, income, receipts, and profits from the Property, and all security deposits and other security therefor (the "Rents"), including those now due, or to become due by virtue of any Lease or other agreement for the occupancy or use of all or any part of the Property, regardless of to whom the Rents are payable. Borrower authorizes Lender or Lender's agents to collect the Rents after an Event of Default and directs each tenant of the Property to pay such Rents to Lender or Lender's agents; provided, however, that prior to the occurrence of an Event of Default (as that term is defined in Article VII), Borrower shall collect and receive all Rents and first apply the Rents so collected to the sums secured by this Instrument in the order provided in Section 2.04, with the balance, so long as no such Event of Default has occurred, to the account of Borrower.

**5.02 EVENT OF DEFAULT.** Upon the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining full control of the Property in person, by agent or by a court-appointed receiver, Lender shall immediately be entitled to possession of all the Rents specified in this Article V as the same become due and payable,

including without limitation Rents then due and unpaid, and all such Rents shall immediately upon delivery of such notice be held by Borrower as trustee for the benefit of Lender only; provided, however, that the written notice by Lender to Borrower of the breach by Borrower shall contain a statement that Lender exercises its rights to such Rents. Borrower agrees that commencing upon delivery of such written notice of an Event of Default by Lender to Borrower, each tenant of the Property shall make such Rents payable to and pay such Rents to Lender or Lender's agents on Lender's written demand to each tenant therefor, delivered to each tenant personally, by mail or by delivering such demand to each rental unit, without any liability on the part of any tenant to inquire further as to the existence of an Event of Default.

**5.03   BORROWER'S COVENANTS.** Except in favor of Lender, Borrower covenants that Borrower has not executed any prior assignment of the Rents or any portion thereof, that Borrower has not performed, and will not perform, any acts and has not executed, and will not execute, any instrument which would prevent Lender from exercising its rights under this Article V and that at the time of execution of this Instrument there has been no anticipation or prepayment of any of the Rents for more than thirty days prior to the due dates of such Rents. Borrower covenants that Borrower will not hereafter collect or accept payment of any Rents more than thirty (30) days prior to the due dates of such Rents without the prior written consent of Lender. Borrower further covenants that Borrower will execute and deliver to Lender such further assignments of Rents as Lender may from time to time request.

**5.04   APPOINTMENT OF RECEIVER; POSSESSION OF THE PROPERTY.** Upon the occurrence of an Event of Default, Lender may in person, by agent or by a court-appointed receiver, regardless of the adequacy of Lender's security, enter upon and take and maintain full control of the Property in order to perform all acts necessary and appropriate for the operation and maintenance thereof, including without limitation the execution, cancellation or modification of Leases, the collection of Rents, the making of repairs to the Property, and the execution or termination of contracts providing for the management or maintenance for the Property, all on such terms as are deemed best to protect the security of this Instrument. Lender or the receiver shall be entitled to receive a reasonable fee for so managing the Property.

**5.05   APPLICATION OF RENTS.** All Rents collected subsequent to the occurrence of an Event of Default shall be applied first to the costs, if any, of taking control of and managing the Property and collecting the Rents, including, without limitation, reasonable attorney's fees, receiver's fees, premiums on receiver's bonds, costs of repairs to the Property, premiums on insurance policies, taxes, assessments, and other charges on the Property, and the costs of discharging any obligation or liability of Borrower as landlord of the Property, and then to the sums secured by this Instrument. Lender or the receiver shall have access to the books and records used in the operation and maintenance of the Property and shall be liable to account only for those Rents actually received. Lender shall not be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Property by reason of anything done or left undone by Lender under this Article V.

**5.06   INSUFFICIENT RENTS.** If the Rents are not sufficient to meet the costs, if any, of taking control of and managing the Property and collecting the Rents, any funds expended by Lender for such purposes shall become an indebtedness of Borrower to Lender secured by this Instrument. Unless Lender and Borrower agree in writing to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof and shall bear interest from the date of disbursement at the rate stated in the Note, unless payment of such interest at such rate would be contrary to applicable law, in which event such amounts shall bear interest at the highest non-usurious rate which may be collected from Borrower under applicable law.

**5.07   NO WAIVER; TERM.** Any entering upon and taking and maintaining of control of the Property by Lender or the receiver and any application of Rents as provided herein shall not cure or waive any default hereunder or invalidate any other right or remedy of Lender under applicable law or provided herein. This assignment of the Rents shall terminate at such time as this Instrument ceases to secure the Indebtedness held by Lender, and Borrower shall have the absolute right to all Rents thereafter.

## ARTICLE VI-BORROWER'S REPRESENTATIONS, WARRANTIES, COVENANTS, AND AGREEMENTS

Borrower covenants, warrants, and represents to and agrees with Lender as follows:

**6.01   PERFORMANCE.** Borrower shall punctually and properly perform all of Borrower's covenants, obligations and liabilities under this Instrument and the other Financing Documents.

**6.02    TITLE TO PROPERTY AND LIENS OF THIS INSTRUMENT.** Borrower has good and indefeasible title to the Land and the Improvements, and good and marketable title to the Personal Property, free and clear of any liens, charges, encumbrances, security interest, and adverse claims whatsoever, except as provided in the Special Warranty Deed effective of even date herewith from Magellan Pipeline Terminals, L.P., a Delaware limited partnership, to Borrower. If the interest of Lender in the Property or any part thereof shall be endangered or shall be attacked, directly or indirectly, Borrower authorizes Lender, at Borrower's expense, to take all necessary and proper steps for the defense of such interest, including the employment of attorneys, the prosecution or defense of litigation, and the compromise or discharge of claims made against such interest.

**6.03    EXISTENCE OF BORROWER.** Borrower shall preserve and keep in full force and effect its existence, rights, franchises, and trade names. Borrower is duly organized and validly existing under applicable state laws, and the execution of this Instrument, the Note and any and all other Loan Documents is within Borrower's power, has been duly authorized by all requisite action and is not in contravention of law or Borrower's governing documentation.

**6.04    TITLE INSURANCE.** Borrower shall, at its sole cost and expense, obtain and maintain mortgagee title insurance (in the form of a commitment, binder, or policy as Lender may require) in form acceptable to Lender in an amount equal to the amount of the Note.

**6.05    HAZARD INSURANCE.**

(a)      Borrower shall, at its sole cost and expense, obtain and maintain insurance upon and relating to all insurable Property by property insurance policies and, if requested by Lender, shall include perils of collapse, flood, earthquake, as well as other insurance coverages, including Rent loss, all in form and in companies acceptable to Lender, in amounts equal to one hundred percent(100%) of the replacement cost of the Improvements during the construction thereof and at least one hundred percent (100%) of the replacement cost of the Improvements not under construction, or in such additional amounts as Lender may require, with loss made payable to Lender and with a standard form mortgage clause. Borrower will additionally maintain insurance and worker's compensation insurance against claims for bodily injury, death or property damage on or around the Property in such amounts and with such endorsements and other terms acceptable to Lender. Borrower shall deliver the policies of insurance to Lender promptly as issued; and, if Borrower fails to do so, Lender, at its option, may procure such insurance at Borrower's expense. All required insurance policies must (i) be issued by companies reasonably acceptable to Lender; (ii) name the owners of the Property as either the named insured on the policy or as an additional named insured on an endorsement to the policy; (iii) be endorsed to be payable to Lender as the mortgagee insured and loss payee and also name Lender as an additional insured; and (iv) expressly prohibit cancellation or modification without twenty (20) days prior written notice to Lender. Lender shall have the right to hold the policies, and Borrower shall promptly furnish to Lender all renewal notices and all receipts of paid premiums. All renewal and substitute policies of insurance shall be delivered at the office of Lender, premiums paid, at least ten (10) days before termination of policies previously delivered to Lender.

(b)      In the event of loss, Borrower shall give immediate written notice to the insurance carrier and to Lender. Borrower hereby authorizes and empowers Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claim under insurance policies, to appear in and prosecute any action arising from such insurance policies, to collect and receive insurance proceeds, and to deduct therefrom Lender's expenses incurred in the collection of such proceeds; provided however, that nothing contained in this Section 6.05 shall require Lender to incur any expense or take any action under this Instrument. If no Event of Default is existing at the time of the loss, then Lender shall disburse the balance of the insurance proceeds to Borrower in the form of construction draws to pay for the cost of reconstruction or repair of the Property. If, however, an Event of Default exists at the time of the loss, Lender, at its option, may (i) apply the balance of such proceeds to the payment of the sums secured by this Instrument, whether or not then due, in the order of application set forth in Section 2.04; or (ii) disburse the balance of the insurance proceeds to Borrower in the form of construction draws to pay for the cost of reconstruction or repair of the Property.

(c)      If the insurance proceeds are held by Lender to reimburse Borrower for the cost of restoration and repair of the Property, the Property shall be restored to the equivalent of its original condition or such other condition as Lender may approve in writing. Lender may, at Lender's option, condition disbursement of any proceeds on Lender's approval of such plans and specifications of an architect satisfactory to Lender, contractor's cost estimates, architect's certificates, waivers of liens, sworn statements of mechanics and materialmen and such other evidence of costs, percentage completion of construction, application of payments and satisfaction of liens as Lender may reasonably require. If the insurance proceeds are applied to the payment of sums secured by this Instrument, any such application of proceeds to principal shall not extend or postpone the due dates of the installments referred to in Sections 2.03 and 6.07 or change the amounts of such installments. If the Property is sold pursuant to Section 8.03 or if Lender acquires title to the Property, Lender shall have all of the right,

title, and interest of Borrower in and to any insurance policies and unearned premiums thereon and in and to the proceeds resulting from any damage to the Property prior to such sale or acquisition.

(d)     COLLATERAL PROTECTION INSURANCE NOTICE. In accordance with the provisions of section 307.052(a) of the Texas Finance Code, Lender hereby notifies Borrower as follows: (A) Borrower is required to: (i) keep the Property insured against damage in the amount the Lender specifies; (ii) purchase the insurance from an insurer that is authorized to do business in the state of Texas or an eligible surplus lines insurer; and (iii) name Lender as the person to be paid under the policy in the event of a loss; (B) Borrower must, if required by Lender, deliver to Lender a copy of the policy and proof of the payment of premiums; and (C) if Borrower fails to meet any requirement listed in Paragraph (A) or (B), Lender may obtain collateral protection insurance on behalf of Borrower at the Borrower's expense.

6.06     TAXES AND ASSESSMENTS. Subject to and in compliance with Section 6.07 below, Borrower shall pay all taxes and assessments against or affecting the Property as the same become due and payable, and, upon request by Lender, Borrower shall deliver to Lender such evidence of the payment thereof as Lender may require. If Borrower fails to do so, Lender may pay them, together with all costs and penalties thereon, at Borrower's expense; provided, however, that Borrower may in good faith, in lieu of paying such taxes and assessments as they become due and payable, by appropriate proceedings, contest their validity. Pending such contest, Borrower shall not be deemed in default under this Instrument because of such nonpayment if: (a) prior to delinquency of the asserted tax or assessment, Borrower furnishes Lender an indemnity bond secured by a deposit in cash or other security acceptable to Lender, or with a surety acceptable to Lender, in the amount of the tax or assessment being contested by Borrower plus a reasonable additional sum to pay all costs, interest and penalties that may be imposed or incurred in connection therewith, conditioned that such tax or assessment, with interest, cost and penalties, be paid as herein stipulated; and (b) Borrower promptly pays any amount adjudged by a court of competent jurisdiction to be due, with all costs, penalties and interest thereon, on or before the date such judgment becomes final. In any event, the tax, assessment, penalties, interest, and costs shall be paid prior to the date on which any writ or order is issued under which the Property or any part of the Property may be sold in satisfaction thereof. Borrower agrees that it will not, without the express written consent of Lender, enter into any arrangements or agreements with any third party for the payment of ad valorem taxes that would grant any third party a lien on the Property, and that any such arrangement or agreement, and any such lien or transfer of an ad valorem tax lien without Lender's prior written consent, will be void and of no force or effect.

6.07     TAX AND INSURANCE ESCROW.

(a)     Borrower shall pay to Lender on the same day as payments due under the Note, until the Note is paid in full, a sum ("Funds") equal to one-twelfth of the yearly taxes and assessments which may be levied on the Property. In addition, at the request of Lender, Borrower shall pay to Lender, at such date as may be required by Lender, the yearly premium installments for fire and other hazard insurance, Rent loss insurance, and such other insurance covering the Property as Lender may require pursuant to Section 6.05, all as reasonably estimated initially and from time to time by Lender on the basis of assessments and bills and reasonable estimates thereof. After an Event of Default, Lender may require Borrower to pay to Lender, in advance, such other Funds for other taxes, charges, premiums, assessments and impositions in connection with Borrower or the Property which Lender shall reasonably deem necessary to protect Lender's interests ("Other Impositions").

(b)     Lender shall make no charge for so holding and applying the Funds, analyzing any account holding all or part of the Funds or for verifying and compiling any assessments and bills, unless Lender pays Borrower interest, earnings, or profits on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing at the time of execution of this Instrument that interest on the Funds shall be paid to Borrower, and unless such agreement is made or applicable law requires interest, earnings, or profits to be paid, Lender shall not be required to pay Borrower any interest, earnings, or profit on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds in Lender's normal format showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Instrument.

(c)     If the amount of the Funds held by Lender at the time of the annual accounting thereof shall exceed the amount deemed necessary by Lender to provide for payment of water and sewer rates, taxes, assessments, insurance premiums, rents, and Other Impositions, as they fall due, such excess shall be credited to Borrower on the next installment or installments of Funds due. If at any time the amount of the Funds held by Lender shall be less than the amount deemed necessary by Lender to pay water and sewer rates, taxes, assessments, insurance premiums, rents, and Other Impositions, as they fall due, Borrower shall pay to Lender any amount necessary to make up the deficiency within thirty (30) days after notice from Lender to Borrower requesting payment thereof.

**6.08  CONDEMNATION.**

(a)     Borrower assigns to Lender all judgments, decrees, and awards for injury or damage, direct or consequential, to the Property, and all awards pursuant to proceedings for condemnation or other taking, whether direct or indirect, of the Property or any part of the Property.  Lender may apply any condemnation proceeds to the Indebtedness in such manner as Lender may elect.  Borrower shall promptly notify Lender of any action or proceeding (or threatened action or proceeding) relating to any condemnation or other taking, whether direct or indirect, of all or any part of the Property.  Borrower shall, unless otherwise directed by Lender in writing, file or defend its claim under any such action and prosecute same with due diligence to its final disposition and shall cause any awards or settlements to be paid over to Lender for disposition pursuant to the terms of this Instrument.  Borrower authorizes Lender, at Lender's option, as attorney-in-fact for Borrower, to commence, appear in, and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any condemnation or other taking of the Property, whether direct or indirect, and to settle or compromise any claim in connection with such condemnation or other taking.  The proceeds of any award, payment, or claim for damages, direct or consequential, in connection with any condemnation or other taking, whether direct or indirect, of the Property, or part thereof, or for conveyances in lieu of condemnation, are hereby assigned to and shall be paid to Lender.  Lender shall be entitled to participate in and be represented by attorneys of Lender's own choice in any such action.  Borrower shall deliver, or cause to be delivered, to Lender such instruments as may be requested by it from time to time to permit such participation.

(b)     If no Event of Default exists at the time of payment of the award, Lender agrees to apply such awards, payments, proceeds, or damages, after the deduction of Lender's expenses incurred in the collection of such amounts, to restoration or repair of the Property.  If, however, an Event of Default does exist at the time of payment of the award, Lender, at its option, may (i) apply such awards, payments, proceeds, or damages, after the deduction of Lender's expenses incurred in the collection of such amounts, to payment of the sums secured by this Instrument, whether or not then due, in the order of application set forth in Section 2.04, with the balance, if any, to Borrower; or (ii) apply such awards, payments, proceeds, or damages, after the deduction of Lender's expenses incurred in the collection of such amounts, to restoration or repair of the Property.  Unless Borrower and Lender otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the installments referred to in Sections 2.03 and 6.07 or change the amount of such installments.  Borrower agrees to execute such further evidence of assignment of any awards, proceeds, damages, or claims arising in connection with such condemnation or taking as Lender may require.

(c)     In the event Lender, as a result of any such judgment, decree, or award, reasonably believes that the payment or performance of any obligation secured by this Instrument is impaired, Lender may, without notice, declare all of the Indebtedness immediately due and payable.

**6.09    TAXES ON NOTE OR INSTRUMENT.**  If at any time any law shall be enacted imposing or authorizing the imposition of any tax upon this Instrument, or upon any rights, titles, liens, or security interests created by this Instrument, or upon the Note, or any part of the Indebtedness, Borrower shall immediately pay all such taxes; provided that, if it is unlawful for Borrower to pay such taxes, Borrower shall prepay the Note in full without penalty within sixty (60) days, after demand therefor by Lender.

**6.10    STATEMENTS BY BORROWER.**  At the request of Lender, Borrower shall furnish promptly a written statement or affidavit in such form as may be required by Lender, stating the unpaid balance of the Note, the date to which any payments have been paid under the Note and that there are no offsets or defenses against full payment of the Note and performance of the terms of the Financing Documents, or, if there are any such offsets or defenses, specifying them.

**6.11    REPAIR, WASTE, ALTERATIONS, ETC.**  Borrower shall keep every part of the Property in good operating order, repair, and condition and shall not commit or permit any waste thereof.  Borrower shall make promptly all repairs, renewals, and replacements necessary to such end.  Borrower shall discharge all claims for labor performed and material furnished therefor, and shall not suffer any lien of mechanics or materialmen to attach to any part of the Property.  Borrower shall have the right to contest in good faith the validity of any such mechanic's or materialman's lien, provided Borrower shall first furnish Lender a bond or other security satisfactory to Lender in such amount as Lender shall reasonably require, but not more than two hundred percent (200%) of the amount of the claim, and provided further that Borrower shall thereafter diligently proceed to cause such lien to be removed and discharged.  If Borrower shall fail to discharge any such lien, then, in addition to any other right or remedy of Lender, Lender may, but shall not be obligated to, discharge the lien, either by paying the amount claimed to be due, or by procuring the discharge of such lien by depositing in court a bond for the amount claimed, or otherwise giving security for such claim, or by taking such action as may be prescribed by law.  Borrower shall guard every part of the Property from removal, destruction, and damage, and shall not do or suffer to be done any act whereby the value of any part of the Property may be lessened.  Borrower or any tenant or other person shall not materially alter the Property without the prior written consent of Lender.

6.12    NO DRILLING OR EXPLORATION. Without the prior written consent of Lender, there shall be no drilling or exploring for or extraction, removal, or production of minerals from the surface or subsurface of the Land. The term "minerals" as used in this Instrument shall include without limitation oil, gas, casinghead gas, coal, lignite, hydrocarbons, methane, carbon dioxide, helium, uranium and all other natural elements, compounds and substances, including sand and gravel.

