IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| THE GATEWAY VENTURES LLC, | § | Case No. 21-30071 |
| | § | |
| Debtor. | § | |
| | § | |

## NOTICE OF PROPOSED ASSUMPTION OF EXECUTORY CONTRACTS AND/OR LEASES UNDER PLAN SCHEDULING ORDER (RE: DOCKET NO. 123)

Pursuant to the *Order Granting Motion of Debtor to (I) Conditionally Approve Disclosure Statement In Support of Plan of Reorganization of The Gateway Ventures LLC Dated July 14, 2021 (II) Establish Plan Related Deadlines, and (III) Set Combined Disclosure Statement and Confirmation Hearing, and Notice of Deadlines and Hearing to Consider Disclosure Statement and Chapter 11 Plan, and Addressing Related Dates and Deadlines (Re: Docket Nos. 101, 102, 103)* (Docket No. 123) (the "Plan Scheduling Order"), regarding the proposed Disclosure Statement in Support of Plan of Reorganization of The Gateway Ventures LLC Dated July 14, 2021 (Docket No. 102) and the proposed *Plan of Reorganization of The Gateway Ventures LLC Dated July 14, 2021* (Docket No. 101), The Gateway Ventures, LLC  ("TGV" or the "Debtor"), Debtor and Debtor in Possession, provides notice of the executory contracts and/or leases that TGV proposes to assume in connection with the Plan.

1. *Retail Lease Agreement* between TGV and Spectrum Gulf Coast LLC (**Exhibit TGV306**, attached), as amended or to be amended (**Exhibit TGV307**, attached.

Debtor reserves the right to modify, amend, and/or supplement this list prior to the Confirmation Hearing (as defined in the Plan Scheduling Order).

Dated:  August 17, 2021

Respectfully submitted:

WEYCER, KAPLAN, PULASKI & ZUBER, P.C.

By:_____*/s/ Jeff Carruth*_____
JEFF CARRUTH (TX SBN:. 24001846)
3030 Matlock Rd., Suite 201
Arlington, Texas 76105
Telephone: (713) 341-1158
Fax: (866) 666-5322
E-mail:  jcarruth@wkpz.com

ATTORNEYS FOR
THE GATEWAY VENTURES LLC,
DEBTOR AND DEBTOR IN POSSESSION

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing was served on August 17, 2021 (1) by electronic notice to all ECF users who have appeared in this case to date (2) by regular mail to all parties appearing in the attached address list (i.e. mailing matrix) obtained from the Court's PACER facility, as set forth in the attached lists. **COPIES SERVED BY MAIL DID NOT INCLUDE THE EXHIBITS. EXHIBITS MAY BE OBTAINED BY CONTACTING THE UNDERSIGNED.**

*/s/ Jeff Carruth*
JEFF CARRUTH

**21-30071-hcm Notice will be electronically mailed to:**

Jeff Carruth on behalf of Debtor The Gateway Ventures, LLC
jcarruth@wkpz.com, jcarruth@aol.com;ATTY_CARRUTH@trustesolutions.com

Harrel L. Davis, III on behalf of Creditor Saleem Makani
hdavis@eplawyers.com, vrust@eplawyers.com;vpena@eplawyers.com

James Michael Feuille on behalf of Creditor Deepesh Shrestha
jfeu@scotthulse.com, tmar@scotthulse.com

Ryan Little on behalf of Interested Party Union Gateway, LLC
little@mgmsg.com, tsilva@mgmsg.com

Michael R. Nevarez on behalf of Creditor Saleem Makani
MNevarez@LawOfficesMRN.com, MRN4Bankruptcy@gmail.com

Clyde A. Pine, Jr. on behalf of Creditor HD Lending, LLC
pine@mgmsg.com, clyde.pine@gmail.com

James W Rose, Jr on behalf of U.S. Trustee United States Trustee - EP12
james.rose@usdoj.gov, brian.r.henault@usdoj.gov;carey.a.tompkins@usdoj.gov;Roxana.peterson@usdoj.gov

Donald P. Stecker on behalf of Creditor City Of El Paso
don.stecker@lgbs.com

United States Trustee - EP12
USTPRegion07.SN.ECF@usdoj.gov

Eric Charles Wood on behalf of Creditor Saleem Makani
eric@brownfoxlaw.com, tracy@brownfoxlaw.com

dip@legalist.com

Label Matrix for local noticing
0542-3
Case 21-30071-hcm
Western District of Texas
El Paso
Tue Jun 8 10:20:29 CDT 2021

The Gateway Ventures, LLC
c/o PDG Prestige, Inc.
780 N Resler Drive, Suite B
El Paso, TX 79912-7196

U.S. BANKRUPTCY COURT
511 E. San Antonio Ave., Rm. 444
EL PASO, TX 79901-2417

Ashish Nayyar
806 Rockport Lane
Allen, TX 75013

Ashish Nayyar
c/o James M. Feuille
ScottHulse PC
P.O. Box 99123
El Paso, TX 79999-9123

Ashish Nayyar, Rahim Noorani,
Deepesh Shrestha, and Umesh Shrestha
c/o James M. Feuille
201 E. Main Drive, Suite 1100
El Paso, TX 79901-1340

Border Demolition
Attn: Bonnie Solis
1004 Diesel Drive
El Paso, TX 79907-3100

City of El Paso
c/o Don Stecker
112 E. Pecan St. Suite 2200
San Antonio, TX 78205-1588

Comptroller of Public Accounts
C/O Office of the Attorney General
Bankruptcy - Collections Division MC-008
PO Box 12548
Austin TX 78711-2548

Deepesh Shrestha
c/o James M. Feuille
ScottHulse PC
P.O. Box 99123
El Paso, TX 79999-9123

Depcesh Shrestha
3708 N. White Chapel Blvd.
Southlake, TX 76092-2042

El Paso County Tax AC
301 Manny Martinez Dr., 1st Floor
El Paso, TX 79905-5503

HD Lending LLC
6080 Surety Dr. Ste 101
El Paso, TX 79905-2066

HD Lending LLC
c/o Stephen H. Nickey PC
1201 North Mesa Ste. B
El Paso, TX 79902-4000

HD Lending, LLC
c/o Clyde A. Pine, Jr.
Mounce Green Myers
P.O. Box 1977
El Paso, Texas 79999-1977

Internal Revenue Service
Special Procedures Staff - Insolvency
P. O. Box 7346
Philadelphia, PA 19101-7346

Michael Dixson
780 N. Resler Drive Suite B
El Paso, TX 79912-7196

PDG Prestige, Inc.
780 N. Resler Drive Suite B
El Paso, TX 79912-7196

Rahim Noorani
4312 Hopi Drive
Carrollton, TX 75010-1133

Rahim Noorani
c/o James M. Feuille
ScottHulse PC
P.O. Box 99123
El Paso, TX 79999-9123

Rahim Noorani, et al.
c/o Marty D. Price
2514 Boll St.
Dalals, TX 75204-2512

Saleem Makani
c/o Eric W. Wood
Brown Fox PLLC
5550 Granite Parkway, Suite 175
Plano, Texas 75024
Email: eric@brownfoxlaw.com 75024-3834

Saleem Makani
c/o Eric Wood (Brown Fox)
8111 Preston Rd. Ste 300
Dallas, TX 75225-6329

Spectrum Gulf Coast, LLC
c/o Thompson Coburn LLP, Attn: Brian Hoc
One U.S. Bank Plaza, Suite 2700
St. Louis, MO 63101-1616

Suhail Bawa
c/o Eric W. Wood
Brown Fox PLLC
5550 Granite Parkway, Suite 175
Plano, Texas 75024
Email: eric@brownfoxlaw.com 75024-3834

Suhail Bawa
c/o Eric Wood (Brown Fox)
8111 Preston Rd. Ste 300
Dallas, TX 75225-6329

Suresh Kumar
c/o Harrel Davis
PO Box 1322
El Paso, TX 79947-1322

Texas Attorney General
Environmental Protection Division
P.O. Box 12548
Austin, TX 78711-2548

(p)TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
ATTN BANKRUPTCY PROGRAM
P O BOX 13087
MC 132
AUSTIN TX 78711-3087

Umesh Shrestha
8505 Revenue Way
North Richland Hills, TX 76182-7431

Umesh Shrestha
c/o James M. Feuille
ScottHulse PC
P.O. Box 99123
El Paso, TX 79999-9123

Union Gateway, LLC
c/o Ryan Little
P. O. Drawer 1977
El Paso, Texas 79999-1977

United States Trustee - EP12
U.S. Trustee's Office
615 E. Houston, Suite 533
P.O. Box 1539
San Antonio, TX 78295-1539

Westar Investor Group LLC
c/o Eric Wood (Brown Fox)
8111 Preston Rd. Ste 300
Dallas, TX 75225-6329

Westar Investors Group LLC
c/o Michael R. Nevarez (Local Counsel)
The Nevarez Law Firm, P.C.
P.O. Box 12247
El Paso, TX 79913-0247

Westar Investors Group, LLC
c/o Eric W. Wood
Brown Fox PLLC
5550 Granite Parkway, Suite 175
Plano, Texas 75024
Email: eric@brownfoxlaw.com  75024-3834

Jeff Carruth
Weycer Kaplan Pulaski & Zuber, P.C.
24 Greenway Plaza, #2050
Houston, TX 77046-2445

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Texas Commission on Environmental Qualit
Reg. 6 Office Compliance Enforcement
401 E Franklin Ave, Suite 560
El Paso, TX 79901-1212

End of Label Matrix
Mailable recipients    36
Bypassed recipients     0
Total                  36

File ID No.: TX0238

## RETAIL LEASE AGREEMENT

**EXHIBIT TGV306**

  This Retail Lease Agreement (this "**Lease**") is entered into by Landlord and Tenant (as defined in Section 1.1 below), effective as of the ⟨13th⟩ day of August, 2020 (the "**Effective Date**"). Landlord and Tenant agree:

### ARTICLE 1 -- BASIC LEASE INFORMATION

  1.1 <u>Basic Lease Information</u>.  In addition to the terms that are defined elsewhere in this Lease, these terms are used in this Lease:

   (a) **Landlord**: The Gateway Ventures, LLC, a Texas limited liability company.

   (b) **Landlord's Address**:  The Gateway Ventures, LLC
c/o Prestige Companies, Inc.
780 North Resler Suite B
El Paso, Texas 79912
property@pdgnm.com

   (c) **Tenant**: Spectrum Gulf Coast, LLC, a Delaware limited liability company.

   (d) **Tenant's Address**:  Spectrum Gulf Coast, LLC
c/o Charter Communications
6360 S. Fiddlers Green Circle
Suite 100
Greenwood Village, Colorado 80111-4951
Attn: Charter Real Estate
File ID No.: TX0238

      And with a copy by email to:

      leaseadmin@charter.com

   (e) **Project**: The land and building(s) to be constructed and named The Gateway, located at 6767 Gateway Boulevard West, El Paso, Texas 79925, as depicted on **Exhibit A** attached hereto.

   (f) **Premises**:  The premises consisting of approximately 3,600 rentable square feet, in the location at the Project indicated on **Exhibit A** to this Lease, and commonly known as Lot 12 of the Project.

   (g) **Building**:  The building, located within the Project, with the same address of the Project, and of which the Premises are a part.

   (h) **Delivery Date**:  The date that Landlord delivers possession of the Premises to Tenant in accordance with Article 3 below.

(i)  **Commencement Date**: The earlier of the date that is 120 days after the Delivery Date, or the date Tenant first opens for business in the Premises, subject to Section 3.3(d) below.

(j)  **Expiration Date**:  The last day of the 84th full calendar month after the Commencement Date (including the calendar month in which the Commencement Date occurs if, but only if, the Commencement Date is the first day of a calendar month).

(k)  **Term**:  Approximately 84 months, beginning on the Commencement Date and expiring on the Expiration Date.

(l)  **Monthly Rent**:

| PERIOD | APPROXIMATE ANNUAL RENTAL RATE | MONTHLY RENT (subject to the Remeasurement) |
|---|---|---|
| Months 1-12 | $35.00/r.s.f. | $10,500.00 per month |
| Months 12-24 | $35.70/r.s.f. | $10,710.00 per month |
| Months 25-36 | $36.41/r.s.f. | $10,924.20 per month |
| Months 37-48 | $37.14/r.s.f. | $11,142.68 per month |
| Months 49-60 | $37.89/r.s.f. | $11,365.53 per month |
| Months 61-72 | $38.64/r.s.f. | $11,592.84 per month |
| Months 73-84 | $39.42/r.s.f. | $11,824.70 per month |

For purposes of the above, "Months" refers to full calendar months, except that if the Commencement Date does not occur on the first day of a calendar month, then Month 1 will include both the partial calendar month in which the Commencement Date occurs and the immediately succeeding full calendar month, and the Monthly Rent for Month 1 shall include Monthly Rent for the full calendar month as well as a prorated amount of Monthly Rent for the partial calendar month.