6.13    COMPLIANCE WITH LAWS. Borrower, the Property, and Borrower's use of the Property shall comply with all laws, rules, ordinances, regulations, covenants, conditions, restrictions, orders and decrees of any governmental authority or court applicable to Borrower or the Property and its use, and Borrower shall pay all fees or charges of any kind in connection therewith. Borrower shall not initiate, participate in, or acquiesce in a change in the zoning classification of the Property without Lender's prior written consent.

6.14    INCOME, EXPENSE AND FINANCIAL STATEMENTS. In addition to the requirements of the Loan Agreement, Borrower shall keep and maintain at all times at Borrower's address stated in this Instrument, or such other place as Lender may approve in writing, complete and accurate books of accounts and records adequate to reflect correctly the results of the operation of the Property and copies of all written contracts, leases, and other instruments which affect the Property. Such books, records, contracts, leases, and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

6.15    HOLD HARMLESS. Borrower shall defend, at Borrower's own cost and expense, and hold Lender harmless from, any proceedings, claims, damages, losses, liabilities, costs and expenses, in any way relating to the Property or the Financing Documents. All costs and expenses incurred by Lender in protecting its interests under this Instrument, including, without limitation, all court costs and reasonable attorneys' fees and expenses, shall be borne by Borrower. The provisions of this Section shall survive the payment in full of the Indebtedness and the release of this Instrument as to events occurring and causes of action arising before such payment and release.

6.16    TRADE NAMES. At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate the Property and representing and warranting that Borrower does business under no other trade name with respect to the Property. Borrower shall immediately notify Lender in writing of any change in any trade name, and shall, upon request of Lender, execute any additional documents and/or certificates required to reflect the change in trade names and shall execute and file any assumed name certificate required by applicable laws.

6.17    FURTHER ASSURANCES. Borrower, upon the request of Lender, shall execute, acknowledge, deliver, and record such further instruments and do such further acts as may be reasonably necessary, desirable, or proper to carry out the purposes of this Instrument or the other Financing Documents and to subject to the liens and security interests created by this Instrument or the other Financing Documents any property intended to be covered by this Instrument and the other Financing Documents pursuant to their terms, including, without limitation, any renewals, additions, substitutions, replacements, improvements, or appurtenances to the Property.

6.18    RECORDING AND FILING. Borrower shall cause this Instrument and the other recordable Financing Documents and all amendments, supplements, extensions, and substitutions thereof to be recorded, filed, re-recorded, and refiled in such manner and in such places as Lender shall reasonably request. Borrower shall pay all such recording, filing, re-recording, and refiling fees, title insurance premiums, and other charges.

6.19    PAYMENT OF DEBTS. Borrower shall promptly pay when due all obligations regarding the ownership and operation of the Property, except any such obligations which are being diligently contested in good faith by appropriate proceedings and as to which Borrower, if requested by Lender, shall have furnished to Lender security satisfactory to Lender.

6.20    INSPECTION. Lender may make or cause to be made reasonable entries upon and inspections of the Property.

6.21    PROTECTION OF LENDER'S SECURITY.

(a)    If Borrower fails to perform the covenants and agreements contained in this Instrument, or if any action or proceeding is commenced which affects the Property or title thereto or the interest of Lender therein, including without limitation eminent domain, insolvency, code enforcement, or arrangements or proceedings involving a bankrupt or decedent, then Lender, at Lender's option, may make such appearances, disburse such sums and take such action as Lender deems

necessary, in its sole discretion, to protect Lender's interest, including without limitation, (i) disbursement of attorney's fees, (ii) entry upon the Property to make repairs, and (iii) procurement of satisfactory insurance as provided in Section 6.05.

(b) Any amounts disbursed by Lender pursuant to this Section 6.21, with interest thereon, shall become additional indebtedness of Borrower secured by this Instrument. Unless Borrower and Lender agree to other terms of payment, such amounts shall be immediately due and payable and shall bear interest from the date of disbursement at the rate stated in the Note unless collection from Borrower of interest at such rate would be contrary to applicable law, in which event such amounts shall bear interest at the highest non-usurious rate which may be collected from Borrower under applicable law. Borrower covenants and agrees that Lender shall be subrogated to the lien of any mortgage or other lien discharged, in whole or in part, by the Indebtedness. Nothing contained in this Section 6.21 shall require Lender to incur any expense or take any action under this Instrument.

**6.22 SUBORDINATE DEED OF TRUST.** Borrower shall not, without the prior written consent of Lender, which consent shall be in Lender's sole discretion, grant any lien, security interest, or other encumbrance (a "Subordinate Instrument") covering any of the Property. If Lender consents to a Subordinate Instrument or if the foregoing prohibition is determined by a court of competent jurisdiction to be unenforceable, any such Subordinate Instrument shall contain express covenants to the effect that: (a) the Subordinate Instrument is unconditionally subordinate to this Instrument; (b) if any action (whether judicial or pursuant to a power of sale) shall be instituted to foreclose or otherwise enforce the Subordinate Instrument, no tenant of any of the Leases shall be named as a party defendant, and no action shall be taken that would terminate any occupancy or tenancy without the prior written consent of Lender; (c) Rents, if collected by or for the holder of the Subordinate Instrument, shall be applied first to the payment of the Indebtedness then due and expenses incurred in the ownership, operation, and maintenance of the Property in such order as Lender may determine, prior to being applied to any indebtedness secured by the Subordinate Instrument; and (d) written notice of default under the Subordinate Instrument and written notice of the commencement of any action (whether judicial or pursuant to a power of sale) to foreclose or otherwise enforce the Subordinate Instrument shall be given to Lender with or immediately after the occurrence of any such default or commencement.

**6.23 LIENS.** Borrower shall promptly discharge any lien which has, or may have, priority over or equality with, the lien of this Instrument, and Borrower shall pay, when due, the claims of all persons supplying labor or materials to or in connection with the Property. Without Lender's prior written permission, Borrower shall not allow any lien inferior to this Instrument to be perfected against the Property.

**6.24 BUSINESS USE.** Borrower warrant and represent to Lender that the proceeds of the Note will be used solely for business or commercial purposes, and in no way will the proceeds be used for personal, family or household purposes.

**6.25 NON-HOMESTEAD.** Borrower warrants and represents to Lender that the Property is not the residential homestead of Borrower or any other person. Borrower has no present intent to occupy in the future or use or claim in the future the Property as a residential homestead.

**6.26 NO PLEDGE OR CHANGE OF STOCK, MEMBERSHIP INTERESTS OR PARTNERSHIP INTERESTS.** If Borrower is a corporation, the shareholders of Borrower shall not sell, pledge, encumber or assign any shares of the stock of Borrower without the prior written consent of Lender, which consent shall not be unreasonably withheld. If Borrower is a limited liability company, the members of Borrower shall not sell, pledge, encumber or assign any of their membership interests in Borrower, and no members shall withdraw from or be admitted into Borrower without the prior written consent of Lender, which consent shall not be unreasonably withheld. If Borrower is a partnership or joint venture, the partners or joint venturers of Borrower shall not sell, pledge, encumber or assign any of their partnership or joint venture interest in Borrower, and no general partner or joint venturer shall withdraw from or be admitted into Borrower without the prior written consent of Lender, which consent shall not be unreasonably withheld.

### ARTICLE VII-EVENTS OF DEFAULT

The occurrence of any one of the following shall be a default under this Instrument and the Financing Documents ("Event of Default"):

**7.01 FAILURE TO PAY INDEBTEDNESS.** Failure by Borrower to timely pay any amount of the Indebtedness to Lender on or before the fifth (5th) day after the due date of any such payment; provided, however, the delinquency charge set forth in Section 3 of the Note shall also apply if Borrower does not make payment to Lender on or before the tenth (10th) day after the due date of any such payment.

**7.02    NONPERFORMANCE OF COVENANTS.** Borrower fails to perform or comply with any non-monetary covenant, condition or obligation in this Instrument or any of the other Financing Documents (collectively, the "Condition") within fifteen (15) days after the date such Condition is required to be met, provided, however, if the Condition cannot be cured within fifteen (15) days, Borrower shall not be deemed to be in default if the cure of such Condition is commenced within such fifteen (15) day period, Lender is promptly notified of same, and said cure is thereafter diligently pursued and completed no later than sixty (60) days after the date such Condition is required to be met.

**7.03    FALSE REPRESENTATION.** Any statement, representation or warranty in this Instrument or any of the other Financing Documents, any financial statement, or any other writing delivered to Lender in connection with the Indebtedness is false, misleading, or erroneous in any material respect.

**7.04    BANKRUPTCY OR INSOLVENCY.** The owner of the Property or any person obligated to pay any part of the Indebtedness: (a) does not pay its debts as they become due or admits in writing its inability to pay its debts or makes a general assignment for the benefit of creditors; (b) commences any case, proceeding, or other action seeking reorganization, arrangement, adjustment, liquidation, dissolution, or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors; (c) in any involuntary case, proceeding, or other action commenced against it which seeks to have an order for relief entered against it, as debtor, or seeks reorganization, arrangement, adjustment, liquidation, dissolution, or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors, (i) fails to obtain a dismissal of such case, proceeding or other action within sixty (60) days of its commencement, or (ii) converts the case from one chapter of the United States Bankruptcy Code to another chapter, or (iii) is the subject of an order for relief; (d) conceals, removes, or permits to be concealed or removed, any part of its property, with intent to hinder, delay, or defraud its creditors or any of them, or makes or suffers a transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance, or similar law; or makes any transfer of its property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid; or suffers or permits, while insolvent, any creditor to obtain a lien upon any of its property through legal proceedings which is not vacated within sixty (60) days from the date thereof; (e) has a trustee, receiver, custodian, or other similar official appointed for or take possession of all or any part of the Property or any other of its property or has any court take jurisdiction of any other of its property which remains undismissed for a period of sixty (60) days (except where a shorter period is specified in the immediately following paragraph (f); (f) fails to have discharged within a period of twenty (20) days any attachment, sequestration, or similar writ levied upon any property of such person; and/or (g) fails to pay immediately any final money judgment against such person.

**7.05    TRANSFER OF THE PROPERTY.** Title to all or any part of the Property (other than obsolete or worn Personal Property replaced by adequate substitutes of equal or greater value than the replaced items when new) shall become vested in any party other than Borrower, whether by operation of law or otherwise. Lender may, in its sole discretion, waive this Event of Default, but it shall have no obligation to do so, and any waiver may be conditioned upon such one or more of the following which Lender may require:  (a) the grantee's integrity, reputation, character, creditworthiness, and management ability being satisfactory to Lender in its sole judgment; and (b) grantee executing, prior to such sale or transfer, a written assumption agreement containing such terms as Lender may require, such as a principal paydown on the Note, an increase in the rate of interest payable under the Note, a transfer fee, and any other modification of the Note, this Instrument or any of the other Financing Documents which Lender may require.

**7.06    GRANT OF EASEMENT, ETC.** Without the prior written consent of Lender, Borrower grants any easement or dedication, files any plat, condominium declaration, or restriction, or otherwise encumbers the Property, unless such action is expressly permitted by this Instrument or any of the other Financing Documents.

**7.07    ABANDONMENT.** (Intentionally Omitted.)

**7.08    DETERIORATION.** Lender reasonably determines that the condition of the Property has deteriorated.

**7.09    FORECLOSURE OF OTHER LIENS.** The holder of any lien, security interest or assignment on the Property institutes foreclosure or other proceedings for the enforcement of its remedies thereunder. Borrower agrees to provide Lender with a copy of any notice it receives in connection with the institution of any such foreclosure or collection proceedings within three (3) days of receipt of said notice. Any foreclosure or collection action initiated hereunder and/or failure to provide any notice described herein to Lender shall be an immediate event of default.

**7.10    LIQUIDATION, DEATH, ETC.** The liquidation, termination, dissolution, failure to maintain good standing in the State of Texas (if applicable), death, or legal incapacity of Borrower or any Guarantor.

**7.11   MATERIAL, ADVERSE CHANGE.** The occurrence of any material, adverse change in the financial condition of either Borrower or any Guarantor.

**7.12   DEFAULT BY PARTNER OR VENTURER.** If Borrower is a partnership or joint venture, a default by any general partner or joint venturer under Borrower's partnership agreement or joint venture agreement.

**7.13   TRANSFER OF OWNERSHIP OF BORROWER.** If Borrower or the owner of the Property (if other than Borrower) is a corporation, the sale, pledge, encumbrance, or assignment of any shares of its stock without the prior written consent of Lender, which consent shall not be unreasonably withheld. If Borrower or the owner of the Property (if other than Borrower) is a limited liability company, the sale, pledge, encumbrance or assignment of any of its membership interests or the withdrawal from or admission into it of any member without the prior written consent of Lender, which consent shall not be unreasonably withheld. If Borrower or the owner of the Property (if other than Borrower) is a partnership or joint venture, the sale, pledge, encumbrance or assignment of any of its partnership or joint venture interests or the withdrawal from or admission into it of any general partner or joint venturer without the prior written consent of Lender, which consent shall not be unreasonably withheld.

**7.14   INCURRING ADDITIONAL INDEBTEDNESS.** Borrower hereby acknowledge and agree that, except as expressly provided herein, a default shall exist under the Note, this Instrument and the other Financing Documents in the event that, after the date hereof, Borrower incurs additional indebtedness secured by a lien on the Property that is prior to the lien granted in this Instrument.

## ARTICLE VIII-DEFAULT AND REMEDIES

**8.01   ACCELERATION AND WAIVER OF NOTICES.** Upon the occurrence of an Event of Default, Lender, at Lender's option, may declare all of the sums secured by this Instrument to be immediately due and payable without further demand and may invoke the power of sale and any other remedies permitted by applicable law or provided herein. Borrower acknowledges that the power of sale granted to Lender may be exercised by Lender without prior judicial hearing. Except as provided in this Instrument and/or any of the other Financing Documents, Borrower and each Guarantor, surety, and endorser of all or any part of the Indebtedness expressly waive all presentations for payment, notices of intention to accelerate maturity, notices of acceleration of maturity, notices of intention to demand payment, demands for payment, protests, and notices of protest. Except as provided in this Instrument and/or any of the other Financing Documents, Borrower and each Guarantor, surety, and endorser acknowledge and understand that by these waivers they waive any right they may have to receive notices of default under this Instrument, the Note, and the other Financing Documents, as well as any opportunity to cure any such default.

**8.02   NOTICE OF SALE.** Notice of sale of all or part of the Property by the Trustee shall be given by posting written notice thereof at the courthouse door (or other area in the courthouse as may be designated for such public notices) of the county in which the sale is to be made, and by filing a copy of the notice in the office of the county clerk of the county in which the sale is to be made, at least twenty-one (21) days preceding the date of the sale, and if the Property to be sold is in more than one county a notice shall be posted at the courthouse door (or other area in the courthouse as may be designated for such public notices) and filed with the county clerk of each county in which the Property to be sold is situated. In addition, Lender shall, at least twenty-one (21) days preceding the date of sale, serve written notice of the proposed sale by certified mail on Borrower and each debtor obligated to pay the Indebtedness secured hereby according to the records of Lender. Service of such notice shall be completed upon deposit of the notice, enclosed in a postpaid wrapper, properly addressed to such debtor at the most recent address as shown by the records of Lender, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service. Any notice that is required or permitted to be given to Borrower may be addressed to Borrower at Borrower's address as stated in this Instrument. Any notice that is to be given by certified mail to any other debtor may, if no address for such other debtor is shown by the records of Lender, be addressed to such other debtor at the address of Borrower as is shown by the records of Lender. Notwithstanding the foregoing provisions of this Section, notice of such sale given in accordance with the requirements of the applicable laws of the State of Texas in effect at the time of such sale shall constitute sufficient notice of such sale.

**8.03   TRUSTEE'S SALE.** Lender may require the Trustee to sell all or part of the Property, at public auction, to the highest bidder, for cash, at the county courthouse of the county in Texas in which the Property or any part thereof is situated, or if the Property is located in more than one county such sale or sales may be made at the courthouse in any county in which

the Property is situated. All sales shall take place at such area of the courthouse as shall be properly designated from time to time by the commissioners court (or, if not so designated by the commissioners court, at such other area in the courthouse as may be provided in the notice of sale hereinafter described) of the specified county, between the hours of 10:00 o'clock a.m. and 4:00 o'clock p.m. (the commencement of such sale to occur within three hours following the time designated in the above described notice of sale as the earliest time at which such sale shall occur, if required by applicable law) on the first Tuesday of any month (unless the first Tuesday of the month occurs on January 1 or July 4, in which case the sale must take place between 10:00 o'clock a.m. and 4:00 o'clock p.m. on the first Wednesday of the month), after giving notice of the time, place and terms of said sale (including the earliest time at which such sale shall occur) and of the Property to be sold in the manner hereinafter described. Notwithstanding the foregoing provisions of this Section or any provisions of this Instrument, the sale may take place at such other place, time and date, and in accordance with such procedures, as may be allowed pursuant to the applicable laws of the State of Texas in effect at the time of such sale. Trustee may sell all or any portion of the Property, together or in lots or parcels. In no event shall Trustee be required to exhibit, present or display at any such sale any of the Personal Property described herein to be sold at such sale. Lender may bid and become the purchaser of all or any part of the Property at any trustee's or foreclosure sale hereunder, and the amount of Lender's successful bid may be credited on the Indebtedness.

**8.04   PARTIAL SALES.** The sale by Trustee of less than the whole of the Property shall not exhaust the power of sale herein granted, and Trustee is specifically empowered to make successive sales under such power until the whole of the Property shall be sold; and if the proceeds of such sale of less than the whole of the Property shall be less than the aggregate of the Indebtedness and the expenses thereof, this Instrument and the lien, security interest and assignment hereof shall remain in full force and effect as to the unsold portion of the Property just as though no sale had been made, provided, however, that Borrower shall never have any right to require the sale of less than the whole of the Property, but Lender shall have the right, at its sole election, to request Trustee to sell less than the whole of the Property. If there is a default on the payment of any amounts due under the Note or any portion of the Indebtedness, and Lender elects not to accelerate the unpaid balance of the Note or Indebtedness, Lender shall have the option to proceed with foreclosure in satisfaction of such unpaid installment or other amount either through judicial proceedings or by directing Trustee to proceed as if under a full foreclosure, conducting the sale as herein provided without declaring the entire Indebtedness due. It is agreed that such sale, if so made, shall not in any manner affect any unmatured part of the Indebtedness, but as to such unmatured part this Instrument shall remain in full force and effect as though no sale had been made under the provisions of this Section. Several sales may be made hereunder without exhausting the right of sale for any unmatured part of the Indebtedness.