(m)  **Additional Rent**: Any amounts that this Lease requires Tenant to pay in addition to Monthly Rent.

(n)  **Rent**: The Monthly Rent and the Additional Rent.

(o)  **Rentable Area of the Project**:  150,000 square feet.

2

(p) **Rentable Area of the Premises**: 3,600 square feet, subject to the Remeasurement (as defined in Article 3 below).

(q) **Tenant's Share**: 2.4% (determined by dividing the Rentable Area of the Premises by the Rentable Area of the Project and multiplying the resulting quotient by 100 and rounding to the third decimal place), subject to the Remeasurement.

(r) **Parking Spaces**: All parking spaces at the Project, in common with other tenants of the Project, at no additional charge to Tenant.

(s) **Landlord's Broker**: Colliers International.

(t) **Tenant's Broker**: Collectively, PIRES International and Cushman & Wakefield U.S., Inc.

(u) **Renewal Terms**: Three (3) renewal terms, of five (5) years each.

(v) **Permitted Use**: Retail sales and service and related uses in support of Tenant's video, broadband, telecommunications, and wireless services and products, as the same may be expanded from time to time.

(w) **Operating Expenses**: Operating Expenses, as defined in Section 5.1(b) below, for calendar year 2020 are estimated to be $10.50 per rentable square foot.

(x) **Tenant's Hours of Operation**: Tenant's operating hours at the Premises shall be Monday – Saturday 10:00 a.m. to 8:00 p.m., and Sunday 12:00 noon to 5:00 p.m.

1.2     Exhibits. The following exhibits are attached to this Lease and are made part of this Lease:

EXHIBIT A:  Depiction of the Project and Location of the Premises
EXHIBIT B:  Intentionally Omitted
EXHIBIT C:  Landlord's Premises Work
EXHIBIT D:  Location of Tenant's Panel on the Monument Sign

## ARTICLE 2 -- AGREEMENT AND USE; PARKING; EARLY ENTRY

2.1     Agreement and Use.

(a)     Landlord leases the Premises to Tenant, and Tenant leases the Premises from Landlord, according to this Lease, for a period beginning on the Commencement Date and ending on the Expiration Date. Landlord grants Tenant a nonexclusive license for the Term to use the entryways, stairs, elevators, driveways, common restrooms, sidewalks, private streets, loading areas, and all other areas and facilities in the Project that are provided and designated from time to time by Landlord for the general nonexclusive use and convenience of Tenant with Landlord and

3

other tenants of the Project (the "**Common Areas**"), subject to the terms and conditions of this Lease. Tenant may use and occupy the Premises for the Permitted Use. Landlord shall not make any permanent changes to the Common Areas that materially and adversely affect the visibility of the storefront of the Premises, access to and from the Premises, or the use and enjoyment of the Premises for the Permitted Use as contemplated herein, nor will Landlord make any such changes that reduce the parking at the Project below the minimum amount required by applicable Laws (as defined in Section 7.1(a) below). Landlord represents and warrants to Tenant that the Permitted Use does not violate any exclusive use rights of any other tenant at the Project. In no event will Tenant be prohibited from engaging in the Permitted Use hereunder at any time during the Term, including the Renewal Terms, regardless of any exclusive rights Landlord grants to other tenant(s) at the Project after the date of this Lease. Tenant shall not be required to operate its business at the Premises outside of Tenant's Hours of Operation.

(b)     Landlord represents and warrants to Tenant that Landlord has not leased any space in the Project to any tenant whose lease allows any of the following uses (collectively, "**Special Proscribed Uses**"): (i) marijuana dispensary or growing operations, or the sale of drug paraphernalia, (ii) shooting range or the sale of firearms, (iii) adult book store, adult video store, or adult entertainment store, or (iv) pawn shop. Landlord shall not use or allow any other person or entity to use any portion of the Project for any of Special Proscribed Uses. If any person or entity engages in any of the Special Proscribed Uses at the Project (a "**Violation**") at any time during the Term of this Lease (including any renewal terms), then Landlord shall cause the Violation to cease as soon as practicable. If the Violation does not cease within a reasonable time after the date of written notice from Tenant to Landlord, then Tenant's rights and remedies shall be as follows:

(1)     Paying, in lieu of Monthly Rent provided for in this Lease, Reduced Rent (as hereinafter defined) which shall be retroactive to the date the Violation occurred in the event the Violation is not cured within a reasonable time frame. For the purposes of this Lease, "**Reduced Rent**" shall be equal to one-half of the then-current Monthly Rent due under this Lease. Tenant shall pay Reduced Rent, in lieu of Monthly Rent provided for in this Lease, in the manner set forth hereunder until the Violation is cured.

(2)     The right to terminate this Lease upon 30 days prior written notice to Landlord, which shall be a continuing option until the Violation is cured.

In the event Tenant elects to terminate this Lease pursuant to this Section 2.1(b)(2), Landlord shall reimburse Tenant, within 30 days of Landlord's receipt of written notice, for the unamortized cost (using a straight-line amortization schedule over the original Term) of Tenant's Initial Improvements (as defined in Article 3 below).

2.2     Parking. Landlord shall provide to Tenant, at no additional charge to Tenant, the Parking Spaces for use by Tenant and its employees, agents, customers, guests, licensees and invitees, in common with other tenants of the Project, and their respective employees, agents, customers, guests, licensees and invitees.

2.3     Early Entry. Tenant shall be permitted entry onto the Premises from and after the Delivery Date, for the purpose of constructing improvements to the Premises, installing Tenant's

4

fixtures, cabling or other telecommunications network, moving or storing personal property and for any other purpose permitted by Landlord. Such early entry will be at Tenant's sole risk and subject to all the terms and provisions of this Lease as though the Commencement Date had occurred, except for the payment of Rent, which will commence on the Commencement Date. All rights of Tenant under this section will be subject to the requirements of all applicable Laws, including without limitation, building codes, zoning requirements. Landlord shall provide all utilities during this early-entry period, at no cost to Tenant.

## ARTICLE 3 -- DELIVERY OF PREMISES

3.1    Landlord's Work.

(a)    Landlord shall deliver to Tenant Landlord's construction plans and specifications for the Project and the Premises ("**Plans and Specs**") within 90 days after the Effective Date. The Plans and Specs shall be consistent with the Depiction of the Project and Location of the Premises as set forth in **Exhibit A** and Landlord's Premises Work as set forth in **Exhibit C** ("**Landlord's Premises Work**"). Tenant will give Landlord written notice of whether or not Tenant approves the proposed Plans and Specs within 10 business days after Tenant's receipt thereof. After Tenant's approval of the Plans and Specs, Landlord shall, at Landlord's sole cost and expense, construct or install the Building and other improvements within the Project consistent with the Plans and Specs, and including completion of Landlord's Premises Work (collectively "**Landlord's Work**").

(b)    Landlord will complete Landlord's Work with new materials, in a good and workmanlike manner, free from defect, and in compliance with all applicable Laws. It is expressly agreed that Landlord shall be liable for any latent defects in the Building or in any portion of Landlord's Work. If Tenant notifies Landlord of such a latent defect at any time during the Term, then Landlord, at its sole cost and expense, will repair such latent defect as soon as practicable.

(c)    If Landlord does not meet any one or more of the following milestones prior to the dates listed below (each separately, a "**Contingency Date**"), Tenant shall have the right to terminate this Lease (without penalty) by written notice to Landlord specifying a termination date that is no sooner than 30 days after the date of such written notice, provided that if Landlord meets such milestone on or before the termination date specified in such written notice, then Tenant's termination shall be negated and be of no force or effect: (i) on or before October 1st, 2020 Landlord shall obtain all necessary permits for the construction of the Project, the Building and the Premises; (ii) on or before January 10th, 2021, Landlord shall complete all grading and site work for the Project and the Building and shall deliver to Tenant written confirmation of same by Landlord's contractor; and (iii) on or before May 1st 2021, Landlord shall complete construction of the shell of the Building and shall deliver to Tenant written confirmation of same by Landlord's contractor.

In the event of such a termination in accordance with this Article 3, Landlord shall, promptly after receipt of an invoice therefor, reimburse Tenant for the actual and reasonable costs and expenses incurred by Tenant with respect to this Lease, including without limitation planning, designing, engineering and other costs and expenses of preparing to take occupancy of the Premises up to a total sum of $40,000. Time is of the essence with respect to the provisions of this Article 3.

3.2    Delivery of Possession.

(a)    On or before the date that is 10 days after the date Landlord completes Landlord's Work, Landlord shall deliver possession of the Premises to Tenant. Landlord shall be deemed to have delivered possession of the Premises to Tenant when (i) Landlord's Work has been completed, subject only to the completion of "punch list" items relating to Landlord's Premises Work that do not materially interfere with Tenant's ability to undertake Tenant's Initial Improvements (as defined below); (ii) the Premises is broom clean and free of all construction debris; and (iii) Tenant has in its possession keys to the Premises.

(b)    Landlord's Work is expected to be completed, and the Delivery Date is expected to occur, on or before April 1, 2021 (the "**Expected Delivery Date**"). Landlord shall provide not less than 30 days' advance written notice to Tenant of the actual date that Landlord's Work is expected to be substantially completed. If Tenant has not terminated this Lease pursuant to this Article 3, and if for any reason Landlord fails to deliver possession of the Premises to Tenant in the condition required above on or before the Expected Delivery Date, then Tenant shall receive one day of free Rent for each day of delay from the Expected Delivery Date until the actual Delivery Date, which free Rent will be applied to the period(s) commencing immediately after the Commencement Date. Within 15 days after the Commencement Date, Landlord and Tenant shall confirm the Commencement Date and the Expiration Date in writing. Notwithstanding the foregoing, if for any reason Landlord fails to deliver possession of the Premises to Tenant in the condition required above on or before the date that is 45 days after the Expected Delivery Date, Tenant may terminate this Lease by written notice to Landlord. If Landlord fails to complete the "punch list" items relating to Landlord's Premises Work within 30 days after notice of the same, then Tenant may at its option, complete all or any portion of such "punch list" items and offset the cost of the same (plus a fee equal to 15% of the cost to complete such "punch list" items as an administrative fee) against its payment of Rent. Time is of the essence with respect to the provisions of this section.

(c)    Notwithstanding the foregoing, the Expected Delivery Date shall be postponed on a day-for-day basis if Landlord is delayed in performing Landlord's Work and delivering the Premises to Tenant in accordance with subsection (a) above as the result of circumstances relating to the coronavirus or COVID-19 or similar pandemic (but the Expected Delivery Date shall only be postponed for the number of days that such circumstances prevent Landlord from performing Landlord's Work and delivering the Premises to Tenant in accordance with subsection (a) above). Landlord will not be entitled to any postponement under this subsection unless Landlord complies with the following: (i) Landlord uses commercially reasonable efforts to minimize the length, and mitigate the effects, of the delay, (ii) as promptly as practicable upon Landlord becoming aware of a delay in its progress toward completion of Landlord's Work, Landlord notifies Tenant in writing, specifying the nature of the delay and Landlord's estimate of the length of the delay, (iii) at Tenant's request, Landlord provides Tenant with the opportunity to use self-help to accomplish one or more aspects of Landlord's Work (e.g., obtaining a building permit) that may be the cause of the delay, in which case Tenant shall have the right to offset the reasonable cost of same against its payment of Rent, and (iv) once the cause for the delay no longer prevents performance of Landlord's Work, Landlord proceeds with diligence to complete Landlord's Work. In no event, however, shall the Expected Delivery Date be postponed pursuant to this subsection for more than 90 days. The provisions of this subsection

6

shall govern any proposed delay of the Expected Delivery Date based on circumstances relating to the coronavirus or COVID-19 or similar pandemic, and shall supersede any provisions of this Lease or common law principles relating to force majeure events.

    3.3    <u>Tenant's Initial Improvements</u>.

        (a)    Tenant may, at Tenant's sole cost, make initial improvements to the Premises in accordance with this Section ("**<u>Tenant's Initial Improvements</u>**"). Tenant has selected Market Contractors as its general contractor for construction of Tenant's Initial Improvements ("**<u>Tenant's GC</u>**"). Landlord acknowledges that it has approved Tenant's GC, and no further approval or consent of Landlord is required. Tenant may use an architect and engineer of Tenant's sole selection in connection with Tenant's Initial Improvements, and no further consent or approval of Landlord as to such architect or engineer shall be required. In addition, Landlord shall not have the right to select any subcontractor, or approve or disapprove of any subcontractor selected by Tenant. Notwithstanding anything to the contrary set forth in this Lease or in any construction documents provided to Tenant in connection with this Lease, union labor is not now, and will not in the future be, required for any work by Tenant under this Lease.