**8.05   FORECLOSURE OF ALL PROPERTY.** The Land, Improvements, and Personal Property may be sold in one or more public sales pursuant to Texas Property Code Section 51.002, *et. seq.* and Texas UCC Section 9.604. Borrower shall assemble the Personal Property and make it available to Lender upon Lender's written request. Borrower and all persons obligated to pay the Indebtedness agree that notice of sale of the Property provided pursuant to Section 8.02 above and pursuant to Texas Property Code Section 51.002 is and shall constitute commercially reasonable notice of the sale of the Property or any part of the Property. Lender shall also be entitled to foreclose its security interests against the Personal Property in accordance with any other rights and remedies Lender may have as a secured party under the Texas UCC.

**8.06   TRUSTEE'S DEED.** Trustee shall deliver to the purchaser a Trustee's deed and such other assignments and documents of transfer and sale as Trustee may deem necessary conveying the Property so sold in fee simple with covenants of general warranty. Borrower covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands. At any such sale (a) Borrower hereby agrees, in its behalf and in behalf of Borrower's heirs, executors, administrators, successors, personal representative and assigns, that any and all recitals made in any deed of conveyance given by Trustee with respect to the identity of Lender, the occurrence or existence of any default, the acceleration of the maturity of any of the Indebtedness, the request to sell, the notice of sale, the giving of notice to all debtors legally entitled thereto, the time, place, terms, and manner of sale, and receipt, distribution and application of the money realized therefrom, or the due and proper appointment of a substitute Trustee, and, without being limited by the foregoing, with respect to any other act or thing having been duly done by Lender or by Trustee hereunder, shall be taken by all courts of law and equity as prima facie evidence that the statements or recitals state facts and are without further question to be so accepted, and Borrower hereby ratifies and confirms every act that Trustee or any substitute Trustee hereunder may lawfully do in the premises by virtue hereof, and (b) the purchaser may disaffirm any easement granted, subdivision plat filed, or rental, lease or other contract made in violation of any provision of this Instrument, and may take immediate possession of the Property free from, and despite the terms of, such grant of easement, subdivision plat, or rental, lease or other contract.

**8.07   PROCEEDS OF SALE.** Trustee shall apply the proceeds of the sale in the following order: (a) to all reasonable costs and expenses of the sale, including but not limited to, reasonable attorney's fees and costs of title evidence; (b) to all

sums secured by this Instrument in such order as Lender, in Lender's sole discretion, directs; and (c) the excess, if any, to the person or persons legally entitled thereto.

**8.08 POSSESSION AFTER SALE.** If the Property is sold pursuant to Section 8.03, Borrower or any person holding possession of the Property through Borrower shall immediately surrender possession of the Property to the purchaser at such sale upon the purchaser's written demand. If possession is not surrendered upon the purchaser's written demand, Borrower or such person shall be a tenant at sufferance and may be removed by writ of possession or by an action for forcible entry and detainer.

**8.09 COSTS AND EXPENSES.** Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including but not limited to, reasonable attorney's fees and costs of documentary evidence, abstracts, and title reports.

**8.10 SUBSTITUTE TRUSTEE.** Lender, at Lender's option, with or without cause, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all title, power, and duties conferred upon the Trustee by this Instrument and by applicable law.

**8.11 REMEDIES CUMULATIVE.** Each remedy provided in this Instrument is distinct and cumulative to all other rights or remedies under this Instrument, the Financing Documents or afforded by law or equity, and may be exercised concurrently, independently, or successively, in any order whatsoever.

**8.12 FORBEARANCE BY LENDER NOT A WAIVER.** Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. The acceptance by Lender of payment of any sum secured by this Instrument after the due date of such payment shall not be a waiver of Lender's right to either require prompt payment when due of all other sums so secured or to declare a default for failure to make prompt payment. The procurement of insurance or the payment of taxes or other liens or charges by Lender shall not be a waiver of Lender's right to accelerate the maturity of the Indebtedness, nor shall Lender's receipts of any awards, proceeds or damages under Sections 6.05 or 6.08 operate to cure or waive Borrower's default in payment of the sums secured by this Instrument.

**8.13 WAIVER OF MARSHALLING.** Notwithstanding the existence of any other security interests in the Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of the remedies provided in this Article VIII. Borrower, any party who consents to this Instrument, and any party who now or hereafter acquires a security interest in the Property and who has actual or constructive notice of this Instrument and Lender's rights and interests under this Instrument, hereby waive any and all right to require the marshalling of assets in connection with the exercise of any of the remedies permitted by applicable law or provided by this Instrument.

**8.14 WAIVER TO CONTEST FAIR MARKET VALUE FOR DEFICIENCY JUDGMENT.** Notwithstanding the provisions of Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, Borrower agrees that Lender shall be entitled to seek a deficiency judgment from either Borrower and any other party obligated on the Indebtedness or Guarantor of the Indebtedness, equal to the difference between the amount owing on the Indebtedness and the amount for which the Property was sold pursuant to a judicial or nonjudicial foreclosure sale. Borrower expressly recognizes that this section constitutes a waiver of the above cited provisions of the Texas Property Code which would otherwise permit Borrower and other persons against whom recovery of deficiencies is sought or guarantors independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Property as of the date of foreclosure and offset against the amount of any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Borrower further recognize and agree that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property on the date of the foreclosure sale for purposes of calculating deficiencies owed by Lender, Guarantors and others against whom a recovery of a deficiency is sought.

Alternatively, in the event this waiver is determined by a court of competent jurisdiction to be unenforceable, the following shall be the basis for the finder of fact's determination of the fair market value of the Property as of the date of the foreclosure sale proceedings in accordance with Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time):

(a)　　The Property shall be valued in "as is" condition on the date of the foreclosure sale, without any assumption or expectation that the Property shall be repaired or improved in any manner before a resale of the Property after foreclosure.

(b)　　The valuation shall be based upon an assumption that the foreclosure purchaser desires a prompt resale of the Property promptly (but in no event later than twelve (12) months following the foreclosure sale).

(c)　　All reasonable closing costs customarily borne by a seller in a commercial real estate transaction should be deducted from the gross fair market value of the Property, including, without limitation, brokerage commissions, title insurance premiums, tax prorations, a survey of the Property, attorneys' fee and marketing costs.

(d)　　The gross fair market value of the Property shall be further discounted to account for any estimated holding costs associated with maintaining the Property pending sale, including, without limitation, utility costs, property management fees, taxes and assessments (to the extent not accounted for herein) and maintenance expenses; and

(e)　　Any expert testimony given or considered in connection with a determination of the fair market value of the Property must be given by persons having at least five (5) years experience in appraising property similar to the Property and who have conducted and prepared a complete written appraisal of the Property taking into consideration the factors set forth above.

**8.15　INDEMNIFICATION.** Borrower shall pay, and shall defend, protect, indemnify and save harmless the Trustee and Lender, their heirs, executors, personal representatives, administrators, legal representatives, successors and assigns, from and against, all liabilities, losses, damages, costs, expenses (including reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature arising out of Borrower's interest in the Property, or the use, condition or occupancy of the Property, including, without limitation, those arising from any or all of the following: (a) injury to or death of any person, or damage to or loss of the Property or connected with the use, condition or occupancy thereof (not arising directly from the Trustee's or the Lender's negligent acts (but not omissions) or willful misconduct on or about the Property), (b) violations by Borrower of this Deed of Trust, (c) real estate taxes and other taxes, claims and charges arising out of the ownership, leasing, use, condition or occupancy of the Property, (d) any notices, orders, violations or penalties filed against Borrower or imposed upon the Property or any part thereof, or, to the extent the same relate to the transactions contemplated by this Instrument, against the Trustee or the Lender (including in each case and without limitation, any liability, expenses, loss or damage arising out of any violation (or alleged violation) of any Hazardous Material laws or the existence (or alleged existence) of any Hazardous Materials on, in or under the Property and whether or not the same shall have migrated there from adjacent properties), and (e) any action taken or omitted to be taken by the Trustee hereunder. Upon the occurrence of any event giving rise to liability of Borrower under the indemnification contained in this Section, the Trustee shall give Borrower notice of such event and a copy of any communication or document received by the Trustee with respect to each event and Borrower shall be entitled to conduct the negotiation or defense of any claim, cause of action, suit, demand or judgment by counsel selected by Borrower, subject to the approval of such counsel by the Trustee in its reasonable judgment. The failure of the Trustee to give prompt notice of such occurrence shall not excuse Borrower from liability under this Section 8.15 except to the extent that such liability arose directly by reason of, or was increased or enhanced by, the failure of the Trustee to give such notice. The indemnification provided in this Section 8.15 shall survive the discharge, release or satisfaction of this Instrument and the payment in full of the obligations under the Note as to any cause of action, suit, claim, demand or judgment arising prior to such discharge, release or satisfaction. This indemnification shall not extend to any willful misconduct, gross negligence or bad faith of Trustee or Lender.

## ARTICLE IX-HAZARDOUS MATERIALS

**9.01　HAZARDOUS MATERIALS.** For the purposes of this Instrument, Borrower, Lender and Trustee agree that, unless the context otherwise specifies or requires, the following terms shall have the following meanings: "Hazardous Materials" shall mean (i) any "hazardous waste" as defined by the Resource Conservation and Recovery Act of 1976 (42 U.S.C. Section 6901 et seq.), as amended from time to time, and regulations promulgated thereunder; (ii) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. Section 9601 et seq.) ("CERCLA"), as amended from time to time, and regulations promulgated thereunder; (iii) asbestos; (iv) polychlorinated biphenyls; (v) underground storage tanks, whether empty, filled or partially filled with any substance, (vi) any substance the presence of which on the Property is prohibited by any applicable governmental requirements and regulations ("Governmental Requirements"); and (vii) any other substance which by any Governmental Requirements requires special handling or notification of any federal, state, or local governmental entity in its collection, storage, treatment, or disposal. (b) "Hazardous Materials Contamination" shall mean the contamination (whether presently existing or hereafter occurring) of any improvements, facilities, soil, groundwater, air or other elements on or of the Property by Hazardous Materials, or the contamination of the buildings, facilities, soil, groundwater, air, or other elements on or of any other

property as a result of Hazardous Materials at any time (whether before or after the date of this Instrument) emanating from the Property.

**9.02 REPRESENTATIONS AND WARRANTIES.** Borrower has inspected and is familiar with the environmental condition of the Property. Borrower represents and warrants that, except as expressly provided in the restrictive covenants affecting the Property and filed of record in the Real Property Records, El Paso County, Texas, and as described in (i) the Phase I Environmental Site Assessment dated June 26, 2018 prepared for Prestige Development Group, Inc. by Terracon Consultants, Inc.; (ii) the public records of the Texas Commission on Environmental Quality; and (iii) the geotechnical reports and analysis prepared by LOI Engineers and provided to Borrower as of the date of this Instrument: (a) no Hazardous Materials are now located on the Property, and neither Borrower nor, to Borrower's actual knowledge, any other person has ever caused or permitted any Hazardous Materials to be placed, held, located, or disposed of on, under, or at the Property or any part thereof; (b) no part of the Property is being used or, to the actual knowledge of Borrower, has been used at any previous time for the disposal, storage, treatment, processing, or other handling of Hazardous Materials, nor is any part of the Property affected by any Hazardous Materials Contamination; (c) to the best of Borrower's actual knowledge and belief, no property adjoining the Property is being used, or has ever been used at any previous time, for the disposal, storage, treatment, processing or other handling of Hazardous Materials, nor is any other property adjoining the Property affected by Hazardous Materials Contamination; and (d) no investigation, administrative order, consent order and agreement, litigation or settlement with respect to Hazardous Materials or Hazardous Materials Contamination is proposed, or, to Borrower's actual knowledge, threatened, anticipated or in existence with respect to the Property. The Property is not currently on, and to Borrower's actual knowledge, has never been on, any federal or state "Superfund" or "Superlien" list. None of the reports or information received by Borrower as of the date hereof related to Hazardous Materials, Hazardous Materials Contamination or the Property will prevent the Property from being commercially developed.

**9.03 BORROWER'S COVENANTS.** Borrower agrees to (a) give notice to Lender immediately upon Borrower's acquiring knowledge of the presence of any Hazardous Materials on the Property or of any Hazardous Materials Contamination with a full description thereof, other than Hazardous Materials that are used, handled and/or stored in compliance with Governmental Requirements and used, handled and/or stored in the ordinary course of business by Borrower or any tenant or as previously described in Section 9.02 above; (b) give notice to Lender immediately upon receipt of any additional reports or information, including without limitation updates to those reports referenced in Section 9.02 above related to any Hazardous Materials or any Hazardous Materials Contamination affecting all or any part of the Property, and copies of any and all such reports or information; (c) promptly comply with any Governmental Requirements affecting the Property, including without limitation, those requiring the removal, treatment or disposal of such Hazardous Materials or Hazardous Materials Contamination and provide Lender with satisfactory evidence of such compliance; (d) promptly comply with all restrictions and covenants affecting the Property and all laws, rules and regulations related to any Hazardous Materials on the Property and (e) provide Lender, within thirty (30) days after demand by Lender, which demand may be given by Lender, in its sole discretion, after Borrower or Lender receives notice with respect to any Hazardous Materials Contamination or Borrower takes or fails to take any action with respect to any Hazardous Materials Contamination beginning on the date hereof, with a bond, letter of credit or similar financial assurance evidencing to Lender's satisfaction that the necessary funds are available to pay the cost of removing, treating and disposing of such Hazardous Materials or Hazardous Materials Contamination and discharging any assessments which may be established on the Property as a result thereof.

**9.04 SITE ASSESSMENTS.** Lender (by it officers, employees and agents) at any time and from time to time, either prior to or after the occurrence of an Event of Default, may contract for the services of persons (the "Site Reviewers") to perform environmental site assessments ("Site Assessments") on the Property for the purpose of determining whether there exists on the Property any environmental condition which could reasonably be expected to result in any liability, cost, or expense to the owner, occupier or operator of such Property arising under any state, federal or local law, rule or regulation relating to Hazardous Materials. The Site Assessments may be performed at any time or times, upon reasonable notice, and under reasonable conditions established by Borrower which do not impede the performance of the Site Assessments. The Site Reviewers are authorized to enter upon the Property for such purposes. The Site Reviewers are further authorized to perform both above and below the ground testing for environmental damage or the presence of Hazardous Materials on the Property and such other tests on the Property as may be necessary to conduct the Site Assessments in the reasonable opinion of the Site Reviewers. Borrower will supply to the Site Reviewers such historical and operational information regarding the Property as may be reasonably requested by the Site Reviewers to facilitate the Site Assessments and will make available for meeting with the Site Reviewers appropriate personnel having knowledge of such matters. On request, Lender shall make the results of such Site Assessments fully available to Borrower, which (prior to an Event of Default hereunder) may, at Borrower's election, participate under reasonable procedures in the direction of such Site Assessments and the description of

tasks of the Site Reviewers. The cost of performing such Site Assessments shall be paid by Borrower upon demand of Lender and any such obligations shall be Indebtedness secured by this Instrument.

**9.05    INDEMNIFICATION.** Regardless of whether any Site Assessments are conducted hereunder, Borrower hereby agrees to and hereby does defend, indemnify, and hold harmless Lender and Trustee from any and all liabilities (including strict liability), actions, demands, penalties, losses, costs, or expenses (including, without limitation, reasonable attorneys' fees and expenses, and remedial costs), suits, costs of any settlement or judgment and claims of any and every kind whatsoever which may now or in the future (whether before or after the release of this Instrument) be paid, incurred or suffered by or asserted against Lender or Trustee by any person or entity or governmental agency for, with respect to, or as a direct or indirect result of, the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Property of any Hazardous Materials or any Hazardous Materials Contamination or arise out of or result from the environmental condition of the Property or the applicability of any Governmental Requirements relating to Hazardous Materials (including, without limitation, of CERCLA or any federal, state, or local so-called "Superfund" or "Superlien" laws, statute, law, ordinance, code, rule, regulation, order or decree), regardless of whether or not caused by or within the control of Borrower, Lender or Trustee. The representations, covenants, warranties, and indemnifications contained in this Article IX shall survive the release of this Instrument, a foreclosure under this Instrument or a deed in lieu of foreclosure. Any amounts owed to Lender or Trustee under this Section 9.05 shall be Indebtedness secured by this Instrument and shall be payable by Borrower upon demand.

**9.06    RIGHTS OF LENDER.** Lender shall have the right, but not the obligation, prior or subsequent to an Event of Default, without in any way limiting Lender's other rights and remedies under this Instrument, to enter onto the Property or to take such other actions as it deems necessary or advisable to clean up, remove, resolve, or minimize the impact of, or otherwise deal with, any Hazardous Materials or Hazardous Materials Contamination on the Property following receipt of any notice from any person or entity asserting the existence of any Hazardous Materials or Hazardous Materials Contamination pertaining to the Property or any part thereof which, if true, could result in an order, suit, imposition of a lien on the Property, or other action and/or which, in Lender's opinion, could jeopardize Lender's security under this Instrument. All costs and expenses paid or incurred by Lender in the exercise of any such right shall be Indebtedness secured by this Instrument and shall be payable by Borrower upon demand.

**9.07    NO WAIVER.** Notwithstanding any provision in this Article IX or elsewhere in this Instrument to the contrary, Lender does not waive and expressly reserves all rights and benefits now or hereafter accruing to or available to Lender under the "security interest exception" set forth in 40 C.F.R. §300.1100. No action taken by Lender pursuant to this Instrument or any other Loan Document shall be deemed or construed to be a waiver or relinquishment or any rights or benefits under the "secured creditor exemption", or "secured party exemption" under CERCLA.

## ARTICLE X-MISCELLANEOUS PROVISIONS

**10.01    RELEASE.** Upon payment of all sums and performance of all obligations secured by this Instrument, Lender shall release this Instrument. Borrower shall pay Lender's reasonable costs incurred in releasing this Instrument.

**10.02    BORROWER AND LIEN NOT RELEASED.** From time to time, Lender may, at Lender's option, without giving notice to or obtaining the consent of Borrower, Borrower's successors or assigns or any junior lienholder or Guarantor, without liability on Lender's part and notwithstanding the existence of any Event of Default, extend the time for payment of the Indebtedness or any part thereof, reduce the payments thereon, release anyone liable on any of the Indebtedness, accept a renewal note or notes therefor, modify the terms and time of payment of the Indebtedness, release from the liens of this Instrument any part of the Property, take or release other or additional security, reconvey any part of the Property, consent to any map or plan of the Property, consent to the granting of any easement, join in any extension or subordination agreement, and agree in writing with Borrower to modify, renew and/or amend the terms of the Note. Any actions taken by Lender pursuant to the terms of this Section 10.02 shall not affect the obligation of Borrower or Borrower's successors or assigns to pay the sums secured by this Instrument and to observe the covenants of Borrower contained herein, shall not affect the guaranty of any person, corporation, partnership, or other entity for payment of the Indebtedness or any part thereof, and shall not affect the liens or priority of liens of this Instrument on the Property. Borrower shall pay Lender a reasonable charge, together with such title insurance premiums and attorney's fees as may be incurred at Lender's option, for any such action if taken at Borrower's request.