        (b)    Upon completion of the plans and specifications depicting Tenant's Initial Improvements (the "**<u>Space Plan</u>**"), Tenant shall deliver a copy of the Space Plan to Landlord for its approval, which approval shall not be unreasonably withheld, conditioned or delayed. Landlord shall notify Tenant in writing within 15 days after its receipt of the Space Plan of Landlord's approval or disapproval of the Space Plan. If Landlord does not approve or disapprove the Space Plan in writing within such 15-day period, Landlord's approval will be deemed given. If Landlord disapproves the proposed Space Plan, Landlord will furnish a written explanation of its objections, specifying the changes to the Space Plan that are necessary to overcome Landlord's objections ("**<u>Landlord's Objection Notice</u>**"). Within five business days after receipt of Landlord's Objection Notice, Tenant will submit a revised Space Plan to Landlord. The foregoing process shall be repeated until Landlord has approved (or has been deemed to have approved) the Space Plan. After the Space Plan has been approved, Tenant shall cause Tenant's Initial Improvements to be performed in accordance with the Space Plan and the working drawings prepared in accordance with the Space Plan.

        (c)    Tenant's contractors, workmen, mechanics, engineers and space planners may enter the Premises on behalf of Tenant to perform work in connection with Tenant's Initial Improvements. Landlord shall not be entitled to any construction management fee, coordination fee, oversight fee, or other "mark-ups" with respect to Tenant's Initial Improvements, or with respect to any Alterations (as defined in Section 9.1 below). Landlord shall not impose any building construction standards on Tenant with respect to Tenant's Initial Improvements or any Alterations, other than those imposed by applicable Laws (as defined in Section 7.1 below).

        (d)    Notwithstanding the foregoing, the Commencement Date shall be postponed on a day-for-day basis if Tenant is delayed in completing Tenant's Initial Improvements as the result of circumstances relating to the coronavirus or COVID-19 or similar pandemic (but the Commencement Date shall only be postponed for the number of days that such circumstances prevent work on Tenant's Initial Improvements). Tenant will not be entitled to any postponement under this subsection unless Tenant complies with the following: (i) Tenant uses commercially

reasonable efforts to minimize the length, and mitigate the effects, of the delay, (ii) as promptly as practicable upon Tenant becoming aware of a delay in its progress toward completion of Tenant's Initial Improvements, Tenant notifies Landlord in writing, specifying the nature of the delay and Tenant's estimate of the length of the delay, and (iii) once the cause for the delay no longer prevents work on Tenant's Initial Improvements, Tenant immediately proceeds with diligence to complete Tenant's Initial Improvements. The provisions of this subsection shall govern any proposed delay of the Commencement Date based on circumstances relating to the coronavirus or COVID-19 or similar pandemic, and shall supersede any provisions of this Lease or common law principles relating to force majeure events.

(e) <u>Mechanic's, Materialmen's, and Other Liens</u>. During the Term and, if applicable, the Renewal Term, of this Lease, Tenant will not permit any mechanic's, materialmen's, or other liens to be placed upon the Project, Building or Premises or any improvements located thereon. If any lien on the interest of Landlord or Tenant is filed against the Project, Building or Premises, Tenant shall cause the same to be discharged of record within thirty (30) days after receipt of written notice of the filing of the same (and in any event prior to any foreclosure or other enforcement thereof). If Tenant shall fail to discharge such lien within such period, then Landlord may, as its sole and exclusive remedy, discharge the same either by paying the amount claimed to be due, by deposit in court, bonding, or otherwise. Any amount paid by Landlord for the satisfaction of any lien caused by Tenant, and all reasonable attorneys' fees and other expenses of Landlord, associated therewith, shall be paid by Tenant to Landlord within 30 days after receipt of an invoice and proof of payment thereof, as Additional Rent.

3.4 <u>Improvement Allowance</u>. Landlord shall provide Tenant with an improvement allowance of $30.00 per rentable square foot of the Premises (*i.e.*, $108,000, subject to the Remeasurement) (the "**Improvement Allowance**") for the costs of the design and construction of Tenant's Initial Improvements. On or before the date that is 30 days after the Commencement Date (the "**Allowance Payment Deadline**"), Landlord shall pay Tenant the Improvement Allowance, provided that Tenant has delivered to Landlord (a) a certificate of occupancy, (b) a copy of Tenant's as-built construction drawings, and (c) unconditional lien waivers from all contractors that perform work in excess of $5,000. If Landlord fails to pay Tenant the Improvement Allowance on or before the Allowance Payment Deadline, (i) Tenant may use any unpaid portion of the Improvement Allowance as a rent credit to be applied to the first month or months' (as the case may be) Rent payments due immediately succeeding the Allowance Payment Deadline, and (ii) interest at a rate of 8% per annum or the maximum rate allowed by applicable law, whichever is less, will accrue on the outstanding balance of the Improvement Allowance from the Allowance Payment Deadline until the date on which the Improvement Allowance is paid in full and received by Tenant. Any unused portion of the Improvement Allowance may, at Tenant's option, be applied by Tenant toward Rent due or becoming due under this Lease.

3.5 <u>Remeasurement</u>.

(a) After the Delivery Date, Landlord or Tenant shall have the one-time right to remeasure the Premises and the Project to determine the Rentable Area of the Premises and the Project (the "**Remeasurement**"). With respect to the Rentable Area of the Project, Landlord shall deliver to Tenant the final, as-built plans for the Project, certified by a licensed architect, which shall set forth the rentable square footage of the Project, and the same shall be deemed to be the

Rentable Area of the Project for purposes of the Remeasurement and this Lease. In the event the Remeasurement discloses that the Rentable Area of the Premises as set forth in Section 1.1(p) of this Lease, or the Rentable Area of the Project as set forth in Section 1.1(o) of this Lease, is incorrect, Landlord and Tenant shall confirm in writing (i) the actual Rentable Area of the Premises; (ii) the actual Rentable Area of the Project; (iii) the Monthly Rent based on the new square footage; (iv) Tenant's Share; and (v) the dollar amount of the Improvement Allowance (collectively the "Remeasurement Adjustments"); provided, however, that if the Remeasurement discloses that the actual Rentable Area of the Premises is less than 95% of the square footage set forth in Section 1.1(p), then Tenant will have the right to terminate this Lease (without penalty) by written notice to Landlord. If the Remeasurement discloses that the actual Rentable Area of the Premises is greater than 105% of the square footage set forth in Section 1.1(p), then there will be no Remeasurement Adjustments, and the Rentable Area of the Premises and the Project will be deemed to be the square footage set forth in Section 1.1(p) and 1.1(o) respectively. In the event that the Remeasurement results in amounts due to Tenant, then Tenant shall have a credit against the next payments of Monthly Rent for such amounts due Tenant. For the purposes of this Lease, the Premises and the Project shall be measured from the exterior face of any exterior walls and to the centerline of common walls.

(b) If at any time during the Term of this Lease, any expansion or contraction of the rentable area of the Project, or any construction, demolition or alteration of any building in the Project, changes the Rentable Area of the Project, Landlord shall provide written notice to Tenant, accompanied by as-built drawings or other documentation substantiating such change in the Rentable Area of the Project, and stating the new Rentable Area of the Project and the new Tenant's Share. Promptly after Tenant's receipt of such notice from Landlord, Landlord and Tenant shall enter into an amendment to this Lease to memorialize the new Rentable Area of the Project and the new Tenant's Share.

**EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, TENANT AGREES AND UNDERSTANDS THAT LANDLORD IS MAKING NO WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE PREMISES, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTIES REGARDING (i) THE CONDITION OF THE PREMISES; (ii) THE TENANT MIX; OR (iii) THE PRESENT OR FUTURE SUITABILITY OF THE PREMISES FOR ANY PARTICULAR USE OR PURPOSE. WITHOUT LIMITATION ON THE FOREGOING, TENANT EXPRESSLY WAIVES ANY AND ALL SUCH WARRANTIES, INCLUDING SPECIFICALLY, BUT WITHOUT LIMITATION, THE WARRANTY OF SUITABILITY. TENANT ACCEPTS THE PREMISES "AS IS" WITH ALL FAULTS, SUBJECT TO LANDLORD'S EXPRESS REPRESENTATIONS, WARRANTIES AND COVENANTS SET FORTH IN THIS LEASE.**

### ARTICLE 4 -- RENT

Tenant will pay Monthly Rent to Landlord as rent for the Premises. Monthly Rent will be paid in advance, at Landlord's Address, on or before the first day of each calendar month of the Term, without notice or demand, except as provided herein. If the Term commences on a day other than the first day of a calendar month or ends on a day other than the last day of a calendar month, then Monthly Rent will be appropriately prorated. Landlord agrees that Tenant may make

its monthly rent payments via ACH transfer or any other form of direct deposit (and Landlord will provide Tenant with all bank instructions and other information needed for such ACH transfer or other direct deposit payment). Within 20 days after mutual execution and delivery of this Lease Landlord shall provide Tenant with a completed W-9.

## ARTICLE 5 -- OPERATING EXPENSES

5.1    General.

(a)    In addition to Monthly Rent, beginning on the Commencement Date, Tenant will pay Tenant's Share of the Operating Expenses (as defined in Section 5.1(b) below) paid by Landlord in each calendar year or partial calendar year during the Term.

(b)    As used in this Lease, the term "**Operating Expenses**" means: all reasonable, direct and actual costs of management, operation and maintenance of the Project, including, without limitation, real and personal property taxes and assessments (and any tax levied in whole or in part in lieu of or in addition to real property taxes); wages, salaries and compensation of employees directly associated with the operation and maintenance of the Project; costs of consulting, accounting, legal, janitorial, maintenance, guard, and other services; management fees and costs to the extent consistent with prevailing market rates for comparable services and projects, not to exceed, however, 5% of Operating Expenses; that part of office rent or rental value of space in the Project used or furnished by Landlord to enhance, manage, operate and maintain the Project; costs of power, water, waste disposal and other utilities; materials and supplies; maintenance and repairs; and insurance obtained with respect to the Project.

(c)    Notwithstanding the provisions of subsection (b) above, the Operating Expenses will not include:  (1) depreciation on the Project; (2) ground lease payments, mortgage principal or interest; (3) capital items; (4) costs of replacements to personal property and equipment; (5) costs of excess or additional services provided to any tenant in the Project which are directly billed to such tenants; (6) the cost of repairs due to casualty or condemnation which are reimbursed by third parties; (7) any cost due to Landlord's breach of this Lease; (8) any income, estate, inheritance, or other transfer tax and any excess profit, franchise or similar taxes on Landlord's business; (9) any legal fees incurred by Landlord in enforcing its rights under other leases for premises in the Project; (10) Landlord's general corporate overhead and general and administrative expenses; (11) advertising and promotional expenditures and costs of signs in or on the Project identifying the owner of the Project or any other tenant; (12) costs incurred in connection with upgrading the Project to comply with any governmental law or regulation; (13) tax penalties incurred as a result of Landlord's failure to make payments and/or file any tax or informational returns when due; (14) any and all costs arising from the presence, removal, abatement, or remediation of Hazardous Materials or Hazardous Waste (as defined in Section 7.3(d) below) in or about the Project, not placed therein by Tenant; (15) Landlord's charitable or political contributions; (16) costs arising from latent defects in the base, shell or core of the Building, or other buildings in the Project, or repair thereof; (17) costs for sculpture, paintings or other objects of art; (18) liabilities and costs (including in connection therewith all attorneys' fees and costs of settlement, judgments and payments in lieu thereof) arising from claims, disputes, or potential disputes in connection with potential or actual claims, litigation or arbitration pertaining to Landlord and/or the Project; (19) rentals for items (except when needed in connection with

10

normal repairs and maintenance of permanent systems), which if purchased, rather than rented, would constitute a capital improvement that is excluded as an Operating Expense hereunder; (20) costs, including permit, license and inspection costs, incurred with respect to the installation of tenant improvements or otherwise improving, decorating, painting or redecorating space for tenants or other occupants of the Project; (21) marketing costs, including finder's fees, leasing commissions and attorneys' fees, in connection with the negotiation and preparation of deal memoranda, letters of intent, leases, subleases and/or assignments, space planning costs and other costs and expenses incurred in connection with lease, sublease and/or assignment negotiations, and transactions with present or prospective tenants or other occupants of the Project; (22) the cost of any deductible in excess of $5,000.00 and (23) any other expenses which, in accordance with generally accepted accounting principles, consistently applied, would not normally be treated as Operating Expenses by landlords of comparable buildings in the area of the Project.

(d)     The Operating Expenses that vary with occupancy levels and that are attributable to any part of the Term of this Lease in which less than 95% of the Rentable Area of the Project is occupied by tenants, will be adjusted by Landlord to the amount which Landlord reasonably believes that they would have been if 95% of the Rentable Area of the Project had been so occupied.

(e)     In no event shall the Operating Expenses for any year exceed the actual costs incurred by Landlord in that year, and Landlord shall make no profit from its collection of Operating Expenses. Operating Expenses will be reduced by reimbursements made to Landlord relating to such expenses, including without limitation after-hours utility charges, after-hours engineer or administrative fees, rebated taxes, insurance refunds, or any other expense offsets. Operating Expenses shall be calculated in conformity with generally accepted accounting principles, applied on a consistent basis and in accordance with industry standards.