**10.03    NOTICE.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Instrument or in the Note shall be given by mailing such notice by United States mail, postage

prepaid, addressed to Borrower at Borrower's address stated in this Instrument or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by United States mail, postage prepaid, addressed to Lender at Lender's address stated in this Instrument or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Instrument or in the Note shall be deemed to have been given to Borrower or Lender when given in the manner designated herein, but actual notice, however given or received, shall always be effective.

**10.04  SUCCESSORS AND ASSIGNS BOUND.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of Section 7.05.

**10.05  JOINT AND SEVERAL LIABILITY.** All covenants and agreements of Borrower shall be joint and several.

**10.06  AGENTS.** In exercising any rights hereunder or taking any actions provided for herein, Lender may act through its employees, agents or independent contractors as authorized by Lender.

**10.07  GOVERNING LAW.** This Instrument shall be governed by the applicable laws of the State of Texas and the United States of America.

**10.08  SEVERABILITY.** In the event that any provision of this Instrument or the Note shall for any reason be held to be invalid, illegal or unenforceable, best efforts shall be used to construe any such provision so as to make it valid and enforceable in light of the parties' apparent intent as evidenced by this Instrument. If such construction cannot be made, any invalidity, illegality or unenforceability shall not affect any other provision of this Instrument or the Note and said documents shall be construed as if such invalid, illegal or unenforceable provision had never been contained therein.

**10.09  USURY DISCLAIMER.** The term "Maximum Lawful Rate" means the maximum rate of interest and the term "Maximum Lawful Amount" means the maximum amount of interest that are permissible under applicable state or federal law for the type of financing arrangements that may be evidenced by the Note and the other Financing Documents. Lender does not intend to contract for, charge or receive more than the Maximum Lawful Rate or Maximum Lawful Amount permitted by applicable state or federal law, and to prevent such an occurrence, Lender, Borrower agrees that all amounts of interest, whenever contracted for, charged or received by Lender, with respect to any amount payable under the Note, this Instrument or any of the other Financing Documents, shall be spread, prorated or allocated over the full period of time the Note, if applicable. If applicable law is ever judicially interpreted so as to render usurious any amount called for under the Note, this Instrument and/or any of the other Financing Documents, or contracted for, charged, taken, reserved or received with respect to the Note or other financing arrangement by and between Lender and Borrower, or if any action under the Note results in Borrower having paid any interest in excess of that permitted by law, <u>then</u> it is Borrower's and Lender's express intent that (i) all excess amounts theretofore collected by Lender be credited on the principal balance of the Note (or, if the obligations under the Note has been or would thereby be paid in full, refunded to Borrower); and (ii) the provisions of the Note, this Instrument and the other Security Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder.

**10.10  PARTIAL INVALIDITY.** In the event any portion of the sums intended to be secured by this Instrument cannot be lawfully secured hereby, payments in reduction of such sums shall be applied first to those portions not secured hereby.

**10.11  CAPTIONS.** The captions and headings of the Articles and Sections of this Instrument are for convenience only and are not to be used to interpret or define the terms and provisions of this Instrument.

**10.12  CONSTRUCTION.** When this instrument is executed by more than one person, corporation or other legal entity, it shall be construed as though "Borrower" were written "Borrowers", "Borrower" were written as "Borrowers" and as though the pronouns and verbs in their number were changed to correspond; and in such case, each of the Borrowers and each of the Borrowers shall be bound jointly and severally with one another to keep, observe and perform the covenants, agreements, obligations and liabilities imposed by this Instrument upon the "Borrower" and "Borrower". The term "Lender" as used herein shall mean and include the holder or holders of the Indebtedness from time to time, and upon acquisition of the Indebtedness by any holder or holders other than the named Lender, effective as of the time of such acquisition, the term "Lender" shall mean all of the then holders of the Indebtedness, to the exclusion of all prior holders not then retaining or reserving an interest in the Indebtedness, to the end that all rights, powers, remedies, liens, benefits and privileges accruing and to accrue hereunder to the Lender, as such term is used herein, shall inure to the benefit of and be owned and held by the

holder or holders of the Indebtedness from time to time, whether such holder acquires the Indebtedness through succession to or assignment from prior lender(s). The masculine and neuter pronouns used in this Instrument shall include the masculine, feminine and neuter genders.

**10.13  CONFLICTS.** In the event any item, term or provision contained in this Instrument is in conflict, or may hereafter be held to be in conflict with the laws of the State of Texas or of the United States, this Instrument shall be affected only as to such particular item, term or provision, and shall in all other respects remain in full force and effect.

**10.14  NO REPRESENTATION OR WARRANTY BY LENDER.** By accepting or approving this Instrument, or anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Instrument, including, without limitation, any certificate, balance sheet, statement of profit and loss, or other financial statements, survey, appraisal or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of it, or any of its terms, provisions or conditions, and such acceptance or approval thereof shall not be or constitute any warranty or representation with respect to or by Lender.

**10.15  WRITTEN LOAN AGREEMENT. THIS WRITTEN INSTRUMENT, TOGETHER WITH THE NOTE AND ALL OTHER FINANCING DOCUMENTS EXECUTED SUBSTANTIALLY CONTEMPORANEOUSLY WITH THIS INSTRUMENT REPRESENT THE FINAL AGREEMENT OF THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**10.16  NO TRANSFER OF TAX LIEN.** BORROWER KNOWINGLY AND EXPRESSLY WAIVES ITS STATUTORY RIGHT TO; (1) TRANSFER A TAX LIEN ON OR AGAINST THE PROPERTY PURSUANT TO CHAPTER 32 OF THE TEXAS PROPERTY TAX CODE; AND (2) AUTHORIZE THE TRANSFER OF A TAX LIEN ON OR AGAINST THE PROPERTY PURSUANT TO SECTION 32.06 OF THE TEXAS PROPERTY TAX CODE. BORROWER ALSO HEREBY AGREES, ACKNOWLEDGES AND UNDERSTANDS THAT ANY AUTHORIZATION TO TRANSFER A TAX LIEN GIVEN OR SIGNED BY BORROWER AFTER THE EFFECTIVE DATE HEREOF PURSUANT TO CHAPTER 32 OF THE TEXAS PROPERTY TAX CODE SHALL NOT BE VALID UNLESS AGREED TO IN WRITING BY LENDER AND RECORDED IN THE REAL PROPERTY RECORDS OF EL PASO COUNTY, TEXAS. IN ADDITION, LENDER SHALL HAVE THE RIGHT TO FILE A NOTICE IN THE REAL PROPERTY RECORDS OF EL PASO COUNTY, TEXAS THAT PROVIDES FOR THE BORROWER'S WAIVER AS PROVIDED HEREIN. IN THE EVENT A TAX LIEN PURSUANT TO CHAPTER 32 OF THE TEXAS PROPERTY TAX CODE IS TRANSFERRED ON OR AGAINST THE PROPERTY BY BORROWER AFTER THE EFFECTIVE DATE HEREOF, BORROWER DOES HEREBY EXPRESSLY SUBORDINATE SUCH TAX LIEN TO THIS INSTRUMENT.

 Initials

**10.17  STANDARDS FOR EXERCISING REMEDIES.** To the extent that applicable law imposes duties on Lender to exercise remedies in a commercially reasonable manner, Borrower acknowledge and agree that it is not commercially unreasonable for Lender: (a) to fail to incur expenses reasonably deemed significant by Lender to prepare any Property for disposition or otherwise to complete raw material for work-in-process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to the Property to be disposed of, or to obtain or if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of the Property to be collected or disposed of, (c) fail to exercise collection remedies against other persons obligated on the Indebtedness or to remove liens on or any adverse claims against the Property, (d) to exercise collection remedies against other persons obligated on the Indebtedness directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of the Property through publications or media of general circulation, whether or not the Property is of a specialized nature, (f) to contact other persons, whether or not in the same business as Borrower, for expressions of interest in acquiring all or any portion of the Property, (g) to hire one or more professional auctioneers to assist in the disposition of the Property, whether or not the Property is of a specialized nature, (h) to dispose of the Property by utilizing Internet sites that provide for the auction of assets of the types included in the Property of that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, (k) to purchase insurance or credit enhancements to insure Lender against risks of loss, collection or disposition of the Property or to provide Lender a guaranteed return from the collection or disposition of the Property, (l) to the extent deemed appropriate by Lender, to

obtain the services of brokers, investment bankers, consultants and other professionals (including Lender and its affiliates) to assist Lender in the collection or disposition of any of the Property or (m) to comply with any applicable estate or federal law requirement in connection with the disposition or collection of the Property. Borrower acknowledge that this Section is intended to provide non-exhaustive indications of what actions or omissions by Lender would not be commercially unreasonable in Lender's exercise of remedies against the Property and that other actions or omissions by Lender shall not be deemed commercially unreasonably solely by not being included in this Section. Without limitation upon the foregoing, nothing contained in this Section shall be construed to grant any rights to Borrower or to impose any duties upon Lender that would not have been granted or imposed by this Instrument or by applicable law in the absence of this Section.

**10.18  TIME IS OF THE ESSENCE.**  Time is of the essence with respect to all of Borrower's obligations under this Instrument and the other Loan Documents.

Executed to be effective April 30, 2019.

**BORROWER:**

**THE GATEWAY VENTURES, LLC,**
a Texas limited liability company

By:  PDG Prestige, Inc.,
a Texas corporation
Its:  Sole Manager

By: _____
Michael J. Dixson, President


STATE OF TEXAS        )
                      )
COUNTY OF EL PASO  )

This instrument was acknowledged before me on the April 29, 2019, by Michael J. Dixson, President of The PDG Prestige, Inc., a Texas corporation, Sole Manager of Gateway Ventures, LLC, a Texas limited liability company, on behalf of said corporation and limited liability company.

Notary's Official Seal:

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

CELIA VARGAS
NOTARY PUBLIC
NOTARY ID# 12508565-5
In and for the State of Texas
My commission expires
OCTOBER 20, 2020

## Exhibit "A"
## Legal Description

BEING A 19.96 ACRE TRACT OF LAND OUT OF A PORTION OF TRACT 4A, NOW KNOWN AS TRACT 4H, BLOCK 2, ASCARATE GRANT, EL PASO COUNTY, TEXAS BEING THE SAME TRACT DESCRIBED IN A DOCUMENT TO MAGELLAN PIPELINE TERMINALS, L.P. ACCORDING TO THE DOCUMENT RECORDED IN DOCUMENT NUMBER 20070077714, OFFICIAL PUBLIC RECORDS EL PASO COUNTY, TEXAS (SEE BELOW "RECORD LEGAL DESCRIPTION") AND BEING COMPRISED ENTIRELY OF A 15.69 ACRE TRACT DEPICTED HEREON AS PARCEL A AND A 4.27 ACRE TRACT DEPICTED HEREON AS PARCEL B AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A FOUND 5/8-INCH IRON ROD (N:10861485.99, E:415633.47) FOR THE SOUTH CORNER OF SAID TRACT, FROM WHICH THE FOUND CITY MONUMENT NUMBER 1033 BEARS N 51°16'26" W, A DISTANCE OF 1031.01 FEET;

THENCE N 58°34'05" W, A DISTANCE OF 740.25 FEET ALONG THE SOUTHWEST LINE OF SAID MAGELLAN TRACT, TO A FOUND "X" CHISELED IN CONCRETE FOR THE MOST SOUTHERLY WEST CORNER OF SAID TRACT;

THENCE N 31°29'49" E, A DISTANCE OF 215.04 FEET ALONG THE NORTHWEST LINE OF SAID MAGELLAN TRACT, TO A SET "X" CHISELED IN ASPHALT FOR AN INTERIOR CORNER OF THIS TRACT COMMON TO THE EAST CORNER OF A LOT 1, BLOCK 1, HOWDY'S SUBDIVISION (CENTRAL) UNIT ONE, EL PASO COUNTY, AS RECORDED IN VOLUME 75, PAGE 34, PLAT RECORDS EL PASO COUNTY, TEXAS;

THENCE N 58°30'13" W, A DISTANCE OF 215.68 FEET ALONG THE SOUTHWEST LINE OF SAID MAGELLAN TRACT COMMON TO THE NORTHEAST LINE OF SAID LOT ONE TO A SET 1/2-INCH IRON ROD WITH CAP MARKED "GATEWAY MIDLAND" FOR THE MOST NORTHERLY WEST CORNER OF SAID TRACT;

THENCE N 31°30'31" E, A DISTANCE OF 749.54 FEET ALONG THE NORTHWEST LINE OF SAID MAGELLAN TRACT COMMON TO THE SOUTHEAST LINE OF THE INTERNATIONAL INDUSTRIAL CENTER, UNIT 1 SUBDIVISION AS RECORDED IN VOLUME 18, PAGE 5, PLAT RECORDS, EL PASO COUNTY, TEXAS TO A SET CHISELED "X" FOR THE MOST WESTERLY NORTH CORNER OF SAID TRACT;

THENCE N 80°43'21" E, A DISTANCE OF 50.99 FEET ALONG THE NORTH LINE OF SAID MAGELLAN TRACT COMMON TO THE SOUTH LINE OF A TRACT TO HOY FAMILY LIMITED PARTNERSHIP, ACCORDING TO THE DOCUMENT RECORDED IN DOCUMENT NUMBER 20060054513, OFFICIAL PUBLIC RECORDS, EL PASO COUNTY, TEXAS TO A FOUND PK NAIL WITH SPINNER FOR THE MOST EASTERLY NORTH CORNER OF SAID TRACT;

THENCE S 53°41'38" E, A DISTANCE OF 909.99 FEET ALONG THE NORTHEAST LINE OF SAID MAGELLAN TRACT, COMMON TO THE SOUTHWEST LINE OF VISCOUNT SUBDIVISION AS RECORDED IN VOLUME 60, PAGE 33, PLAT RECORDS EL PASO COUNTY, TEXAS TO A FOUND CHISELED "X" FOR THE MOST NORTHERLY EAST CORNER OF SAID MAGELLAN TRACT;

THENCE S 32°45'26" W, A DISTANCE OF 365.01 FEET ALONG THE SOUTHEAST LINE OF SAID MAGELLAN TRACT TO A FOUND 5/8-INCH IRON ROD FOR AN INTERIOR CORNER OF SAID MAGELLAN TRACT;

THENCE S 59°44'42" E, A DISTANCE OF 31.47 FEET ALONG THE NORTHEAST LINE OF SAID MAGELLAN TRACT TO A SET 1/2-INCH IRON ROD WITH CAP MARKED "GATEWAY MIDLAND" FOR AN EXTERIOR CORNER OF SAID TRACT;

THENCE S 32°50'26" W, A DISTANCE OF 556.66 FEET TO THE POINT OF BEGINNING AND CONTAINING 19.96 ACRES OF LAND.

AND MORE PARTICULARLY DESCRIBED IN RECORD DESCRIPTION PER INSTRUMENT NUMBER 20070077714, OFFICIAL PUBLIC RECORDS EL PASO COUNTY, TEXAS:

A PARCEL OF LAND LYING IN AND BEING A PORTION OF TRACT 4A, BLOCK 2, ASCARATE GRANT, EL PASO COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT AN X CHISELED IN A CONCRETE CURB. SAID POINT BEING THE INTERSECTION OF THE EAST RIGHT-OF-WAY LINE OF AIRWAY BLVD. AND THE NORTH RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY 10, AND ALSO BEING THE POINT OF BEGINNING OF THE PARCEL BEING DESCRIBED: THENCE NORTH 28°21'26" EAST A DISTANCE OF 130.27 FEET TO A POINT; THENCE FOLLOWING A CURVE TO THE LEFT ALONG THE EASTERLY RIGHT-OF-WAY LINE OF AIRWAY BLVD. AN ARC DISTANCE OF 222.09 FEET TO A POINT, THE CENTRAL ANGLE OF SAID CURVE BEING 15°54'11", ITS RADIUS BEING 800.15 FEET, AND THE LONG CHORD BEARING NORTH 20°24'21" EAST A DISTANCE OF 221.38 FEET; THENCE FOLLOWING A CURVE TO THE RIGHT AN ARC DISTANCE OF 36.97 FEET TO A POINT, THE CENTRAL ANGLE OF SAID CURVE BEING 105°54'40", ITS RADIUS BEING 20.00 FEET, AND THE LONG CHORD BEARING NORTH 65°24'35" EAST A DISTANCE OF 31.93 FEET; THENCE SOUTH 61°38'34" EAST A DISTANCE OF 11.40 FEET TO A POINT; THENCE NORTH 28°21'26" EAST A DISTANCE OF 628.18 FEET TO A CONCRETE NAIL WITH A DISC; THENCE SOUTH 56°46'44" EAST A DISTANCE OF 948.90 FEET TO A 5/8 INCH DIAMETER IRON REBAR; THENCE 29°22'10" WEST A DISTANCE OF 364.09 FEET TO A 5/8 INCH DIAMETER IRON REBAR; THENCE SOUTH 62°38'50" EAST A DISTANCE OF 31.47 FEET TO A 5/8 INCH IRON REBAR; THENCE SOUTH 29°55'26" WEST A DISTANCE OF 559.00 FEET TO A 5/8 INCH DIAMETER IRON REBAR LYING IN THE NORTHERLY RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY 10; THENCE NORTH 61°38'34" WEST ALONG SAID NORTHERLY RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY 10 DISTANCE OF 955.31 FEET TO THE POINT OF BEGINNING OF THE PARCEL BEING DESCRIBED AND CONTAINING 920,338.530 SQUARE FEET OR 21.128 ACRES OF LAND MORE OR LESS.