(f)     Each time Landlord provides Tenant with an actual and/or estimated statement of Operating Expenses, such statement shall be itemized on a line-item-by-line-item basis, showing the applicable expense for the applicable year and the year prior to the applicable year.

(g)     All assessments and premiums which can be paid by Landlord in installments shall be included in Operating Expenses by Landlord as if paid in the maximum number of allowable installments and not included as Operating Expenses except in the year in which the assessment or premium installment would have been actually paid.

5.2     Estimated Payments.  During each calendar year or partial calendar year in the Term of this Lease, in addition to Monthly Rent, Tenant will pay to Landlord on the first day of each month an amount equal to 1/12 of the product of Tenant's Share multiplied by the Estimated Operating Expenses (as hereinafter defined) for such calendar year.  "**Estimated Operating Expenses**" for any calendar year shall mean Landlord's reasonable estimate of Operating Expenses for the Project for such calendar year.  During any partial calendar year during the Term of this Lease, Estimated Operating Expenses will be estimated on a full-year basis.  During each December during the Term of this Lease, or as soon after each December as practicable, Landlord will give Tenant written notice of Estimated Operating Expenses for the ensuing calendar year.  On or before the first day of each month during the ensuing calendar year (or each month of the

11

Term, of this Lease if a partial calendar year), Tenant will pay to Landlord 1/12 of the product of Tenant's Share multiplied by the Estimated Operating Expenses for such calendar year; however, if such written notice is not given in December, Tenant will continue to make monthly payments on the basis of the prior year's Estimated Operating Expenses until the month after such written notice is given, at which time Tenant will commence making monthly payments based upon the revised Estimated Operating Expenses. In the month Tenant first makes a payment based upon the revised Estimated Operating Expenses, Tenant will pay to Landlord the difference between the amount payable based upon the revised Estimated Operating Expenses and the amount payable based upon the prior year's Estimated Operating Expenses, for each month which has elapsed since December. If at any time it reasonably appears to Landlord that the actual Operating Expenses for any calendar year will vary from the Estimated Operating Expenses for such calendar year, Landlord may, by 30 days prior written notice to Tenant, revise the Estimated Operating Expenses for such calendar year, and subsequent payments by Tenant in such calendar year will be based upon such revised Estimated Operating Expenses.

5.3     Limitation on Operating Expenses. Notwithstanding anything to the contrary contained in this Lease, (a) for calendar year 2021, the Controllable Expenses (as defined below) shall not, for purposes of this Lease, increase by more than 5% over the actual amount of Controllable Expenses for calendar year 2020 calculated on an annualized basis if applicable, and (b) commencing with calendar year 2022, Tenant's Share of the Controllable Expenses shall not increase by more than 5% per annum over the amount of Controllable Expenses, calculated on an annualized basis if applicable, actually charged to Tenant for the immediately preceding calendar year. As used herein, "**Controllable Expenses**" means Operating Expenses other than taxes and charges for snow removal, utilities and insurance premiums.

5.4     Annual Settlement. Within 120 days after the end of each calendar year or as soon after the end of the year as practicable, Landlord will deliver to Tenant a statement of amounts payable under Section 5.1 for such calendar year prepared and verified by Landlord. Landlord shall maintain books of account which shall be open to Tenant and its representatives at all reasonable times so that Tenant can determine that the Operating Expenses have, in fact, been paid or calculated in accordance the provisions of this Article 5. Any disagreement with respect to any one or more of said charges if not satisfactorily settled between Landlord and Tenant shall be referred by the parties to an independent certified public accountant to be mutually agreed upon. Tenant shall pay the amount established and billed by Landlord, all subject to final adjustment once the issue is resolved as provided for above. Landlord shall promptly reimburse to Tenant the amount of any overcharges. If it is determined that Landlord has overcharged Tenant by 5% or more of the actual Operating Expenses owed by Tenant for any calendar year, then, in addition to reimbursing Tenant the amount of the overcharge, Landlord shall pay all reasonable costs and expenses of Tenant's audit. Notwithstanding anything to the contrary contained herein, any statement of Operating Expenses submitted to Tenant that contains charges older than 1.5 years from the date such charges were incurred by Landlord shall be deemed null and void, and Tenant shall have no obligation to reimburse Landlord for the same. Time is of the essence with respect to this provision.

5.5     Final Proration. In the last calendar year of this Lease, the Operating Expenses payable by Tenant applicable to the calendar year in which this Lease ends will be calculated on the basis of the number of days of the Term of this Lease falling within such calendar year.

5.6    <u>Other Taxes</u>.

(a)    Tenant will not be obligated to pay any inheritance tax, gift tax, transfer tax, franchise tax, income tax (based on net income), profit tax or capital levy imposed upon Landlord.

(b)    Tenant will pay promptly when due all personal property taxes on Tenant's personal property in the Premises and any other taxes payable by Tenant, the non-payment of which might give rise to a lien on the Premises or Tenant's interest in the Premises.

5.7    <u>Additional Rent</u>.  Amounts payable by Tenant according to this Article 5 will be payable as Additional Rent.  If Tenant fails to pay any amounts due according to this Article 5, Landlord will have all the rights and remedies available to it on account of Tenant's failure to pay Additional Rent.

## ARTICLE 6 -- INSURANCE AND WAIVER

6.1    <u>Tenant's Insurance</u>.  At all times during the Term of this Lease, Tenant shall maintain, at Tenant's expense, the following insurance from insurers authorized to do business in the state where the Project is located:

(a)    Commercial General Liability insurance with an occurrence limit of not less than $1,000,000 and an aggregate of $2,000,000.  Tenant shall name Landlord as an additional insured and provide Landlord, upon written request, with certificates evidencing such coverage.

(b)    Employer's Liability with a limit of $500,000 and Statutory Worker's Compensation pursuant to the Worker's Compensation laws of the state where the Project is located.

Further, Tenant will assume all risk for Tenant's trade fixtures, equipment and other personal property.

6.2    <u>Landlord's Insurance</u>.  At all times during the Term of this Lease, Landlord will carry and maintain "All Risk" property (including earthquake and flood) insurance covering the Project and its equipment in amounts not less than their full replacement cost.  Landlord shall also carry commercial general liability insurance with a minimum of $1,000,000 per occurrence and $2,000,000 aggregate.  Upon request by Tenant, Landlord shall provide Tenant with a certificate of insurance evidencing Landlord's required insurance herein.

6.3    <u>Waiver of Subrogation</u>.  Notwithstanding anything to the contrary contained in this Lease, Landlord and Tenant each waives any claims that it may have against the other to the extent such claims are covered by property insurance policies required to be carried under this Lease, or any other property insurance actually carried by such party and covering the Project or the Premises.  Landlord and Tenant agree that they will cause their respective insurers to issue appropriate waiver of subrogation rights endorsements to all property insurance policies required to be carried under this Lease, or any other property insurance actually carried by such party and covering the Project or the Premises.

## ARTICLE 7 -- COMPLIANCE WITH LAWS

7.1 <u>Compliance with Laws</u>.

      (a)    Landlord represents, warrants and covenants that, as of the Delivery Date, (1) the Premises and the Project will comply with all applicable laws, statutes, ordinances, rules, codes, regulations, orders, and interpretations of all federal, state, and other governmental or quasi-governmental authorities having jurisdiction over the Project, including, without limitation, the Americans With Disabilities Act of 1990 (the "**ADA**") (collectively "**Laws**"), and (2) the Premises and the entire Building will be fully sprinklered in accordance with all Laws, including all applicable building codes and fire department codes. Landlord will, at Landlord's sole cost, cause the entrance(s) to the Premises to be in compliance with the ADA as of the Delivery Date. Landlord will, at Landlord's sole cost and expense, promptly comply with all Laws, and will cause the Common Areas to comply with all Laws throughout the Term of this Lease. Subject to Landlord's obligations set forth above, Tenant will, at Tenant's sole cost and expense, cause the non-structural portions of the Premises to comply with all Laws throughout the Term of this Lease.

      (b)    Landlord will be solely responsible for and will defend, indemnify, and hold Tenant, its agents, and employees harmless from and against all claims, costs, liabilities and penalties, including, without limitation, reasonable attorneys' fees and costs, arising out of or in connection with either or both of (1) Landlord's breach of its obligation under this section, or (2) Landlord's failure to promptly comply with all Laws as required by this section. Landlord's obligations under this section will survive the expiration or other termination of this Lease.

      (c)    Tenant will be solely responsible for and will defend, indemnify, and hold Landlord, its agents, and employees harmless from and against all claims, costs, liabilities and penalties, including, without limitation, reasonable attorneys' fees and costs, arising out of or in connection with either or both of (1) Tenant's breach of its obligation under this section, or (2) Tenant's failure to promptly comply with all Laws as required by this section. Tenant's obligations under this section will survive the expiration or other termination of this Lease.

7.2 <u>Environmental Matters</u>.

      (a)    <u>Landlord's Obligations</u>.

         (1)    Landlord hereby represents and warrants to Tenant that to its current actual knowledge:

           A.    the Project is not contaminated by any Hazardous Materials (as defined below);

           B.    no portion of the Project is being used for the treatment, storage or disposal of any Hazardous Waste (as defined below);

           C.    no Hazardous Materials are being used, generated or disposed of on or about the Project, except in compliance with all applicable Environmental Laws (as defined below).

14

D. the Project is not on any governmental list of contaminated properties, nor is any investigation, administrative order or notice, consent order or agreement for litigation in existence or anticipated with respect to the Project.

(2) Landlord covenants that, during the Term of this Lease, it will not cause or permit the treatment, storage or disposal of any Hazardous Waste in, on or about any part of the Project by Landlord, its agents, employees or contractors in violation of any Environmental Laws, and it will permit the introduction of other Hazardous Materials to the Project only in compliance with all Environmental Laws.

(3) Landlord will be solely responsible for and will defend, indemnify, and hold harmless Tenant, its subsidiaries and affiliated entities, and the respective officers, directors, employees, partners, shareholders, members, managers, representatives, agents, predecessors, successors, and assigns of Tenant (collectively, the "**Tenant Indemnitees**"), and its subsidiaries and affiliated entities, from and against any and all claims, demands, actions, causes of action, damages, awards, judgments, fines, forfeitures, penalties, losses, liabilities, costs and expenses, including, without limitation, actual attorneys' fees reasonably incurred (collectively, "**Liabilities**"), known or unknown, accrued or unaccrued, arising out of or in connection with Landlord's breach of its obligation under this section. Landlord's obligations under this section will survive the expiration or other termination of this Lease.

(4) If removal, cleanup, or restoration work materially interferes with Tenant's use of the Premises, in Tenant's reasonable determination, then, without limiting Tenant's other available rights and remedies, (A) if such removal, cleanup, or restoration work continues for a period in excess of five business days, Rent will abate hereunder until such removal, cleanup or restoration is completed; and (B) if such removal, cleanup, or restoration work continues for a period in excess of 15 business days, Tenant may terminate this Lease, at no penalty, upon notice to Landlord, such termination to be effective as of the termination date designated in Tenant's termination notice.

(5) Notwithstanding anything to the contrary contained in this Lease, in no event will Tenant be responsible for any Hazardous Materials, mold or asbestos that existed in or about the Premises or the Building prior to the date of this Lease, including any asbestos that is released into the Premises as a result of any construction, work, use or occupancy of the Premises by Tenant. Landlord will be responsible, at its sole cost, for the cleanup of, and will defend, indemnify, and hold harmless Tenant from and against any and all Liabilities, known or unknown, accrued or unaccrued, arising out of or in connection with, any of the following: any mold, asbestos or Hazardous Materials that existed in or about the Premises or the Building prior to the Delivery Date. Landlord's obligations under this section will survive the expiration or other termination of this Lease.

(b) Tenant's Obligations.

(1) Tenant will not cause the storage, treatment or disposal of any Hazardous Materials in, on, or about the Premises or any part of the Project in violation of any Environmental Laws. Tenant will not affirmatively allow the Premises to be used or operated in

15

a manner that may cause the Project or any part of the Project to be contaminated by any Hazardous Materials in violation of any Environmental Laws.

(2) Tenant will be solely responsible for and will defend, indemnify, and hold Landlord, its agents and employees harmless from and against all reasonable, actual, and direct claims, costs, and liabilities, including reasonable attorneys' fees and costs, arising out of or in connection with Tenant's breach of its obligations in this section. Tenant's obligations under this section shall survive the expiration or other termination of this Lease.

(c)     Joint Obligations. Each party will promptly notify the other party of (1) any and all enforcement, cleanup, remedial, removal or other governmental or enforcement cleanup or other governmental or regulatory actions instituted, completed or threatened pursuant to any Environmental Laws relating to any Hazardous Materials affecting any part of the Project; and (2) all claims made or threatened by any third party against Tenant, Landlord or any part of the Project relating to damage, contribution, cost recovery, compensation, loss or injury resulting from any Hazardous Materials on or about the Project.