SAVE AND EXCEPT:

BEING 0.0045 OF AN ACRE OF LAND, (195.27 SQUARE FEET) MORE OR LESS, OUT OF AND A PART OF TRACT 4H, BLOCK 2, ASCARATE GRANT, CITY OF EL PASO, EL PASO COUNTY, TEXAS, SAID 0.0045 OF AN ACRE OF LAND BEING DESCRIBED BY METES AND BOUNDS AS FOLLOWS, TO-WIT: COMMENCING AT A POINT WHICH IS A CITY MONUMENT AND LOCATED AT THE CENTERLINE OF AIRWAY BOULEVARD, SAID POINT IS ALSO THE POINT OF CURVATURE ALONG SAID AIRWAY BOULEVARD CENTERLINE; THENCE, SOUTH 28°21'08" WEST, A DISTANCE OF 130.27 FEET TO THE POINT OF INTERSECTION OF SAID CENTERLINE AND THE PROJECTED NORTHERLY RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY 10 (1H-10); THENCE, ALONG SAID PROJECTED RIGHT-OF-WAY LINE OF 1H-10, SOUTH 61°38'52" EAST, A DISTANCE OF 60.00 FEET TO THE TRUE POINT OF BEGINNING; THENCE, ALONG THE EASTERLY RIGHT-OF-WAY LINE OF SAID AIRWAY BOULEVARD, NORTH 28°21'08" EAST A DISTANCE OF 19.00 FEET TO A POINT ON THE PROPOSED RIGHT-OF-WAY LINE OF 1H-10, SAID POINT IS ALSO A POINT OF CURVATURE; THENCE, 32.75 FEET ALONG THE ARC OF A CURVE TO THE LEFT, WHOSE CENTRAL ANGLE IS 37°07'07", WHOSE RADIUS IS 55.00 FEET AND WHOSE CHORD BEARS SOUTH 25°34'38" EAST, A DISTANCE OF 32.27 FEET TO A POINT OF TANGENCY; THENCE, ALONG SAID NORTHERLY EXISTING RIGHT-OF-WAY LINE OF SAID

INTERSTATE 10, NORTH 61°38'52" WEST, A DISTANCE OF 26.08 FEET TO THE TRUE POINT OF BEGINNING, CONTAINING AN AREA OF 0.0045 OF AN AREA (ACRE?) OF LAND, MORE OR LESS.

ALSO SAVE AND EXCEPT:

ALL THAT CERTAIN TRACT OF PARCEL OF LAND CONTAINING 706 SQUARE FEET LYING WITHIN THE CORPORATE LIMITS OF THE CITY OF EL PASO, EL PASO COUNTY, TEXAS, SAME BEING A PORTION OF TRACT 4H, BLOCK 2, OF THE ASCARATE GRANT AND BEING THAT SAME PARCEL OF LAND DESCRIBED IN A QUITCLAIM DEED FROM SHELL OIL COMPANY TO ROBERT H. HOY, JR., ET UX. OF RECORD IN VOLUME 2761, PAGE 1838, OF THE DEED RECORDS OF EL PASO COUNTY, TEXAS, AND ALSO BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS: BEGINNING AT A 1/2 INCH REBAR FOUND MARKING THE NORTH CENTER OF SAID TRACT 4H, SAME BEING THE WEST CORNER OF TRACT 4H2A, OF SAID BLOCK 2, AND BEING ON THE SOUTHEAST LINE OF LOT 1, BLOCK 4, OF THE INTERNATIONAL INDUSTRIAL CENTER, UNIT 1, AN ADDITION TO THE CITY OF EL PASO, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 18, PAGE 5, OF THE PLAT RECORDS OF EL PASO COUNTY, TEXAS; THENCE, SOUTH 59°39'10" EAST, WITH THE NORTHWEST LINE OF SAID TRACT 4H, SAME BEING THE SOUTHWEST LINE OF SAID TRACT 4H2A, A DISTANCE OF 36.76 FEET TO A CHAINLINK FENCE, SAME BEING ON THE SOUTH SIDE OF A CONCRETE DRAIN, AND BEING NORTH 56°39'10" WEST, 687.70 FEET, FROM A FOUND 1/2 INCH REBAR; THENCE, SOUTH 77°44'37" WEST, WITH THE SAID CHAINLINK FENCE AND ALONG THE SOUTH SIDE OF SAID CONCRETE DRAIN, SAME BEING THE SOUTH LINE OF SAID ROBERT H. HOY, JR., TRACT, A DISTANCE OF 50.92 FEET TO THE SOUTHEAST LINE OF SAID LOT 1, BLOCK 4, SAME BEING THE NORTHWEST LINE OF SAID TRACT 4H, AND BEING NORTH 28°21'26" EAST, 589.39 FEET FROM A FOUND 1/2 INCH REBAR; THENCE, NORTH 28°21'26" EAST, WITH THE SOUTH EAST LINE OF SAID LOT 1, SAME BEING THE NORTHWEST LINE OF SAID TRACT 4H, A DISTANCE OF 36.56 FEET TO THE POINT OF BEGINNING AND CONTAINING 706 SQUARE FEET OF LAND.

ALSO SAVE AND EXCEPT:

LOT 1, BLOCK 1, HOWDY'S SUBDIVISION (CENTRAL) UNIT ONE, AN ADDITION TO THE CITY OF EL PASO, EL PASO COUNTY, TEXAS, ACCORDING TO THE RECORDED PLAT OF RECORD IN THE PLAT RECORDS OF EL PASO COUNTY, TEXAS.

EXHIBIT

**3**

Doc# 20190091881

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## MODIFICATION AGREEMENT

This Modification Agreement ("Agreement") is entered into effective on November 22, 2019 by and among the parties described below.

WHEREAS, THE GATEWAY VENTURES, LLC., a Texas limited liability company ("Borrower") executed that one certain Promissory Note (the "Note"), dated effective April 30, 2019, in the original principal amount of NINE MILLION FOUR HUNDRED THIRTY THOUSAND AND 00/100THS DOLLARS ($9,430,000.00), or so much thereof as may be advanced thereunder, payable to the order of HD LENDING, LLC, a Texas limited liability company ("Lender"); and

WHEREAS, the Note is secured by all instruments heretofore, now or hereafter executed by Borrower or any Guarantors in favor of Lender and by their terms securing the payment of this Note (hereinafter collectively the "Security Documents") including, without limitation, the following:

A. A Deed of Trust, Security Agreement, Assignment of Leases, Assignment of Rents and Financing Statement (the "Deed of Trust") dated effective April 30, 2019 from Borrower to a Trustee as named therein, in favor of Lender, recorded in/under Clerk's File No. 20190031430, Real Property Records, El Paso County, Texas, creating a security interest against the following described real property and the improvements located thereon (the "Original Property"):

Being a 19.96 acre tract of land out of a portion of Tract 4A, now known as Tract 4H, Block 2, Ascarate Grant, El Paso County, Texas, more particularly described by metes and bounds on Schedule A, hereto and made a part hereof for all purposes;

B. The Continuing Unlimited Guaranty Agreements (collectively, "Guaranties") dated April 30, 2019 from PDG PRESTIGE, INC., a Texas corporation ("PDG") and MICHAEL J. DIXSON in favor of Lender (collectively, "Guarantors");

C. A Loan Agreement (the "Loan Agreement") by and between Borrower, Lender and Guarantors dated April 30, 2019; and

D. The Subordination, Non-Disturbance, Attornment and Estoppel Agreements executed by Hoy Fox Automotive Group and Titan Towers, L.P. for the benefit of Lender (collectively, the "Subordination Agreements").

WHEREAS, Borrower has requested a release of a portion of the Property and Lender has agreed to same upon the terms and conditions described herein, including without limitation, the addition of the collateral described below; and

WHEREAS, Borrower agrees that the additional collateral required by Lender shall be granted to Lender as additional collateral for the obligations of Borrower pursuant to the Note and all provisions of the Note and Security Documents shall apply to said collateral, the same as if it was originally granted to Lender; and

WHEREAS, Lender, in consideration of the premises herein stated and at the request of Borrower and Guarantors, has agreed to modify the Note and Security Documents as hereinafter provided;

NOW, **THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.  **Unpaid Balance.** Simultaneously with the execution hereof and as a material condition for the agreement of Lender to the terms hereof, Borrower shall pay Lender the amount of $1,200,000 to be applied to the principal balance owed on the Note. Accordingly, Borrower hereby acknowledges and promises to pay to the order of Lender, in the City of El Paso, El Paso County, Texas the sum of EIGHT MILLION TWO HUNDRED THIRTY THOUSAND AND NO/100THS DOLLARS, or so much as may be advanced pursuant to the terms of the Note and Loan Agreement, which consists of the outstanding principal as of the date hereof of $7,850,665.50 (after the principal payment made today is deducted) and the interest reserve and advances described in Section 2 below. Payment terms, advances and application of the Interest Reserve shall continue to be subject to the terms of the Note and Security Documents, including without limitation, the Loan Agreement.

2.  **Allocations of Payments and Reserved Amounts.**

    a.  **Interest Reserve.** Borrower acknowledges and agrees that, effective as of the date hereof, $258,197.16 remains available under the Interest Reserve, as that term is defined in the Loan Agreement, for use by Lender pursuant to the terms of the Note and Loan Agreement.

    b.  **Advances.** Borrower acknowledges and agrees that, effective as of the date hereof, $121,137.34 remains available for advances pursuant to the terms of Section 3 in the Loan Agreement.

    c.  **Interest Escrow.** As a material condition for the agreement of Lender to the terms hereof, simultaneously with the execution hereof, Borrower shall deposit with Lender $200,000, which shall be held by Lender in escrow as a deposit for interest payments to be made pursuant to the Note before the Interest Reserve is used (the "Interest Escrow"). Lender agrees to draw from the Interest Escrow to pay accrued interest then due by Borrower so that interest payments due and owing are timely paid prior to drawing from the Interest Reserve. Lender shall not pay Borrower any interest, earnings or profits on the Interest Escrow. If the Interest Escrow is not used prior to maturity, at maturity, Lender shall provide Borrower with an accounting of said funds. The Interest Escrow is hereby pledged by Borrower to Lender as additional security for the Note. Any remaining balance of the Interest Escrow shall be credited to Lender upon payment in full of the amounts owed to Lender pursuant to the terms of the Note and Security Documents.

    d.  **Tax Escrow.** Borrower will be notified if the monthly tax escrow provided in the Loan Agreement is required by Lender. Until Borrower receives written notification that said escrow payment is required, Borrower will not be required to make the monthly tax escrow payments. Except as expressly provided herein, Lender reserves all rights available to it under the Security Documents with respect to the monthly tax escrow.

3.  **Release of Certain Collateral.** In consideration of the payment described in Section 2 hereof, and the addition of the collateral described in Section 4 below, Lender shall execute a Partial Release of Lien dated of even date herewith (the "Partial Release"), releasing the following described real property (the "Released Property"), the Subordination Agreements and the leases which are a subject thereof from the Deed of Trust lien. The Released Property is described as:

    A portion of Tract 4H, Block 2, ASCARATE GRANT, City of El Paso, El Paso County, Texas, according to the resurvey of said ASCARATE GRANT made by El Paso County, Texas for tax purposes and being more particularly described by metes and bounds in Exhibit "A" attached hereto and made a part hereof for all purposes.

4.  **Addition of Collateral.** Borrower hereby grants a lien on the following described property (the "Additional Property") to Lender, as additional collateral for the payment and performance of the obligations of Borrower to Lender pursuant to the Security Documents and agrees that the

Additional Property shall be included in the definition of "Land" under the Deed of Trust and the "Property" under the Note and Loan Agreement, such that all the provisions of the Deed of Trust applicable to "Land" and all provisions of the Note and Loan Agreement applicable to "Property" shall also apply to the Additional Property. The Additional Property is described as:

Parcel 1: Lot 2, Block 4, INTERNATIONAL INDUSTRIAL CENTER UNIT 1, an Addition to the City of El Paso, El Paso County, Texas, according to the plat thereof recorded in Volume 18, Page 5, Plat Records of El Paso County, Texas; and

Parcel 2: A parcel of land which was originally owned as a portion of Lot 3, Block 4, INTERNATIONAL INDUSTRIAL CENTER UNIT 1, an Addition to the City of El Paso, El Paso County, Texas, according to the plat thereof recorded in Volume 18, Page 5, Plat Records of El Paso County, Texas, a subsequently re-platted as a portion of International Drive, according to the certain re-plat filed in Volume 18, Page 54, Plat Records, El Paso County, Texas, and vacated by the City of El Paso by Ordinance Number 7479, dated 04/20/1991, said parcel being more particularly described by metes and bounds in Exhibit "B" attached hereto and made a part hereof for all purposes.

5.    **Other Terms and Conditions Not Affected.** Except as expressly modified by the terms and provisions hereof, each and every of the terms and provisions of the Note and Security Documents and any documents executed in connection with same, are and shall remain in full force and effect. Except as otherwise specified herein, the terms and provisions hereof shall in no manner impair, limit, restrict or otherwise affect the obligations of Borrower and Guarantors to Lender pursuant to the Note and Security Documents, as modified by this Agreement. Borrower and Guarantors further agree that all terms and provisions of the Note and the Security Documents shall be and remain in full force and effect as therein written, except as otherwise expressly provided herein. Borrower and Guarantors further agree that this Agreement is fully enforceable in accordance with its terms and shall not impair or reduce Borrower's liability pursuant to the Note except as expressly provided herein. Except as expressly described in this Agreement, capitalized terms used herein shall have the same meaning as in the Note and Security Documents.

6.    **Reaffirmation of Security.** Effective as of the date hereof, the property given as collateral for the obligations of Borrower to Lender under the Note and Security Documents shall now be the Original Property plus the Additional Property save and except the Released Property. The Note, as herein modified, shall be and remain fully secured by the Security Documents heretofore or hereafter executed by Borrower or any third party, to secure the payment of the Note, and Borrower and Guarantors, by execution of this Agreement, hereby ratify and confirm all such liens, security interests and Security Documents to secure the full payment of the Note except as expressly provided otherwise herein. Borrower and Guarantors additionally confirm that all representations made in the Note, the Security Documents and any additional documents executed in connection with the Note are and remain true and correct.

7.    **No Default Exists.** As a material inducement to Lender to execute and deliver this Agreement and modify the collateral as described herein, Borrower and Guarantors acknowledge that there are no claims or offsets against, or defenses or counterclaims to, the terms or provisions of, and the other obligations created by the Note and/or the Security Documents and represent that no event has occurred and no condition exists which would constitute a default, either with or without notice or lapse of time, or both, under the Note and/or the Security Documents.

8.    **No Waiver.** Any failure by Lender to insist upon strict performance by Borrower of the terms and provisions of the Note and Security Documents prior to the date hereof shall not be deemed a waiver of same, and Lender shall have the continued right to insist upon strict performance by Borrower of all such terms and provisions. Lender's delay in exercising, partial exercise of, or failure to exercise

any of the remedies or rights available to it pursuant to the Note, Security Documents and/or this Agreement does not waive Lender's rights to subsequently exercise those remedies or rights.

9. **Consent of Guarantors.** As a material inducement to Lender to execute and deliver this Agreement and the Partial Release, Guarantors acknowledge and consent to the modification of the Note and Security Documents as described herein. Guarantors hereby warrant and represent to Lender that the modification described herein shall not in any manner limit, reduce or otherwise impair each of their respective Guaranties and each Guaranty shall continue to cover the obligations of Borrower as outlined in the Security Documents. Guarantors further warrant, represent and confirm that each continue to receive a benefit from the making of their Guaranties and each of their Guaranties is a valid and enforceable binding obligation and shall remain in full force and effect until final payment of the full amount of both principal and interest owed under the Note.

10. **Lender Approval.** Lender has received all approvals required to enter into this Agreement and perform any obligations described herein.

11. **Costs and Expenses.** Upon the execution hereof, Borrower shall pay and/or furnish to Lender: (a) the principal reduction and interest escrow described in Sections 1 and 2 above; (b) all fees and expenses of counsel to Lender; and (c) any recording fees and other costs and expenses payable to any third parties incurred by either Borrower or Lender in connection with the modification described herein.

12. **Additional Documents.** Borrower and Guarantors agree to execute, upon Lender's request, any such additional documentation as may be required by Lender to evidence the intention of the parties as provided herein and to further confirm the collateral provided to Lender as security for the obligations described herein.

13. **ENTIRE AGREEMENT. THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

Executed effective on the date first set forth above.

**LENDER:**

**HD LENDING, LLC,**
a Texas limited liability company

By: Carlos Tovar, Chief Operating Officer

(Additional Signatures and Acknowledgements on Following Page.)

**BORROWER:**

**THE GATEWAY VENTURES, LLC,**
a Texas limited liability company

By: PDG Prestige, Inc.,
a Texas corporation
Its: Sole Manager

By: _____
Michael J. Dixson, President

**GUARANTORS:**

**PDG PRESTIGE, INC.,**
a Texas corporation

By: _____
Michael J. Dixson, President

_____
**MICHAEL J. DIXSON**


STATE OF TEXAS      )
                    )
COUNTY OF EL PASO  )

This instrument was acknowledged before me on November ___, 2019, by Carlos Tovar, Chief Operating Officer of High Desert Capital, LLC, a Texas limited liability company, on behalf of said limited liability company.

Notary's Official Seal:

TAFFY BAGLEY
Notary Public, State of Texas
Comm. Expires 08-28-2022
Notary ID 6021978

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS


(Additional Acknowledgement on Following Page.)


Page 5 of 12

STATE OF TEXAS      )
                    )
COUNTY OF EL PASO )

    This instrument was acknowledged before me on November 26, 2019, by Michael J. Dixson, individually and as President of PDG Prestige, Inc., a Texas corporation, as Guarantor and as sole Manager of The Gateway Ventures, LLC, a Texas limited liability company, on behalf of said entities.