(d)     Definitions.     "**Hazardous Materials**" means asbestos, explosives, radioactive materials, hazardous waste, hazardous substances, or hazardous materials including, without limitation, substances defined as "hazardous substances" in the Comprehensive Environmental Response Compensation Liability Act of 1980, as amended, 42 U.S.C. Sections 9601-9657 ("**CERCLA**"); the Hazardous Material Transportation Act of 1975, 49 U.S.C. Sections 1801-1812; the Resource Conservation Recovery Acts of 1976, 42 U.S.C. Sections 6901-6987; the Occupational Safety And Health Act of 1970, 29 U.S.C. Section 651, *et seq*., or any other federal, state or local statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning hazardous materials, wastes or substances now or at any time hereinafter in effect (collectively, "**Environmental Laws**"). "**Hazardous Waste**" means hazardous waste as defined under the Resource Conservation Recovery Act of 1976, 42 U.S.C. Sections 6901-6987. Notwithstanding the foregoing, Landlord hereby approves of Tenant's use and storage of ordinary kitchen and office products and equipment containing de minimis amounts of Hazardous Materials for cleaning and retail purposes.

## ARTICLE 8 -- MAINTENANCE AND REPAIR; UTILITIES

8.1     Landlord's Representations.  Landlord represents, warrants and covenants that as of the Delivery Date, (a) the roof of the Building (including the roof membrane) will be in good condition and repair, and all existing penetrations and flashing will be properly sealed, and (b) the Premises, including, without limitation, the structural portions of the storefront and the heating, ventilating, air conditioning, mechanical, electrical, plumbing, fire suppression, life safety and sprinkler systems serving the Premises, will be in good working order and repair.

8.2     Landlord's Maintenance and Services.   Landlord will, at its sole cost and expense, maintain and repair in good condition and repair, and replace as needed: (a) the roof (including the roof membrane), the exterior walls (including the storefront walls), and the structure and foundation of the Building (including the structural portions of the storefront); (b) the utility meters, utility lines, pipes and conduits located outside the Premises; (c) any under-slab electrical and plumbing services; (d) any fire suppression, life safety and sprinkler systems not serving the

Premises; and (e) any mechanical, HVAC, plumbing and electrical systems not serving the Premises. If Landlord reasonably determines that any such repairs or replacements are necessitated by Tenant's negligent acts or negligent omissions, or those of Tenant's agents, employees, contractors or invitees, Landlord shall notify Tenant of the damages and the required repairs. Tenant agrees to reimburse Landlord for all such required repairs within 30 days after receipt of an invoice and proof of payment thereof. Landlord will, at its sole cost and expense, reseal and resurface the parking areas as needed, to be determined by Landlord in its reasonable discretion. Landlord will, subject to Article 5 above, maintain, repair, replace and restore the Common Areas of the Project as needed, to be determined by Landlord in its reasonable discretion, which may include, without limitation, (1) timely removal of any snow and ice from the Common Areas in a manner consistent with industry standard and at least one hour prior to Tenant opening for business; (2) janitorial services; (3) regular pickup of trash and garbage at the Project; (4) cleaning, sweeping and restriping the parking areas; (5) lighting (including replacement of bulbs and ballasts) the Common Areas; and (6) maintaining plants and landscaping. Tenant will be entitled to access to the Premises 24 hours per day, seven days per week.

8.3 <u>Tenant's Maintenance</u>. Subject to Landlord's obligations set forth in Section 8.2 above, Tenant, at its sole cost and expense, shall at all times keep all parts of the Premises in good order, condition and repair and in a clean, orderly, sanitary and safe condition. Without limitation on the foregoing, Tenant's maintenance, repair and replacement obligations shall include all furnishings, glass, plate glass, signage, windows, window moldings, partitions, exterior or interior doors, fixtures, ceilings, interior walls, flooring, interior side of demising walls, fire sprinklers and fire protection systems, equipment and appurtenances thereof, lighting, electrical and plumbing appurtenances exclusively serving the Premises; and all interior and exterior heating, ventilation and air-conditioning equipment exclusively serving the Premises (the "**HVAC System**"). Subject to Landlord's obligations set forth in Section 8.2 above, Tenant shall make all repairs to the interior of the Premises, including, without limitation, those required solely and uniquely as a result of Tenant's manner of use or occupancy of the Premises for other than normal and customary retail purposes . Notwithstanding anything to the contrary set forth herein, Tenant shall have no obligation to maintain, repair or replace (a) any equipment, facilities or systems unless the same exclusively serve the Premises and are located within the Premises after the point of entry (except with respect to the HVAC System, doors and windows), or (b) the storefront of the Premises, except for window glass, window frames, doors and door frames). Tenant shall enter into a quarterly HVAC maintenance agreement for the HVAC System with a reputable vendor reasonably acceptable to Landlord, and shall provide a copy of such agreement to Landlord. Notwithstanding anything to the contrary set forth in this Lease, Tenant shall not be required to make any Capital Repair (as defined below) to the Premises, regardless of cost. If any portion of the Premises requires a Capital Repair, then the same shall be performed promptly by Landlord. Landlord shall be solely responsible for the cost of any Capital Repair; provided, however, that Tenant shall be obligated to pay Tenant's Monthly Allocation to Landlord for such Capital Repair. As used herein, "**Tenant's Monthly Allocation**" shall be the quotient resulting from dividing the actual, out-of-pocket cost of the Capital Repair (the "**Capital Cost**") by the useful life (expressed in number of months) of the Capital Repair, as such useful life is specified pursuant to federal income tax regulations or guidelines for depreciation thereof. Tenant's Monthly Allocation shall be paid until the earlier of (1) the Term of this Lease (including any Renewal Term) expires or is otherwise terminated, or (2) the Capital Cost has been fully reimbursed. As used herein, "**Capital**

**Repair**" shall mean any repair or replacement which under standard accounting practices is considered "capital" in nature and is made to the Premises after the Commencement Date.

    8.4   <u>Utilities</u>.

        (a)   Landlord agrees, at Landlord's expense, to procure all necessary permits, licenses, and authorizations for all utilities to the Premises, and shall cause to be provided, the necessary mains, conduits, pipes, tubes, wires, and other facilities so that water, sewer, gas, telephone and electricity are available and connected to the Premises prior to the Delivery Date. Landlord shall provide all utilities to the Premises during Tenant's completion of Tenant's Initial Improvements, at no cost to Tenant. From and after the date Tenant first opens for business in the Premises, Tenant will be solely responsible for and will contract directly for provision of, and pay the appropriate suppliers for, all water, sewer, gas, electricity, heat, power, and other utilities and communications services used by Tenant on the Premises; any separate metering or submetering of such utilities shall be completed by Landlord at Landlord's sole cost and expense prior to the Delivery Date. Landlord shall provide adequate lighting of the exterior portions of the Project and all entrances and exits to the Project from 30 minutes before dusk until 11 p.m., seven days a week, 365 days a year.

        (b)   In the event of any interruption of any utility or other service to the Premises, Landlord shall not be liable to Tenant in damages or otherwise, unless such interruption is caused by the gross negligence or willful misconduct of Landlord. Except in cases of an emergency, Landlord shall provide Tenant a minimum of three business days prior written notice of any planned interruption of any utility or other services.

    8.5   <u>Interference with Tenant's Business</u>. Except in cases of an emergency, Landlord shall provide Tenant a minimum of three business days prior written notice of any planned repairs to any portion of the Building. Landlord shall perform all repair and other work at the Building in a manner that minimizes interference with the conduct of Tenant's business at the Premises and access to the Premises. If Tenant is prevented from the conduct of its business to a material extent for more than two full business days due to Landlord's repair work, then Rent shall be abated for the period from the third business day after Tenant is so prevented from the conduct of its business until Tenant is able to resume normal business operations at the Premises.

## ARTICLE 9 -- ALTERATIONS

    9.1   <u>General Alterations</u>. Tenant shall not make any alterations, improvements or additions (collectively "**Alterations**") to the Premises without Landlord's prior written consent, which shall not be unreasonably withheld, conditioned or delayed. If Landlord does not consent or object in writing to a proposed Alteration within 30 days after its receipt of Tenant's request for consent, Landlord's consent will be deemed given. Notwithstanding the foregoing, Tenant may, without Landlord's consent, make any Alterations that are cosmetic in nature and do not affect the structure of the Building or the Building systems. Tenant may engage a contractor of its selection to perform any Alterations, and no further consent or approval of Landlord as to such contractor shall be required, and no overhead charges shall be payable to Landlord. Tenant shall not be required to remove Tenant's Initial Improvements made to the Premises prior to the Commencement Date, or any Alterations that are normal and customary for retail purposes.

Tenant may, but shall not be obligated to, remove any free-standing work partitions, custom cabinetry, lockers, countertops, wiring, cabling and other systems installed in the Premises by Tenant, provided that such removal can be done without damaging the Premises or Building, and provided further that Tenant agrees to repair any such damage at its cost upon demand.

9.2     Security System.  Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right (a) to install, without further approval of Landlord, a security system or card reader system at all entrances of the Premises, or (b) to use all or any portion of the existing security system from the prior tenant, or both (collectively the "**Security System**"). Notwithstanding anything to the contrary contained in this Lease, at the end of the Term of this Lease, Tenant shall have the right, but not the obligation, to remove all or a portion of the Security System, provided that such removal can be done without damaging the Premises or Building, and provided further that Tenant agrees to repair any such damage at its cost upon demand.

9.3     Fiber.  Subject to Landlord's approval as to location and plans and specifications (which approval shall not be unreasonably withheld, conditioned or delayed), Tenant shall have the right to install its own fiber and communication services through (a) existing conduits, and/or (b) new conduits installed by Tenant.  Subject to Landlord's approval as to location and plans and specifications (which approval shall not be unreasonably withheld, conditioned or delayed), Landlord grants Tenant a license right during the Term of this Lease to run cable, conduit, wiring and other lines to or through other portions of the Project, and from a public right of way to the Premises.  Tenant shall not be required to execute a separate access agreement for fiber.  Such fiber shall be used by Tenant to facilitate Tenant's business within the Premises and to demonstrate Tenant's services and products within the Premises.

## ARTICLE 10 -- END OF TERM

10.1     End of Term.  At the end of the Term of this Lease, subject to Sections 7.1, 8.1 and 8.2 above, Tenant will promptly quit and surrender the Premises in good order, condition and repair, ordinary wear and tear and damage by casualty excepted.

10.2     Holdover.

(a)     Provided that no uncured Event of Default (as defined in Section 12.1 below) exists on the expiration of this Lease, and provided further that Tenant has provided Landlord with at least 90 days advance written notice of its election to hold over under the terms of this section at the end of the Term, Tenant may elect, as set forth in said written notice, to remain in possession of the Premises and continue to pay Rent for up to 180 days following the expiration of this Lease (the "**Permitted Holdover Period**").  Tenant's notice shall designate the number of days that it desires to hold over pursuant to this section.  Any such possession shall be subject to all provisions hereof (other than those relating to the Term of this Lease), except that Monthly Rent shall be equivalent to 150% of the Monthly Rent payable for the last month prior to the expiration of this Lease.

(b)     If (i) Tenant remains in possession of the Premises after the expiration of the Permitted Holdover Period, or (ii) Tenant fails to give notice at least 90 days in advance as set forth in subsection (a) above, but remains in possession of the Premises after the expiration of the

19

tenancy created hereunder without the written consent of Landlord and without execution of a new lease or amendment hereto, then in either of such cases, Tenant shall occupy the Premises under a month-to-month tenancy (terminable by either party upon 30 days prior written notice to the other party), subject to all provisions hereof (other than those relating to the Term of this Lease) except that Monthly Rent for each month of such holdover period shall be equivalent to 150% of the Monthly Rent payable for the last month prior to the expiration of this Lease.

## ARTICLE 11 -- DEFAULT

11.1     Events of Default.  The occurrence of any one of the following events shall constitute an "**Event of Default**" hereunder by Tenant:

(a)     The failure by Tenant to make any payment required to be made by Tenant hereunder on or before its due date, where such failure continues for 5 business days after receipt of written notice from Landlord of such failure.

(b)     The failure by Tenant to observe or perform any of the covenants or other provisions of this Lease to be observed or performed by Tenant, where such failure continues for a period of 30 days after receipt of written notice thereof from Landlord to Tenant; provided that if the nature of Tenant's default is such that more than 30 days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within said 30-day period and thereafter diligently prosecutes such cure to completion.

(c)     if any petition is filed by or against Tenant under any section or chapter of the then current federal bankruptcy laws or under any similar law or statute of the United States or any state thereof, and, in the case of an involuntary petition, such petition is not dismissed with forty-five (45) days from the date of filing; or Tenant becomes insolvent or makes a transfer in fraud of creditors, or  Tenant makes an assignment for the benefit of creditors; or a receiver is appointed for Tenant or any of the assets of Tenant.