Notary's Official Seal:

TERRY BAGLEY
Notary Public, State of Texas
Comm. Expires 08-28-2022
Notary ID 6021976

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

## Schedule "A"
## Original Legal Description

BEING A 19.96 ACRE TRACT OF LAND OUT OF A PORTION OF TRACT 4A, NOW KNOWN AS TRACT 4H, BLOCK 2, ASCARATE GRANT, EL PASO COUNTY, TEXAS BEING THE SAME TRACT DESCRIBED IN A DOCUMENT TO MAGELLAN PIPELINE TERMINALS, L.P. ACCORDING TO THE DOCUMENT RECORDED IN DOCUMENT NUMBER 20070077714, OFFICIAL PUBLIC RECORDS EL PASO COUNTY, TEXAS (SEE BELOW "RECORD LEGAL DESCRIPTION") AND BEING COMPRISED ENTIRELY OF A 15.69 ACRE TRACT DEPICTED HEREON AS PARCEL A AND A 4.27 ACRE TRACT DEPICTED HEREON AS PARCEL B AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A FOUND 5/8-INCH IRON ROD (N:10681485.99, E:415533.47) FOR THE SOUTH CORNER OF SAID TRACT, FROM WHICH THE FOUND CITY MONUMENT NUMBER 1033 BEARS N 51°1626" W, A DISTANCE OF 1031.01 FEET;

THENCE N 58°34'05" W, A DISTANCE OF 740.25 FEET ALONG THE SOUTHWEST LINE OF SAID MAGELLAN TRACT, TO A FOUND "X" CHISELED IN CONCRETE FOR THE MOST SOUTHERLY WEST CORNER OF SAID TRACT;

THENCE N 31°29'49" E, A DISTANCE OF 215.04 FEET ALONG THE NORTHWEST LINE OF SAID MAGELLAN TRACT, TO A SET "X" CHISELED IN ASPHALT FOR AN INTERIOR CORNER OF THIS TRACT COMMON TO THE EAST CORNER OF A LOT 1, BLOCK 1, HOWDY'S SUBDIVISION (CENTRAL) UNIT ONE, EL PASO COUNTY, AS RECORDED IN VOLUME 75, PAGE 34, PLAT RECORDS EL PASO COUNTY, TEXAS;

THENCE N 58°30'13" W, A DISTANCE OF 215.68 FEET ALONG THE SOUTHWEST LINE OF SAID MAGELLAN TRACT COMMON TO THE NORTHEAST LINE OF SAID LOT ONE TO A SET 1/2-INCH IRON ROD WITH CAP MARKED "GATEWAY MIDLAND" FOR THE MOST NORTHERLY WEST CORNER OF SAID TRACT;

THENCE N 31°30'31" E, A DISTANCE OF 749.54 FEET ALONG THE NORTHWEST LINE OF SAID MAGELLAN TRACT COMMON TO THE SOUTHEAST LINE OF THE INTERNATIONAL INDUSTRIAL CENTER, UNIT 1 SUBDIVISION AS RECORDED IN VOLUME 18, PAGE 5, PLAT RECORDS, EL PASO COUNTY, TEXAS TO A SET CHISELED "X" FOR THE MOST WESTERLY NORTH CORNER OF SAID TRACT;

THENCE N 80°43'21" E, A DISTANCE OF 50.99 FEET ALONG THE NORTH LINE OF SAID MAGELLAN TRACT COMMON TO THE SOUTH LINE OF A TRACT TO HOY FAMILY LIMITED PARTNERSHIP, ACCORDING TO THE DOCUMENT RECORDED IN DOCUMENT NUMBER 20060054513, OFFICIAL PUBLIC RECORDS, EL PASO COUNTY, TEXAS TO A FOUND PK NAIL WITH SPINNER FOR THE MOST EASTERLY NORTH CORNER OF SAID TRACT;

THENCE S 53°41'38" E, A DISTANCE OF 909.99 FEET ALONG THE NORTHEAST LINE OF SAID MAGELLAN TRACT, COMMON TO THE SOUTHWEST LINE OF VISCOUNT SUBDIVISION AS RECORDED IN VOLUME 60, PAGE 33, PLAT RECORDS EL PASO COUNTY, TEXAS TO A FOUND CHISELED "X" FOR THE MOST NORTHERLY EAST CORNER OF SAID MAGELLAN TRACT;

THENCE S 32°45'26" W, A DISTANCE OF 365.01 FEET ALONG THE SOUTHEAST LINE OF SAID MAGELLAN TRACT TO A FOUND 5/8-INCH IRON ROD FOR AN INTERIOR CORNER OF SAID MAGELLAN TRACT;

THENCE S 59°44'42" E, A DISTANCE OF 31.47 FEET ALONG THE NORTHEAST LINE OF SAID MAGELLAN TRACT TO A SET 1/2-INCH IRON ROD WITH CAP MARKED "GATEWAY MIDLAND" FOR AN EXTERIOR CORNER OF SAID TRACT;

THENCE S 32°50'26" W, A DISTANCE OF 556.66 FEET TO THE POINT OF BEGINNING AND CONTAINING 19.96 ACRES OF LAND.

AND MORE PARTICULARLY DESCRIBED IN RECORD DESCRIPTION PER INSTRUMENT NUMBER 20070077714, OFFICIAL PUBLIC RECORDS EL PASO COUNTY, TEXAS:

A PARCEL OF LAND LYING IN AND BEING A PORTION OF TRACT 4A, BLOCK 2, ASCARATE GRANT, EL PASO COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT AN X CHISELED IN A CONCRETE CURB. SAID POINT BEING THE INTERSECTION OF THE EAST RIGHT-OF-WAY LINE OF AIRWAY BLVD. AND THE NORTH RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY 10, AND ALSO BEING THE POINT OF BEGINNING OF THE PARCEL BEING DESCRIBED: THENCE NORTH 28°21'26" EAST A DISTANCE OF 130.27 FEET TO A POINT; THENCE FOLLOWING A CURVE TO THE LEFT ALONG THE EASTERLY RIGHT-OF-WAY LINE OF AIRWAY BLVD, AN ARC DISTANCE OF 222.09 FEET TO A POINT, THE CENTRAL ANGLE OF SAID CURVE BEING 15°54'11", ITS RADIUS BEING 800.15 FEET, AND THE LONG CHORD BEARING NORTH 20°24'21" EAST A DISTANCE OF 221.38 FEET; THENCE FOLLOWING A CURVE TO THE RIGHT AN ARC DISTANCE OF 36.97 FEET TO A POINT, THE CENTRAL ANGLE OF SAID CURVE BEING 105°54'40", ITS RADIUS BEING 20.00 FEET, AND THE LONG CHORD BEARING NORTH 65°24'35" EAST A DISTANCE OF 31.93 FEET; THENCE SOUTH 61°38'34" EAST A DISTANCE OF 11.40 FEET TO A POINT; THENCE NORTH 28°21'26" EAST A DISTANCE OF 628.18 FEET TO A CONCRETE NAIL WITH A DISC; THENCE SOUTH 56°48'44" EAST A DISTANCE OF 948.90 FEET TO A 5/8 INCH DIAMETER IRON REBAR; THENCE 29°22'10" WEST A DISTANCE OF 364.09 FEET TO A 5/8 INCH DIAMETER IRON REBAR; THENCE SOUTH 62°38'50" EAST A DISTANCE OF 31.47 FEET TO A 5/8 INCH IRON REBAR; THENCE SOUTH 29°55'26" WEST A DISTANCE OF 558.00 FEET TO A 5/8 INCH DIAMETER IRON REBAR LYING IN THE NORTHERLY RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY 10; THENCE NORTH 61°38'34" WEST ALONG SAID NORTHERLY RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY 10 DISTANCE OF 955.31 FEET TO THE POINT OF BEGINNING OF THE PARCEL BEING DESCRIBED AND CONTAINING 920,338.530 SQUARE FEET OR 21.128 ACRES OF LAND MORE OR LESS.

SAVE AND EXCEPT:

BEING 0.0045 OF AN ACRE OF LAND, (195.27 SQUARE FEET) MORE OR LESS, OUT OF AND A PART OF TRACT 4H, BLOCK 2, ASCARATE GRANT, CITY OF EL PASO, EL PASO COUNTY, TEXAS, SAID 0.0045 OF AN ACRE OF LAND BEING DESCRIBED BY METES AND BOUNDS AS FOLLOWS, TO-WIT: COMMENCING AT A POINT WHICH IS A CITY MONUMENT AND LOCATED AT THE CENTERLINE OF AIRWAY BOULEVARD, SAID POINT IS ALSO THE POINT OF CURVATURE ALONG SAID AIRWAY BOULEVARD CENTERLINE; THENCE, SOUTH 28°21'08" WEST, A DISTANCE OF 130.27 FEET TO THE POINT OF INTERSECTION OF SAID CENTERLINE AND THE PROJECTED NORTHERLY RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY 10 (1H-10); THENCE, ALONG SAID PROJECTED RIGHT-OF-WAY LINE OF 1H-10, SOUTH 61°38'52" EAST, A DISTANCE OF 60.00 FEET TO THE TRUE POINT OF BEGINNING; THENCE, ALONG THE EASTERLY RIGHT-OF-WAY LINE OF SAID AIRWAY BOULEVARD, NORTH 28°21'08" EAST A DISTANCE OF 19.00 FEET TO A POINT ON THE PROPOSED RIGHT-OF-WAY LINE OF 1H-10, SAID POINT IS ALSO A POINT OF CURVATURE; THENCE, 32.75 FEET ALONG THE ARC OF A CURVE TO THE LEFT, WHOSE CENTRAL ANGLE IS 37°07'07", WHOSE RADIUS IS 55.00 FEET AND WHOSE CHORD BEARS SOUTH 25°34'38" EAST, A DISTANCE OF 32.27 FEET TO A POINT OF TANGENCY; THENCE, ALONG SAID NORTHERLY EXISTING RIGHT-OF-WAY LINE OF SAID

INTERSTATE 10, NORTH 61°38'52" WEST, A DISTANCE OF 26.08 FEET TO THE TRUE POINT OF BEGINNING, CONTAINING AN AREA OF 0.0045 OF AN AREA (ACRE?) OF LAND, MORE OR LESS.

ALSO SAVE AND EXCEPT:

ALL THAT CERTAIN TRACT OF PARCEL OF LAND CONTAINING 706 SQUARE FEET LYING WITHIN THE CORPORATE LIMITS OF THE CITY OF EL PASO, EL PASO COUNTY, TEXAS, SAME BEING A PORTION OF TRACT 4H, BLOCK 2, OF THE ASCARATE GRANT AND BEING THAT SAME PARCEL OF LAND DESCRIBED IN A QUITCLAIM DEED FROM SHELL OIL COMPANY TO ROBERT H. HOY, JR., ET UX. OF RECORD IN VOLUME 2761, PAGE 1838, OF THE DEED RECORDS OF EL PASO COUNTY, TEXAS, AND ALSO BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS: BEGINNING AT A 1/2 INCH REBAR FOUND MARKING THE NORTH CENTER OF SAID TRACT 4H, SAME BEING THE WEST CORNER OF TRACT 4H2A, OF SAID BLOCK 2, AND BEING ON THE SOUTHEAST LINE OF LOT 1, BLOCK 4, OF THE INTERNATIONAL INDUSTRIAL CENTER, UNIT 1, AN ADDITION TO THE CITY OF EL PASO, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 18, PAGE 5, OF THE PLAT RECORDS OF EL PASO COUNTY, TEXAS; THENCE, SOUTH 59°39'10" EAST, WITH THE NORTHWEST LINE OF SAID TRACT 4H, SAME BEING THE SOUTHWEST LINE OF SAID TRACT 4H2A, A DISTANCE OF 38.76 FEET TO A CHAINLINK FENCE, SAME BEING ON THE SOUTH SIDE OF A CONCRETE DRAIN, AND BEING NORTH 56°39'10" WEST, 687.70 FEET, FROM A FOUND 1/2 INCH REBAR; THENCE, SOUTH 77°44'37" WEST, WITH THE SAID CHAINLINK FENCE AND ALONG THE SOUTH SIDE OF SAID CONCRETE DRAIN, SAME BEING THE SOUTH LINE OF SAID ROBERT H. HOY, JR., TRACT, A DISTANCE OF 50.92 FEET TO THE SOUTHEAST LINE OF SAID LOT 1, BLOCK 4, SAME BEING THE NORTHWEST LINE OF SAID TRACT 4H, AND BEING NORTH 28°21'26" EAST, 589.39 FEET FROM A FOUND ½ INCH REBAR; THENCE, NORTH 28°2126" EAST, WITH THE SOUTH EAST LINE OF SAID LOT 1, SAME BEING THE NORTHWEST LINE OF SAID TRACT 4H, A DISTANCE OF 36.56 FEET TO THE POINT OF BEGINNING AND CONTAINING 706 SQUARE FEET OF LAND.

ALSO SAVE AND EXCEPT:

LOT 1, BLOCK 1, HOWDY'S SUBDIVISION (CENTRAL) UNIT ONE, AN ADDITION TO THE CITY OF EL PASO, EL PASO COUNTY, TEXAS, ACCORDING TO THE RECORDED PLAT OF RECORD IN THE PLAT RECORDS OF EL PASO COUNTY, TEXAS.



*Exhibit A*

**BROCK & BUSTILLOS INC.**
CIVIL ENGINEERS    URBAN DESIGNERS    LAND SURVEYORS

ROMAN BUSTILLOS, P.E.
President
RANDY P. BROCK, P.E.
Executive Vice President
SERGIO J. ADAME, P.E.
Vice President - Engineering
AARON ALVARADO, R.P.L.S.
Vice President - Surveying
TBPE Reg. No. F-737
TBPLS Reg. No. 101314-00

## METES AND BOUNDS DESCRIPTION
### (HOY FAMILY PARCEL)

*A 2.6634 acres parcel of land situate within the corporate limits of the City of El Paso, El Paso County, Texas as a portion of Tract 4H, Block 2, Ascarate Grant, El Paso County, Texas and being more particularly described by metes and bounds as follows:*

*COMMENCING* at a 5/8-inch rebar found on the northerly right-of-way line of U.S. Interstate Highway No. 10 (300 feet wide) and the westerly boundary line of Young American Subdivision as filed in Volume 44, Page 35, El Paso County Plat Records, identical to the southeasterly corner of said Tract 4H, *WHENCE*, a chiseled "X" in concrete found for the east-southwesterly corner of said Tract 4H, identical to the southeasterly corner of Lot 1, Block 1, Howdy's Subdivision as filed in Volume 75, Page 34, El Paso County Plat Records, bears North 58°34'05" West, a distance of 740.25 feet; *THENCE*, leaving the northerly right-of-way line of said U.S. Interstate Highway No. 10 and following the westerly boundary line of said Young American Subdivision, North 32°50'26" East, a distance of 556.66 feet to an angle point; *THENCE*, continuing along the westerly boundary line of said Young American Subdivision, North 59°44'42" West, a distance of 31.47 feet to an angle point; *THENCE*, continuing along the westerly boundary line of said Young American Subdivision, North 32°45'26" East, a distance of 280.01 feet to a 1/2-inch rebar with survey cap No. "TX 6223" set for the *POINT OF BEGINNING* of the parcel herein described;

*THENCE*, leaving the westerly boundary line of said Young American Subdivision, North 53°41'38" West, a distance of 861.57 feet to a 1/2-inch rebar with survey cap No. "TX 6223" set for an angle point of the parcel herein described;

*THENCE*, South 31°30'31" West, a distance of 423.71 feet to a 1/2-inch rebar with survey cap No. "TX 6223" set for an angle point of the parcel herein described;

*THENCE*, North 58°29'29" West, a distance of 85.00 feet to a 1/2-inch rebar with survey cap No. "TX 6223" set for the southwesterly corner of the parcel herein described, identical to the easterly boundary line of International Industrial Center Unit 1 as filed in Volume 18, Page 5, El Paso County Plat Records;

*THENCE*, following the easterly boundary line of said International Industrial Center Subdivision, North 31°30'31" East, a distance of 479.19 feet to a chiseled "X" in concrete found for the west-northwesterly corner of the parcel herein described, identical to the southeast corner of Tract 4H3, Block 2, Ascarate Grant;

617 Executive Center Blvd.  •  El Paso, Texas 79902  •  P - (915) 542-4900  •  F - (915) 542-2867  •  www.brockbustillos.com

Page 2 of 2

*THENCE*, leaving the easterly boundary line of said International Industrial Center Unit 1 and following the southeast boundary line of said Tract 4H3, North 80°30'49" East, a distance of 51.14 feet to a PK Nail with shiner found for the east-northwesterly corner of the parcel herein described, identical to the northeast corner of said Tract 4H3;

*THENCE*, following the northerly boundary line of said Tract 4H, South 53°41'38" East, a distance of 909.99 feet to a chiseled "X" in concrete found on the westerly boundary line of said Young American Subdivision for the northeasterly corner of the parcel herein described, identical to the southeasterly corner of Lot 4, Block 1, Viscount Subdivision as filed in Volume 60, Page 33, El Paso County Plat Records;

*THENCE*, following the west boundary line of said Young American Subdivision, South 32°45'26" West, a distance of 85.00 feet to the *POINT OF BEGINNING*.

Said parcel containing 2.6634 acres (116,016.5 square feet), more or less, and being subject to all easements, restrictions or covenants of record.

*Aaron Alvarado, TX R.P.L.S. No.6223*
*Date: November 12, 2019*
*07173-001A4-HOY-DESC.doc*



# EXHIBIT "B"
## (PARCEL 2)

A portion of International Drive rights-of-way as shown on the recorded plat of International Industrial Center, being a replat of Lots 1-18, inclusive, Block 1, International Industrial Center Unit 1, eliminating access right-of-way road designated as Gateway Blvd. West and being a portion of Tract 4-A, Block 2 of survey 144, Juan and Jacinto Ascarate Grant El Paso County, Texas, all located in the City of El Paso, El Paso County, Texas and being more particularly described by metes and bounds as follows:

Beginning at the northeasterly boundary corner of the aforesaid replat;

Thence South 28°21'26" West along the easterly boundary line of the aforesaid replat a distance of 60.00 feet;

Thence North 61°38'34" West a distance of 11.40 feet;

Thence 36.97 feet along the arc of a curve to the left whose radius is 20.00 feet, whose interior angle is 105°54'11" and whose long chord bears South 65°22'52" West a distance of 31.93 feet (note curve does not become tangent);

Thence 90.54 feet along the easterly right-of-way line of Airway Blvd. and along the arc of a curve to the left whose radius is 800.15 feet, whose interior angle is 06°29'00" and whose chord bears North 09°12'48" East a distance of 90.49 feet;

Thence South 61°38'34" East a distance of 60.30 feet to the point of beginning and containing in all 3096.32 square feet or 0.071081 acres of land, more or less.

Doc# 20190091881
#Pages 12  #$5+Pages 1
11/27/2019 4:13:29 PM
Filed & Recorded in
Official Records of
El Paso County
Delia Briones
County Clerk
Fees $70.00

I hereby certify that this instrument was filed on the date and time stamped hereon by me and was duly recorded by document number in the Recording Division of Real Property in El Paso County.

EL PASO COUNTY, TEXAS



Being a 19.96 acre tract of land out of a portion of Tract 4A, now known as Tract 4H, Block 2, Ascarate Grant, El Paso County, Texas, more particularly described by metes and bounds in **Exhibit "A"**, save and except **Exhibit "A-1"**, both attached hereto and made a part hereof for all purposes; and

Parcel 1:  Lot 2, Block 4, INTERNATIONAL INDUSTRIAL CENTER UNIT 1, an Addition to the City of El Paso, El Paso County, Texas, according to the plat thereof recorded in Volume 18, Page 5, Plat Records of El Paso County, Texas; and

Parcel 2:  A parcel of land which was originally owned as a portion of Lot 3, Block 4, INTERNATIONAL INDUSTRIAL CENTER UNIT 1, an Addition to the City of El Paso, El Paso County, Texas, according to the plat thereof recorded in Volume 18, Page 5, Plat Records of El Paso County, Texas, a subsequently re-platted as a portion of International Drive, according to the certain re-plat filed in Volume 18, Page 54, Plat Records, El Paso County, Texas, and vacated by the City of El Paso by Ordinance Number 7479, dated 04/20/1991, said parcel being more particularly described by metes and bounds in **Exhibit "B"** attached hereto and made a part hereof for all purposes.