11.2     Remedies of Landlord.

(a)     On the occurrence of an Event of Default, Landlord shall have the following rights:

(1)     terminate this Lease by giving express written notice thereof to Tenant, in which event Tenant shall immediately and without demand surrender possession of the Premises to Landlord without Tenant being released from liability for the performance of this Lease for the remainder of the Term and, if applicable, the Renewal Term of this Lease or for any damage claim or remedy provided herein or by law.

(2) To lawfully reenter and take possession of the Premises, expel Tenant and remove the effects of Tenant, using such force for such purposes as may be reasonably necessary, and without prejudice to any remedies for arrears of the Monthly Rent or other amounts payable under this Lease.  In such case, Landlord may, without being obligated to and without terminating this Lease, relet the Premises for the account of Tenant on such conditions and terms as Landlord may determine, and Landlord may collect and receive the rent.  Tenant will pay to Landlord the Monthly Rent and other sums as provided in this Lease that would be payable under

this Lease if such repossession had not occurred, less the net proceeds, if any, of any reletting of the Premises.

(3) To cure any Event of Default and to charge Tenant for the cost of effecting such cure including, without limitation, reasonable attorneys' fees and costs, provided that Landlord will have no obligation to cure any such Event of Default of Tenant.

(b)     Upon any Event of Default by Tenant, Landlord shall be required to use commercially reasonable efforts to mitigate its damages.

11.3     Landlord's Default.  In the event of any default by Landlord in the performance of its obligations under this Lease, Tenant will have the following rights:

(a)     If Landlord's default results in an emergency that adversely affects the health, safety or welfare of Tenant's employees, customers, guests or invitees, or adversely affects Tenant's ability to conduct normal business operations from the Premises (collectively an "**Emergency Default**"), and if Landlord fails to commence a cure for such Emergency Default within three business days after receiving written notice regarding the same, or if Landlord fails to diligently pursue such cure to completion, then Tenant shall have the right, in its sole discretion, to exercise such self-help measures as may be reasonably necessary to cure the Emergency Default. Any costs and expenses so incurred by Tenant (plus a fee equal to 15% of the cost to cure such Emergency Default as an administrative fee) shall be reimbursed by Landlord upon demand, or at Tenant's option deducted from any Rent due or becoming due.

(b)     If Landlord fails to cure any default not otherwise falling within subsection (a) above within 30 days after written notice of such default, Tenant shall have the right, in its sole discretion, to exercise such self-help measures as may be reasonably necessary to cure the default (provided that if the nature of Landlord's default is such that more than 30 days are reasonably required for its cure, then Landlord shall not be deemed to be in default if Landlord commences such cure within said 30-day period and thereafter diligently prosecutes such cure to completion). Any costs and expenses so incurred by Tenant (plus a fee equal to 15% of the cost to cure such default, as an administrative fee) shall be reimbursed by Landlord upon demand, or at Tenant's option deducted from any Rent due or becoming due.

(c)     If Landlord fails to cure any default within 45 days after receipt of written notice of such default, and if such Landlord default materially impairs Tenant's use of a material portion of the Premises, Tenant shall have the right to terminate this Lease, without penalty, upon written notice to Landlord, such termination to be effective as of the termination date designated on Tenant's termination notice.

(d)     Notwithstanding anything to the contrary contained in this Lease, if any default by Landlord prevents Tenant from opening for business in the Premises for more than five consecutive business days after written notice of such default, then Rent shall be abated from the sixth day following such impairment until the date the specified default is cured

11.4     Remedies Not Exclusive.  Each right and remedy provided for in this Lease is cumulative and is in addition to every other right or remedy provided for in this Lease or at law or in equity.

## ARTICLE 12 -- EARLY TERMINATION

Tenant will have the one-time right to terminate this Lease, effective as of the expiration of the 61st Month of the Term of this Lease, upon not less than 180 days prior written notice to Landlord ("**Tenant's Termination Notice**"). Within 30 days after Tenant's delivery of Tenant's Termination Notice, Landlord will provide Tenant with an itemized statement setting forth (a) the amount of the Improvement Allowance paid or credited to Tenant, and all broker commissions paid by Landlord in connection with entering into this Lease (collectively, the "**Transaction Costs**"), and (b) the amount of the unamortized Transaction Costs as of the proposed termination date, based on a straight-line amortization of the Transaction Costs over the initial Term of this Lease , and (c) a termination penalty equal to six months' Rent (including Operating Expenses) at the then current rate (the amounts set forth in (b) and (c) above are collectively referred to herein as the "**Termination Fee**"). Tenant will pay the Termination Fee to Landlord within 30 days after Tenant's receipt of the above-referenced statement. Upon Tenant's compliance with the terms of this Article, this Lease will terminate as of the date of termination set forth in Tenant's Termination Notice and neither Landlord nor Tenant will have any further rights or obligations under this Lease, except with respect to those matters in this Lease that expressly survive the termination of this Lease.

## ARTICLE 13 -- OPTION TO RENEW

Tenant will have the option to renew the Term of this Lease for the Renewal Terms, subject to the further provisions of this article.

(a)      Tenant must exercise the option with respect to each Renewal Term, if at all, by giving notice of exercise ("**Tenant's Renewal Notice**") to Landlord no less than six months and no more than 12 months prior to the then applicable Expiration Date.

(b)      Each Renewal Term will be on the same terms and conditions as this Lease, except the Monthly Rent, which shall be the then fair market rent for the Premises (as hereinafter defined).

(c)      The "**fair market rent for the Premises**" means what a landlord under no compulsion to lease the Premises and a tenant under no compulsion to lease the Premises would determine as rent (after making an appropriate discount based on there being no market tenant finish allowance or other concessions) for the Renewal Term as of the time of Tenant's Renewal Notice, taking into consideration the uses permitted under this Lease; the quality, size, design, and location of the Premises; and the rent for comparable space in comparable buildings in the vicinity of the Project.

(d)      Within 15 days after Landlord's receipt of Tenant's Renewal Notice, Landlord shall deliver to Tenant written notice of Landlord's determination of the Monthly Rent for that Renewal Term. If Landlord's determination of the Monthly Rent for that Renewal Term is not acceptable to Tenant, Landlord and Tenant shall attempt to agree on the Monthly Rent for that Renewal Term. If Landlord and Tenant are unable to agree on the Monthly Rent for a Renewal Term within 30 days after Landlord's receipt of Tenant's Renewal Notice, Landlord and Tenant will each appoint a commercial real estate broker with at least five years' full-time commercial

leasing experience in the metropolitan area in which the Premises are located to determine the Monthly Rent for the Premises. If either Landlord or Tenant does not appoint a broker within 10 days after the other has given notice of the name of its broker, the single broker appointed will be the sole broker and will set the Monthly Rent for the Premises. If two brokers are appointed pursuant to this paragraph, they will meet promptly and attempt to set the Monthly Rent for the Premises. If they are unable to agree within 30 days after the second broker has been appointed, they will attempt to elect a third broker, meeting the qualifications stated in this paragraph, within 10 days after the last day the two brokers are given to set the Monthly Rent for the Premises. If they are unable to agree on a third broker, either Landlord or Tenant, by giving 10 days prior notice to the other, can apply to the then-presiding president of the local NAIOP chapter for the selection of a third broker who meets the qualifications stated in this paragraph. Landlord and Tenant will each bear one-half of the cost of appointing the third broker and of paying the third broker's fee. The third broker, however selected, must be a person who has not previously acted in any capacity for either Landlord or Tenant. Within 30 days after selection of the third broker, a majority of the brokers will set the Monthly Rent for the Premises. If a majority of the brokers are unable to set the Monthly Rent for the Premises within 30 days after selection of the third broker, the two closest market rate determinations will be averaged and that average will be the Monthly Rent for the Premises.

(e)     Within 10 days after receipt of Landlord's determination of the Monthly Rent for the Premises for the Renewal Term, or within 10 days after the determination of the Monthly Rent for the Premises for the Renewal Term in accordance with subsection (d) above, as the case may be, Tenant may, upon written notice to Landlord, revoke Tenant's Renewal Notice, provided that if the parties have arbitrated the issue of the Monthly Rent for the Premises in accordance with subsection (d) above, Tenant shall, within 30 days after receipt of Landlord's invoice delivered after such revocation, reimburse Landlord all actual, out-of-pocket costs incurred by Landlord in the arbitration process used to establish the Monthly Rent for the Premises.

## ARTICLE 14 – INTENTIONALLY OMITTED

## ARTICLE 15 -- GENERAL

15.1     Condemnation. If all of the Premises are taken by exercise of the power of eminent domain (or conveyed by Landlord in lieu of such exercise), this Lease will terminate on the date (the "**Termination Date**") that is the earlier of the date upon which the condemning authority takes possession of the Premises or the date on which title to the Premises is vested in the condemning authority. If more than 25% of the Rentable Area of the Premises is so taken; or if an area critical to Tenant's operations (in Tenant's sole determination) is so taken; or if 5% or more of the parking spaces at the Project, or 5% or more of the Parking Spaces allocated to Tenant, are taken (unless Landlord can provide alternative parking acceptable to Tenant); then Tenant will have the right to terminate this Lease by written notice to Landlord given no later than 20 days after the Termination Date. If less than 25% of the Rentable Area of the Premises, and less than the requisite number of parking spaces and no area critical to Tenant's operations is so taken, or if Tenant does not terminate this Lease according to the preceding sentence, then (a) the Monthly Rent will be abated in the proportion of the Rentable Area of the Premises so taken to the Rentable Area of the Premises immediately before such taking, (b) Landlord shall repair, at its sole cost and expense, any damage to the Premises caused by the taking and restore the Premises such that a

23

whole unit (less the area taken) is fully usable by Tenant, and (c) Tenant's Share will be appropriately recalculated. In the event of any such taking, a portion of the award (whether or not paid directly to Landlord) will be allocated to Tenant for (1) Tenant's moving expenses, (2) leasehold improvements owned by Tenant, (3) tenant improvements installed in the Premises by Tenant, and (4) the value of Tenant's unexpired Term of this Lease.

15.2    Assignment and Subletting. Tenant will not sublease all or a part of the Premises, and will not assign this Lease or any interest in this Lease, without the prior written consent of Landlord, which will not be unreasonably withheld, conditioned, or delayed. If Landlord does not consent or object in writing to such proposed sublease or assignment within 30 days after its receipt of Tenant's request for consent, Landlord's consent will be deemed given. Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to sublet all or a portion of the Premises or to assign this Lease, without Landlord's consent, to any of Tenant's Affiliates (as defined below) or to any Communications Purchaser (as defined below). Any such subtenant or assignee shall have a similar right to sublet all or a portion of the Premises or to assign this Lease, without Landlord's consent, to any of Tenant's Affiliates or to any Communications Purchaser. As used herein, "**Tenant's Affiliates**" means any person or entity that controls, is controlled by, or is under common control with, Tenant, or any successor entity resulting from a merger, acquisition, reorganization, consolidation, or other business combination involving Tenant. As used herein, **"Control"** (including its correlative form "**Controlled**") means the power to direct the management and policies of an entity, directly or indirectly, whether through the ownership of voting securities, by contract, or otherwise. As used herein, "**Communications Purchaser**" means any purchaser of all or a portion of the communications systems, equipment or business operations of Tenant or Tenant's Affiliates located on or related to the Premises. Upon any assignment of this Lease as permitted by this section, Tenant shall be relieved of all obligations and liabilities arising hereunder from and after the date of the assignment, provided that the assignee has a net worth greater than or equal to $25,000,000 as of the date of the assignment. No transfer or assignment of the stock of Tenant, or any ownership interest in Tenant, whether by sale, merger, exchange or other means, shall constitute an assignment of this Lease.

15.3    Notices. Any notice or other communication required or permitted under this Lease must be in writing and may be given by personal delivery, by being deposited with any nationally recognized overnight carrier that routinely issues receipts, or by being deposited with the United States Postal Service, postage prepaid, certified mail, return receipt requested, addressed to the party for whom it is intended at its address set forth in Section 1.1. Any such notice shall be deemed delivered upon (but not until) receipt or refusal of receipt.