## Exhibit "A"
## Legal Description

BEING A 19.96 ACRE TRACT OF LAND OUT OF A PORTION OF TRACT 4A, NOW KNOWN AS TRACT 4H, BLOCK 2, ASCARATE GRANT, EL PASO COUNTY, TEXAS BEING THE SAME TRACT DESCRIBED IN A DOCUMENT TO MAGELLAN PIPELINE TERMINALS, L.P. ACCORDING TO THE DOCUMENT RECORDED IN DOCUMENT NUMBER 20070077714, OFFICIAL PUBLIC RECORDS EL PASO COUNTY, TEXAS (SEE BELOW "RECORD LEGAL DESCRIPTION") AND BEING COMPRISED ENTIRELY OF A 15.69 ACRE TRACT DEPICTED HEREON AS PARCEL A AND A 4.27 ACRE TRACT DEPICTED HEREON AS PARCEL B AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A FOUND 5/8-INCH IRON ROD (N:10661485.99, E:416533.47) FOR THE SOUTH CORNER OF SAID TRACT, FROM WHICH THE FOUND CITY MONUMENT NUMBER 1033 BEARS N 51°16'26" W, A DISTANCE OF 1031.01 FEET;

THENCE N 55°34'05" W, A DISTANCE OF 740.25 FEET ALONG THE SOUTHWEST LINE OF SAID MAGELLAN TRACT, TO A FOUND "X" CHISELED IN CONCRETE FOR THE MOST SOUTHERLY WEST CORNER OF SAID TRACT;

THENCE N 31°29'49" E, A DISTANCE OF 215.04 FEET ALONG THE NORTHWEST LINE OF SAID MAGELLAN TRACT, TO A SET "X" CHISELED IN ASPHALT FOR AN INTERIOR CORNER OF THIS TRACT COMMON TO THE EAST CORNER OF A LOT 1, BLOCK 1, HOWDY'S SUBDIVISION (CENTRAL) UNIT ONE, EL PASO COUNTY, AS RECORDED IN VOLUME 75, PAGE 34, PLAT RECORDS EL PASO COUNTY, TEXAS;

THENCE N 55°30'13" W, A DISTANCE OF 215.65 FEET ALONG THE SOUTHWEST LINE OF SAID MAGELLAN TRACT COMMON TO THE NORTHEAST LINE OF SAID LOT ONE TO A SET 1/2-INCH IRON ROD WITH CAP MARKED "GATEWAY MIDLAND" FOR THE MOST NORTHERLY WEST CORNER OF SAID TRACT;

THENCE N 31°30'31" E, A DISTANCE OF 749.54 FEET ALONG THE NORTHWEST LINE OF SAID MAGELLAN TRACT COMMON TO THE SOUTHEAST LINE OF THE INTERNATIONAL INDUSTRIAL CENTER, UNIT 1 SUBDIVISION AS RECORDED IN VOLUME 18, PAGE 5, PLAT RECORDS, EL PASO COUNTY, TEXAS TO A SET CHISELED "X" FOR THE MOST WESTERLY NORTH CORNER OF SAID TRACT;

THENCE N 80°43'21" E, A DISTANCE OF 50.99 FEET ALONG THE NORTH LINE OF SAID MAGELLAN TRACT COMMON TO THE SOUTH LINE OF A TRACT TO HOY FAMILY LIMITED PARTNERSHIP, ACCORDING TO THE DOCUMENT RECORDED IN DOCUMENT NUMBER 20060054513, OFFICIAL PUBLIC RECORDS, EL PASO COUNTY, TEXAS TO A FOUND PK NAIL WITH SPINNER FOR THE MOST EASTERLY NORTH CORNER OF SAID TRACT;

THENCE S 53°41'36" E, A DISTANCE OF 909.99 FEET ALONG THE NORTHEAST LINE OF SAID MAGELLAN TRACT, COMMON TO THE SOUTHWEST LINE OF VISCOUNT SUBDIVISION AS RECORDED IN VOLUME 60, PAGE 33, PLAT RECORDS EL PASO COUNTY, TEXAS TO A FOUND CHISELED "X" FOR THE MOST NORTHERLY EAST CORNER OF SAID MAGELLAN TRACT;

THENCE S 32°45'25" W, A DISTANCE OF 365.01 FEET ALONG THE SOUTHEAST LINE OF SAID MAGELLAN TRACT TO A FOUND 5/8-INCH IRON ROD FOR AN INTERIOR CORNER OF SAID MAGELLAN TRACT;

THENCE S 59°44'42" E, A DISTANCE OF 31.47 FEET ALONG THE NORTHEAST LINE OF SAID MAGELLAN TRACT TO A SET 1/2-INCH IRON ROD WITH CAP MARKED "GATEWAY MIDLAND" FOR AN EXTERIOR CORNER OF SAID TRACT;

THENCE S 32°50'25" W, A DISTANCE OF 556.56 FEET TO THE POINT OF BEGINNING AND CONTAINING 19.96 ACRES OF LAND.

AND MORE PARTICULARLY DESCRIBED IN RECORD DESCRIPTION PER INSTRUMENT NUMBER 20070077714, OFFICIAL PUBLIC RECORDS EL PASO COUNTY, TEXAS:

A PARCEL OF LAND LYING IN AND BEING A PORTION OF TRACT 4A, BLOCK 2, ASCARATE GRANT, EL PASO COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT AN X CHISELED IN A CONCRETE CURB. SAID POINT BEING THE INTERSECTION OF THE EAST RIGHT-OF-WAY LINE OF AIRWAY BLVD. AND THE NORTH RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY 10, AND ALSO BEING THE POINT OF BEGINNING OF THE PARCEL BEING DESCRIBED: THENCE NORTH 28°21'26" EAST A DISTANCE OF 130.27 FEET TO A POINT; THENCE FOLLOWING A CURVE TO THE LEFT ALONG THE EASTERLY RIGHT-OF-WAY LINE OF AIRWAY BLVD. AN ARC DISTANCE OF 222.00 FEET TO A POINT, THE CENTRAL ANGLE OF SAID CURVE BEING 15°54'11", ITS RADIUS BEING 800.15 FEET, AND THE LONG CHORD BEARING NORTH 20°24'21" EAST A DISTANCE OF 221.38 FEET; THENCE FOLLOWING A CURVE TO THE RIGHT AN ARC DISTANCE OF 36.97 FEET TO A POINT, THE CENTRAL ANGLE OF SAID CURVE BEING 105°54'40", ITS RADIUS BEING 20.00 FEET, AND THE LONG CHORD BEARING NORTH 65°24'35" EAST A DISTANCE OF 31.93 FEET; THENCE SOUTH 61°38'34" EAST A DISTANCE OF 11.40 FEET TO A POINT; THENCE NORTH 28°21'26" EAST A DISTANCE OF 826.18 FEET TO A CONCRETE NAIL WITH A DISC; THENCE SOUTH 58°48'44" EAST A DISTANCE OF 948.90 FEET TO A 5/8 INCH DIAMETER IRON REBAR; THENCE 29°22'10" WEST A DISTANCE OF 364.09 FEET TO A 5/8 INCH DIAMETER IRON REBAR; THENCE SOUTH 62°38'50" EAST A DISTANCE OF 31.47 FEET TO A 5/8 INCH IRON REBAR; THENCE SOUTH 29°55'26" WEST A DISTANCE OF 558.00 FEET TO A 5/8 INCH DIAMETER IRON REBAR LYING IN THE NORTHERLY RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY 10; THENCE NORTH 61°38'34" WEST ALONG SAID NORTHERLY RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY 10 DISTANCE OF 955.31 FEET TO THE POINT OF BEGINNING OF THE PARCEL BEING DESCRIBED AND CONTAINING 920,338.530 SQUARE FEET OR 21.129 ACRES OF LAND MORE OR LESS.

SAVE AND EXCEPT:

BEING 0.0045 OF AN ACRE OF LAND, (195.27 SQUARE FEET) MORE OR LESS, OUT OF AND A PART OF TRACT 4H, BLOCK 2, ASCARATE GRANT, CITY OF EL PASO, EL PASO COUNTY, TEXAS, SAID 0.0045 OF AN ACRE OF LAND BEING DESCRIBED BY METES AND BOUNDS AS FOLLOWS, TO-WIT: COMMENCING AT A POINT WHICH IS A CITY MONUMENT AND LOCATED AT THE CENTERLINE OF AIRWAY BOULEVARD, SAID POINT IS ALSO THE POINT OF CURVATURE ALONG SAID AIRWAY BOULEVARD CENTERLINE; THENCE, SOUTH 28°21'08" WEST, A DISTANCE OF 130.27 FEET TO THE POINT OF INTERSECTION OF SAID CENTERLINE AND THE PROJECTED NORTHERLY RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY 10 (1H-10); THENCE, ALONG SAID PROJECTED RIGHT-OF-WAY LINE OF 1H-10, SOUTH 61°38'52" EAST, A DISTANCE OF 80.00 FEET TO THE TRUE POINT OF BEGINNING; THENCE, ALONG THE EASTERLY RIGHT-OF-WAY LINE OF SAID AIRWAY BOULEVARD, NORTH 28°21'08" EAST A DISTANCE OF 19.00 FEET TO A POINT ON THE PROPOSED RIGHT-OF-WAY LINE OF 1H-10, SAID POINT IS ALSO A POINT OF CURVATURE; THENCE, 32.75 FEET ALONG THE ARC OF A CURVE TO THE LEFT, WHOSE CENTRAL ANGLE IS 37°07'07", WHOSE RADIUS IS 55.00 FEET AND WHOSE CHORD BEARS SOUTH 25°34'35" EAST, A DISTANCE OF 32.27 FEET TO A POINT OF TANGENCY; THENCE, ALONG SAID NORTHERLY EXISTING RIGHT-OF-WAY LINE OF SAID

INTERSTATE 10, NORTH 61°39'52" WEST, A DISTANCE OF 26.08 FEET TO THE TRUE POINT OF BEGINNING, CONTAINING AN AREA OF 0.0045 OF AN AREA (ACRE?) OF LAND, MORE OR LESS.

ALSO SAVE AND EXCEPT:

ALL THAT CERTAIN TRACT OF PARCEL OF LAND CONTAINING 706 SQUARE FEET LYING WITHIN THE CORPORATE LIMITS OF THE CITY OF EL PASO, EL PASO COUNTY, TEXAS, SAME BEING A PORTION OF TRACT 4H, BLOCK 2, OF THE ASCARATE GRANT AND BEING THAT SAME PARCEL OF LAND DESCRIBED IN A QUITCLAIM DEED FROM SHELL OIL COMPANY TO ROBERT H. HOY, JR., ET UX. OF RECORD IN VOLUME 2761, PAGE 1856, OF THE DEED RECORDS OF EL PASO COUNTY, TEXAS, AND ALSO BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS: BEGINNING AT A 1/2 INCH REBAR FOUND MARKING THE NORTH CENTER OF SAID TRACT 4H, SAME BEING THE WEST CORNER OF TRACT 4H2A, OF SAID BLOCK 2, AND BEING ON THE SOUTHEAST LINE OF LOT 1, BLOCK 4, OF THE INTERNATIONAL INDUSTRIAL CENTER, UNIT 1, AN ADDITION TO THE CITY OF EL PASO, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 18, PAGE 5, OF THE PLAT RECORDS OF EL PASO COUNTY, TEXAS; THENCE, SOUTH 59°39'10" EAST, WITH THE NORTHWEST LINE OF SAID TRACT 4H, SAME BEING THE SOUTHWEST LINE OF SAID TRACT 4H2A, A DISTANCE OF 35.76 FEET TO A CHAINLINK FENCE, SAME BEING ON THE SOUTH SIDE OF A CONCRETE DRAIN, AND BEING NORTH 56°39'10" WEST, 667.70 FEET, FROM A FOUND 1/2 INCH REBAR; THENCE, SOUTH 77°44'37" WEST, WITH THE SAID CHAINLINK FENCE AND ALONG THE SOUTH SIDE OF SAID CONCRETE DRAIN, SAME BEING THE SOUTH LINE OF SAID ROBERT H. HOY, JR., TRACT, A DISTANCE OF 50.92 FEET TO THE SOUTHEAST LINE OF SAID LOT 1, BLOCK 4, SAME BEING THE NORTHWEST LINE OF SAID TRACT 4H, AND BEING NORTH 28°21'25" EAST, 589.39 FEET FROM A FOUND 1/2 INCH REBAR; THENCE, NORTH 28°21'26" EAST, WITH THE SOUTH EAST LINE OF SAID LOT 1, SAME BEING THE NORTHWEST LINE OF SAID TRACT 4H, A DISTANCE OF 38.56 FEET TO THE POINT OF BEGINNING AND CONTAINING 706 SQUARE FEET OF LAND.

ALSO SAVE AND EXCEPT:

LOT 1, BLOCK 1, HOWDY'S SUBDIVISION (CENTRAL) UNIT ONE, AN ADDITION TO THE CITY OF EL PASO, EL PASO COUNTY, TEXAS, ACCORDING TO THE RECORDED PLAT OF RECORD IN THE PLAT RECORDS OF EL PASO COUNTY, TEXAS.

ALSO SAVE AND EXCEPT:

# Exhibit A-1



## BROCK & BUSTILLOS INC.
CIVIL ENGINEERS    URBAN DESIGNERS    LAND SURVEYORS

ROMAN BUSTILLOS, P.E.
President
RANDY P. BROCK, P.E.
Executive Vice President
SERGIO J. ADAMS, P.E.
Vice President - Engineering
AARON ALVARADO, R.P.L.S.
Vice President - Surveying
TBPE Reg. No. F-737
TBPLS Reg. No. 101314-00

### METES AND BOUNDS DESCRIPTION
### (HOY FAMILY PARCEL)

*A 2.6634 acres parcel of land situate within the corporate limits of the City of El Paso, El Paso County, Texas as a portion of Tract 4H, Block 2, Ascarate Grant, El Paso County, Texas and being more particularly described by metes and bounds as follows:*

*COMMENCING* at a 5/8-inch rebar found on the northerly right-of-way line of U.S. Interstate Highway No. 10 (300 feet wide) and the westerly boundary line of Young American Subdivision as filed in Volume 44, Page 35, El Paso County Plat Records, identical to the southeasterly corner of said Tract 4H, *WHENCE*, a chiseled "X" in concrete found for the east-southwesterly corner of said Tract 4H, identical to the southeasterly corner of Lot 1, Block 1, Howdy's Subdivision as filed in Volume 75, Page 34, El Paso County Plat Records, bears North 58°34'05" West, a distance of 740.25 feet; *THENCE*, leaving the northerly right-of-way line of said U.S. Interstate Highway No. 10 and following the westerly boundary line of said Young American Subdivision, North 32°50'26" East, a distance of 556.66 feet to an angle point; *THENCE*, continuing along the westerly boundary line of said Young American Subdivision, North 59°44'42" West, a distance of 31.47 feet to an angle point; *THENCE*, continuing along the westerly boundary line of said Young American Subdivision, North 32°45'26" East, a distance of 280.01 feet to a 1/2-inch rebar with survey cap No. "TX 6223" set for the *POINT OF BEGINNING* of the parcel herein described;

*THENCE*, leaving the westerly boundary line of said Young American Subdivision, North 53°41'38" West, a distance of 861.57 feet to a 1/2-inch rebar with survey cap No. "TX 6223" set for an angle point of the parcel herein described;

*THENCE*, South 31°30'31" West, a distance of 423.71 feet to a 1/2-inch rebar with survey cap No. "TX 6223" set for an angle point of the parcel herein described;

*THENCE*, North 58°29'29" West, a distance of 85.00 feet to a 1/2-inch rebar with survey cap No. "TX 6223" set for the southwesterly corner of the parcel herein described, identical to the easterly boundary line of International Industrial Center Unit 1 as filed in Volume 18, Page 5, El Paso County Plat Records;

*THENCE*, following the easterly boundary line of said International Industrial Center Subdivision, North 31°30'31" East, a distance of 479.19 feet to a chiseled "X" in concrete found for the west-northwesterly corner of the parcel herein described, identical to the southeast corner of Tract 4H3, Block 2, Ascarate Grant;

417 Executive Center Blvd. • El Paso, Texas 79902 • P - (915) 542-4900 • F - (915) 542-2867 • www.brockbustillos.com

"EXHIBIT A-1"

*THENCE*, leaving the easterly boundary line of said International Industrial Center Unit 1 and following the southeast boundary line of said Tract 4H3, North 80°30'49" East, a distance of 51.14 feet to a PK Nail with shiner found for the east-northwesterly corner of the parcel herein described, identical to the northeast corner of said Tract 4H3;

*THENCE*, following the northerly boundary line of said Tract 4H, South 53°41'38" East, a distance of 909.99 feet to a chiseled "X" in concrete found on the westerly boundary line of said Young American Subdivision for the northeasterly corner of the parcel herein described, identical to the southeasterly corner of Lot 4, Block 1, Viscount Subdivision as filed in Volume 60, Page 33, El Paso County Plat Records;

*THENCE*, following the west boundary line of said Young American Subdivision, South 32°45'26" West, a distance of 85.00 feet to the *POINT OF BEGINNING*.

Said parcel containing 2,6634 acres (116,016.5 square feet), more or less, and being subject to all easements, restrictions or covenants of record.

*Aaron Alvarado, TX R.P.L.S. No.6223*
*Date: November 12, 2019*
*07173-001A4-HOY-DBSC.doc*



# EXHIBIT A -1

# EXHIBIT "B"
## (PARCEL 2)

A portion of International Drive rights-of-way as shown on the recorded plat of International Industrial Center, being a replat of Lots 1-18, inclusive, Block 1, International Industrial Center Unit 1, eliminating access right-of-way road designated as Gateway Blvd. West and being a portion of Tract 4-A, Block 2 of survey 144, Juan and Jacinto Ascarate Grant El Paso County, Texas, all located in the City of El Paso, El Paso County, Texas and being more particularly described by metes and bounds as follows:

Beginning at the northeasterly boundary corner of the aforesaid replat;

Thence South 28°21'26" West along the easterly boundary line of the aforesaid replat a distance of 60.00 feet;

Thence North 61°38'34" West a distance of 11.40 feet;

Thence 36.97 feet along the arc of a curve to the left whose radius is 20.00 feet, whose interior angle is 105°54'11" and whose long chord bears South 65°22'52" West a distance of 31.93 feet (note curve does not become tangent);

Thence 90.54 feet along the easterly right-of-way line of Airway Blvd. and along the arc of a curve to the left whose radius is 800.15 feet, whose interior angle is 06°29'00" and whose chord bears North 09°12'48" East a distance of 90.49 feet;

Thence South 61°38'34" East a distance of 60.30 feet to the point of beginning and containing in all 3096.32 square feet or 0.071081 acres of land, more or less.



**EXHIBIT**

**5**

✚ Positive
As of: April 27, 2021 3:24 PM Z

## *In re Ferris Props.*

United States Bankruptcy Court for the District of Delaware

July 30, 2015, Decided

Chapter 11, Case No. 14-10491 Jointly Administered

**Reporter**
2015 Bankr. LEXIS 2554 *; 2015 WL 4600248

*In re: FERRIS* PROPERTIES, INC., et al., Debtors.