15.4    Brokers. Landlord and Tenant each represents and warrants to the other that it has not consulted or negotiated with any broker or finder with regard to the Premises or this Lease, except Landlord's Broker and Tenant's Broker. Each of them will indemnify the other against and hold the other harmless from any claims for fees or commissions from anyone with whom it has consulted or negotiated with regard to the Premises, except Landlord's Broker and Tenant's Broker. Pursuant to a separate commission agreement (the "**Commission Agreement**"), Landlord will pay or cause to be paid any fees or commissions due Tenant's Broker ("**Tenant's Broker Fee**"). If Tenant's Broker Fee is not paid to Tenant's Broker within 20 days after the due date set forth in the Commission Agreement, then Tenant may provide Landlord written notice that Tenant intends to pay Tenant's Broker Fee to Tenant's Broker if Tenant's Broker Fee is not paid within

24

10 days after the date of such written notice. If Tenant's Broker Fee is not paid within said 10-day period, then Tenant may pay Tenant's Broker Fee to Tenant's Broker, and Tenant may offset the amount thereof against its payment(s) of Rent due or next becoming due hereunder

15.5  <u>Signs</u>. Tenant shall be entitled to install, in compliance with all applicable Laws, signage on the exterior of the Building sign containing Tenant's logo and on the Project monument sign containing Tenant's logo. Tenant shall also be entitled to install a sign outside the entrance door to the Premises containing Tenant's logo or other pertinent business information. Tenant's signage panel on the Project monument sign shall be in the location indicated on **Exhibit D** attached hereto. All such signage shall be at Tenant's sole cost, but may, at Tenant's option, be paid for out of the Improvement Allowance should unused funds be available. All Tenant's signage shall comply with all applicable Laws and be subject to Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed.

15.6  <u>Subordination and Non-disturbance</u>.

(a)  This Lease and Tenant's rights under this Lease are subject and subordinate to any mortgage or deed of trust (each, a "**Superior Lien**"), together with any renewals, extensions, modifications, consolidations and replacements of such Superior Lien, now or after the date of this Lease affecting or placed, charged or enforced against the Project or any interest of Landlord in the Project or Landlord's interest in this Lease and the leasehold estate created by this Lease (except to the extent any such instrument will expressly provide that this Lease is superior to such instrument). Notwithstanding the foregoing, such subordination to any future Superior Lien shall not be effective unless the holder of such Superior Lien delivers to Tenant a written agreement reasonably satisfactory to Tenant that Tenant's rights under this Lease shall not be disturbed by such holder so long as Tenant is not in default beyond applicable notice and cure periods under this Lease. Tenant will execute, acknowledge and deliver to Landlord, within 30 days after receipt of written demand by Landlord, such documents as may be reasonably requested by Landlord or the holder of any Superior Lien to confirm or effect any such subordination, priority, or non-disturbance, provided that any such subordination agreement contains a non-disturbance agreement as set forth above.

(b)  On or before the Effective Date, Landlord shall obtain a non-disturbance agreement satisfactory to Tenant from the holder of the present mortgage or deed of trust on the Project.

(c)  Landlord represents and warrants to Tenant that it owns the Project free and clear of all liens and encumbrances other than those previously disclosed to Tenant in writing and that there are no covenants, conditions or restrictions that affect the Project or Tenant's use of the Premises. Prior to the Commencement Date, Landlord shall provide Tenant with a current title report, from a reputable title company, showing the status of title (including all exceptions thereto) to the Project and confirming the foregoing representation and warranty.

15.7  <u>Governing Law</u>. This Lease will be governed by the internal laws of the state in which the Project is located, without reference to its conflict of laws principles.

15.8   Binding Effect.  This Lease will bind and inure to the benefit of Landlord and Tenant and their respective successors, heirs, administrators and assigns, except as otherwise provided in this Lease.

15.9   Authority.  Tenant and Landlord each represents to the other party that each of the parties executing this Lease on its behalf is authorized to do so by requisite action of its respective company.

15.10   Time of the Essence.  Time is of the essence for the performance of all obligations under this Lease.

15.11   Quiet Enjoyment.  Tenant shall be entitled to the quiet enjoyment and possession of the Premises without hindrance, disturbance or molestation by Landlord, its agents, or other tenants, subject to the terms and conditions of this Lease.

15.12   Gender.  Masculine or feminine pronouns may be substituted for each other or for the neuter form or vice versa, and the plural may be substituted for the singular or vice versa in any place or places herein where the context requires such substitutions.

15.13   Damage and Destruction.

(a) If the Premises or a portion of the Building or any other portion of the Project necessary for Tenant's occupancy is damaged during the Term of this Lease by any casualty which is insurable under standard fire and extended coverage insurance policies, Landlord will repair or rebuild the Premises, the Building and the Project to substantially the same condition as immediately prior to such destruction.  The Monthly Rent will be abated proportionately during any period in which there is substantial interference with the operation of Tenant's business.  If the Premises, the Building or the Project are damaged to the extent that it would take, in Landlord's reasonable judgment, more than 45 days to repair, then Tenant may terminate this Lease upon written notice to Landlord.  In the case of uninsurable casualty, Tenant may terminate this Lease upon written notice to Landlord, unless Landlord repairs such damage within 30 days after the date of casualty.

(b) If, by reason of a casualty, all or a portion of the Premises shall be rendered unusable for the ordinary conduct of Tenant's previous use of such portion of the Premises (such unusable portion hereinafter called the "**Untenantable Space**"), whether by reason of damage to the Premises or the Building, or by reason of damage to any other portion of the Project that, in Tenant's reasonable determination, results in a lack of access to, or material interference with Tenant's ability to use or occupy the Premises, the Monthly Rent and the Additional Rent shall be abated in the proportion that the Untenantable Space bears to the total area of the Premises, as calculated by Landlord and Tenant.  If, by reason of a casualty, more than 10% of the Parking Spaces shall be rendered unusable (such unusable Parking Spaces hereinafter called the "**Unusable Parking Spaces**"), whether by reason of direct damage or loss of access thereto, then, unless Landlord can provide alternative parking within the Project acceptable to Tenant, the Monthly Rent and the Additional Rent shall be abated in the proportion that the Unusable Parking Spaces bear to the total number of Parking Spaces that Tenant is entitled to use.  If a casualty results in

there being both Untenantable Space and Unusable Parking Spaces, the abatement formulae set forth above shall be cumulated to determine the amount of Rent that will be abated.

(c) Regardless of the estimated time for repairs, if the repairs have not been completed within 60 days after the date of the casualty, Tenant shall have the right to terminate this Lease upon written notice to Landlord given at any time prior to completion of such repair.

15.14  Estoppel Certificates.  Within 30 days after receipt of written request by either Tenant or Landlord, the other party will execute, acknowledge and deliver to the requesting party a certificate certifying (a) that this Lease is unmodified and in full force and effect or, if there have been modifications, that this Lease is in full force and effect, as modified, and stating the date and nature of each modification; (b) the date, if any, to which Rent and other sums payable under this Lease have been paid; (c) that no written notice of any default has been delivered by the certifying party, which default has not been cured, except as to defaults specified in said certificate; and (d) to the certifying party's actual knowledge without duty of investigation or inquiry, there is no Event of Default under this Lease, or an event which, with notice or the passage of time, or both, would result in an Event of Default under this Lease, except for defaults specified in said certificate.  Any such certificate may be relied upon by any prospective purchaser, lease assignee or sublessee, or existing or prospective mortgagee or beneficiary under any deed of trust of the Building or any part of the Project.   If the requested party fails to deliver such a certificate within such time, the statements contained in such certificate will conclusively be deemed made and admitted by the requested party.

15.15  Tenant's Name.  Landlord is prohibited from using Tenant's name, logo, mark, or any other identifying symbol as a business reference, in any advertising or sales promotion, or in any publicity matter without Tenant's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

15.16  Confidentiality.  Except to the extent such disclosure is required by applicable Laws, Landlord shall not disclose, and shall ensure that its partners, joint venturers, members, managers, and employees do not disclose, the Monthly Rent and other terms of this Lease to any person or entity other than Landlord's lenders, partners, joint venturers, members, managers, employees, and professional advisors.  Before any such disclosure, Landlord shall notify such lenders, partners, joint venturers, members, managers, employees and professional advisors of the confidential nature of the terms of this Lease and prohibit further disclosure of same by such parties.

15.17  No Liens.  Except with respect to a post-judgment lien, Landlord shall not have the right to place a lien, whether statutory, consensual or otherwise, on any furniture, trade fixtures, signage, equipment, wiring, systems or other personal property of Tenant located in or about the Premises.

15.18  Rooftop Communications Equipment.  Tenant may construct, install, operate, maintain and remove, at its cost and expense, one or more antennae, satellite dishes or other communications equipment (each, and collectively, the "**Communications Equipment**") on the roof of the Building for any legal purpose.  There will be no additional fee or charge imposed by Landlord, or any party acting on behalf of Landlord, in connection with Tenant's construction,

installation, operation, maintenance and removal of any such Communications Equipment. The location of any such Communications Equipment, and all plans and specifications for the initial construction and installation of such Communications Equipment (collectively, the "**Installation Plans**"), will be subject to Landlord's prior written consent, which consent will not be unreasonably conditioned, delayed or withheld. If, within 30 days after Landlord's receipt of Tenant's request for consent to the proposed Installation Plans, Landlord does not consent or object in writing, Landlord's consent will be deemed given. Landlord agrees that Tenant will also have the non-exclusive right, at no additional fee or charge, to use the risers in the Building for the installation and operation of the Communications Equipment. Tenant will be responsible, at its cost and expense, for obtaining any and all permits, consents or governmental approvals necessary for the construction, installation, operation, maintenance and removal of the Communications Equipment. Landlord will ensure that the construction, installation, operation, maintenance and removal of any other antennae, satellite dishes or other communications equipment on the roof of the Building after Tenant installs its Communications Equipment will not unreasonably interfere with Tenant's Communications Equipment. Tenant will be responsible for installing, servicing, maintaining, repairing and removing the Communications Equipment, and all related equipment and wiring, during the Term of the Lease and at its expiration, at no cost or expense to Landlord, and will have access to the Building, the risers and the roof of the Building 24 hours per day, 365 days per year, for such purposes. Tenant's use of its Communications Equipment shall not interfere with equipment existing on the roof of Building as of the date of this Lease. Tenant shall, at its sole cost, repair any damage to the roof or risers of the Building caused as a result of Tenant's installation, operation and/or removal of its Communications Equipment. Upon the expiration or earlier termination of the Lease, Tenant will, at no cost or expense to Landlord, remove the Communications Equipment, all related equipment and wiring, and repair any damage to the roof or risers of the Building caused as a result of such use or removal.

15.19 <u>Severability</u>. If any provision of this Lease proves to be illegal, invalid or unenforceable, the remainder of this Lease will not be affected by such finding, and in lieu of each provision of this Lease that is illegal, invalid or unenforceable, a provision will be added as a part of this Lease as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

15.20 <u>Captions</u>. The captions of the various Articles and Sections of this Lease are for convenience only and do not necessarily define, limit, describe or construe the contents of such Articles or Sections.

15.21 <u>Landlord's Contact Parties</u>.

(a) For purposes of contacting Landlord with respect to maintenance, repair and services issues, as well as general questions or concerns, Tenant may contact the following person ("**Landlord's General Contact Person**"):

Name: Michael Dixson

Phone: 915-243-0721

Email: Mdixson@pdgnm.com

(b) For purposes of contacting Landlord with respect to construction issues, Tenant may contact the following person ("**Landlord's Construction Contact Person**"):

Name: Michael Dixson

Phone: 915-243-0721

Email: Mdixson@pdgnm.com

Landlord may change either of Landlord's Contact Parties by giving 10 days prior written notice of such change to Tenant. Tenant agrees that communication via telephone or email with a Landlord's Contact Party shall in no way satisfy the notice requirements set forth in other provisions of this Lease, unless those provisions expressly allow verbal or email notification as an acceptable means of fulfilling Tenant's notification obligation.

15.22 Zoning. Landlord represents and warrants that the Premises can be used by Tenant for the purposes intended; Tenant's ability to do so is a condition precedent to Tenant's obligations under this Lease.

15.23 Drafting. This Lease has been prepared by Tenant and its professional advisors and reviewed by Landlord and its professional advisors. Landlord, Tenant and their separate advisors believe this Lease is the product of all of their efforts, that it expresses their agreement and that it should not be interpreted in favor of either Landlord or Tenant or against either Landlord or Tenant merely because of their efforts in preparing it.

15.24 Counterparts. This Lease may be signed and delivered by facsimile or electronically and the same facsimile or "pdf" signatures shall constitute original signatures hereof with all force and effect of law. This Lease may be executed in counterparts, each of which will constitute an original and all of which together shall constitute one and the same document.

15.25 Memorandum of Lease. Concurrently with the execution of this Lease, Landlord and Tenant shall execute and deliver a Memorandum of Lease in form and substance reasonably acceptable to Tenant, which Tenant shall have the right to record in the real property records of the county in which the Premises is located.

15.26 Force Majeure. If, by reason of (a) strike, (b) labor troubles, (c) governmental pre-emption in connection with a national emergency, (d) any rule, order or regulation of any governmental agency, (e) conditions of supply or demand that are affected by war or other national, state or municipal emergency, or (f) any cause beyond Landlord's or Tenant's reasonable control (the foregoing circumstances described in this Section being herein called "**Force Majeure Causes**"), Landlord or Tenant shall be unable to fulfill, or is delayed in fulfilling, any of its respective obligations under this Lease, or if Landlord shall be unable to supply any service which Landlord is obligated to supply, then, the period of such delay or such prevention shall be deemed added to the time herein provided for the performance of any such obligation by Landlord or Tenant, except for the payment of any monetary obligations payable by Landlord or Tenant in accordance herewith.