## Core Terms

Properties, monition, satisfaction, argues, liens, delinquent taxes, free and clear, partition sale, confirmed, legal proceedings

## Case Summary

### Overview

HOLDINGS: [1]-Debtors could not use either *11 U.S.C.S. § 724(b)* or *11 U.S.C.S. § 1129(b)* to support a sale free and clear of the lienholder's liens under *11 U.S.C.S. § 363(f)(5)*, which allowed a debtor to sell property of the estate free and clear of liens of an entity if that entity "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest"; [2]-The possibility of a monition sale of some of the Properties did not support a sale free and clear of the liens; [3]-Debtors and the offeror could not rely on a partition theory to support a sale of the Properties free and clear of the liens; [4]-Because neither of the properties on which the lienholder erroneously claimed to hold a mortgage was the subject of the Sale Motion, the error did not significantly affect debtors' (or offeror's) rights. The sale could not be confirmed under *§ 363(f)(2)*.

### Outcome

Debtors' Motion for an Order Approving the Sale of the Properties was denied.

## LexisNexis® Headnotes

Bankruptcy Law > ... > Administrative Powers > Estate Property Lease, Sale & Use > Sales Free of Interest

Evidence > Burdens of Proof > General Overview

*HN1*[⬇] **Estate Property Lease, Sale & Use, Sales Free of Interest**

*11 U.S.C.S. § 363(f)(5)* allows a debtor to sell property of the estate free and clear of liens, claims, and encumbrances of an entity if that entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. *11 U.S.C.S. § 363(f)(5)*. When the sales price offered is insufficient to pay the creditor in full, the sale proponents must prove the existence of a legal or equitable proceeding that could compel it to accept a money satisfaction of its interest in the properties to be sold. Furthermore, the sale proponents must do more than show that it is theoretically possible to compel a creditor to accept a

In re Ferris Props.

money satisfaction under *§ 363(f)(5)*. Debtors must demonstrate how satisfaction of the lien could be compelled.

Bankruptcy Law > Individuals With Regular Income > Plans > Cramdowns

Bankruptcy Law > ... > Administrative Powers > Estate Property Lease, Sale & Use > Sales Free of Interest

*HN2*[⬇] **Plans, Cramdowns**

A court has held that *11 U.S.C.S. § 1129(b)* cramdown can be used to satisfy *11 U.S.C.S. § 363(f)(5)*, but required the debtor to demonstrate how the creditor could be crammed down.

Tax Law > ... > Real Property Taxes > Collection of Tax > Tax Deeds & Tax Sales

*HN3*[⬇] **Collection of Tax, Tax Deeds & Tax Sales**

In a monition sale, property with delinquent taxes is sold, free and clear of other liens and encumbrances, to pay the back taxes. A monition sale prioritizes the payment of delinquent taxes over other liens. *Del. Code Ann. tit. 9, § 8727.*

Tax Law > ... > Real Property Taxes > Collection of Tax > Tax Deeds & Tax Sales

*HN4*[⬇] **Collection of Tax, Tax Deeds & Tax Sales**

The purpose of the monition sale process is either to sell real property to pay its delinquent taxes or to allow any person who has an interest in the property to cure those delinquent taxes. A monition sale under Delaware law begins when the taxing authority asks the Superior court to issue a Writ of Monition. *Del. Code Ann. tit. 9, § 8722.* The Writ of Monition serves as notice to the public that the property has been seized and warns that it will be sold at a public sale unless the taxes are paid. Monition sales must be confirmed by the Superior Court of Delaware. Del. Super. Ct. R. Civ. P. 69(d). Prior to confirmation, the Superior Court may void the monition sale if "any person having an interest" in the property pays the delinquent taxes. Wilmington, Del., Code § 4-147; also *Del. Code Ann. tit. 9, § 8732.* Even if the

Superior Court confirms a monition sale, anyone who has an interest or lien on the property may still redeem the property within one year of confirmation by paying the monition sale purchase price plus fifteen percent. *Del. Code Ann. tit. 9, § 8760.*

Real Property Law > Estates > Transfers > Partition Actions

*HN5*[⬇] **Transfers, Partition Actions**

In a partition sale, property held by two or more joint tenants or tenants in common is sold free and clear of all ownership interests in the property. *Del. Code Ann. tit. 25, § 732.* Partition sales are legal proceedings that can compel co-owners to accept a money satisfaction of their interest. Debtors must demonstrate how satisfaction of the lien "could be compelled."

Bankruptcy Law > ... > Administrative Powers > Estate Property Lease, Sale & Use > Sales Free of Interest

*HN6*[⬇] **Estate Property Lease, Sale & Use, Sales Free of Interest**

*11 U.S.C.S. § 363(f)(2)* provides that a debtor may sell property of the estate free and clear of liens, claims, and encumbrances of an entity if that entity consents to the sale.

Bankruptcy Law > Procedural Matters > General Overview

Civil Procedure > Judgments > General Overview

*HN7*[⬇] **Bankruptcy Law, Procedural Matters**

Pursuant to *Fed. R. Bankr. P. 9005*, which applies *Fed. R. Civ. P. 61*, the court must disregard all errors and defects that do not affect any party's substantial rights. *Fed. R. Civ. P. 61.* Error must rise above threshold of "harmless error".

**Counsel:** [*1] For Ferris Properties, Inc., Debtor: Shannon J. Dougherty, David M. Klauder, O'Kelly Ernst

In re Ferris Props.

& Bielli, LLC, Wilmington, DE.

For United States Trustee, U.S. Trustee: David L. Buchbinder, Office of the U.S. Trustee, Wilmington, DE.

**Judges:** Mary F. Walrath, United States Bankruptcy Judge.

**Opinion by:** Mary F. Walrath

# Opinion

## MEMORANDUM OPINION[1]

This opinion addresses the Motion of Ferris Properties, Inc., and Lexell, LLC (collectively, the "Debtors") for an Order approving the sale of eleven properties free and clear of liens and encumbrances pursuant to *sections 363(f) (2)* and *363(f) (5) of the Bankruptcy Code* (the "Sale Motion"). Wells Fargo Bank, NA ("Wells Fargo") objects to the Sale Motion. Because the Court finds that Wells Fargo could not be compelled to accept a money satisfaction of its interests in the Debtors' properties and did not consent to the sale, it will deny the Sale Motion.

### I . BACKGROUND

The Debtors leased and managed forty-eight parcels of real estate in Wilmington and Elsmere, Delaware. (D.I. 214.) On March 6, 2014, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy **[*2]** Code. (D.I. 1.)

Pursuant to this Court's order of September 11, 2014, approving procedures for the sale and auction of the Debtors' properties, the Debtors began marketing their properties to potential buyers. (D.I. 150.) One-Pie Investments, LLC ("One-Pie") purchased four of the

---

[1] This Memorandum Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to *Rule 7052 of the Federal Rules of Bankruptcy Procedure*, which is made applicable to contested matters by *Rule 9014 of the Federal Rules of Bankruptcy Procedure*.

Debtors' properties at auction and twenty-two others pursuant to a bulk sale agreement. There was no objection to either sale and the Court confirmed the sales on October 23, 2014, and January 20, 2015, respectively. (D.I. 164, 165, 167, 169 & 195.)

On March 30, 2015, the Debtors received another bulk sale of fer from One-Pie for eleven of their remaining properties (the "Properties") at a proposed purchase price of $240,000. (D.I. 214.) On May 13, 2015, the Debtors filed the Sale Motion seeking approval of the sale to One-Pie. (Id.) On May 29, 2015, Wells Fargo, which holds mortgages on each of the Properties, filed an objection to the Sale Motion, because the sale proceeds are less than it is owed on the Properties. (D.I. 220.) On June 3, 2015, a hearing was held, at which the Court took the matter under advisement and requested supplemental briefing.

On June 9, 2015, One-Pie filed a letter memorandum in support **[*3]** of the Sale Motion. (D.I. 226.) On June 16, 2015, Wells Fargo filed a response maintaining its objection to the Sale Motion. (D.I. 228.) Briefing is complete and the matter is now ripe for decision.

### II. JURISDICTION

The Court has jurisdiction over this core matter pursuant to *28 U.S.C. §§ 1334* & *157 (b) (2) (A)*, *(N)* & *(O)*.

### III. DISCUSSION

One-Pie argues that the proposed sale is proper under *section 363(f) (5) of the Bankruptcy Code* because Wells Fargo could be compelled to accept a money satisfaction of its interests in the Properties under *section 1129(b) (2) (A)* or *section 724(b) of the Bankruptcy Code*, or under state law through a monition sale or a partition sale.

One-Pie further argues that a sale is proper under *section 363(f) (2)* because Wells Fargo did not properly object to the Sale Motion and must be deemed to have consented to it.

Wells Fargo argues that the Sale Motion should be denied because it could not be compelled to accept a money satisfaction of its interests in the Properties under any of the legal proceedings cited by the Debtors and because it did not consent to the sale.

### A. *Section 363(f) (5)*

**HN1**[⬆] *Section 363(f) (5)* allows a debtor to sell property of the estate free and clear of liens, claims, and

In re Ferris Props.

encumbrances of an entity if that entity "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." *11 U.S.C. § 363 (f) (5)*.

Because the sales [*4] price offered by One-Pie is insufficient to pay Wells Fargo in full, the sale proponents must prove the existence of a legal or equitable proceeding that could compel it to accept a money satisfaction of its interest in the properties to be sold. *In re PW, LLC, 391 B.R. 25, 45 (B.A.P. 9th Cir. 2008)*. Furthermore, the sale proponents must do more than show that it is theoretically possible to compel a creditor to accept a money satisfaction under *section 363(f) (5)*. Id. (holding that debtors "must demonstrate how satisfaction of the lien 'could be compelled.'"). See also *In re Haskell, L.P., 321 B.R. 1, 8-9 (Bankr. D. Mass. 2005)* (rejecting the argument that debtors need only show that it is theoretically possible to compel a party under *§ 363(f) (5)*); *In re Terrace Chalet Apartments, Ltd., 159 B.R. 821, 827 (N.D. Ill. 1993)* (requiring debtor to demonstrate how a creditor could be compelled to accept satisfaction of its interest by *§ 1129(b)* "cramdown").

1. *Sections 724(b)* and *1129(b) (2) (A)*

One-Pie argues that Wells Fargo could be compelled to accept a money satisfaction of its liens in the Properties under either *section 724(b)* or *1129(b) (2) (A)*. See *In re Grand Slam U.S.A., Inc., 178 B.R. 460, 463 (E.D. Mich. 1995)* (stating that both *§ 724(b) (2)* and *§ 1129(b) (2) (A)* are proceedings by which a creditor could be compelled to accept a money satisfaction of its interest within the meaning of *§ 363(f) (5)*).

With respect to *section 724(b) (2)*, the Court finds the *Grand Slam* case distinguishable. There, the Court found that *section 724(b)*, which subordinates certain tax liens to administrative expenses, [*5] could support a sale under *section 363(f) (5)* which did not pay the tax lienor in full. In this case, Wells Fargo is not a tax lien creditor; it is a first lien mortgagor. Therefore, *section 724(b)* is not a proceeding under which Wells Fargo's interest could be subordinated or under which it could be compelled to accept a money satisfaction which is less than its claim.

With respect to *section 1129(b) (2)*, courts disagree as to whether it is a legal proceeding by which a sale proponent could satisfy *section 363(f) (5)*. Compare *Terrace Chalet Apartments, 159 B.R. at 829* (finding that cramdowns are legal proceedings within the

meaning of *§ 363(f) (5)*), with *PW, LLC, 391 B.R. at 46* (holding that "the availability of cramdown under *§ 1129(b) (2)* is not a legal or equitable proceeding to which *§ 363(f) (5)* is applicable.").

Even if *section 1129(b) (2)* were a legal proceeding within the meaning of *section 363(f) (5)*, the Debtors and One-Pie have not demonstrated that they could cram down Wells Fargo under that section. See *Terrace Chalet Apartments, 159 B.R. at 830* ([HN2⬆] holding that a *§ 1129(b)* cramdown can be used to satisfy *§ 363(f) (5)*, but requiring debtor to demonstrate how creditor could be crammed down). To cram down Wells Fargo under *section 1129(b) (2)* the Debtors would have to demonstrate that (1) Wells Fargo is retaining its liens, (2) Wells Fargo is receiving deferred cash payments totaling at least the allowed amount of its claim, or (3) Wells Fargo is receiving the [*6] indubitable equivalent of its claim. *11 U.S.C. § 1129(b) (2) (A)*. The Debtors have not shown how they can satisfy any of these elements.

Therefore, the Court finds that the Debtors cannot use either *section 724(b)* or *1129(b)* to support a sale free and clear of Wells Fargo's liens under *section 363(f) (5)*.

2. Monition Sale

One-Pie also argues that Wells Fargo could be compelled to accept a money satisfaction of its interests in the Properties through a state court monition sale. [HN3⬆] In a monition sale, property with delinquent taxes is sold, free and clear of other liens and encumbrances, to pay the back taxes. A monition sale prioritizes the payment of delinquent taxes over other liens. See *Del. Code Ann. tit. 9, § 8727*. One-Pie asserts that because eight of the Properties are delinquent on water and sewage taxes, the county government could pursue a monition sale. One-Pie argues that the monition sale would then subordinate Wells Fargo's mortgage liens on the properties, thereby compelling it to accept a money satisfaction from any proceeds left after payment of the delinquent taxes.

Wells Fargo argues that it could not be compelled to accept a money satisfaction of its interests in the Properties through a monition sale for two reasons. First, Wells Fargo argues that it would receive [*7] notice of a potential monition sale and an opportunity to cure the delinquent taxes. Second, Wells Fargo argues that it could redeem the Properties if they were sold.

The Court agrees with Wells Fargo. [HN4⬆] The purpose of the monition sale process is either to sell real

In re Ferris Props.

property to pay its delinquent taxes or to allow any person who has an interest in the property to cure those delinquent taxes. *In re Tax Judgment, C.A. No. N10J-01-771, 2011 Del. Super. LEXIS 363, 2011 WL 3617207, at \*1 (Del. Super. Ct. Aug. 4, 2011)*.

A monition sale under Delaware law begins when the taxing authority asks the Superior court to issue a Writ of Monition. *Del. Code Ann. tit. 9, § 8722*. The Writ of Monition serves as notice to the public "that the property has been seized and warns that it will be sold at a public sale unless the taxes are paid." *Tax Judgment, 2011 Del. Super. LEXIS 363, 2011 WL 3617207, at \*1*. Monition sales must be confirmed by the Superior Court of Delaware. Del. Super. Ct. R. 69(d). Prior to confirmation, the Superior Court may void the monition sale if "any person having an interest" in the property pays the delinquent taxes. Wilmington, Del., Code § 4-147. See also *Del. Code Ann. tit. 9, § 8732*.

Furthermore, even if the Superior Court confirms a monition sale, anyone who has an interest or lien on the property may still redeem the property within one year of confirmation by paying the monition [\*8] sale purchase price plus fifteen percent. *Del. Code Ann. tit. 9, § 8760*.

Because Wells Fargo could avoid a monition sale by paying the delinquent taxes or could redeem the property if it were sold, the Court finds that it could not be compelled by a monition sale to accept a money satisfaction of its interests in the Properties. Therefore, the Court finds that the possibility of a monition sale of some of the Properties does not support a sale free and clear of Wells Fargo's liens under *section 363(f) (5)*.

3. Partition Sale

One-Pie also argues that Wells Fargo could be compelled to accept a money satisfaction of its interests in the Properties through a partition sale. Wells Fargo argues that a partition sale is inapplicable to the Properties.

*HN5*[↑] In a partition sale, property held by two or more joint tenants or tenants in common is sold free and clear of all ownership interests in the property. *Del. Code Ann. tit. 25, § 732*. While partition sales are legal proceedings that can compel co-owners to accept a money satisfaction of their interest, the Debtors have not shown that a partition sale would be applicable to these Properties. See *PW, LLC, 391 B.R. at 45* (debtors "must demonstrate how satisfaction of the lien 'could be compelled.'"). Wells Fargo is not a joint tenant or a tenant in [\*9] common in the Properties; it is a lien

holder. Therefore, the Court finds that the Debtors and One-Pie cannot rely on a partition theory to support a sale of the Properties free and clear of Wells Fargo's liens under *section 363(f) (5)*.

B. *Section 363(f) (2)*

*HN6*[↑] *Section 363(f) (2)* provides that a debtor may sell property of the estate free and clear of liens, claims, and encumbrances of an entity if that entity consents to the sale.

One-Pie argues that Wells Fargo never properly objected to the Sale Motion and, therefore, must be deemed to have consented. One-Pie notes that in its objection, Wells Fargo listed claims on thirteen properties, but the mortgages on two of those properties have been satisfied. (D.I. 226 at Ex. C.)

Wells Fargo maintains that these errors were immaterial and that it properly objected to the sale. (D.I. 228.)

The Court agrees with Wells Fargo. *HN7*[↑] Pursuant to *Rule 9005 of the Federal Rules of Bankruptcy Procedure*, which applies *Rule 61 of the Federal Rules of Civil Procedure*, "the court must disregard all errors and defects that do not affect any party's substantial rights." *Fed. R. Civ. P. 61*. Because neither of the properties on which Wells Fargo erroneously claimed to hold a mortgage is the subject of this Sale Motion, the error did not significantly affect the Debtors' (or One-Pie's) rights. See *Wallace v. Ener, 521 F.2d 215, 222 (5th Cir. 1975)* (error must rise above threshold of "harmless [\*10] error").

Moreover, Wells Fargo corrected the error at the sale hearing and in its letter response to One-Pie's memorandum in support of the Sale Motion. (D.I. 228.)

For these reasons, the Court finds that the error was not so significant as to void the objection and that Wells Fargo properly objected to the sale. Therefore, the Court finds that the sale cannot be confirmed under *section 363(f) (2)*.

IV. CONCLUSION

For the reasons set forth above, the Debtors' Motion for an Order Approving the Sale of the Properties will be denied.

An appropriate order is attached.

Dated: July 30, 2015

In re Ferris Props.

BY THE COURT:

/s/ Mary F. Walrath

Mary F. Walrath

United States Bankruptcy Judge


**ORDER**

**AND NOW**, this **30th** day of **JULY, 2015**, upon consideration of the Debtors' Sale Motion, and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the Debtors' Sale Motion is **DENIED**.

BY THE COURT:

/s/ Mary F. Walrath

Mary F. Walrath

United States Bankruptcy Judge

cc: Michelle Berkley-Ayres, Esquire[1]

---

End of Document

---

[1] Counsel shall distribute a copy of this Order and the accompanying Memorandum Opinion to all interested parties and file a Certificate of Service with the Court.

Clyde Pine