15.27  Financial Statements.  Tenant shall not be required to provide any financial statements to Landlord. Notwithstanding the foregoing, within 15 business days after Landlord's written request in connection with any sale, financing or refinancing by Landlord of the Project (but in no event more than one time in any 12-month period), Tenant shall furnish Landlord with an updated financial comfort letter, in form and substance similar to the letter provided to Landlord by Tenant prior to the Effective Date, certifying that Tenant's then current net worth exceeds $50,000,000. Any information set forth in Tenant's letter shall be confidential and shall not be disclosed by Landlord other than to carry out the purposes of this Lease.

15.28  Indemnification.

(a)  Subject to Section 6.3 above and except to the extent of the negligence or willful misconduct of Landlord or any of its agents, servants, directors officers and employees (collectively "**Indemnitees**"), Tenant agrees to indemnify, defend and hold harmless Landlord and its Indemnitees against all liabilities, costs, damages, suits or claims (including reasonable costs of suit, attorneys' fees and costs of investigation), and actions of any kind, whether for personal injury, bodily injury, or property damage, or for any personal, property or economic injury (collectively, "**Losses**") (i) occurring within the Premises during the Term and, if applicable, the Renewal Term, of this Lease; (ii) arising out of any nonperformance, breach, violation or default by Tenant hereunder; or (iii) arising out of any negligence or willful misconduct of Tenant or its agent, employee or contractor; provided, however, if the Losses result from the concurrent strict liability, the concurrent willful misconduct, or the concurrent ordinary negligence of Indemnitees, then such indemnity by Tenant with respect to the Indemnitees shall extend only to such portion of the Losses as are allocable to Tenant's share of such concurrent strict liability, concurrent willful misconduct, or concurrent ordinary negligence. Tenant shall, at its own expense, defend all actions brought against Landlord, its agent or employees, for which Tenant is responsible for indemnification hereunder, and if Tenant fails to do so, Landlord (at its option, but without being obligated to do so) may, at the expense of Tenant and upon notice to Tenant, defend such actions and Tenant shall pay and discharge any and all judgments that arise therefrom.

(b)  Subject to Section 6.3 above and except to the extent of the negligence or willful misconduct of Tenant or any of its Indemnitees, Landlord agrees to indemnify, defend and hold harmless Tenant and its Indemnitees against all Losses which arise out of (i) the use or occupancy or manner of use or occupancy of the Common Areas by Landlord or any person claiming under Landlord; (ii) any activity, work, or thing done by or at the instruction of Landlord in or about the Common Areas; (iii) any injury, loss or damage to the person, property or business of Landlord, its employees, agents, or contractors or any invitees entering upon the Common Areas under the express or implied invitation of Landlord; or (iv) any nonperformance, breach, violation or default by Tenant hereunder; provided, however, if the Losses result from the concurrent strict liability, the concurrent willful misconduct, or the concurrent ordinary negligence of Tenant's Indemnitees, then such indemnity by Landlord with respect to Tenant's Indemnitees shall extend only to such portion of the Losses as are allocable to Landlord's share of such concurrent strict liability, concurrent willful misconduct, or concurrent ordinary negligence. Landlord shall, at its own expense, defend all actions brought against Tenant, its agent or employees, for which Landlord is responsible for indemnification hereunder, and if Landlord fails to do so, Tenant (at its option, but without being obligated to do so) may, at the expense of Landlord and upon notice

to Landlord, defend such actions and Landlord shall pay and discharge any and all judgments that arise therefrom.

        (c)    Notwithstanding anything to the contrary contained in this Lease, in no event shall Landlord or Tenant be liable for indirect, consequential, punitive or special damages. As used in this Section 15.28, "agents" or "contractors" shall not include any type of delivery service, including without limitation, UPS, Federal Express or food, flower or other delivery services. The provisions of this Section 15.28 shall survive the expiration or earlier termination of this Lease.

    15.29  <u>Limited Liability of Landlord</u>. Notwithstanding anything contained herein to the contrary, Landlord shall not be liable for any property damage caused by the public or by persons in the Premises or by other tenants of the Building or the Project, or for property damage caused by operations in construction of any private, public or quasi-public work. All property of Tenant kept or stored on the Premises shall be so kept or stored at the risk of Tenant only, unless such damage shall be caused by willful act or gross negligence of Landlord.

**[SIGNATURE PAGE TO FOLLOW]**

Landlord and Tenant have executed this Lease effective as of the Effective Date set forth above.

LANDLORD:                                    TENANT:

**The Gateway Ventures, LLC**                **Spectrum Gulf Coast, LLC**

**By: PDG PRESTIGE, Inc.**                   By:    Charter Communications, Inc.,
**its Manager**                                     its Manager

By: _Michael Dixson_                         By: _____
Name: __Michael Dixson__                     Name: Michael D. Reid
Title: __President__                         Title: Group Vice President, Corporate Sec

### EXHIBIT A

DEPICTION OF THE PROJECT AND LOCATION OF THE PREMISES.



Exhibit A

## **EXHIBIT B**

INTENTIONALLY OMITTED

**EXHIBIT C**

LANDLORD'S PREMISES WORK

1. Landlord shall deliver the Premises demolished, in "vanilla" shell condition, demised, and broom clean, meeting all code requirements.

2. Landlord shall provide all demising/exterior walls fire rated, fire caulked, and insulated to meet all code requirements.

3. Landlord shall provide an ACP-5 as required by local jurisdiction. Landlord shall remediate as required.

4. Landlord shall provide base building CO or TCO prior to construction start.

5. Landlord shall deliver the Premises pest and mold free.

6. Landlord shall deliver the Premises with finished level floors, void of structural issues.

7. The Premises will be delivered with floor poured back, other than the plumbing leave out as specified by Tenant's engineer. If not slab on grade, Landlord to provide specifications and engineering drawings if available.

8. Landlord shall perform any and all required storefront work/repair, including placement of entry doors per Tenant's architectural drawings. Store front shall be structurally sound and shall meet all code requirements. If needed, a structural survey shall be provided by Landlord. Any existing window films, such as security film or solar film, shall be completely removed, unless such film is completely void of any defects or blemishes. Door hardware shall be provided in working order, including door closers, locking mechanisms, door stops, thresholds, and push bar/door handles.

9. Landlord shall provide repairs to existing EIFS/stucco, gutters and leaders, repoint bricks, realign parapets, power wash, patch to match and repaint if needed.

10. Landlord shall remove all existing exterior signage and patch, repair and paint facade.

11. Landlord shall confirm all exterior lighting is functional and meets current code requirements.

12. Landlord shall ensure that all entrances, sidewalks, ramps, and parking meet all current code requirements, including the ADA.

13. Landlord shall provide outside store sidewalks sealed and leak free. Proper slope and drainage shall be provided by Landlord.

14. Landlord shall provide stubbed utilities to the Premises, including but not limited to, electrical, water, plumbing, sprinklers, and natural gas.

Exhibit C

15.     Landlord shall provide a minimum of 300 amps of electricity to the Premises, ready for distribution, exclusive of power required for HVAC. Landlord shall provide a meter cabinet and two 42-circuit electrical panels in coordination with the Tenant's MEP Engineer. Landlord shall confirm that all electrical panels meet all current electrical codes (if existing).

16.     Landlord shall provide sufficient HVAC for adequate heating and cooling in coordination with Tenant's MEP engineer (one ton per 300 square feet with main duct and primary distribution handled by Tenant).

17.     Landlord shall provide HVAC maintenance contract details for Tenant due diligence on existing HVAC unit(s). If HVAC is 10 years or older landlord shall replace the units. Landlord shall replace the units if unable to be repaired. HVAC units shall have electrical power and gas (if required) for testing at turnover.

18.     Landlord shall confirm whether the fire alarm is a stand-alone system, or connected to base building system.

19.     If the Premises is adjacent to a food service, Landlord shall provide proper exhaust and drainage system.

20.     Landlord shall empty, remove and cap all grease traps. Landlord shall demolish, clean out and cap off all drains and water lines not required for bathrooms, mop sink, and break room.

21.     Landlord shall procure and install a four-foot-wide (4'-0") rear delivery door, incorporating Tenant specified door hardware/frames and finish in the location coordinated by Tenant's architect.

22.     Landlord shall confirm that all exterior doors do not lead onto or into any barriers or landscaping. All doors shall open towards a secure level flat floor landing surface/pavement, opening towards the clearest logical direction for access. The existing or new landing shall be clean, void of trip hazards, and lead onto a firm flat concrete landing, level with the existing grade, ramped down or up per code requirements to meet the existing pavement for deliveries.

23.     Landlord shall provide two ADA compliant bathrooms in Tenant specified locations. Bathroom fixtures, finishes and accessories to be specified by Tenant.

24.     Landlord to provide barricade specifications for any property requiring such.

25.     Landlord to notify Tenant and Tenant's architect of any changes made to the existing LOD within 48 hours of any such change.

Exhibit C-Page 2

# EXHIBIT D

## LOCATION OF TENANT'S PANEL ON THE MONUMENT SIGN



Exhibit D

## LEASE AMENDMENT

**EXHIBIT TGV307**

THIS LEASE AMENDMENT ("Amendment") is executed this _____ day of _____, 2021, by and between THE GATEWAY VENTURES LLC, a Texas limited liability company (collectively the "***Landlord***"), and SPECTRUM GULF COAST LLC, a Delaware limited liability (the "***Tenant***").

### WITNESSETH

WHEREAS, Landlord and Tenant are parties to that certain Lease Agreement dated August 13, 2020, together with all amendments and modifications thereto (collectively, the "***Lease***"), covering certain premises more particularly described in the Lease; and

WHEREAS, the Landlord is Debtor and Debtor in Possession in a Chapter 11 bankruptcy case styled and captioned as Case No. 21-30071, *In re Gateway Ventures LLC*, pending in the United States Bankruptcy Court for the Western District of Texas (the "***Bankruptcy Case***"); and

WHEREAS, Landlord seeks to modify (as provided herein) and thereby assume the Lease through the Chapter 11 plan of reorganization currently presented in the Bankruptcy Case; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant covenant and agree as follows:

### AGREEMENT

1. <u>Assumption of the Lease.</u>  Tenant hereby consents to the assumption of the Lease in the Bankruptcy Case under 11 U.S.C. §365 and/or otherwise through the proposed Chapter 11 plan, with the Leases being amended as set forth herein.  No cure or modification of the Lease, other than through this instant Amendment, is required for assumption of the Lease.

2. <u>Withdrawal of Proof of Claim No. 7.</u>  Promptly following the effective date of the confirmed Chapter 11 plan of Landlord in the Bankruptcy Case, Tenant shall withdraw the proof of claim of Tenant filed in the Bankruptcy Case (Claim No. 7).

3. <u>Landlord's Work.</u>  The three dates listed under items (i), (ii), and (iii) under Section 3.1(c) of the Lease are modified to the following dates.

| (i) [permits] | **October 1, 2021** |
| (ii) [grading and site work] | **November 1, 2021** |
| (iii) [construction of shell] | **January 1, 2021** |

4. <u>Delivery of Possession.</u>  The Expected Deliver Date of Section 3.2 of the Lease of the is hereby modified to **February 1, 2022**.

5. <u>No Further Modification.</u>  Except as set forth in this Amendment, all of the terms and provisions of the Lease shall remain unmodified and in full force and effect.  In the event of a conflict between the terms of the Lease and the terms of this Amendment, the terms of this Amendment will govern.  Effective as of the date hereof, all references to the "Lease" shall refer to the Lease as amended by this Amendment. Both Landlord and Tenant each represent and warrant to the other that both of them and each individual signing on behalf of Landlord and Tenant are authorized and empowered to enter into this Amendment.

6. <u>No Joinder.</u>  Landlord represents and warrants to Tenant that (i) Landlord holds a fee simple title to the Premises, and (ii) no joinder or approval of another person or entity is required with respect to Landlord's right and authority to enter into and execute this Amendment.

7. <u>Counterparts.</u>  This Amendment may be executed in counterparts, each of which will be deemed an original, but all of which, when taken together, will constitute one and the same instrument. The counterparts of this Amendment may be executed by physically signed documents exchanged via email attachments in .pdf or equivalent format, and such executed counterparts shall have the same force and effect as an originally executed counterpart.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

*{continued on following page}*

---

**LEASE AMENDMENT — Page 2**                                                      2011811.DOCX[1]

Landlord:

THE GATEWAY VENTURES LLC,
a Texas limited liability company

By:    PDG Prestige, Inc.
       Manager

By:_____
Name: Michael Dixson
Title:  _____

Tenant:

SPECTRUM GULF COAST LLC,
a Delaware limited liability company

By:_____
Name: _____
Title:  _____