EXECUTED VERSION



## ELEMENT FRANCHISE AGREEMENT

FRANCHISOR:   MARRIOTT INTERNATIONAL, INC.

FRANCHISEE:   WESTAR INVESTORS GROUP, LLC

LOCATION:   THE NORTHEAST QUADRANT OF GATEWAY
BOULEVARD AND AIRWAY BOULEVARD, EL PASO, TX 79925

DATE:   OCTOBER 15, 2019

## TABLE OF CONTENTS

Page

1. LICENSE...........................................................................................................................1
   1.1 Limited Grant..........................................................................................................1
   1.2 Franchisor's Reserved Rights.................................................................................1

2. TERM..............................................................................................................................1
   2.1 Term.........................................................................................................................1
   2.2 Not Renewable........................................................................................................1

3. FEES, CHARGES AND COSTS.....................................................................................1
   3.1 Application Fee; Expansion Fee.............................................................................1
   3.2 Franchise Fees........................................................................................................2
   3.3 Franchisor Travel Costs.........................................................................................2
   3.4 Other Fees, Charges and Costs...............................................................................2
   3.5 Timing of Payments and Performance of Services................................................2
   3.6 Interest on Late Payments......................................................................................2
   3.7 Program Services Contribution..............................................................................2

4. HOTEL CONSTRUCTION, DESIGN, RENOVATION AND MAINTENANCE..........4
   4.1 Number of Guestrooms; Expansion........................................................................4
   4.2 Initial Construction or Renovation of the Hotel....................................................4
   4.3 Periodic Renovations..............................................................................................4
   4.4 Design Process........................................................................................................4
   4.5 Maintenance............................................................................................................5

5. FURNITURE, FIXTURES, EQUIPMENT, INVENTORIES AND SUPPLIERS...........5
   5.1 Uniformity of System.............................................................................................5
   5.2 Suppliers.................................................................................................................5

6. ADVERTISING AND MARKETING; PRICINGS, RATES AND RESERVATIONS.....5
   6.1 Franchisee's Local Advertising and Marketing Programs......................................5
   6.2 Marketing Fund.......................................................................................................6
   6.3 Additional Marketing Programs.............................................................................7
   6.4 Pricing, Rates and Reservations.............................................................................7

7. ELECTRONIC SYSTEMS..............................................................................................8
   7.1 Systems Installation and Use.................................................................................8
   7.2 Reservation System................................................................................................8
   7.3 Electronic Systems Provided Under License.........................................................8
   7.4 Access to Information..............................................................................................8

8. HOTEL OPERATIONS....................................................................................................8
   8.1 Operator of the Hotel..............................................................................................8
   8.2 Employees...............................................................................................................9
   8.3 Compliance with the Standards..............................................................................9
   8.4 System Promotion; No Diversion to Other Businesses........................................10

9. TRAINING, COUNSELING AND ADVISORY SERVICES........................................10
   9.1 Training.................................................................................................................10
   9.2 Counseling and Advisory Services.......................................................................10

**10. SYSTEM AND STANDARDS; FRANCHISEE ASSOCIATION**..............................................**10**

    10.1    Compliance with System and Standards. ..................................................10
    10.2    Modification of the System and Standards. ...........................................10
    10.3    Franchisee Association. ...............................................................................11

**11. PROPRIETARY MARKS AND INTELLECTUAL PROPERTY** ...............................**11**

    11.1    Franchisor's Representations Concerning the Proprietary Marks..............11
    11.2    Franchisee's Use of Intellectual Property and the System. .......................11
    11.3    Franchisee's Use of Other Marks. .............................................................13
    11.4    Websites and Domain Names. ....................................................................13

**12. CONFIDENTIAL INFORMATION; DATA PROTECTION LAWS** ..........................**13**

    12.1    Confidential Information................................................................................13
    12.2    Data Protection Laws. ..................................................................................14

**13. ACCOUNTING AND REPORTS; TAXES**........................................................**14**

    13.1    Accounting. ...................................................................................................14
    13.2    Books, Records and Accounts......................................................................14
    13.3    Accounting Statements.................................................................................14
    13.4    Franchisor Examination and Audit of Hotel Records. ...............................15
    13.5    Taxes.............................................................................................................15

**14. INDEMNIFICATION** ...................................................................................**16**

**15. INSURANCE**.............................................................................................**16**

    15.1    Insurance Required........................................................................................16
    15.2    Other Requirements. .....................................................................................17

**16. FINANCING OF THE HOTEL** .....................................................................**17**

**17. TRANSFERS**.............................................................................................**17**

    17.1    Franchisee's Transfer Rights........................................................................17
    17.2    Transfers Not Requiring Notice or Consent...............................................17
    17.3    Transfers Requiring Notice but Not Consent..............................................18
    17.4    Transfers Requiring Notice and Consent. ...................................................19
    17.5    Proposed Transfer to Competitor and Right of First Refusal.....................20
    17.6    Restricted Persons. .......................................................................................21
    17.7    Transfers by Franchisor................................................................................21

**18. PROSPECTUS REVIEW** .............................................................................**22**

    18.1    Franchisor's Review of Prospectus. ............................................................22
    18.2    Exemption from Review. ..............................................................................22

**19. DEFAULT AND TERMINATION** ..................................................................**22**

    19.1    Immediate Termination.................................................................................22
    19.2    Default with Opportunity to Cure. ..............................................................23
    19.3    Suspension of Reservation System. ............................................................24
    19.4    Damages........................................................................................................24

**20. POST-TERMINATION** ...............................................................................**25**

    20.1    Franchisee Obligations.................................................................................25
    20.2    Franchisor's Rights on Expiration or Termination. ...................................26

21. CONDEMNATION AND CASUALTY ....................................................................27
    21.1    Condemnation. ...................................................................................27
    21.2    Casualty. ...........................................................................................27

22. COMPLIANCE WITH APPLICABLE LAW; LEGAL ACTIONS ....................28
    22.1    Compliance with Applicable Law. .................................................28
    22.2    Notice of Legal Actions. .................................................................28

23. RELATIONSHIP OF PARTIES ........................................................................28

24. GOVERNING LAW; ARBITRATION; INTERIM RELIEF; COSTS OF ENFORCEMENT; WAIVERS ................................................................................28
    24.1    Governing Law, Arbitration, and Jurisdiction. ..............................28
    24.2    Equitable Relief. ..............................................................................29
    24.3    Costs of Enforcement. ....................................................................29
    24.4    WAIVER OF PUNITIVE DAMAGES. ..........................................29
    24.5    WAIVER OF JURY TRIAL. ..........................................................30

25. NOTICES ..............................................................................................................30

26. REPRESENTATIONS AND WARRANTIES ....................................................30
    26.1    Existence; Authorization; Ownership; Other Representations. .....30
    26.2    Additional Franchisee Acknowledgments and Representations. ....31

27. MISCELLANEOUS ............................................................................................32
    27.1    Counterparts. ...................................................................................32
    27.2    Construction and Interpretation. .....................................................32
    27.3    Reasonable Business Judgment. .....................................................32
    27.4    Consents and Approvals. ................................................................33
    27.5    Waiver. .............................................................................................33
    27.6    Entire Agreement. ...........................................................................33
    27.7    Amendments. ...................................................................................33
    27.8    Survival. ...........................................................................................33

EXHIBIT A KEY TERMS ..........................................................................................A-1

EXHIBIT B DEFINITIONS ........................................................................................B-1

EXHIBIT C NEW DEVELOPMENT .........................................................................C-1

## FRANCHISE AGREEMENT

This Agreement between Franchisor and Franchisee is executed and becomes effective on the Effective Date.

## RECITALS

A.     Franchisor owns the System and Franchisee has requested a license to use the System to operate the Hotel as a System Hotel at the Approved Location.

B.     Franchisor has agreed to grant a license to Franchisee subject to the terms of this Agreement.

C.     Guarantor will provide the Guaranty.

NOW, THEREFORE, in consideration of the promises in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Franchisor and Franchisee agree as follows:

**1.     LICENSE**

**1.1     Limited Grant.** Franchisor grants to Franchisee a limited, non-exclusive license to use the Proprietary Marks and the System to operate the Hotel as a System Hotel at the Approved Location under the terms of this Agreement.

**1.2     Franchisor's Reserved Rights.**

A.     *Development Activities.* Franchisee agrees that Franchisor and its Affiliates reserve the right to conduct Development Activities at any location, other than the Approved Location, without notice to Franchisee, subject to Item 9 of Exhibit A. Franchisee covenants not to do anything that may interfere with Franchisor's and its Affiliates' exercise of such right to conduct Development Activities.

B.     *Territorial Rights.* Franchisee agrees that it is not entitled to any territorial rights or exclusivity, except as stated in Item 9 of Exhibit A.

C.     *Use of the System.* Franchisee acknowledges that Franchisor and its Affiliates will allow other Franchisor Lodging Facilities to use various parts of the System and may allow other lodging facilities to use various parts of the System under affiliation or marketing agreements.

**2.     TERM**

**2.1     Term.** The term of this Agreement is stated in Item 4 of Exhibit A (the "Term").

**2.2     Not Renewable.** This Agreement expires on the last day of the Term, and the rights granted under it are not renewable and Franchisee has no expectation of any right to extend the Term.

**3.     FEES, CHARGES AND COSTS**

**3.1     Application Fee; Expansion Fee.** Franchisee has paid Franchisor the non-refundable application fee stated in Item 10 of Exhibit A. If Franchisor approves an increase in the number of

KUMAR 000807

Guestrooms in the Hotel under Section 4.1, Franchisee will pay the then-current per-Guestroom expansion fee, multiplied by the number of additional Guestrooms.

**3.2** **Franchise Fees.** Beginning on the Opening Date, Franchisee will pay Franchisor for each month an amount equal to the percentage of Gross Room Sales stated in Item 11 of <u>Exhibit A</u> for such month (the "<u>Franchise Fees</u>"). Franchisee will not offer complimentary or reduced-price Guestrooms or food and beverage to benefit any other business at or outside of the Hotel.

**3.3** **Franchisor Travel Costs.** If Franchisor requests, Franchisee will reimburse Franchisor for all Travel Costs for individuals designated by Franchisor to provide training, inspections or services for the Hotel, including counseling and advisory services, which will not exceed the amounts permissible under Franchisor's corporate travel policies. If the Hotel is not in a sold-out position, Franchisee will provide complimentary lodging at the Hotel to such individuals while they are providing such training, inspections, or services, and to Franchisor's representatives or independent auditors while conducting audits.

**3.4** **Other Fees, Charges and Costs.** Franchisee will pay the fees, charges and costs required under this Agreement and any other Marriott Agreement, and will pay for any optional programs in which it participates. Franchisee will also pay Franchisor for any goods or services purchased, leased or licensed by Franchisee from Franchisor, including any costs related to purchasing, installing and upgrading any Electronic Systems. The Franchise Fees and Application Fee are personal to Franchisee; all other fees, charges and costs under this Agreement and any other Marriott Agreement (and any applicable changes) will be computed on a fair and consistent basis among similarly situated System Hotels. Franchisor may change such other fees, charges and costs to reflect any change in (i) the costs of providing, or the scope of, the relevant goods, programs or services; (ii) the method Franchisor uses to determine allocation of the applicable charges; or (iii) the competitive needs of the System.

**3.5** **Timing of Payments and Performance of Services.**

A. *Timing of Payments.* Franchise Fees are due within 15 days after the end of each month. All other payments are due as invoiced. All payments will be made in immediately available funds, at the location designated by Franchisor, and through electronic debit/credit transfer to the accounts designated by Franchisor or by such other method as Franchisor approves.

B. *Affiliates and Designees.* Any service or obligation of Franchisor under this Agreement may be performed by an Affiliate or designee of Franchisor. Franchisor may designate that payment be made to the Person performing the service. Any reference in this Agreement to Franchisor concerning payments or performance of services includes such Affiliates and designees. Any designation for the performance of services will not relieve Franchisor or Franchisee of any of their obligations under this Agreement.

**3.6** **Interest on Late Payments.** If any payment due under this Agreement is not received by its due date, such payment will be overdue, and Franchisor may require Franchisee to pay interest that will accrue at a rate of 18% per annum (or, if less, the maximum interest rate permitted by Applicable Law) from the date such overdue amount was due until paid. Franchisor's right to receive interest is in addition to any other remedies Franchisor may have.

**3.7** **Program Services Contribution.**

A. *Program Services.* Beginning on the Opening Date, Franchisee will pay Franchisor each month the Program Services Contribution, which as of the Effective Date, is the amount

stated in Item 12.A of <u>Exhibit A</u>. Franchisor will use the Program Services Contribution to fund certain mandatory programs and services for System Hotels that Franchisee would otherwise be required to pay for separately ("<u>Program Services</u>"), which include, to the extent described in the Disclosure Document:

        1.       Marketing Fund Activities as described in Section 6.2;

        2.       development, modification, maintenance, support, administration and operation of certain mandatory Electronic Systems;

        3.       development, operation, administration and oversight of certain other mandatory programs and services; and

        4.       the retention or employment of personnel, consultants and other professionals or specialists to assist Franchisor in the development, implementation and administration of Program Services, including collection and accounting of the Program Services Fund, as well as overhead, other costs incurred in providing Program Services, and the reimbursement of capital invested in the development of such Program Services, together with costs incurred by Franchisor to finance such capital.

Franchisor may modify Program Services from time to time. Unless otherwise determined by Franchisor, Program Services do not include services or costs relating to the purchase, installation or deployment of, or training for, any Electronic System.

        B.      *Permitted Changes.* Franchisor may at any time (i) change the method of funding Program Services (including by establishing methods of funding Program Services other than by the Program Services Contribution), (ii) change the programs and services covered by the Program Services Contribution; (iii) change the amount of the Program Services Contribution or the method of calculation of the Program Services Contribution, (iv) merge or operate the Program Services Fund together with program services funds used to benefit other Franchisor Lodging Facilities; or (v) discontinue the use of the Program Services Contribution to fund any one or all mandatory programs or services for System Hotels, and Franchisee will be bound by any such changes.

        C.      *Benefits.* Franchisor may use the Program Services Fund to cover the costs of Program Services that benefit System Hotels as a whole, groups of System Hotels, and other Franchisor Lodging Facilities in addition to System Hotels. Franchisor has no obligation to ensure that any particular System Hotel, including the Hotel, benefits from Program Services on a pro-rata or other basis or that the Hotel will benefit from Program Services proportionate to the Program Services Contribution paid by Franchisee.

        D.      *No Fiduciary Duty.* Franchisor and its Affiliates do not hold the Program Services Fund as a trustee or as a trust fund and have no fiduciary duty to Franchisee for the Program Services Fund. The Program Services Contribution may be commingled with other money of Franchisor and its Affiliates and used to pay all costs, including administrative costs, salaries and overhead, and collection and accounting costs, incurred by Franchisor or any of its Affiliates for the Program Services Fund and the Program Services. Franchisor or its Affiliates may (but are not obligated to): (i) loan money for Program Services and charge interest on any such loan; and (ii) use the Program Services Contribution to repay any such loan plus interest.

4.    **HOTEL CONSTRUCTION, DESIGN, RENOVATION AND MAINTENANCE**

**4.1    Number of Guestrooms; Expansion.**  The Hotel will have the number of Guestrooms stated in Item 7 of Exhibit A or such other number approved by Franchisor. Franchisee may expand the Hotel or build additional Guestrooms in compliance with this Agreement only with Franchisor's prior written approval. If additional Guestrooms are approved, Franchisee will pay an expansion fee under Section 3.1.

**4.2    Initial Construction or Renovation of the Hotel.**  Franchisee will timely start and complete the initial construction or renovation of the Hotel, as applicable, to Franchisor's satisfaction in accordance with Section 4.4, Exhibit C and the Standards (the "Initial Work").

**4.3    Periodic Renovations.**  Franchisee will timely start and complete the periodic renovation of all Guestrooms and Public Facilities to Franchisor's satisfaction in accordance with Section 4.4 and the Standards, including replacing Soft Goods and Case Goods periodically as required by the Standards ("Periodic Renovations"). At the time of any replacement of FF&E, Franchisor may require Franchisee to upgrade the rest of the Hotel to conform to the Standards applicable to similarly situated System Hotels.

**4.4    Design Process.** Franchisee will obtain the Design Criteria from Franchisor within 10 days of the Effective Date for the Initial Work, and in a timely manner for any Periodic Renovation. In connection with the Initial Work and any Periodic Renovation, Franchisee will pay to Franchisor its then-current fees and comply with the following requirements (the "Design Process"):

A.    *Design Team.* For the Initial Work, and as needed for Periodic Renovations, Franchisee will retain a qualified registered architect, engineer and interior designer, and based on the nature of the project, Franchisor may require that Franchisee retain other specialty consultants. Franchisee will provide Franchisor the name, address and relevant work experience on similar projects for any such Person that Franchisee proposes to retain, and Franchisor will have 30 days after receipt of such information to notify Franchisee of its election to consent or withhold its consent. Franchisor's election to consent or withhold its consent will be based on prior experiences with such Person and such Person's reputation and experience on similar projects. Franchisor may charge its then-current fee for reviewing any interior designer that is not included on Franchisor's list of recommended interior designers for the Hotel, if any. If Franchisor does not respond to Franchisee within 30 days after Franchisor's receipt of such information, then Franchisee may retain such Person. Neither Franchisor's failure to respond nor Franchisor's consent to the use of such Person will be deemed an endorsement or recommendation by Franchisor. Franchisor is not liable for the unsatisfactory performance of any Person retained by Franchisee.

B.    *Submission of Plans.* For the Initial Work and Periodic Renovations, Franchisee will adapt the Design Criteria to the Hotel and Applicable Law, including Accessibility Requirements. For the Initial Work, and if Franchisor requests for any Periodic Renovations, Franchisee will prepare and submit Plans electronically in the phases and with the detail required by the Standards. The Plans will not deviate from the Design Criteria unless previously approved by Franchisor, and any such deviations will be clearly designated in a separate document delivered along with the Plans.

C.    *Review of Plans.* Franchisor will promptly review the Plans only for compliance with the Design Criteria and any applicable property improvement plan, and in the case of the Initial Work, to confirm that the number, configuration and location of Guestrooms and the size, configuration and location of Public Facilities are as previously approved by Franchisor. If Franchisor determines that the Plans do not satisfy such requirements, Franchisor may require changes and Franchisee will deliver revised Plans incorporating such changes. If Franchisor determines that the Plans are incomplete,

KUMAR 000810

Franchisor may defer its review of the Plans until it receives complete Plans. Franchisee will not begin the Initial Work or any Periodic Renovation requiring submission of Plans until Franchisor confirms in writing that such Plans comply with such requirements. On receipt of Franchisor's confirmation, Franchisee will promptly submit the final Plans electronically. Once finalized, the Plans will not be changed without Franchisor's prior consent. Franchisee will ensure that the renovation of the Hotel is completed in accordance with the Plans.

        D.    *Compliance with Applicable Law.* Franchisee (and not Franchisor or its Affiliates) is responsible for ensuring that the Plans comply with Applicable Law, including Accessibility Requirements. Franchisor and its Affiliates will have no liability or obligation concerning the means, methods or techniques used in constructing or renovating the Hotel. Franchisee will not reproduce, use or permit the use of any Design Criteria or Plans other than for the Hotel.

        **4.5   Maintenance.** Franchisee will maintain the Hotel in good repair and first-class condition and in conformity with Applicable Law, the Standards and <u>Exhibit C</u>. Franchisee will make repairs, alterations and replacements to the Hotel as required by the Standards. Franchisee will not make any material alterations to the Hotel without Franchisor's prior consent, unless such alterations are required by Applicable Law or for the continued safe and orderly operation of the Hotel.

**5.**    <u>FURNITURE, FIXTURES, EQUIPMENT, INVENTORIES AND SUPPLIERS</u>

        **5.1   Uniformity of System**. Franchisee will use only such FF&E, Inventories and Fixed Asset Supplies that comply with the Standards. The requirements of this Section 5.1 are to ensure that items used at System Hotels are uniform and of high quality to maintain the identity, integrity and reputation of the System. Before purchasing FF&E to be used in constructing or renovating the Hotel, if requested by Franchisor, Franchisee will prepare furnished models of Guestrooms, color boards and drawings for Franchisor's confirmation that such proposed FF&E will meet the Standards. Franchisor will promptly respond to Franchisee's proposal.

        **5.2   Suppliers**. Franchisor may designate suppliers, including Franchisor, for certain items related to FF&E, Inventories and Fixed Asset Supplies. Franchisee may propose new suppliers by delivering sufficient information and samples for Franchisor's confirmation that such item meets the Standards and the proposed supplier is capable of providing such item in accordance with the Standards. Franchisor may require: (i) reimbursement for the cost of such review; (ii) that such supplier have insurance protecting Franchisor and Franchisee; and (iii) that any supplier using the Intellectual Property enter into an agreement for its use. Franchisor will have no liability for damage to any sample. Franchisor may refuse to permit future purchases if the supplier fails to meet the requirements of this Section 5.2 or the Standards.

**6.**    <u>ADVERTISING AND MARKETING; PRICINGS, RATES AND RESERVATIONS</u>

        **6.1   Franchisee's Local Advertising and Marketing Programs.**

        A.    *Local Advertising.* Franchisee will undertake local advertising, marketing, promotional, sales and public relations programs and activities for the Hotel, including preparing and using any Marketing Materials, in accordance with the Standards.

        B.    *Use of Signs and Marketing Materials.* Franchisee will use signs and other Marketing Materials only in the places and manner approved or required by Franchisor and in accordance with the Standards and Applicable Law. Franchisee will deliver samples of Marketing Materials not provided by Franchisor and obtain prior approval from Franchisor before any use. If Franchisor

withdraws its approval, Franchisee will promptly stop using such Marketing Materials. Any Marketing Materials developed by Franchisee may be used or modified by other Franchisor Lodging Facilities without compensation to Franchisee.

### 6.2 Marketing Fund.

A. *Marketing Fund Activities.* To promote general public recognition of the Proprietary Marks and use of System Hotels, Franchisor may undertake the following activities (the "Marketing Fund Activities"):

> 1. brand strategy and brand development activities;

> 2. the creation, production, placement and distribution of Marketing Materials in any form of media;

> 3. advertising, marketing, promotional, public relations, inventory management, reservation activities and sales campaigns, programs, sponsorships, seminars and other sales activities;

> 4. market research and oversight and management of the guest satisfaction program and the Loyalty Programs; and

> 5. the retention or employment of personnel, advertising agencies, marketing consultants and other professionals or specialists to assist in the development, implementation and administration of any such activities.

These activities may be conducted on a local, regional, national, continental, international or Category basis. Franchisor may modify the Marketing Fund Activities from time to time.

B. *Marketing Fund Contribution.* Beginning on the Opening Date, Franchisee will pay Franchisor for each month an amount equal to the percentage of Gross Room Sales stated in Item 12.B of Exhibit A for such month, which Franchisor will use for the Marketing Fund Activities (the "Marketing Fund Contribution"). The Marketing Fund Contribution will be paid by Franchisee as part of the Program Services Contribution. Franchisor may change the method of funding the Marketing Fund Activities (including by establishing methods of funding Marketing Fund Activities other than by the Marketing Fund Contribution or the Program Services Contribution) or the amount of the Marketing Fund Contribution (without any obligation to make a corresponding change to the total Program Services Contribution), and Franchisee will be bound by any such changes.

C. *Benefits.* Franchisor may use the Marketing Fund for purposes that benefit or include System Hotels as a whole, groups of System Hotels, and other Franchisor Lodging Facilities in addition to System Hotels. Franchisor has no obligation to ensure that any particular System Hotel, including the Hotel, benefits from Marketing Fund Activities on a pro-rata or other basis or that the Hotel will benefit from the Marketing Fund Activities proportionate to the Marketing Fund Contribution paid by Franchisee or allocated by Franchisor to the Marketing Fund from the Program Services Contribution paid by Franchisee.

D. *Allotment of Marketing Materials.* If Marketing Materials are produced using funds from the Marketing Fund, all System Hotels will receive an allotment of relevant materials. If Franchisee requests Marketing Materials in addition to the portion allotted to Franchisee, Franchisor may require Franchisee to pay additional costs.

KUMAR 000812

E.    *No Fiduciary Duty.* Franchisor and its Affiliates do not hold the Marketing Fund as a trustee or as a trust fund and have no fiduciary duty to Franchisee for the Marketing Fund. The Marketing Fund Contribution may be commingled with other money of Franchisor and its Affiliates and used to pay all costs, including administrative costs, salaries and overhead, and collection and accounting costs, incurred by Franchisor or any of its Affiliates for the Marketing Fund and the Marketing Fund Activities. Franchisor or its Affiliates may (but are not obligated to): (i) loan money for Marketing Fund Activities and charge interest on any such loan; and (ii) use the Marketing Fund Contribution to repay any such loan plus interest. On request, Franchisor will provide to Franchisee an unaudited accounting of the uses of amounts in the Marketing Fund for any fiscal year of Franchisor if such request is made between 90 and 180 days after the end of such fiscal year.

F.    *Permitted Changes.* Franchisor may (i) change the local, country, regional, continental or international scope of the Marketing Fund or the Marketing Fund Activities; (ii) merge or operate the Marketing Fund together with marketing funds used to benefit other Franchisor Lodging Facilities; or (iii) discontinue any Marketing Fund Activities.

**6.3    Additional Marketing Programs.**  Franchisor may provide, and Franchisee will participate in, Additional Marketing Programs that are mandatory for similarly situated System Hotels. Franchisee may elect to participate in optional Additional Marketing Programs. Franchisee will pay for Additional Marketing Programs in which it participates on the same basis as other participating System Hotels.

**6.4    Pricing, Rates and Reservations.**

A.    *Pricing and Rates.* Franchisee is responsible for setting its own prices and rates for Guestrooms and other products and services at the Hotel, including determining any prices or rates that appear in the Reservation System. Franchisor may, however: (i) prohibit certain types of charges or billing practices that Franchisor determines are misleading or detrimental to the System, including price-gouging or incremental fees for services that guests would normally expect to be included in the Guestroom charge; (ii) require that Franchisee price consistently in all distribution channels; or (iii) impose other pricing requirements permitted by Applicable Law.

B.    *Pricing Recommendations; Participation in Programs.* Franchisor may recommend prices or rates for the products and services offered by Franchisee or require participation in various sales or inventory management programs or promotions offered by Franchisor. Franchisor's recommendations are not mandatory; Franchisee is ultimately responsible for determining the prices or rates at which it offers its products and services, and Franchisor's recommendations are not a representation or warranty by Franchisor that the use of such recommended prices or rates will produce, increase, or optimize Franchisee's profits. Franchisor will have no liability for any such recommendations, including those made in connection with any sales activity or Inventory Management. Franchisor may require Franchisee to participate in Inventory Management or may act as Sales Agent for Franchisee. If Franchisor is acting as Sales Agent for Franchisee, Franchisee consigns hotel inventory to Franchisor, and Franchisee retains all risk of loss of unsold inventory or inventory sold at a reduced price.

C.    *Honoring Reservations.* Franchisee will provide its prices and rates for use in the Reservation System in accordance with the Standards. Franchisee will: (i) honor any prices, rates or discounts that appear in the Reservation System or elsewhere; (ii) honor all reservations made through the Reservation System or that are confirmed; and (iii) not charge any Hotel guest a rate higher than the rate specified for the Hotel guest's reservation in the Reservation System or, if not made through the Reservation System, in the reservation confirmation. Franchisee will also honor all pricing and terms for any other product or service offered in connection with the Hotel.

7.    **ELECTRONIC SYSTEMS**

    **7.1    Systems Installation and Use.**  At its cost, Franchisee will purchase or lease, install, maintain and use at the Hotel all mandatory Electronic Systems (and optional Electronic Systems that Franchisee elects to use) in compliance with the Standards or other approved specifications. Franchisee will pay all Electronic Systems Fees that are not covered by the Program Services Contribution. Franchisee will not use the Electronic Systems for any purpose except for the benefit of the Hotel.

    **7.2    Reservation System.**  Subject to Section 19.3, Franchisor will make the Reservation System available to the Hotel. Franchisee will cause the Hotel to participate in the Reservation System in accordance with the Standards and this Agreement. Franchisor is not required to make the Reservation System available to the Hotel for any reservations occurring after the expiration or termination of this Agreement.

    **7.3    Electronic Systems Provided Under License.**  As a condition to using the Electronic Systems, Franchisee will execute the Electronic Systems License Agreement. The Electronic Systems that are proprietary to Franchisor or third-party vendors, as applicable, will remain their sole property. Franchisee will treat the Electronic Systems as confidential at all times. The Electronic Systems may be modified, replaced or become obsolete, and new Electronic Systems may be created to meet the needs of the System and changes in technology. If Franchisor determines that it is necessary to amend or replace the Electronic Systems License Agreement because of such events, Franchisee will execute the then-current form of, or an amendment to, the Electronic Systems License Agreement.

    **7.4    Access to Information.**  Franchisor may access the Electronic Systems to obtain marketing, sales and guest information and Franchisee will take all actions reasonably necessary to provide such access. Franchisor and its Affiliates may use any data related to the Hotel, Franchisee and its Affiliates obtained through the Electronic Systems, including Guest Personal Data.

8.    **HOTEL OPERATIONS**

    **8.1    Operator of the Hotel.**

        A.    *Franchisor Consent Required.* The Hotel will be operated only by Franchisee or a Management Company, in either case, only with the prior consent of Franchisor.  Franchisee will at all times be responsible for complying with the obligations of this Agreement even though Franchisee may retain a Management Company.  Franchisor has consented to the Person identified in Item 8 of Exhibit A to operate the Hotel, subject, in the case of a Management Company, to the execution and delivery by such Management Company and Franchisee of a Management Company Acknowledgment.  Franchisor's consent may be withdrawn at any time if Franchisor determines that such Person no longer satisfies the conditions in Section 8.1.B.

        B.    *Conditions for Consent.* Franchisor may withhold its consent to any proposed management company that: (i) Franchisor determines (a) is not financially capable, (b) does not have the managerial skills or operational capacity required to operate the Hotel in accordance with the Standards and this Agreement or (c) is a Competitor, an Affiliate of a Competitor, or the principal operator of hotels for a Competitor; (ii) does not provide Franchisor with all information and access that Franchisor reasonably requests; or (iii) has (or any of its Affiliates have) (a) been convicted of a Serious Crime, (b) engaged in conduct that Franchisor determines may adversely affect the Hotel, the System or Franchisor's interests or (c) been a party to any material civil litigation with Franchisor or its Affiliates.  Franchisor will not consent to any proposed management company that is a Restricted Person, is an Affiliate of a

Restricted Person, or in which a Restricted Person has an interest. Franchisor has the right to review any management agreement between Franchisee and its proposed management company.

C.     *Change in Circumstances*. If there is a change in Control of the Management Company or if the Management Company becomes a Competitor (or an Affiliate of a Competitor) or a Restricted Person (or an Affiliate of a Restricted Person), or if Management Company becomes the principal operator for a Competitor or if there is a material adverse change to the financial condition or operational capacity of the Management Company, Franchisee will promptly notify Franchisor of any such event of which it becomes aware together with such additional information that Franchisor may reasonably request. Based on these changed circumstances, Franchisor may require Franchisee to terminate its agreement with such Management Company and retain a replacement management company that will be subject to Franchisor's consent. After Franchisor receives such notice and any such additional information Franchisor reasonably requests, Franchisor will respond to Franchisee within 30 days.

**8.2    Employees.**

A.     *Hotel Staffing*. Franchisee will ensure that suitable qualified individuals are employed at the Hotel sufficient to staff the Hotel. Managers at the Hotel will devote their full time to the management and operation of the Hotel and supervision of employees.

B.     *Hotel Employment Matters*. All employment decisions at the Hotel will be made solely by Franchisee or the Management Company. Franchisor does not direct or control the employment policies or decisions for the Hotel. All employees at the Hotel are solely employees of Franchisee or the Management Company, not Franchisor, and neither Franchisee nor the Management Company is Franchisor's agent for any purpose with regard to Hotel employees. Franchisee or the Management Company will promptly inform Franchisor whenever it hires a general manager.

C.     *Communication with Managers and Management Company*. Franchisor may communicate directly with the managers at the Hotel and the Management Company about day-to-day operations of the Hotel and Franchisor may rely on such statements of the managers and Management Company. Such communications will not affect the requirements of Section 25 or Section 27.7. Franchisor will under no circumstances direct or control such Hotel operations.

**8.3    Compliance with the Standards.**

A.     *Required Activities*. Franchisee will: (i) operate the Hotel at all times in compliance with the Standards; (ii) fully participate in the Quality Assurance Program and all mandatory programs for System Hotels (which may require providing complimentary guestrooms and refunds); (iii) offer all guest services required for System Hotels (which may include complimentary services); (iv) make all payments due in accordance with the terms of all contracts and invoices related to the Hotel, except for payments that are disputed in good faith; and (v) provide all food and beverage service in the Hotel in compliance with the Standards and Applicable Law and pay the F&B Support Fee to Franchisor.

B.     *Prohibited Activities*. Except as permitted in the Standards, Franchisee will not, without Franchisor's prior approval: (i) knowingly permit gambling to take place at the Hotel or use the Hotel for any casino, lottery, or other type of gaming activities, or directly or indirectly associate with any gaming activity; (ii) knowingly permit adult entertainment activities at the Hotel; or (iii) sell, display or use in the Hotel any vending machines, honor bars, video or other entertainment devices or similar products.

C. *Inspection Rights.* Franchisee will permit Franchisor's representatives to enter and inspect the Hotel at all reasonable times to confirm that Franchisee is complying with the terms of this Agreement and the Standards, and to test the equipment, food products and supplies at the Hotel. In conducting such inspections, Franchisor will not unduly interfere with the operation of the Hotel. Franchisee will pay all fees and costs related to such inspections to the extent not covered by the Program Services Contribution. Franchisee will pay all on site costs of third-party inspectors.

**8.4 System Promotion; No Diversion to Other Businesses.**

A. *System Promotion.* Franchisee will use reasonable efforts to encourage and promote the use of System Hotels and will refer reservation requests that cannot be fulfilled by the Hotel to other System Hotels or Franchisor Lodging Facilities in accordance with the Standards.

B. *No Diversion to Other Businesses.* Franchisee will not use any part of the Hotel for any business other than operating a System Hotel. Franchisee will not use any part of the Hotel or the System to divert business to, or promote, any other business at or outside of the Hotel, except, if approved by Franchisor, Vacation Club Products operated under the "Marriott Vacation Club," "Grand Residences by Marriott," "Sheraton" or "Westin" Marks. This prohibition includes advertising hotels, vacation or timeshare facilities or any similar product sold on a periodic basis not operated under a trade name or trademark owned by Franchisor or any of its Affiliates (including those which Franchisee or its Affiliates operate or in which they have an Ownership Interest).

## 9. TRAINING, COUNSELING AND ADVISORY SERVICES

**9.1 Training.** The Hotel will at all times be managed by personnel who have successfully completed all mandatory training under the Standards. Franchisor may offer optional training related to operating System Hotels. Franchisee will pay (i) all tuition, supplies, and Travel Costs and allocations of internal costs and overhead of Franchisor and its Affiliates for any training in which Franchisee participates; (ii) an annual charge based on an allocation among System Hotels for the costs of developing and providing such training; and (iii) a charge for the general manager conference, regardless of whether Franchisee's personnel attend. Franchisee will provide training required by Franchisor for personnel working at the Hotel.

**9.2 Counseling and Advisory Services.** Franchisor will make representatives available at Franchisor's designated offices or at the Hotel to consult with Franchisee about the design and operation of the Hotel as a System Hotel. Franchisor may require Franchisee to pay the Travel Costs of such representatives who consult at the Hotel.

## 10. SYSTEM AND STANDARDS; FRANCHISEE ASSOCIATION

**10.1 Compliance with System and Standards.** Franchisee agrees that conformity with all aspects of the System and the Standards is essential to maintain the uniform quality and guest service of System Hotels. Franchisee will comply at all times with the Standards and operate the Hotel in compliance with the System and the Marriott Agreements. Franchisor will make the Standards available to Franchisee through the Electronic Systems or in such other manner Franchisor deems appropriate. The Standards will at all times remain the sole property of Franchisor and its Affiliates.

**10.2 Modification of the System and Standards.** Franchisor and its Affiliates may modify the System and Standards, and such modifications may include materially changing, adding or deleting elements of the System or the Standards. Franchisee agrees that modifications to the System may be made for all System Hotels or for any Category of System Hotels. Franchisor may allocate the costs of System

modifications among System Hotels or any Category of System Hotels, and such allocation will be on a fair and consistent basis. Such costs may include development costs and the reimbursement of capital invested in the development of such System modifications, together with costs incurred by Franchisor to finance such capital.

**10.3 Franchisee Association.** If Franchisor creates or approves the creation of an association organized to consider and make recommendations on matters related to the operation of System Hotels (the "Association"), Franchisee, Franchisor and other System Hotel franchisees will be eligible for membership. Franchisee will pay any Association dues and assessments, which will be consistently applied to all System Hotel franchisees. The Association will vote on bylaws and election of officers. Franchisor will regard recommendations of the Association as expressing the consensus of members of the Association.

## 11. PROPRIETARY MARKS AND INTELLECTUAL PROPERTY

**11.1 Franchisor's Representations Concerning the Proprietary Marks.**

A. *Representations.* Franchisor represents that:

1. Franchisor and its Affiliates have the right to grant Franchisee the right to use the Proprietary Marks in accordance with this Agreement; and

2. Franchisor and its Affiliates will take all steps reasonably necessary to preserve and protect the ownership and validity of the Proprietary Marks. Franchisor will not be required to maintain any registration for any Proprietary Marks that Franchisor determines, in its sole discretion, cannot or should not be maintained.

B. *Indemnification for Infringement Claims.* Franchisor will indemnify and hold Franchisee harmless against claims that Franchisee's use of the Proprietary Marks in accordance with this Agreement infringes the rights of any third party unrelated to Franchisee, if Franchisee: (i) is in compliance with this Agreement, (ii) gives prompt notice of any such claim to Franchisor, (iii) permits Franchisor to have sole control over the defense and settlement of the claim and (iv) cooperates fully with Franchisor in defending or settling the claim.

**11.2 Franchisee's Use of Intellectual Property and the System.**

A. *Use of the Intellectual Property and the System.* Franchisee agrees that:

1. Franchisee will use the Intellectual Property and the System only for the operation of the Hotel and only in the form and manner as provided in the Standards or approved by Franchisor. Franchisee will offer or sell only those goods and services under the Proprietary Marks that are of a nature and quality that comply with the Standards. Any use of the System not authorized by Franchisor will constitute an infringement of Franchisor's rights and a default under Section 19.2 of this Agreement;

2. Franchisee will use the Proprietary Marks only in substantially the same places, combination, arrangement and manner as provided in the Standards or approved by Franchisor;

3. Franchisee will identify itself as a franchisee or licensee of Franchisor and the owner or operator of the Hotel only in the form and manner as provided in the Standards.

KUMAR 000817

Franchisee will not use any Proprietary Marks in any manner that could imply that Franchisee has an Ownership Interest in the Proprietary Marks;

    4.    Franchisee has no right to, and will not, Transfer, sublicense or allow any Person to use any part of the System, unless permitted in this Agreement;

    5.    Franchisee will not use any part of the System to incur any obligation or indebtedness on behalf of Franchisor or any of its Affiliates;

    6.    Franchisee will not use any of the Proprietary Marks or any names or marks that consist of, contain or are similar to or an abbreviation of any Proprietary Marks, in Franchisor's sole opinion ("Similar Marks"), as part of Franchisee's corporate or legal name, in connection with any business activity except the Hotel, or as a road name or address, whether alone or in combination with Other Marks;

    7.    Franchisee will not register or apply to register any of the Proprietary Marks or Similar Marks, whether alone or in combination with other trademarks;

    8.    Franchisee will notify Franchisor of any required business, trade, fictitious, assumed or similar name registration, and indicate in the registration that Franchisee may use such name only in accordance with this Agreement;

    9.    if litigation involving the Intellectual Property is instituted or threatened against Franchisee, or a claim of infringement involving the Intellectual Property is made against Franchisee, or Franchisee becomes aware of any infringement of the Intellectual Property, Franchisee will promptly notify Franchisor and will cooperate fully in any action, defense or settlement of such matters. Franchisee will not make any demand, serve any notice, institute any legal action or negotiate, litigate, compromise or settle any controversy about any such matter without first obtaining Franchisor's prior consent, which may be withheld in Franchisor's sole discretion. Franchisor will have the right to bring any action and to join Franchisee as a party to any action involving the Intellectual Property; and

    10.    if Franchisor believes, in its sole discretion, that Franchisee's use of the Intellectual Property does not conform with the Marriott Agreements or the Standards, then Franchisee will immediately stop the non-conforming use on notice from Franchisor.

    B.    *Ownership of the System.* Franchisee agrees that:

    1.    Franchisor and its Affiliates are the owners or licensees of all right, title and interest in and to the System (except certain Electronic Systems provided by third parties), and all goodwill arising from Franchisee's use of the System, including the Proprietary Marks, will inure solely and exclusively to the benefit of Franchisor and its Affiliates. On the expiration or termination of this Agreement, no monetary amount will be attributable to any goodwill associated with Franchisee's use of the System;

    2.    the Proprietary Marks are valid and serve to identify the System and System Hotels, and any infringement of the Proprietary Marks will result in irreparable injury to Franchisor;

    3.    the Proprietary Marks may be deleted, replaced or modified by Franchisor or its Affiliates in their sole discretion. Franchisor may require Franchisee, at Franchisee's

expense, to discontinue or modify Franchisee's use of any of the Proprietary Marks or to use one or more additional or substitute marks;

   4. Franchisee will not directly or indirectly: (i) attack the ownership, title or rights of Franchisor or its Affiliates in the System; (ii) contest the validity of the System or Franchisor's right to grant to Franchisee the right to use the System in accordance with this Agreement; (iii) take any action that could impair, jeopardize, violate or infringe any part of the System; (iv) claim any right, title, or interest in the System except rights granted under this Agreement; or (v) misuse or harm or bring into disrepute the System;

   5. Franchisee has no, and will not obtain any, Ownership Interest in any part of the System (including any modifications made by or on behalf of Franchisee or its Affiliates). Franchisee assigns, and will cause each of its employees or independent contractors who contributed to System modifications to assign, to Franchisor, in perpetuity throughout the world, all rights, title and interest (including the entire copyright and all renewals, reversions and extensions of such copyright) in and to such System modifications. Except to the extent prohibited by Applicable Law, Franchisee waives, and will cause each of its employees or independent contractors who contributed to System modifications to waive, all "moral rights of authors" or any similar rights in such System modifications. For the purposes of this Section 11.2.B.5, "modifications" includes any derivatives and additions; and

   6. Franchisee will execute, or cause to be executed, and deliver to Franchisor any documents, and take any actions required by Franchisor to protect the Proprietary Marks and the title in any System modifications.

  **11.3 Franchisee's Use of Other Marks.** Franchisee will not use any Mark in connection with the Hotel or the System that is not a Proprietary Mark, including the names of restaurants or other outlets at the Hotel ("Other Marks") without Franchisor's prior approval. Franchisee will not use any Other Marks that may infringe or be confused with a third party's trade name, trademark or other rights in intellectual property. Franchisee consents to the use of the Other Marks by Franchisor and its Affiliates during the Term. Franchisee represents that there are no claims or proceedings that would materially affect Franchisor's use of the Other Marks.

  **11.4 Websites and Domain Names.** Franchisee will not display any of the Proprietary Marks on, or associate the System with (through a link or otherwise), any website, electronic Marketing Materials, application or software for mobile devices or other technology or media, domain name, address, designation or listing on the internet or other communication system or medium without Franchisor's consent or as permitted in the Standards. Franchisee will not register or use any internet domain name, address, mobile application or other designation that contains any Proprietary Mark or any mark that is, in Franchisor's sole opinion, confusingly similar. At Franchisor's request, Franchisee will promptly cancel or transfer to Franchisor any such domain name, address or other designation under Franchisee's control.

## 12. CONFIDENTIAL INFORMATION; DATA PROTECTION LAWS

  **12.1 Confidential Information.**

   A. *Confidentiality Obligations.* Franchisee will use Confidential Information only for the benefit of the Hotel and in conformity with this Agreement, the Standards and Applicable Law. Franchisee will protect Confidential Information and will immediately on becoming aware report to Franchisor any Security Incident. Franchisee may divulge Confidential Information only to Franchisee's employees or agents who require access to it to operate the Hotel, and only after they are advised that

such information is confidential and that they are bound by Franchisee's confidentiality obligations under this Agreement. Without Franchisor's prior consent, Franchisee will not copy, reproduce or make Confidential Information available to any Person not authorized to receive it. The Confidential Information is proprietary and a trade secret of Franchisor and its Affiliates. Franchisee agrees that the Confidential Information has commercial value and that Franchisor and its Affiliates have taken reasonable measures to maintain its confidentiality. Franchisee is liable for any breaches of such confidentiality obligations by its employees or agents.

B.     *Confidentiality of Negotiated Terms.* Franchisee agrees it will not disclose to any Person the content of the negotiated terms of this Agreement or other Marriott Agreements without the prior consent of Franchisor except: (i) as required by Applicable Law; (ii) as may be necessary in any legal proceedings; and (iii) to those of Franchisee's managers, members, officers, directors, employees, attorneys, accountants, agents, lenders, prospective lenders, or any nationally-recognized debt ratings agency, in each case to the extent necessary for the operation or financing of the Hotel and only if Franchisee informs such Persons of the confidentiality of the negotiated terms. Franchisee will be in default under this Agreement for any disclosure of negotiated terms by any such Persons.

**12.2  Data Protection Laws.** Franchisee will comply with all Data Protection Laws and the Standards and take such actions and execute such documents as requested by Franchisor that are necessary for compliance with any of the Data Protection Laws by Franchisor or its Affiliates. Franchisee will not take any action that could cause Franchisor or its Affiliates to violate any of the Data Protection Laws. Franchisee will reimburse Franchisor and its Affiliates for all costs and damages incurred in connection with a Security Incident of Franchisee, or Franchisee's non-compliance with the Data Protection Laws or the Standards.

13.     <u>ACCOUNTING AND REPORTS; TAXES</u>

**13.1  Accounting.** Franchisee will account for Gross Room Sales and Gross Revenues on an accrual basis and in compliance with this Agreement.

**13.2  Books, Records and Accounts.** Franchisee will maintain and preserve complete and accurate books, records and accounts for the Hotel in accordance with the Uniform System and United States generally accepted accounting principles, consistently applied, Applicable Law and the Standards. Franchisee will preserve these books, records and accounts for at least 5 years from the dates of their preparation.

**13.3  Accounting Statements.**

A.     *Monthly Statements.* At Franchisor's request, for each full or partial month after the Opening Date, Franchisee will prepare and deliver to Franchisor an operating statement containing the information required by Franchisor, including Gross Revenues and Gross Room Sales for such month.

B.     *Quarterly Projections.* On or before the first day of each full calendar quarter after the Opening Date, Franchisee will provide to Franchisor a monthly estimate of Gross Revenues and Gross Room Sales for each of the next four calendar quarters in a format approved or required by Franchisor.

C.     *Annual Statements.* For each full or partial calendar or fiscal year (whichever is used by Franchisee for income tax purposes), Franchisee will prepare and provide to Franchisor a complete statement of income and expense from the operation of the Hotel for the preceding year. This statement is due within 90 days after each year. This statement will be prepared in accordance with the

KUMAR  000820

Uniform System and the United States generally accepted accounting principles, consistently applied, Applicable Law, the Standards, and the Uniform System "Income Statement" with standard line items specified by Franchisor, and Franchisee will provide such supporting documentation and other information that Franchisor may require relating to this statement. In addition, Franchisee will promptly deliver to Franchisor such other reports and financial information relating to Franchisee and the Hotel as Franchisor may request.

### 13.4 Franchisor Examination and Audit of Hotel Records.

A. *Examination and Audit.* Franchisor and its authorized representatives may, at any time, but on reasonable notice to Franchisee, examine and copy all books, records, accounts and tax returns of Franchisee related to the operation of the Hotel during the five years preceding such examination. Franchisor may have an independent audit made of any such books, records, accounts and tax returns. Franchisee will provide any assistance reasonably requested for the audit and will provide copies of any documentation requested by Franchisor without charge.

B. *Underreporting.* If an examination or audit reveals that Franchisee has made underpayments to Franchisor, Franchisee will promptly pay Franchisor on demand the amount underpaid plus interest under Section 3.6. If an examination or audit finds that Franchisee has understated payments due Franchisor by 5% or more for the relevant period, or if the examination or audit reveals that the accounting procedures are insufficient to determine the accuracy of the calculation of payments due, Franchisee will reimburse Franchisor for all costs relating to the examination or audit (including reasonable accounting and legal fees). If the examination or audit establishes a pattern of underreporting, Franchisor may require that the annual financial reports due under Section 13.3.C. be audited by an independent accounting firm consented to by Franchisor. The rights of Franchisor in this Section 13.4 are in addition to any other remedies that Franchisor may have, including the right to terminate this Agreement.

C. *Overpayments.* If an examination or audit reveals that Franchisee has made overpayments to Franchisor, the amount of such overpayment, without interest, will be promptly credited against future payments due Franchisor.

### 13.5 Taxes.

A. *Payment of Taxes.* Franchisee will pay when due all Taxes relating to the Hotel, Franchisee, this Agreement, any other Marriott Agreement or in connection with operating the Hotel, except income or franchise taxes assessed against Franchisor.

B. *Withholding Taxes.*

1. The amounts payable to Franchisor will not be reduced by any deduction or withholding for any present or future Taxes.

2. If Applicable Law imposes an obligation on Franchisee to deduct or withhold Taxes directly from any amount paid to Franchisor, then Franchisee will deduct or withhold the required amount and will timely pay the full amount deducted or withheld to the relevant governmental authority in accordance with Applicable Law. The amount paid to Franchisor will be increased so that after the deduction or withholding has been made in accordance with Applicable Law, the net amount actually received by Franchisor will equal the full amount originally invoiced or otherwise payable. If required or permitted, Franchisee must promptly pay any such deduction or withholding directly to the relevant governmental authority and provide Franchisor proof of payment.

3.     If Applicable Law does not impose an obligation on Franchisee to deduct or withhold Taxes directly from any amount paid to Franchisor, but requires Franchisor to pay such Taxes, then Franchisee will pay Franchisor, within 15 days after request, the full amount of the Taxes paid or payable by Franchisor with respect to such payment so that the net amount actually retained by Franchisor after payment of Taxes (other than taxes assessed on Franchisor's net income) will equal the full amount originally invoiced or otherwise payable.

C.     *Sales Tax & Similar Taxes.* The amounts payable to Franchisor will not be reduced by any sales, goods and services, value added or similar taxes, all of which will be paid by Franchisee. Therefore, in addition to making any payment to Franchisor required under this Agreement, Franchisee will: (i) pay Franchisor the amount of these taxes due with respect to the payment; or (ii) if required or permitted by Applicable Law, pay these taxes directly to the relevant taxing authority.

D.     *Tax Disputes.* If there is a Dispute by Franchisee as to any Tax liability, Franchisee may contest the Tax liability in accordance with Applicable Law, but Franchisee will not permit a sale, seizure or attachment to occur against the Hotel. If such Dispute involves payments of Taxes that will be withheld, deducted and paid by Franchisee related to payments to Franchisor as provided in this Section 13.5, Franchisee will notify Franchisor before taking action with regard to the Dispute with the tax authority and, if requested by Franchisor, cooperate with Franchisor in preparing its response. Upon Franchisor's request, Franchisee will pay such Taxes and seek reimbursement from the governmental authority. Franchisee will be responsible for any interest or penalties assessed.

## 14.     INDEMNIFICATION

Franchisee will indemnify, defend and hold harmless Franchisor and its Affiliates (and each of their respective predecessors, successors, assigns, current and former directors, officers, shareholders, subsidiaries, employees and agents), against all Claims and Damages, including allegations of negligence by such Persons, to the fullest extent permitted by Applicable Law, arising from: (i) the unauthorized use of Intellectual Property; (ii) the violation of Applicable Law; or (iii) the construction, conversion and renovation, repair, operation, ownership or use of the Hotel or the Approved Location (including Claims and Damages arising from the use of the Other Marks) or of any other business related to the Hotel or the Approved Location. Franchisor will have the right, at Franchisee's cost, to control the defense of any Claim (including the right to select its counsel or defend or settle any Claim) if Franchisor determines such Claim may affect the interests of Franchisor or its Affiliates. Such undertaking by Franchisor will not diminish Franchisee's indemnity obligations. Neither Franchisor nor any indemnified Person will be required to seek recovery from third parties or mitigate its losses to maintain its right to receive indemnification from Franchisee. The failure to pursue such recovery or mitigate its losses will not reduce the amounts recoverable from Franchisee by an indemnified Person. Franchisee's obligation to maintain insurance under Section 15 will not relieve Franchisee of its obligations under this Section 14. Franchisee's obligations under this Section 14 will survive the termination or expiration of this Agreement.

## 15.     INSURANCE

15.1  **Insurance Required.**  During the Term, Franchisee will procure and maintain insurance with the coverages, deductibles, limits, carrier ratings, and policy obligations required by the Standards. Such insurance requirements may include: property insurance including business interruption, earthquake, flood, terrorism and windstorm; workers' compensation; commercial general liability; liquor liability; business auto liability; umbrella or excess liability; fidelity coverage; employment practices liability; cyber liability; and such other insurance customarily carried on hotels similar to the Hotel. Franchisor

KUMAR  000822

may change such requirements in the Standards and may also require Franchisee to obtain additional types of insurance or increase the amount of coverages. All insurance will by endorsement specifically:

        A.     name as unrestricted additional insureds Franchisor, any Affiliate designated by Franchisor and their employees and agents (except for workers' compensation and fidelity insurance);

        B.     provide that the coverages will be primary and that any insurance carried by any additional insured will be excess and non-contributory;

        C.     contain a waiver of subrogation in favor of Franchisor and any Affiliate of Franchisor; and

        D.     provide that the policies will not be canceled, non-renewed or reduced without at least 30 days' prior notice to Franchisor.

**15.2  Other Requirements.**  Franchisee will deliver to Franchisor a certificate of insurance (and certified copy of such insurance policy if requested) evidencing the insurance required. Renewal certificates of insurance will be delivered to Franchisor not less than 10 days before their respective inception dates. If Franchisee fails to procure or maintain the required insurance, Franchisor will have the right and authority to procure (without any obligation to do so) such insurance at Franchisee's cost, including a reasonable fee for Franchisor's procurement and maintenance of such insurance. If Franchisee delegates its insurance obligations to any other Person, Franchisee will ensure that such Person satisfies such obligations. Such delegation will not relieve Franchisee of its obligations under this Section 15 and the Standards. Any failure to satisfy the insurance requirements is a default under this Agreement. Franchisee will cooperate with Franchisor in pursuing any claim under insurance required by this Agreement.

## 16.    <u>FINANCING OF THE HOTEL</u>

Franchisee and each Interestholder in Franchisee may grant a lien or other security interest in the Hotel or the revenues of the Hotel, or pledge Ownership Interests in Franchisee or a Control Affiliate as collateral for the financing of the Hotel. If any Person exercises its rights under such lien, security interest or pledge, Franchisor will have the rights under Section 19.1. Franchisee will not pledge this Agreement as collateral or grant a security interest in this Agreement, but Franchisor may provide a comfort letter to a lender in the form included in the then-current Disclosure Document and, if it does so, Franchisee will pay the then-current lender comfort letter processing fee.

## 17.    <u>TRANSFERS</u>

**17.1  Franchisee's Transfer Rights.**  Franchisee agrees that its rights and duties in this Agreement are personal to Franchisee and that Franchisor entered into this Agreement in reliance on the business skill, financial capacity and character of Franchisee and its Affiliates and their principals. Accordingly, any Transfer of the Hotel, or any Ownership Interest in Franchisee, a Control Affiliate or the Hotel, may be made only in accordance with this Section 17 (including Section 17.5) and only if such Transfer does not violate Section 17.6. This Agreement may not be Transferred without Franchisor's prior consent.

**17.2  Transfers Not Requiring Notice or Consent.**  As long as the following Transfers of Passive Investor Interests do not result in a change of Control of Franchisee, no notice to or consent by Franchisor is required:

KUMAR  000823

A.  *Publicly-traded Securities*.  A Transfer of publicly-traded securities purchased on the open market, pursuant to a registration statement or through a registered broker/dealer or investment adviser;

B.  *10% Threshold*.  A Transfer of Passive Investor Interests (other than those held by a Guarantor) to a transferee that immediately before and after the Transfer owns less than 10% of the Ownership Interests in Franchisee; and

C.  *Investment Fund*. A Transfer of limited partnership interests in an investment fund formed by a sponsoring company in the business of raising capital for investment purposes, as long as such fund has at least 20 limited partners, none of which owns (immediately before or after such Transfer) 10% or more of the Ownership Interests in Franchisee or directs the decisions of, or exercises any Control over, the fund or the companies in which the fund invests.

**17.3  Transfers Requiring Notice but Not Consent.** Franchisee must provide notice to Franchisor at least 20 days prior to any of the following Transfers that are not covered in Section 17.2, but no consent by Franchisor is required:

A.  *Passive Investor Transfer*.  A Transfer of Passive Investor Interests if the following requirements are met:

1.  Franchisee provides Franchisor with the identity of the proposed transferees and their Interestholders, together with all other related information reasonably requested by Franchisor;

2.  such Transfer, individually and in the aggregate, will not result in: (i) a change of Control of Franchisee; (ii) any Person and its Affiliates that did not own a majority of the Ownership Interests in Franchisee before such Transfers collectively owning a majority of the Ownership Interests in Franchisee after such Transfer; or (iii) a Transfer of all of Guarantor's Ownership Interest in Franchisee;

3.  each new Interestholder meets Franchisor's then-current owner qualifications (which may include that such Interestholder or any of its Affiliates has not been convicted of a Serious Crime and has not engaged in conduct that may adversely affect the Hotel, the System, or Franchisor, and has not been a party to any material civil litigation with Franchisor or its Affiliates), and Franchisee pays the fees for any required background checks; and

4.  if Franchisor requests, Franchisee will execute an amendment to this Agreement that updates the ownership information in <u>Exhibit A</u>, and pay Franchisor's outside counsel costs related to such documentation, if any.

B.  *Transfer to Affiliates; Transfer for Estate Planning Purposes*.  A Transfer of the Hotel or an Ownership Interest in Franchisee to an Affiliate of Franchisee, or a Transfer of an Ownership Interest in Franchisee for estate planning purposes to an immediate family member or to an entity owned by, or a trust for the benefit of, an immediate family member, in the case of each such Transfer, if the following requirements are met:

1.  Franchisee or its Control Affiliate owns, directly or indirectly, more than 50% of the economic interests of the proposed transferee (if the transferee is an entity), and such Transfer does not otherwise result in a change of Control of Franchisee or the Hotel;

KUMAR  000824

2.      Franchisee provides the identity of the proposed transferee and its Interestholders, documentation acceptable to Franchisor evidencing the Transfer, and all other related information reasonably requested by Franchisor;

3.      each Guarantor acknowledges the Transfer and reaffirms its obligations under the Guaranty and, if required by Franchisor, another party acceptable to Franchisor executes a guaranty substantially identical to the form in the then-current Disclosure Document;

4.      Franchisee is not in breach or default under any of the Marriott Agreements, or if there is a breach or default, there is an agreement to cure such breach or default;

5.      each new Interestholder meets Franchisor's then-current owner qualifications (which may include that such Interestholder or any of its Affiliates has not been convicted of a Serious Crime and has not engaged in conduct that may adversely affect the Hotel, the System, or Franchisor, and has not been a party to any material civil litigation with Franchisor or its Affiliates), and Franchisee pays the fees for any required background checks; and

6.      if Franchisor requests, Franchisee and such transferee will execute any documents required by Franchisor to reflect the Transfer, and Franchisee will pay Franchisor's outside counsel costs related to such documentation, if any.

**17.4  Transfers Requiring Notice and Consent.**  Transfers of the Hotel or a Controlling Ownership Interest in the Franchisee, a Control Affiliate or the Hotel may be made only with at least 30 days' advance notice to Franchisor and Franchisor's prior consent.

A.      *Conditions to Transfer.* Franchisor's consent to a Transfer under this Section 17.4 will be subject to satisfaction of the following conditions:

1.      Franchisee provides Franchisor the identity of all parties and their Interestholders, a copy of the purchase agreement, the organizational documents of the transferee and its Interestholders, together with all other information reasonably requested by Franchisor;

2.      payment by Franchisee of the then-current non-refundable property improvement plan fee, and payment of the then-current application fee for System Hotels to Franchisor by the transferee with its submission of the application. If Franchisor does not consent to the Transfer, Franchisor will refund the application fee, less $10,000;

3.      satisfaction by each Interestholder of the transferee of Franchisor's then-current owner qualifications (which may include that such Interestholder or any of its Affiliates has not been convicted of a Serious Crime and has not engaged in conduct that may adversely affect the Hotel, the System, or Franchisor, and has not been a party to any material civil litigation with Franchisor or its Affiliates);

4.      retention of a management company consented to by Franchisor under Section 8.1 if Franchisor determines in its sole discretion that the transferee is not qualified to operate the Hotel;

5.      execution by the transferee of the then-current form of franchise and related agreements. The new franchise agreement will contain the standard terms for new franchise System Hotels as of the date of the Transfer, including the then-current fees and charges, except that the duration will be shortened to the remaining Term. The new franchise agreement will also include a

KUMAR  000825

property improvement plan requiring the transferee to address any renovations necessary to comply with the Standards;

      6.    payment of all amounts due Franchisor and execution of a general release of all claims against Franchisor and its Affiliates; and

      7.    payment of Franchisor's outside counsel costs related to the Transfer.

Prior Transfers of Ownership Interests by or to a Person that already owns Ownership Interests or an Affiliate of such Person will be taken into account in determining whether a Transfer of a Controlling Ownership Interest has occurred. Within 30 days after Franchisor receives notice and all required information, Franchisor will notify Franchisee of its consent to such Transfer or the reason Franchisor is withholding its consent.

      B.    *Withholding of Consent.* Even if the conditions in Section 17.4.A. are satisfied, Franchisor may withhold its consent to a Transfer under this Section 17.4 if:

      1.    Franchisor determines that the proposed transferee's debt service or overall financial status will not permit the Hotel to be operated in compliance with the Standards; or

      2.    an uncured breach or default of a Marriott Agreement exists, and there is no agreement to cure such breach or default in connection with the Transfer; or

      3.    the Hotel is not in good standing under the Quality Assurance Program.

      C.    *Mental Incompetency or Death.* If any Person holding a Controlling Ownership Interest in Franchisee becomes mentally incompetent or dies, the interest of such Person may be Transferred subject to the terms of this Section 17.4 and only if: (i) any such Transfer will be made within 12 months after such Person is deemed mentally incompetent or dies; and (ii) the obligations of Franchisee will be satisfied pending the Transfer and the Hotel is operated in compliance with this Agreement. If such Person was a Guarantor, Franchisor may require another party acceptable to Franchisor to execute a Guaranty substantially identical to the form in the then-current Disclosure Document. If an executor, custodian, or other representative is appointed to oversee the management of Franchisee, Franchisee will give Franchisor notice of such appointment within 30 days and the appointee will cause the Hotel to be operated in compliance with this Agreement.

    **17.5  Proposed Transfer to Competitor and Right of First Refusal.**

      A.    *Right of First Refusal.* If there is a proposed Transfer of the Hotel or an Ownership Interest in Franchisee or a Control Affiliate to a Competitor, Franchisee will notify Franchisor stating the identity of the prospective transferee (including the Interestholders of such prospective transferee), the terms of the proposed transaction, and all other information reasonably requested by Franchisor. Within 30 days after receipt of such notice and information, Franchisor will notify Franchisee of its election of one of the following:

      1.    if the proposed Transfer is a cash transaction, Franchisor (or its designee) will have the right to purchase or lease the Hotel or acquire the Ownership Interest at the same price and on the same terms as the Competitor, and Franchisee and Franchisor (or its designee) will promptly enter into an agreement on such terms; or

KUMAR 000826

2.        if the proposed Transfer is a non-cash transaction or other form of Transfer, Franchisor (or its designee) will have the right to purchase or lease the Hotel or acquire the Ownership Interest for its fair market value; if Franchisee and Franchisor are unable to agree on the fair market value within 14 days of Franchisor's election, Franchisor will promptly provide Franchisee with a list of at least three nationally recognized appraisers of hotel properties, and within five days Franchisee will select one of such appraisers to appraise the Hotel or the Ownership Interest. Franchisor and Franchisee will share the costs of the appraisal equally. Such appraisal will constitute the fair market value of the Hotel or the Ownership Interest for purposes of this Section 17.5.A.2. Within 30 days of receipt of the appraisal, Franchisor (or its designee) may either: (i) enter into an agreement to purchase the Hotel or the Ownership Interest at the fair market value determined by the appraiser; or (ii) take the action specified in Section 17.5.A.3.; or

3.        Franchisor may place Franchisee in default and give notice of its intent to terminate this Agreement under Section 19.1.B., in which case either: (i) Franchisee will cancel the Transfer; or (ii) this Agreement will terminate and Franchisee will pay liquidated damages and comply with its post-termination obligations; or

4.        Franchisor may consent to such Transfer, which consent will be on such terms as Franchisor may require, in its sole discretion.

B.        *Real Estate Interest and Injunctive Relief.* Franchisee acknowledges that Franchisor's rights under Section 17.5.A. are rights in real estate. If requested by Franchisor, Franchisee will execute a Competitor ROFR, and Franchisor may record such Competitor ROFR in the appropriate real estate records of the jurisdiction where the Hotel is located, and Franchisee will cooperate in such filing. Franchisee agrees that damages are not an adequate remedy if Franchisee breaches its obligations under this Section 17.5, and Franchisor will be entitled to declaratory, injunctive or other relief without proving the inadequacy of money damages as a remedy and without posting a bond. If this Agreement is terminated and Franchisor's rights under Section 17.5 are no longer in effect, on request, Franchisor will execute a termination of such interest.

C.        *Survival of Right of First Refusal.* Except for termination of this Agreement under Section 17.5.A.3. or in connection with a Transfer consented to by Franchisor under Section 17.5.A.4., Franchisor's rights under Section 17.5.A. survive early termination of this Agreement and will apply to any Transfer to a Competitor that occurs within six months after such termination.

**17.6  Restricted Persons.** No Transfer of any Ownership Interest in Franchisee, the Hotel or any Marriott Agreement will be made to a Restricted Person, an Affiliate of a Restricted Person or a Person in which a Restricted Person has an interest or provides funding. Any such Transfer is a default under Section 19.1.B.

**17.7  Transfers by Franchisor.**

A.        *Transfer to Affiliates.* Franchisor may Transfer this Agreement to any of its Affiliates that assumes Franchisor's obligations to Franchisee and is reasonably capable of performing Franchisor's obligations, without prior notice to, or consent of, Franchisee.

B.        *Transfer to Other Persons.* Franchisor may Transfer this Agreement to any Person that assumes Franchisor's obligations to Franchisee, is reasonably capable of performing Franchisor's obligations and acquires substantially all of Franchisor's rights in System Hotels, without prior notice to, or consent of, Franchisee. Franchisee agrees that any such Transfer will constitute a release of Franchisor and a novation of this Agreement.

KUMAR  000827

C. *Franchisor's Successors and Assigns.* This Agreement will be binding on and inure to the benefit of Franchisor and its permitted successors and assigns.

## 18. PROSPECTUS REVIEW

**18.1 Franchisor's Review of Prospectus.** Except as stated in Section 18.2, if any Prospectus uses the Proprietary Marks, identifies the Hotel or Franchisor or its Affiliates or describes the relationship between Franchisor or Franchisee and their respective Affiliates, Franchisee will:

A. deliver to Franchisor for its review a copy of such Prospectus and all related materials at least 30 days before the earlier of the date such Prospectus is delivered to a potential purchaser, a potential investor or filed with the Securities and Exchange Commission or other governmental authority. Franchisor may require Franchisee to pay its outside counsel costs for the review of such Prospectus;

B. indemnify, defend and hold harmless Franchisor and its Affiliates in connection with such Prospectus and the offering; and

C. use any Proprietary Marks in such Prospectus and in any related materials only as consented to by Franchisor.

Franchisor's review of any Prospectus is conducted solely to determine the accuracy of any description of Franchisor's relationship with Franchisee and compliance with this Agreement, including the requirements of Section 12.1 and this Section 18, and not to benefit any other Person. Such consent will not constitute an endorsement or ratification of the proposed offering or Prospectus.

**18.2 Exemption from Review.** Franchisor will waive the requirement for its review of a Prospectus if such Prospectus: (i) only uses the Proprietary Marks in block letters to identify the Hotel, (ii) provides a clear statement that the Hotel is operated under a license from Franchisor, and (iii) provides that Franchisor has not reviewed, endorsed or ratified the proposed offering or Prospectus.

## 19. DEFAULT AND TERMINATION

**19.1 Immediate Termination.** Franchisee will be in default and Franchisor may terminate this Agreement without providing Franchisee any opportunity to cure the default, effective on notice to Franchisee (or on the expiration of any notice or cure period given by Franchisor in its sole discretion or required by Applicable Law), if any of the following occurs:

A. *Financial Defaults.*

1. Franchisee or any Guarantor files a voluntary petition or a petition for reorganization under any bankruptcy, insolvency or similar law;

2. Franchisee or any Guarantor consents to an involuntary petition under any bankruptcy, insolvency or similar law or fails to vacate any order approving such an involuntary petition within 90 days from the date the order is entered;

3. Franchisee or Guarantor is unable to pay its debts as they become due;

4. Franchisee or Guarantor is adjudicated to be bankrupt, insolvent or of similar status by a court of competent jurisdiction;

5.      A receiver, trustee, liquidator or similar authority is appointed over the Hotel;

6.      Execution is levied against the Hotel, Franchisee or any material real or personal property in the Hotel in connection with a final judgment; or

7.      A suit to foreclose any lien, mortgage or security interest in the Hotel or any material personal property at the Hotel, or any security interest in Franchisee is filed and is not vacated within 90 days.

B.      *Non-Financial Defaults.*

1.      Franchisee or any Guarantor or any other Person that Controls or has an Ownership Interest in Franchisee is or becomes a Restricted Person;

2.      Franchisee or any of its Affiliates or any Guarantor takes any action that constitutes a violation of Applicable Law that adversely affects the Hotel or the System;

3.      Franchisee or any of its Affiliates or any Guarantor becomes a Competitor or a Transfer occurs that does not comply with the terms of Section 17;

4.      Franchisee or any of its Control Affiliates or any Guarantor dissolves or liquidates;

5.      Franchisee loses its right to operate or possess the Hotel, or loses ownership of the Hotel; or, if the Hotel is subject to a lease referenced in Item 17 of Exhibit A, Franchisee or the Owner referenced in Item 17 of Exhibit A is in default under such lease, or such lease is terminated for any reason;

6.      the Hotel ceases to operate as a System Hotel;

7.      Franchisee engages in a pattern of underreporting amounts payable to Franchisor under this Agreement involving three or more months within any 24-month period;

8.      a threat to public health or safety occurs from the condition of the Hotel or its operation, that in the opinion of Franchisor, could result in: (i) substantial liability; or (ii) an adverse effect on the Hotel, other System Hotels, the System or the Proprietary Marks and Franchisee fails to close the Hotel and remedy the condition on notice from Franchisor;

9.      the Hotel fails to achieve the thresholds of performance established by the Quality Assurance Program and such failure has not been cured within the applicable cure period; or

10.     any Confidential Information is disclosed in breach of Section 12.

**19.2  Default with Opportunity to Cure.**  Franchisee will be in default and Franchisor may terminate this Agreement for the events listed below, if after 30 days' notice of default (or such greater number of days given by Franchisor in its sole discretion or as required by Applicable Law), Franchisee fails to cure the default as specified in the notice:

A.      Franchisee fails to timely start and complete construction or conversion of the Hotel or fails to timely open the Hotel in accordance with this Agreement and the Standards; or

KUMAR  000829

   B. Franchisee fails to timely complete any renovation or repair of the Hotel in accordance with this Agreement and the Standards; or

   C. Franchisee and its Affiliates fail to pay any amounts due under the Marriott Agreements; or

   D. any Marriott Agreement is in default or terminated based on a default of Franchisee or its Affiliates (or any Owner referenced in Item 17 of Exhibit A); or

   E. Franchisee or any Interestholder in Franchisee, or any officer, director or employee of Franchisee, is convicted of a Serious Crime or is engaged in conduct that may adversely affect the Hotel, the System, any Franchisor Lodging Facility or Franchisor, and such Person is not terminated from its relationship with Franchisee; or

   F. Franchisee fails to comply with the Standards or there occurs any other breach of the Marriott Agreements, including any representations and warranties by Franchisee.

  **19.3 Suspension of Reservation System.**  If Franchisee is in default under this Agreement and the default is not cured within the cure period (if any), Franchisor may, in addition to any other remedies, suspend the Hotel from the Reservation System while such default remains uncured. Once the default is cured, Franchisor will promptly reconnect the Hotel to the Reservation System. Franchisor's exercise of its remedies in this Section 19.3 will not (i) constitute actual or constructive termination or abandonment of this Agreement; (ii) be a waiver of the default or any breach of this Agreement; or (iii) preclude Franchisor from terminating this Agreement in accordance with Section 19.1 or 19.2, as applicable, or pursuing any equitable or other remedies. Franchisee waives all claims against Franchisor and its Affiliates arising from any suspension from the Reservation System arising as a result of Franchisee's default under this Agreement.

  **19.4 Damages.**

   A. *Harm to Franchisor.* Franchisee agrees that if it fails to operate the Hotel as a System Hotel for the entire Term, Franchisor will incur damages, including loss of future Franchise Fees and Marketing Fund Contributions, and loss of opportunities for Development Activities, and that replacement of the Hotel with a comparable hotel will take significant time and effort. Franchisee agrees that it is difficult to calculate such damages over the remainder of the Term and that the liquidated damages provided for in this Agreement are not a penalty and represent a reasonable estimate of fair compensation for the damages that Franchisor will incur. Franchisee acknowledges that if this Agreement is terminated under the circumstances described in clauses 1 through 4 of Section 19.4.B., Franchisor and the System will suffer greater damages due to the increased difficulty in replacing Franchisor Lodging Facilities and the loss of competitive advantage and customer confidence.

   B. *Payment of Liquidated Damages.* If Franchisor terminates this Agreement due to Franchisee's default, Franchisee will promptly pay as liquidated damages to Franchisor an amount equal to (i) the average monthly Franchise Fees and Marketing Fund Contributions payable for the Hotel during the immediately preceding 24 months (without giving effect to any discounts or incentives, and calculated assuming the Marketing Fund Contribution was payable during such period) *multiplied by* (ii) the lesser of (x) 36 or (y) 1/2 the number of months remaining in the Term (the "LD Amount"), except:

    1. If, in addition to the termination of this Agreement, at least one (but not more than eight) additional franchise, license or management agreement for Franchisor Lodging Facilities between Franchisor and Franchisee, or their respective Affiliates, is terminated due to Franchisee's or its

Affiliate's default within 12 months of the termination of this Agreement, Franchisee will pay 150% of the LD Amount;

       2.      If this Agreement is terminated as a result of a Transfer to a Competitor, Franchisee will pay 150% of the LD Amount;

       3.      If this Agreement is terminated as a result of a Transfer to a Competitor and at least one (but not more than eight) additional franchise, license or management agreement for Franchisor Lodging Facilities between Franchisor and Franchisee, or their respective Affiliates, is terminated due to Franchisee's or its Affiliate's default within 12 months of the termination of this Agreement, Franchisee will pay 200% of the LD Amount; or

       4.      If, in addition to the termination of this Agreement, at least nine additional franchise, license or management agreements for Franchisor Lodging Facilities between Franchisor and Franchisee, or their respective Affiliates, are terminated due to Franchisee's or its Affiliate's default within 12 months of the termination of this Agreement, Franchisee will pay 300% of the LD Amount.

If the Hotel has not operated as a System Hotel for at least 24 months prior to termination, the "LD Amount" means (i) the greater of (a) the average monthly franchise fees and marketing fund contributions payable for the previous 24 months for all franchised System Hotels on a per room basis (calculated assuming System Hotels were paying the Marketing Fund Contribution during such period) multiplied by the number of Guestrooms at the Hotel or (b) the average monthly Franchise Fees and Marketing Fund Contributions payable for the Hotel during the period the Hotel was operating as a System Hotel (calculated assuming the Marketing Fund Contribution was payable during such period) *multiplied by* (ii) 36. If either Franchisee or Franchisor believes that such calculation does not fairly represent the Hotel's projected stabilized performance, it will notify the other, and clause (i) will be replaced by "the average monthly Franchise Fees and Marketing Fund Contributions that would have been payable during such period based on the stabilized Hotel revenue projected by Franchisee in its application, without giving effect to any discounts or incentives, and assuming the Marketing Fund Contribution would have been payable during such period."

       C.      *Other Remedies*. Payment of liquidated damages will not preclude Franchisor from pursuing any equitable or other remedies under Applicable Law (other than recovery of future Franchise Fees and Marketing Fund Contributions) and will not affect the obligations of Franchisee to comply with Section 20.

## 20.     POST-TERMINATION

### 20.1 Franchisee Obligations.

       A.      *De-Identification*. On the expiration or other termination of this Agreement, Franchisee will immediately:

       1.      cease to operate the Hotel as a System Hotel and not represent or create the impression that it is a present or former franchisee or licensee of Franchisor or that the Hotel is or was previously part of the System, unless required under Section 20.1.A.8. or 9. below;

       2.      permanently cease to use, and remove from the Hotel and any other place of business, any Intellectual Property and any other identifying characteristics of the System, including

KUMAR  000831

any Electronic Systems, advertising or any articles that display any of the Proprietary Marks or any trade dress or distinctive features or designs associated with the System or Franchisor Lodging Facilities;

       3.     remove any signs containing any Proprietary Marks (if Franchisee is unable to remove the signs immediately, Franchisee will cover the signs and remove them within 48 hours);

       4.     remove from any internet sites all content under its control related to the System or Franchisor and take all actions necessary to disassociate itself from Franchisor on the internet. Franchisee will, at Franchisor's option, cancel or assign to Franchisor or its designee, any domain name under the control of Franchisee or its Affiliates that contains any Proprietary Mark, or any mark that Franchisor determines is confusingly similar, including misspellings and acronyms;

       5.     cancel any fictitious, trade or assumed name or equivalent registration that contains any Proprietary Mark or any variations, and provide satisfactory evidence to Franchisor of its compliance within 30 days after expiration or termination of this Agreement;

       6.     deliver to Franchisor the originals and all copies of any Intellectual Property and all other materials relating to the operation of the Hotel under the System. Franchisee will not retain a copy of any Intellectual Property or other System materials, except for any documents that Franchisee reasonably needs for compliance with Applicable Law. If Franchisor explicitly permits Franchisee to use any Intellectual Property after the termination or expiration date, such use by Franchisee will be in accordance with this Agreement;

       7.     cease using any of the Confidential Information or the System and disclosing it to anyone not authorized by Franchisor to receive it;

       8.     make such necessary alterations to the Hotel so that the public will not confuse it with a System Hotel. Until such alterations are completed, Franchisee will place a conspicuous sign at the registration desk, stating that the Hotel is no longer a System Hotel; and

       9.     advise all customers in accordance with the Standards that the Hotel is no longer a System Hotel.

       B.     *Other Obligations and Termination Costs.* On expiration or termination of this Agreement, Franchisee will (a) comply with the obligations in the Sections referenced under Section 27.8; and (b) promptly pay: (i) all amounts owing to Franchisor; (ii) all of Franchisor's costs or fees charged for removing the Hotel from the System; and (iii) a reasonable estimate of costs and fees that will be due but have not yet been invoiced (if the estimated payment exceeds actual amounts due, Franchisor will refund the difference to Franchisee). Franchisor will have the right to recover reasonable legal fees and court costs incurred in collecting such amounts. If this Agreement is terminated under Section 21.2, Franchisee will cooperate with Franchisor in pursuing its claim under the business interruption insurance required under this Agreement.

     **20.2  Franchisor's Rights on Expiration or Termination.** Before or on the expiration or termination of this Agreement, Franchisor may give notice that the Hotel is leaving the System and take any other action related to customers, Travel Management Companies, suppliers and other Persons affected by such expiration or termination.

KUMAR 000832

21. **CONDEMNATION AND CASUALTY**

    **21.1 Condemnation.**

        A. *Condemnation Notification.* Franchisee will promptly notify Franchisor if it receives notice of any proposed taking of any portion of the Hotel by eminent domain, condemnation, compulsory acquisition or similar proceeding by any governmental authority.

        B. *Condemnation Restoration.* If the condemnation award is sufficient to restore the Hotel to meet the Standards, Franchisee will cause the Hotel to be promptly restored and reopened within a reasonable time.

        C. *Condemnation Termination.* If the taking in Section 21.1.A. would materially affect the continued operation of the Hotel as a System Hotel, Franchisor or Franchisee may terminate this Agreement, in which case, Franchisor and Franchisee will execute a termination agreement and release on Franchisor's then-current form, and Franchisee will comply with the post-termination obligations in Section 20.

        D. *No Liquidated Damages on Condemnation Termination.* A termination under this Section 21.1 will not be a default under this Agreement and Franchisee will not be required to pay liquidated damages. However, Franchisor will be entitled to receive a fair and reasonable portion of any condemnation award to compensate Franchisor for its lost revenue, but not more than the amount of liquidated damages that would have been due under Section 19.4.B.

    **21.2 Casualty.**

        A. *Casualty Notification.* Franchisee will promptly notify Franchisor if the Hotel is damaged by any casualty.

        B. *Casualty Restoration.* If the Hotel is damaged by any casualty and the cost to restore the Hotel to the same condition as existed previously is less than 60% of the Hotel's replacement cost at the time of the casualty, Franchisee will cause the Hotel to be promptly renovated and reopened within a reasonable time under Section 4.

        C. *Casualty Termination.* If the Hotel is damaged by any casualty and the cost to restore the Hotel to the same condition as existed previously is 60% or more of the Hotel's replacement cost at the time of the casualty, Franchisee will have 180 days after the date of the casualty to elect whether it will restore the Hotel to its previous condition or terminate this Agreement. If Franchisee elects to restore the Hotel, the Hotel will be promptly renovated and reopened within a reasonable time under Section 4. If Franchisee elects to terminate this Agreement, Franchisor and Franchisee will execute a termination agreement and release on Franchisor's then-current form and Franchisee will comply with the post-termination obligations in Section 20. Such termination will not affect Franchisor's right to business interruption insurance proceeds.

        D. *No Liquidated Damages on Casualty Termination.* A termination under this Section 21.2 will not be a default under this Agreement and Franchisee will not be required to pay liquidated damages unless, before the date on which the Term otherwise would have ended, Franchisee or any of its Affiliates operates an Other Lodging Product at the Approved Location.

KUMAR 000833

**22.    COMPLIANCE WITH APPLICABLE LAW; LEGAL ACTIONS**

**22.1  Compliance with Applicable Law.** Franchisee will comply with all Applicable Law, and will obtain all permits, certificates and licenses necessary to operate the Hotel and comply with the Marriott Agreements.

**22.2  Notice of Legal Actions.**  Within seven days of receipt, Franchisee will notify Franchisor and provide copies of: (i) any Claim involving the Hotel, Franchisee or Franchisor; (ii) any judgment, order, or other decree related to the Hotel or Franchisee; or (iii) any inspection reports and warnings about a material failure to meet health or life safety requirements or any other material violation of Applicable Law related to the Hotel or Franchisee. This Section 22.2 will not change any notice requirement that Franchisee may have under any insurance policies.

**23.    RELATIONSHIP OF PARTIES**

This Agreement does not create a fiduciary relationship between Franchisor and Franchisee. Franchisee is an independent contractor, and neither party is an agent, legal representative, joint venturer, partner, joint employer, or employee of the other for any purpose and Franchisee will make no representation to the contrary. Nothing in this Agreement authorizes Franchisee to make any agreement or representation on Franchisor's behalf or to incur any obligation in Franchisor's name.

**24.    GOVERNING LAW; ARBITRATION; INTERIM RELIEF; COSTS OF ENFORCEMENT; WAIVERS**

**24.1  Governing Law, Arbitration, and Jurisdiction.**

A.      *Governing Law*. This Agreement takes effect on its acceptance and execution by Franchisor in Maryland and will be construed under and governed by Maryland law, which law will prevail if there is any conflict of law. Nothing in this Section 24.1 will make the Maryland Franchise Registration and Disclosure Law apply to this Agreement or the relationship between Franchisor and Franchisee, if such law would not otherwise apply.

B.      *Arbitration.*

1.      Except as otherwise specified in this Agreement and for Claims for indemnification under Section 14 or actions for injunctive or other equitable relief under Section 24.2, any Dispute related to the Hotel, the Marriott Agreements, the relationship of the parties, or any actions or omissions in connection with any of the above, will be resolved, referred to, and finally settled by, arbitration under and in accordance with the Commercial Arbitration Rules of the American Arbitration Association (or any similar successor rules).  The arbitrator(s) will be appointed in accordance with such rules.  The number of arbitrators will be one unless the parties agree otherwise in accordance with such rules.  The place where arbitration proceedings will be conducted is Baltimore, Maryland.  The party bringing the arbitration will submit the following together with any demand or filing required by the American Arbitration Association: (i) a full and specific description of the claim under this Agreement, including identifying the specific provisions that the other party has breached, (ii) documentary evidence of the facts alleged by the complaining party, and (iii) a declaration under penalty of perjury that all facts stated in the claim and documentation are true and correct and do not fail to state facts known to the complaining party that are material to the determination of the dispute.

2.      The decision of the arbitral tribunal will be final and binding on the parties and will be enforceable in any courts having jurisdiction.  The arbitral tribunal will have no

KUMAR  000834

authority to amend or modify the terms of this Agreement. The arbitral tribunal will have the right to award or include in its award any relief it deems proper, including money damages and interest on unpaid amounts, specific performance and legal fees and costs in accordance with this Agreement; however, the arbitral tribunal may not award punitive, consequential or exemplary damages. The costs and expenses of arbitration will be allocated and paid by the parties as determined by the arbitral tribunal.

3.      Any arbitration proceeding under this Agreement will be conducted on an individual (not a class-wide) basis and will not be consolidated with any other arbitration proceedings to which Franchisor is a party, except that Franchisor may join any management company operating the Hotel, any owner under an owner agreement related to the Hotel, and any guarantor of any obligations with respect to the Hotel in any such proceeding. Any Dispute to be settled by arbitration under this Section will at the request of Franchisee or Franchisor be resolved in a single arbitration before a single tribunal together with any Dispute arising out of or relating to any other agreement between Franchisee and Franchisor and its Affiliates. A decision on a matter in another arbitration proceeding will not prevent a party from submitting evidence with respect to a similar matter or prevent the arbitral tribunal from rendering an independent decision without regard to such decision in such other arbitration proceeding.

4.      Franchisor or Franchisee may, without waiving any rights, seek from a court having jurisdiction any interim or provisional relief that may be necessary to protect its rights or property (including any aspect of the System, or any reason concerning the safety of the Hotel or the health and welfare of any of the Hotel's guests, invitees or employees).

C.      *Jurisdiction.* Franchisee expressly and irrevocably submits to the non-exclusive jurisdiction of the courts of the State of Maryland for the purpose of any Disputes that are not required to be subject to arbitration under Section 24.1.B. So far as permitted under Maryland law, this consent to personal jurisdiction will be self-operative.

**24.2  Equitable Relief.** Franchisor is entitled to injunctive or other equitable relief, including restraining orders and preliminary injunctions, in any court of competent jurisdiction for any threatened or actual material breach of the Marriott Agreements or non-compliance with the Standards. Franchisor is entitled to such relief without the necessity of proving the inadequacy of money damages as a remedy, without the necessity of posting a bond and without waiving any other rights or remedies.

**24.3  Costs of Enforcement.** The prevailing party in any legal or equitable action related to the Hotel, this Agreement or the other Marriott Agreements will recover its reasonable legal fees and costs, including fees and costs incurred in confirming and enforcing an award under Section 24.1.B. The prevailing party will be determined based upon an assessment of which party's arguments or positions could fairly be said to have prevailed over the other party's arguments or positions on major disputed issues in the arbitration or at trial, and should include an evaluation of the following: the amount of the net recovery; the primary issues disputed by the parties; whether the amount of the award comprises a significant percentage of the amount sought by the claimant; and the most recent settlement positions of the parties.

**24.4  WAIVER OF PUNITIVE DAMAGES.** EACH OF FRANCHISEE AND FRANCHISOR ABSOLUTELY, IRREVOCABLY AND UNCONDITIONALLY WAIVES THE RIGHT TO CLAIM OR RECEIVE PUNITIVE DAMAGES IN ANY DISPUTE RELATED TO THE HOTEL, THE MARRIOTT AGREEMENTS, THE RELATIONSHIP OF THE PARTIES, OR ANY ACTIONS OR OMISSIONS IN CONNECTION WITH ANY OF THE ABOVE. NOTHING IN THIS SECTION 24.4 LIMITS FRANCHISEE'S OBLIGATIONS UNDER SECTION 14.

**24.5  WAIVER OF JURY TRIAL.**  EACH OF FRANCHISEE AND FRANCHISOR ABSOLUTELY, IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY DISPUTE RELATED TO THE HOTEL, THE MARRIOTT AGREEMENTS, THE RELATIONSHIP OF THE PARTIES OR ANY ACTIONS OR OMISSIONS IN CONNECTION WITH ANY OF THE ABOVE.

## 25.  NOTICES

A.  *Written Notices.* Subject to Section 25.B., all notices, requests, statements and other communications under this Agreement will be: (i) in writing; (ii) delivered by hand with receipt, or by courier service with tracking capability; and (iii) addressed, (a) in the case of Franchisor, to the address stated in Item 15 of Exhibit A; and (b) in the case of Franchisee, to the address stated in Item 16 of Exhibit A, or in either case at any other address designated in writing by the party entitled to receive the notice. Any notice will be deemed received (x) when delivery is received or first refused, if delivered by hand or (y) one day after posting of such notice, if sent via overnight courier.

B.  *Electronic Delivery.* Franchisor may provide Franchisee with electronic delivery of routine information, invoices, the Standards and other System requirements and programs. Franchisor and Franchisee will cooperate with each other to adapt to new technologies that may be available for the transmission of such information.

## 26.  REPRESENTATIONS AND WARRANTIES

**26.1  Existence; Authorization; Ownership; Other Representations.**

A.  *Existence.* Each of Franchisor and Franchisee represents and warrants that it: (i) is duly formed, validly existing and in good standing under the laws of the jurisdiction of its formation; and (ii) has and will continue to have the ability to perform its obligations under this Agreement.

B.  *Authorization.* Each of Franchisor and Franchisee represents and warrants that the execution and delivery of this Agreement and the performance of its obligations under this Agreement: (i) have been duly authorized; (ii) do not and will not violate, contravene or result in a default or breach of (a) any Applicable Law, (b) its governing documents or (c) any agreement, commitment or restriction binding on the relevant party; and (iii) do not require any consent that has not been obtained by the relevant party.

C.  *Prior Representations.* Franchisee represents and warrants that all of the representations, warranties and information in the application and provided for this Agreement were true as of the time made and are true as of the Effective Date, regardless of whether such representations, warranties and information were provided by Franchisee or another Person.

D.  *Restricted Person.* Franchisee represents and warrants that Franchisee is not, and that none of its Affiliates (including their directors and officers), Interestholders or the funding sources for any of them, is a Restricted Person.

E.  *Ownership of Franchisee.* Franchisee represents and warrants that the information in Attachment Two to Exhibit A regarding its Interestholders is complete and accurate. Upon any Transfer that requires notice to, or the consent of, Franchisor under Section 17, Franchisee will provide a list of the names and addresses of the Interestholders and documents necessary to confirm such information and update Attachment Two to Exhibit A.

KUMAR  000836

F.    *Ownership of the Hotel*. Unless stated in Item 17 of <u>Exhibit A</u>, Franchisee represents and warrants that either: (i) it is the sole owner of the Hotel and holds good and marketable fee title to the Approved Location; or (ii) the Approved Location is subject to a valid purchase, contribution, or similar agreement, and on closing of such agreement, Franchisee will be the sole owner of the Hotel and will hold good and marketable fee title to the Approved Location.  Franchisee will deliver a copy of the recorded deed in Franchisee's name to Franchisor no later than the Construction Start Deadline.

**26.2   Additional Franchisee Acknowledgments and Representations.**

A.    *NO RELIANCE.* IN ENTERING THIS AGREEMENT, FRANCHISEE REPRESENTS AND WARRANTS THAT IT DID NOT RELY ON, AND NEITHER FRANCHISOR NOR ANY OF ITS AFFILIATES HAS MADE, ANY PROMISES, REPRESENTATIONS, WARRANTIES OR AGREEMENTS RELATING TO THE FRANCHISE, THE HOTEL, OR THE APPROVED LOCATION OR THE SYSTEM, UNLESS CONTAINED IN THIS AGREEMENT.

B.    *BUSINESS RISK.* FRANCHISEE AGREES THAT THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT INVOLVES SUBSTANTIAL BUSINESS RISK, IS A VENTURE WITH WHICH FRANCHISEE HAS RELEVANT EXPERIENCE AND ITS SUCCESS IS LARGELY DEPENDENT ON FRANCHISEE'S ABILITY AS AN INDEPENDENT BUSINESS. FRANCHISOR DISCLAIMS THE MAKING OF, AND FRANCHISEE AGREES IT HAS NOT RECEIVED, ANY INFORMATION, WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL REVENUES, PROFITS OR SUCCESS OF SUCH BUSINESS VENTURE. IF, PRIOR TO THE EFFECTIVE DATE, FRANCHISOR HAS FURNISHED ANY HISTORICAL PERFORMANCE DATA OR PROJECTIONS WITH RESPECT TO THE HOTEL IN CONNECTION WITH THE POSSIBILITY OF FRANCHISOR OR ITS AFFILIATES MANAGING THE HOTEL (AS OPPOSED TO GRANTING A FRANCHISE TO FRANCHISEE), FRANCHISEE ACKNOWLEDGES AND AGREES THAT SUCH DATA AND PROJECTIONS ARE NOT APPLICABLE TO A FRANCHISED SYSTEM HOTEL AND THAT IT HAS NOT RELIED THEREON IN ENTERING INTO THIS AGREEMENT. FRANCHISOR WILL NOT INCUR ANY LIABILITY FOR ANY ERROR, OMISSION OR FAILURE CONCERNING ANY ADVICE, TRAINING OR OTHER ASSISTANCE FOR THE HOTEL PROVIDED TO FRANCHISEE, INCLUDING FINANCING, DESIGN, CONSTRUCTION, RENOVATION OR OPERATIONAL ADVICE.

C.    *DISCLOSURE AND NEGOTIATION.* FRANCHISEE ACKNOWLEDGES THAT IT HAS READ AND UNDERSTOOD THE DISCLOSURE DOCUMENT AND THE MARRIOTT AGREEMENTS. FRANCHISEE HAS HAD SUFFICIENT TIME AND OPPORTUNITY TO CONSULT WITH ITS ADVISORS ABOUT THE POTENTIAL BENEFITS AND RISKS OF ENTERING INTO THIS AGREEMENT. FRANCHISEE HAS HAD AN OPPORTUNITY TO NEGOTIATE THIS AGREEMENT.

D.    *HOLDING PERIODS.* FRANCHISEE ACKNOWLEDGES THAT IT RECEIVED A COPY OF THIS AGREEMENT, ITS EXHIBITS AND ATTACHMENTS, IF ANY, AND RELATED AGREEMENTS, IF ANY, AT LEAST SEVEN DAYS BEFORE THE DATE ON WHICH THIS AGREEMENT WAS EXECUTED. FRANCHISEE FURTHER ACKNOWLEDGES THAT IT HAS RECEIVED THE DISCLOSURE DOCUMENT AT LEAST 14 DAYS BEFORE THE DATE ON WHICH IT EXECUTED THIS AGREEMENT OR MADE ANY PAYMENT TO FRANCHISOR IN CONNECTION WITH THIS AGREEMENT.

E.    *DISCLOSURE EXEMPTION.* NOTWITHSTANDING FRANCHISEE'S ACKNOWLEDGMENT IN SECTION 26.2.D, FRANCHISEE REPRESENTS AND ACKNOWLEDGES THAT THIS FRANCHISE SALE IS FOR MORE THAN $1,143,100,

EXCLUDING THE COST OF UNIMPROVED LAND AND ANY FINANCING RECEIVED FROM FRANCHISOR OR ITS AFFILIATES, AND THUS IS EXEMPTED FROM THE FEDERAL TRADE COMMISSION'S FRANCHISE RULE DISCLOSURE REQUIREMENTS PURSUANT TO 16 CFR 436.8(a)(5)(i).

27.    **MISCELLANEOUS**

27.1  **Counterparts.** This Agreement may be executed in any number of counterparts, each of which will be deemed an original and all of which constitute one and the same instrument. Delivery of an executed signature page by electronic transmission is as effective as delivery of an original signed counterpart.

27.2  **Construction and Interpretation.**

A.      *Partial Invalidity.* If any term of this Agreement, or its application to any Person or circumstance, is invalid or unenforceable at any time or to any extent, then: (i) the remainder of this Agreement, or the application of such term to Persons or circumstances except those as to which it is held invalid or unenforceable, will not be affected and each term of this Agreement will be valid and enforced to the fullest extent permitted by Applicable Law; and (ii) Franchisor and Franchisee will negotiate in good faith to modify this Agreement to implement their original intent as closely as possible in a mutually acceptable manner.

B.      *Non-Exclusive Rights and Remedies.* No right or remedy of Franchisor or Franchisee under this Agreement is intended to be exclusive of any other right or remedy under this Agreement at law or in equity.

C.      *No Third-Party Beneficiary.* Nothing in this Agreement is intended to create any third-party beneficiary or give any rights or remedies to any Person except Franchisor or Franchisee and their respective permitted successors and assigns.

D.      *Actions from Time to Time.* When this Agreement permits Franchisor to take any action, exercise discretion or modify the System, Franchisor may do so from time to time.

E.      *Interpretation of Agreement.* Franchisor and Franchisee intend that this Agreement excludes all implied terms to the maximum extent permitted by Applicable Law. Headings of Sections are for convenience and are not to be used to interpret the Sections to which they refer. All Exhibits to this Agreement form an integral part of this Agreement and are incorporated by reference, including all Items of <u>Exhibit A</u> even if such Items are not specifically referred to in this Agreement. Words indicating the singular include the plural and vice versa as the context may require. References to days, months and years are all calendar references. References that a Person "will" do something mean the Person has an obligation to do such thing. References that a Person "may" do something mean a Person has the right, but not the obligation, to do so. References that a Person "may not" or "will not" do something mean the Person is prohibited from doing so. Examples used in this Agreement and references to "includes" and "including" are illustrative and not exhaustive.

F.      *Definitions.* All capitalized terms in this Agreement have the meaning stated in <u>Exhibit B</u>.

27.3  **Reasonable Business Judgment.**

A.      *Definition.* Reasonable Business Judgment means:

KUMAR 000838

1.    For decisions affecting the System, that the rationale for Franchisor's decision has a business basis that is intended to: (i) benefit the System or the profitability of the System, including Franchisor, regardless of whether some hotels may be unfavorably affected; (ii) increase the value of the Proprietary Marks; (iii) enhance guest, franchisee or owner satisfaction; or (iv) minimize potential brand inconsistencies or customer confusion; and

2.    For decisions unrelated to the System (for example, a requested approval for the Hotel), that the rationale for Franchisor's decision has a business basis and Franchisor has not acted in bad faith.

B.    *Use of Reasonable Business Judgment.* Franchisor will use Reasonable Business Judgment when discharging its obligations or exercising its rights under this Agreement, including for any consents and approvals and the administration of Franchisor's relationship with Franchisee, except when Franchisor has reserved sole discretion.

C.    *Burden of Proof.* Franchisee will have the burden of establishing that Franchisor failed to exercise Reasonable Business Judgment. The fact that Franchisor or any of its Affiliates benefited from any action or decision, or that another reasonable alternative was available, does not mean that Franchisor failed to exercise Reasonable Business Judgment. If this Agreement is subject to any implied covenant or duty of good faith and Franchisor exercises Reasonable Business Judgment, Franchisee agrees that Franchisor will not have violated such covenant or duty.

**27.4  Consents and Approvals.**  Except as otherwise provided in this Agreement, any approval or consent required under this Agreement will not be effective unless it is in writing and signed by the duly authorized officer or agent of the party giving such approval or consent. Franchisor will not be liable for: (i) providing or withholding any approval or consent; (ii) providing any suggestion to Franchisee; (iii) any delay; or (iv) denial of any request.

**27.5  Waiver.**  The failure or delay of either party to insist on strict performance of any of the terms of this Agreement, or to exercise any right or remedy, will not be a waiver for the future.

**27.6  Entire Agreement.**  This Agreement and the Marriott Agreements are fully integrated and contain the entire agreement between the parties as it relates to this franchise, the Hotel and the Approved Location and, subject to Section 26.1.C., supersede and extinguish all prior statements, agreements, promises, assurances, warranties, representations and understandings, whether written or oral, by any Person. Nothing in this Agreement is intended to require Franchisee to waive reliance on any representations made in the Disclosure Document.

**27.7  Amendments.**  This Agreement may only be amended in a written document that has been duly executed by the parties and may not be amended by conduct manifesting assent, and each party is put on notice that any individual purporting to amend this Agreement by conduct manifesting assent is not authorized to do so.

**27.8  Survival.**  The terms of Sections 11, 12, 13.4, 14, 17.5, 18, 19.4, 20, 21.1.D., 21.2.D. and 24 survive expiration or termination of this Agreement.

*{Signatures appear on the following page}*

IN WITNESS WHEREOF, Franchisor and Franchisee have caused this Franchise Agreement to be executed, under seal, as of the Effective Date.

FRANCHISOR:

MARRIOTT INTERNATIONAL, INC.

By: _____ (SEAL)
Name:   Jennie Benzon
Title:   Vice President, Franchising


FRANCHISEE:


WESTAR INVESTORS GROUP, LLC


By: _____ (SEAL)
Name:   Shatarpati Suresh Kumar
Title:   Manager

KUMAR  000840

IN WITNESS WHEREOF, Franchisor and Franchisee have caused this Franchise Agreement to be executed, under seal, as of the Effective Date.

FRANCHISOR:

MARRIOTT INTERNATIONAL, INC.

By:      _____  (SEAL)
Name:  Jennie Benzon
Title:    Vice President, Franchising

FRANCHISEE:

WESTAR INVESTORS GROUP, LLC

By:      _____  (SEAL)
Name:  Shatarpati Suresh Kumar
Title:    Manager

KUMAR 000841

**EXHIBIT A**
**KEY TERMS**

| | | |
|---|---|---|
| 1. | **Trade Name(s):** | Element |
| 2. | **Approved Location:** | the Northeast Quadrant of Gateway Boulevard and Airway Boulevard, El Paso, TX 79925 |
| 3. | **Effective Date:** | October 15, 2019 |
| 4. | **Term:** | Begins on Effective Date and ends on the 20th anniversary of the Opening Date |
| 5. | **Franchisor:** | Marriott International, Inc., a Delaware corporation |
| 6. | **Franchisee:** | Westar Investors Group, LLC, a Texas limited liability company |
| 7. | **Number of Guestrooms:** | 107 |

8. **Entity that will Operate the Hotel:** A third party management company that satisfies the requirements in Section 8.1.A. Such management company must execute the Management Company Acknowledgment by the Construction Start Deadline stated in Item 13 of Exhibit A. At such time, this Item will be amended to reflect the name of such management company.

If, during the Term, the Hotel is placed in the Yellow Zone for any two consecutive tracking periods or in the Red Zone for any single tracking period under the Quality Assurance Program, then Franchisor may, in its sole discretion, require Franchisee to replace the Management Company with another management company that has been approved by Franchisor to operate the Hotel. Such replacement will occur within 60 days after Franchisor delivers notice to Franchisee advising that it must replace the Management Company. If Franchisee fails to replace the Management Company in accordance with this provision, then Franchisee will be in default under this Agreement. "Yellow Zone" and "Red Zone" mean "Yellow Zone" and "Red Zone" (or any comparable replacement terms) as used in the Quality Assurance Program.

9. **Restricted Territory (Element only):** Franchisor or its Affiliates will not, and will not authorize any other Person to, open to the public for business a System Hotel for a period of 3 years after the Opening Date

of the Hotel, but not to extend beyond September 1, 2024, within a 3-mile radius measured from the front door of the Hotel ("Restricted Territory"). The Restricted Territory is the area outlined on the map in Attachment One to this Exhibit. Should a conflict exist between the map and the narrative, the narrative will control. The restrictions in this paragraph will not apply to: (i) a Chain Acquisition; (ii) any other Franchisor Lodging Facility that is not included within the System; or (iii) any System Hotel existing or under development as of the Effective Date in the Restricted Territory, and if any such System Hotel in the Restricted Territory ceases to operate as a System Hotel or does not open as a System Hotel, then for each such hotel, an additional hotel may operate as a System Hotel in the Restricted Territory.

| | | |
|---|---|---|
| 10. | **Application Fee:** | $60,000 |

11. **Franchise Fees:** 5.5% of Gross Room Sales; except that, if the Opening Date occurs before the Incentive End Date, Franchise Fees will be discounted to the following amounts (it being understood that if the Opening Date occurs after any of the following periods, then the discount for such period will not apply):

| Period | % of Gross Room Sales |
|---|---|
| From the Incentive Begin Date until the 1st anniversary of the Incentive Begin Date | 3% |
| From the 1st anniversary of the Incentive Begin Date until the 2nd anniversary of the Incentive Begin Date | 3.5% |
| From the 2nd anniversary of the Incentive Begin Date until the 3rd anniversary of the Incentive Begin Date (the last day of such period, the "Incentive End Date") | 4% |
| From the Incentive End Date through the remainder of the Term | 5.5% |

"Incentive Begin Date" means the date that is the earlier of (i) the Opening Date and (ii) the Opening Deadline (as stated in Item 14 of Exhibit A as of the Effective Date).

KUMAR 000843

The percentages stated before the last row in the table above are an incentive or discount from standard Franchise Fees and are not transferable.

| | | |
|---|---|---|
| 12.A | **Program Services Contribution:** | An amount equal to: (a) 3.15% of Gross Room Sales for such month (which includes the Marketing Fund Contribution stated in Item 12.B below); *plus* (b) $833.33 per month; *plus* (c) $18.33 per Guestroom per month. |
| 12.B | **Marketing Fund Contribution:** | 1% of Gross Room Sales |
| 13. | **Construction Start Deadline:** | May 1, 2020 |
| 14. | **Opening Deadline:** | September 1, 2021 |
| 15. | **Franchisor Notice Address:** | Marriott International, Inc.<br>10400 Fernwood Road<br>Bethesda, MD 20817<br>Attn:  Law Department 52/923.27 |
| 16. | **Franchisee Notice Address:** | Westar Investors Group, LLC<br>750 York Court<br>Lewisville, TX  75056<br>Attn:  Saleem Makani<br>Email: saleemmakani@gmail.com |
| 17. | **Lease Provisions:** | Not Applicable |
| 18. | **System Hotel-specific terms:** | Not Applicable |
| 19. | **PIP Review Date:** | Not Applicable |
| 20. | **Additional Terms:** | Not Applicable |

KUMAR  000844

ATTACHMENT ONE
TO EXHIBIT A

RESTRICTED TERRITORY

*{See map on following page}*

KUMAR  000845

**Territorial Restriction**
**Element El Paso Airport**
**3 Mile Radius**



KUMAR 000846

Development GIS/KSJ
6/13/2019

**ATTACHMENT TWO**
**TO EXHIBIT A**

**OWNERSHIP INTEREST IN FRANCHISEE**

| Name of Owner | Address (Include Country of Residence, if not U.S.) | Country of Formation or Nationality (Include if not U.S.) | % Interest |
|---|---|---|---|
| **NAME AND ADDRESS OF WESTAR INVESTORS GROUP, LLC** | | | |
| Westar Investors Group, LLC | 750 York Court Lewisville, TX 75056 | | N/A |
| **OWNERSHIP OF WESTAR INVESTORS GROUP, LLC** | | | |
| Saleem Makani (Manager) | 750 York Court Lewisville, TX 75056 | | 50% |
| Shatarpati Suresh Kumar (Manager) | 211 West Grubb Drive Mesquite, TX 75149 | | 35% |
| Suhail Bawa (Manager) | 1313 Oneida Drive Carrollton, TX 75010 | | 15% |

KUMAR 000847

## EXHIBIT B
## DEFINITIONS

The following terms used in this Agreement have the meanings given below:

"Accessibility Requirements" means the Americans with Disabilities Act and other applicable state laws, codes, and regulations governing public accommodations for persons with disabilities.

"Additional Marketing Programs" means advertising, marketing, promotional, public relations, and sales programs and activities that are not funded by the Marketing Fund, each of which may vary in duration, apply on a local, regional, national, or Category basis, or include other Franchisor Lodging Facilities. Examples include email marketing, internet search engine marketing, transaction-based paid internet searches, sales lead referrals and bookings, cooperative advertising programs, Travel Management Companies programs, incentive awards, gift cards, guest satisfaction programs, complaint resolution programs and Loyalty Programs.

"Affiliate" means, for any Person, a Person that is directly or indirectly Controlling, Controlled by, or under common Control with such Person.

"Agreement" means this Franchise Agreement, including any exhibits and attachments, as may be amended.

"Applicable Law" means applicable national, federal, regional, state or local laws, codes, rules, ordinances, regulations, or other enactments, orders or judgments of any governmental, quasi-governmental or judicial authority, or administrative agency having jurisdiction over the Hotel, Franchisee, Guarantor, Franchisor in its capacity as licensor under this Agreement or any of the Marriott Agreements, or the matters that are the subject of this Agreement, including any Data Protection Laws or any of the above that prohibit unfair, fraudulent or corrupt business practices and related activities, including any such actions or inactions that would constitute a violation of money laundering or terrorist financing laws and regulations.

"Approved Location" means the site, including all land and easements used for the Hotel, described in Item 2 of Exhibit A.

"Brand" means a hotel brand, trade name, trademark, system, or chain of hotels.

"Case Goods" means furniture and fixtures used in the Hotel such as cabinets, shelves, chests, armoires, chairs, beds, headboards, desks, tables, mirrors, lighting fixtures and similar items.

"Category" means a group of System Hotels designated by Franchisor or its Affiliates based on criteria such as geographic (for example, local, regional, national or international) or other attributes (for example, resorts, urban, or suburban). A Category may have specific Standards or be a descriptive classification.

"Chain Acquisition" means any hotel or hotels that are members of a chain or group of hotels with a minimum of four hotels in operation, if (a) all or substantially all are (in a single transaction or combination of related transactions) acquired by, merged with, franchised by or joined through a marketing agreement with, Franchisor or an Affiliate, or (b) the operation of all or substantially all of such hotels is transferred to Franchisor or an Affiliate, in all cases even if such hotel(s) is re-branded as a System Hotel.

KUMAR  000848

"Claim" means any demand, inquiry, investigation, action, claim or charge asserted, including in any judicial, arbitration, administrative, debtor or creditor proceeding, bankruptcy, insolvency, or similar proceeding.

"Competitor" means any Person that has a direct or indirect Ownership Interest in a Brand or is an Affiliate of such a Person, or any Person that is a Master Franchisee of a Brand, or any officer or director of such Person, but only if the Brand is comprised of at least: (i) 10 luxury hotels; (ii) 20 full-service hotels; or (iii) 50 limited-service hotels. For purposes of this definition: "luxury" hotels are hotels that had a system average daily rate in excess of $180 for the most recent year; "full-service" hotels are hotels that offer three meals per day and have at least 3,000 square feet of meeting space; and "limited-service" hotels are hotels that are neither "luxury" hotels nor "full-service" hotels. No Person will be considered a Competitor if such Person has an interest in a Brand merely as: (i) a franchisee; (ii) a management company that operates hotels on behalf of multiple brands; or (iii) a passive investor that has no Control over the business decisions of the Brand, such as limited partners or non-Controlling stockholders.

"Competitor ROFR" means a memorandum of right of first refusal for the Hotel, the current form of which is included in the Disclosure Document.

"Confidential Information" means: (i) the Standards; (ii) documents or trade secrets approved for the System or used in the design, construction, renovation or operation of the Hotel; (iii) any Electronic Systems and related documentation; (iv) Guest Personal Data; or (v) any other knowledge, trade secrets, business information or know-how obtained or generated (a) through the use of the System by Franchisee or the operation of the Hotel (or otherwise obtained from Franchisor by virtue of being a franchisee of System Hotels) that Franchisor deems confidential or (b) under any Marriott Agreements.

"Construction Start Deadline" is defined in Exhibit C.

"Control" (in any form, including "Controlling" or "Controlled") means, for any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person or the power to veto major policy decisions of such Person. No Person (or Persons acting together) will be considered to have Control of a publicly-traded company merely due to ownership of voting stock of such company if such Persons collectively beneficially own less than 25% of the voting stock of such company.

"Control Affiliate" means an Affiliate of Franchisee that Controls Franchisee.

"Damages" means losses, costs (including legal or attorneys' fees, litigation costs and settlement payments), liabilities (including employment liabilities, bodily injury, death, property damage and loss, personal injury and mental injury), penalties, interest, and damages of every kind and description.

"Data Protection Laws" means data protection and privacy laws applicable to the Hotel, the System, Franchisor or Franchisee.

"Design Criteria" means those standards for the design of Hotel Improvements and such other information for planning, constructing or renovating and furnishing a System Hotel.

"Design Process" is defined in Section 4.4.

"Development Activities" means the development, promotion, construction, ownership, lease, acquisition, management or operation of: (i) Franchisor Lodging Facilities (including other System

Hotels); and (ii) other business operations, in each case by Franchisor or its Affiliates, or the authorization, licensing or franchising to other Persons to conduct similar activities.

"<u>Disclosure Document</u>" means that certain document entitled "Franchise Disclosure Document" provided by Franchisor to prospective franchisees of System Hotels, as such document may be updated by Franchisor.

"<u>Dispute</u>" means any disagreement, controversy, or Claim relating to or arising out of any Marriott Agreement, the relationship created by any Marriott Agreement, or the validity or enforceability of any Marriott Agreement.

"<u>Effective Date</u>" means the date stated in Item 3 of <u>Exhibit A</u>.

"<u>Electronic Systems</u>" means all Software, Hardware and all electronic access to Franchisor's systems and data (including telephone and internet access), licensed or made available to Franchisee, including the Reservation System, the Property Management System, the Yield Management System and any other system established under Sections 7 and 10.

"<u>Electronic Systems Fees</u>" means the fees charged by Franchisor for the Hotel's use of the Electronic Systems, which fees include the development and incremental operating costs, ongoing maintenance, field support costs and the reimbursement of capital invested in the development of such Electronic Systems, together with costs incurred by Franchisor to finance such capital.

"<u>Electronic Systems License Agreement</u>" means the agreement that is executed by Franchisee as a condition to using the Electronic Systems, the current form of which is included in the Disclosure Document.

"<u>F&B Support Fee</u>" means the fees charged by Franchisor for the food and beverage program for System Hotels, which fees include the development, ongoing sustainment and field support costs and the reimbursement of capital invested in the development of such program, together with costs incurred by Franchisor to finance such capital.

"<u>FF&E</u>" means Case Goods, Soft Goods, signage and equipment (including telephone systems, printers, televisions, vending machines, and Hardware), but excludes any item included in Fixed Asset Supplies.

"<u>Fixed Asset Supplies</u>" means items such as linen, china, glassware, tableware, uniforms and similar items included within "Operating Equipment" under the Uniform System.

"<u>Franchise Fees</u>" is defined in Section 3.2.

"<u>Franchisee</u>" means the Person identified in Item 6 of <u>Exhibit A</u>.

"<u>Franchisor</u>" means the Person identified in Item 5 of <u>Exhibit A</u>, and its successors and assigns.

"<u>Franchisor Lodging Facilities</u>" means all hotels and other lodging facilities, chains, brands, or systems owned, leased, under development, or operated or franchised or licensed, now or in the future, by Franchisor or any of its Affiliates, including: (i) AC Hotels by Marriott; African Pride Hotels; Aloft Hotels; Autograph Collection Hotels; Bvlgari Hotels and Resorts; Courtyard by Marriott Hotels; Delta Hotels by Marriott; Design Hotels; Edition Hotels; Element Hotels; Fairfield by Marriott Hotels; Fairfield Inn by Marriott Hotels; Fairfield Inn & Suites by Marriott Hotels; Four Points Hotels; Gaylord Hotels;

KUMAR 000850

JW Marriott Hotels & Resorts; JW Marriott Marquis Hotels; Le Méridien Hotels and Resorts; Marriott Conference Centers; Marriott Executive Apartments; Marriott Hotels, Resorts and Suites; Marriott Marquis Hotels; Moxy Hotels; Protea Hotels by Marriott; Protea Hotels Fire & Ice!; Renaissance Hotels; Residence Inn by Marriott Hotels; Ritz-Carlton Hotels and Resorts; Ritz-Carlton Reserve; Sheraton Hotels and Resorts; Sheraton Grand Hotels and Resorts; SpringHill Suites by Marriott Hotels; St. Regis Hotels, Resorts and Suites; The Luxury Collection Hotels, Resorts and Suites; TownePlace Suites by Marriott Hotels; Tribute Portfolio Hotels and Resorts; W Hotels; and Westin Hotels and Resorts; (ii) whole ownership facilities and other similar products or concepts, including Autograph Collection Residences; Edition Residences; Grand Residences by Marriott; JW Marriott Residences; Le Méridien Residences; Marriott Residences; Renaissance Residences; Sheraton Residences; St. Regis Residences; The Luxury Collection Residences; The Residences at The Ritz-Carlton; The Ritz-Carlton Residences; W Residences; and Westin Residences; (iii) home sharing facilities and similar products or concepts, including Tribute Portfolio Homes; (iv) Vacation Club Products, including Marriott Vacation Club; Vistana Signature Experiences; The Luxury Collection Residence Club; The Ritz-Carlton Club; and The Ritz-Carlton Destination Club; and (v) any other lodging product or concept developed or used by Franchisor or any of its Affiliates in the future.

"Gross Revenues" means all revenues and receipts of every kind (from both cash and credit transactions, with no reduction for charge backs, credit card service charges, or uncollectible amounts) derived from operating the Hotel. Gross Revenues *includes* revenues from: (i) Gross Room Sales; (ii) food and beverage sales; (iii) licenses, leases and concessions; (iv) equipment rental; (v) vending machines; (vi) telecommunications services; (vii) parking; (viii) health club or spa revenues; (ix) sales of merchandise; (x) service charges; (xi) condemnation proceeds for a temporary taking; (xii) any proceeds from business interruption or other loss of income insurance; and (xiii) any awards, judgments or settlements representing payment for loss of revenues. Gross Revenues *excludes*: gratuities received by Hotel employees; sales tax, value added tax, or similar taxes on such revenues and receipts; and proceeds from the sale of FF&E.

"Gross Room Sales" means all revenues and receipts of every kind that accrue from the rental of Guestrooms (with no reduction for charge backs, credit card service charges, or uncollectible amounts). Gross Room Sales *includes*: (i) no-show revenue, early departure fees, late check-out fees and other revenues allocable to rooms revenue under the Uniform System; (ii) resort fees, destination fees, and mandatory surcharges for facilities (although inclusion of such fees or surcharges does not constitute approval by Franchisor of such fees and surcharges, which may be limited or prohibited); (iii) attrition or cancellation fees collected from unfulfilled reservations for Guestrooms; (iv) the amount of all lost sales due to the non-availability of Guestrooms in connection with a casualty event, whether or not Franchisee receives business interruption insurance proceeds; and (v) any awards, judgments or settlements representing payment for loss of room sales. Gross Room Sales *excludes* sales tax, value added tax, or similar taxes on such revenues and receipts.

"Guarantor" means the Person or Persons who guarantee the performance of Franchisee's obligations under the Marriott Agreements.

"Guaranty" means a guaranty executed by Guarantor for the benefit of Franchisor, the current form of which is included in the Disclosure Document.

"Guest Personal Data" means any information relating to identified or identifiable actual or potential guests or customers of the Hotel and other Franchisor Lodging Facilities, including contact information (such as addresses, phone numbers, facsimile numbers, email and SMS addresses), Guest Preferences and any other information collected from or about actual or potential guests or customers of the Hotel and other Franchisor Lodging Facilities.

"Guest Preferences" means guest histories, preferences, loyalty program activity and any other related information collected from or about actual or potential guests or customers of Franchisor Lodging Facilities through the Loyalty Programs or other means.

"Guestroom" means each rentable unit in the Hotel consisting of a room, suite or suite of rooms used for overnight guest accommodation, the entrance to which is controlled by the same key; however, adjacent rooms with connecting doors that can be locked and rented as separate units are considered separate Guestrooms.

"Hardware" means all computer hardware and other equipment (including all upgrades and replacements) required for the operation of any Electronic System.

"Hotel" means: (i) the Approved Location; (ii) Hotel Improvements; and (iii) all FF&E, Fixed Asset Supplies, and Inventories at the Hotel Improvements.

"Hotel Improvements" means the building or buildings containing Guestrooms, Public Facilities, administrative facilities, parking, pools, landscaping, and all other improvements constructed or to be constructed or renovated at the Approved Location.

"Initial Work" is defined in Section 4.2.

"Intellectual Property" means the following items, regardless of the form or medium (for example, paper, electronic, tangible or intangible): (i) all Software, including the data and information processed or stored by such Software; (ii) all Proprietary Marks; (iii) all Confidential Information; and (iv) all other information, materials, and subject matter that are copyrightable, patentable or can be protected under applicable intellectual property laws, and owned, developed, acquired, licensed, or used by Franchisor or its Affiliates for the System.

"Interestholder" means, for any Person, a Person that directly or indirectly holds an Ownership Interest in that Person.

"Inventories" means "Inventories" as defined in the Uniform System, including provisions in storerooms, refrigerators, pantries and kitchens; beverages; other merchandise intended for sale; fuel; mechanical supplies; stationery; and other expensed supplies and similar items.

"Inventory Management" means those inventory management services made available by Franchisor to Franchisee under revenue management or consulting agreements.

"LD Amount" is defined in Section 19.4.B.

"Loyalty Programs" means all loyalty, recognition, affinity, and other programs designed to promote stays at, or usage of, the Hotel, System Hotels and such other Franchisor Lodging Facilities designated by Franchisor or its Affiliates, or any similar, complementary, or successor programs or combination thereof. As of the Effective Date, such programs include "Marriott Bonvoy" and various programs sponsored by airlines, credit card and other companies.

"Management Company" means a management company for the Hotel selected by Franchisee and consented to by Franchisor.

"Management Company Acknowledgment" means an acknowledgment signed by the Management Company, Franchisee and Franchisor, the current form of which is included in the Disclosure Document.

"Marketing Fund" means money collected by Franchisor for Marketing Fund Activities.

"Marketing Fund Activities" is defined in Section 6.2.A.

"Marketing Fund Contribution" is defined in Section 6.2.B.

"Marketing Materials" means all advertising, marketing, promotional, sales and public relations concepts, press releases, materials, concepts, plans, programs, brochures, or other information to be released to the public, whether in paper, digital or electronic, or in any other form of media.

"Marks" means: (i) any trademarks, trade names, trade dress, words, symbols, logos, slogans, designs, insignia, emblems, devices, service marks, and indicia of origin (including taglines, program names, and restaurant, spa or other outlet names); and (ii) any combinations of the above; in each case, whether registered or unregistered.

"Marriott Agreements" means, collectively, this Agreement, any other agreements executed with this Agreement related to the Hotel and any other agreement, whenever executed, related to the Hotel to which Franchisee, Guarantor or any of their respective Affiliates is a party and to which Franchisor or any of its Affiliates is also a party or beneficiary, as such agreements may be amended.

"Master Franchisee" means a Person that has the exclusive rights to develop, operate or sub-license a Brand.

"Opening Date" means the date identified as the Hotel opening date in the letter agreement issued by Franchisor described in Exhibit C.

"Opening Deadline" is defined in Exhibit C.

"Other Lodging Product" means a hotel, Vacation Club Products, whole ownership facilities, condominium, apartment or other similar lodging product that is not a Franchisor Lodging Facility.

"Other Mark(s)" is defined in Section 11.3.

"Ownership Interest" means all forms of legal or beneficial ownership or Control of entities or property, including the following: stock, partnership, membership, joint tenancy, leasehold, proprietorship, trust, beneficiary, proxy, power-of-attorney, option, warrant, and any other interest that evidences ownership or Control, whether direct or indirect (unless otherwise specified).

"Passive Investor Interests" means non-Controlling Ownership Interests in Franchisee.

"Periodic Renovations" is defined in Section 4.3.

"Person" means an individual (and the heirs, executors, administrators or other legal representatives of an individual), a partnership, a joint venture, a firm, a company, a corporation, a governmental department or agency, a trustee, a trust, an unincorporated organization or any other legal entity.

KUMAR 000853

"Plans" means construction documents, including a site plan and architectural, mechanical, electrical, civil engineering, plumbing, landscaping and interior design drawings and specifications.

"Program Services Contribution" means the amount charged by Franchisor to the Hotel for Program Services.

"Program Services Fund" means money collected by Franchisor for Program Services.

"Program Services" is defined in Section 3.7.A.

"Property Management System" means all property management systems (including all Software, Hardware and electronic access) designated by Franchisor for use in the front office, back-of-the-office or other operations of System Hotels.

"Proprietary Marks" means any Marks, whether owned currently by Franchisor or any of its Affiliates or later developed or acquired, that are used or registered by Franchisor or one of its Affiliates, or by usage are associated with one or more System Hotels.

"Prospectus" means any registration statement, memorandum, offering document, or similar document for the sale or transfer of an Ownership Interest.

"Public Facilities" means the lobby areas, meeting rooms, convention or banquet facilities, restaurants, bars, lounges, corridors and other similar facilities at the Hotel.

"Quality Assurance Program" means the program that Franchisor uses to monitor guest satisfaction and the operations, facilities and services at System Hotels.

"Reasonable Business Judgment" is defined in Section 27.3.A.

"Reservation System" means any reservation system designated by Franchisor for System Hotels (including Software, Hardware and related electronic access).

"Restricted Person" means a Person that is (i) identified by any government or legal authority as a Person with whom Franchisor or its Affiliates are prohibited or restricted from transacting business, including a Person identified on the Office of Foreign Assets Control List of Specially Designated Nationals and Blocked Persons or the United Nations Consolidated Security Council List; (ii) owned, directly or indirectly, 10% or more by any Person that satisfies (i) above; or (iii) ordinarily resident, incorporated or based in any country or territory that is the subject of a comprehensive embargo by the United States, or owned or controlled by, or acting on behalf of the government of, any such country or territory.

"Restricted Territory" is defined in Item 9 of Exhibit A.

"Sales Agent" means a representative of Franchisor or its Affiliates who acts on behalf of Franchisee for: (i) Inventory Management; (ii) booking reservations at the Hotel or other booking activities, including accessing the Reservation System; or (iii) sales activities, including arranging group sales.

"Security Incident" means a breach of security leading to the accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to, Confidential Information transmitted, stored or otherwise processed.

KUMAR 000854

"Serious Crime" means a crime punishable by either or both: (i) imprisonment of one year or more; or (ii) payment of a fine or penalty of $10,000 (or the foreign currency equivalent) or more.

"Similar Marks" is defined in Section 11.2.A.6.

"Soft Goods" means wall and floor coverings, window treatments, carpeting, bedspreads, lamps, artwork, decorative items, pictures, wall decorations, upholstery, textile, fabric, vinyl and similar items used in the Hotel.

"Software" means all computer software (including all future upgrades and modifications) and related documentation provided by Franchisor or designated suppliers for the Electronic Systems.

"Standards" means Franchisor's manuals, procedures, systems, guides, programs (including the Quality Assurance Program), requirements, directives, specifications, Design Criteria, and such other information and initiatives for operating System Hotels.

"System" means the Standards, Intellectual Property, the Electronic Systems, the Marketing Fund Activities, Additional Marketing Programs, Marketing Materials, training programs, and other elements that Franchisor or its Affiliates have designated for System Hotels.

"System Hotel" means a hotel operated by Franchisor, an Affiliate of Franchisor, or a franchisee or licensee of Franchisor or its Affiliates under the trade name(s) identified in Item 1 of Exhibit A in any of the 50 States of the United States of America, the District of Columbia and Canada, and excludes any other Franchisor Lodging Facility or other business operation.

"Taxes" means taxes, levies, imposts, duties, fees, charges or liabilities imposed by any governmental authority, including any interest, additions to tax or penalties applicable to any of the foregoing.

"Term" is defined in Section 2.1.

"Transfer" means any absolute or conditional sale, conveyance, transfer, assignment, exchange, lease or other disposition.

"Travel Costs" means all travel, food and lodging, living, and other out-of-pocket costs.

"Travel Management Companies" means travel agencies, online travel agencies, group intermediaries, wholesalers, concessionaires, and other similar travel companies.

"Uniform System" means the Uniform System of Accounts for the Lodging Industry, Eleventh Revised Edition, 2014, as published by the American Hotel & Lodging Educational Institute, or any later edition, revision or replacement that Franchisor designates.

"Vacation Club Products" means timeshare, fractional, interval, vacation club, destination club, vacation membership, private membership club, private residence club, and points club products, programs and services and includes other forms of products, programs and services where purchasers acquire an ownership interest, use or other rights to use determinable leisure units on a periodic basis and pay in advance for such ownership interest, use or other right.

"Yield Management System" means any yield management system (including all Software, Hardware and electronic access) designated by Franchisor for use by System Hotels.

**EXHIBIT C**
**NEW DEVELOPMENT**

Franchisee acknowledges that the Hotel is to be newly developed and constructed at the Approved Location under the terms of this Exhibit C and Section 4.4.

1.    Construction of the Hotel.

  A.    *Construction Start Deadline.* By the date stated in Item 13 of Exhibit A (the "Construction Start Deadline"), Franchisee will have (a) obtained written long term and construction financing commitments; (b) entered into a construction contract; (c) obtained zoning clearances, ingress and egress permits, and building permits in accordance with the approved Plans; and (d) excavated or started excavation for foundations or underground utilities. Within 10 days after the date Franchisee has commenced construction, Franchisee will notify Franchisor that it has satisfied the above conditions. If requested, Franchisee will deliver evidence that such conditions have been met.

  B.    *Opening Deadline.* Franchisee will complete construction and furnish the Hotel in accordance with the approved Plans, the Standards and the Marriott Agreements so that the Opening Date occurs by the date stated in Item 14 of Exhibit A (the "Opening Deadline").

  C.    *Extensions.* Time is of the essence, but the Construction Start Deadline and the Opening Deadline will be equitably extended for any delay caused by acts of nature, terrorism, strikes, war, governmental restrictions, or other causes beyond Franchisee's control (excluding for the avoidance of doubt, unavailability of financing). If Franchisee wishes to extend such deadlines, Franchisee will make a written request giving the reasons for the delay. Franchisor may, in its sole discretion, extend such deadlines, but no extension will be granted for more than six months. For any extension (other than ones for which deadlines were equitably extended under the first sentence of this paragraph), Franchisor may require Franchisee to pay its then-current extension fee. The extension fee will be paid to Franchisor with the request for the extension and is nonrefundable unless Franchisor declines to grant the requested extension. Any extension of the Construction Start Deadline will automatically extend the Opening Deadline for the same amount of time.

  D.    *Permits and Certifications.* Franchisee will obtain all permits and certifications required for lawful construction and operation of the Hotel, including zoning, access, sign, building permits and fire requirements and, if requested, will certify that it has obtained all such permits and certifications.

  E.    *Compliance.* Franchisee will ensure that the Hotel complies with Applicable Law, the Standards and the Design Criteria, including the Fire Protection and Life Safety Standards (even if such Standards exceed local code requirements).

  F.    *Franchisee's Responsibilities.* Franchisee is responsible for the entire cost of constructing, equipping, supplying and furnishing the Hotel as a System Hotel.

  G.    *Site Visits.* During construction, Franchisor's representatives may visit the job site at any time to observe the work, and Franchisee, its contractors and subcontractors will cooperate fully with any such site visits. Upon request, Franchisee will submit photos showing the progress of construction to Franchisor. Franchisor may submit any deficiencies or discrepancies to Franchisee, and Franchisee will promptly correct such items.

2.    Opening Date. Without Franchisor's prior approval, Franchisee will not advertise, promote or operate the Hotel as a System Hotel until:

KUMAR 000856

A.      The Hotel has been completed in accordance with the Plans, the Standards and the Marriott Agreements, as determined by Franchisor in its sole discretion. Franchisor may require Franchisee to deliver an architect's certification that the Hotel has been completed in accordance with the Plans and a copy of the certificate of occupancy for the Hotel;

B.      Franchisee delivers a certificate from its licensed architect, engineer or recognized expert consultant on Accessibility Requirements in the form attached to this Exhibit C as Attachment Two;

C.      Franchisee has installed all FF&E, Electronic Systems and other items and equipment for opening the Hotel as a System Hotel, including Fixed Asset Supplies and Inventories, and all is in working order;

D.      Franchisee has employed a general manager and department managers, and they have successfully completed Franchisor's training programs;

E.      Franchisee has paid all amounts due Franchisor;

F.      Franchisee has complied with the insurance requirements of this Agreement;

G.      Franchisee has retained Franchisor and paid Franchisor the then-current testing and inspection fee to test and inspect the fire protection and life safety systems of the Hotel, and such testing and inspection verifies the Hotel complies with Franchisor's fire protection and life safety Standards and the fire protection and life safety systems of the Hotel are operational. If the Hotel meets certain criteria determined by Franchisor, instead of retaining Franchisor, Franchisee may deliver a certification in the form attached to this Exhibit C as Attachment Three that verifies the Hotel complies with Franchisor's fire protection and life safety Standards and the fire protection and life safety systems of the Hotel are operational. Any such certification must be issued by a third-party licensed fire protection engineer, engineer, or recognized expert consultant on fire and life safety requirements that has been approved by Franchisor.  Franchisor may require that such certification be issued by a party that has not participated in the design of the fire protection and life safety systems of the Hotel;

H.      Franchisee has notified Franchisor that all requirements for construction, furnishing and opening the Hotel have been completed and the Hotel is ready to open as a System Hotel; and

I.      Franchisor has granted approval to open and operate the Hotel as a System Hotel and established the Opening Date in a letter agreement signed by Franchisor and Franchisee or its general manager in the form attached to this Exhibit C as Attachment One. If Franchisor establishes an Opening Date but the letter agreement provides for additional construction, upgrading, renovation, or training (the "Additional Work"), Franchisee will be authorized to use the System and identify the Hotel as a System Hotel only for such time as Franchisee is diligently completing the Additional Work. Failure to timely complete the Additional Work is a default under this Agreement. Franchisor may review any Additional Work, and Franchisee must ensure that the Hotel complies with all requirements of Franchisor following such review. Franchisee, its contractors and subcontractors must cooperate fully with any inspections conducted by Franchisor. If any site visits and inspections are necessary to ensure the Hotel complies with the Additional Work requirements, Franchisor may charge its then-current fee for the additional time spent inspecting the Hotel plus Travel Costs. If Franchisor determines an additional test and inspection of the fire protection systems or life safety components of the Hotel is necessary, Franchisor may charge Franchisee its then-current fee for such site visits and inspections.

3. <u>Inspection of the Hotel</u>. Franchisor will use its commercially reasonable efforts to inspect the Hotel within 20 days after receipt of the notice specified in Section 2.H of this <u>Exhibit C</u> to determine whether Franchisee has satisfied all the requirements for opening the Hotel as a System Hotel; however, Franchisor will not be liable for delays or loss caused by Franchisor's inability to complete an inspection within such time period. If at any time Franchisor determines any additional testing and inspection of the Hotel's fire protection and life safety systems are necessary, Franchisor may require that Franchisee comply with the first sentence of Section 2.G of this <u>Exhibit C</u>.

4. <u>Opening Team</u>. Franchisor will provide an opening team to assist in the opening of the Hotel as a System Hotel and to train the Hotel employees. The team members will remain at the Hotel for such time as Franchisor deems appropriate to open the Hotel as a System Hotel. Franchisee will pay Franchisor's costs associated with providing such assistance, including Travel Costs.

5. <u>Opening Advertising</u>. Franchisee will conduct an opening advertising and marketing campaign that complies with the Standards.

6. <u>Parking</u>. If the number of dedicated parking spaces at the Hotel does not comply with the Standards, Franchisee will secure at a location approved by Franchisor as many nearby parking spaces as necessary to comply with the Standards (or such lesser amount as Franchisor agrees to in writing). If such nearby parking spaces are not available for use exclusively by Hotel guests and Franchisor determines that inadequate parking has negatively affected guest satisfaction at the Hotel, Franchisor reserves the right to require that Franchisee (i) secure additional parking spaces that will be used exclusively by Hotel guests or (ii) provide valet parking for vehicles of Hotel guests 24 hours a day, 7 days a week and secure a sufficient number of parking spaces in the vicinity of the Hotel to park such vehicles. Any parking alternatives must be approved by Franchisor and operated and maintained in a condition and at all times in a manner consistent with the high standards of quality and service of the Hotel and the System and will be considered part of the Hotel, including for purposes of insurance and indemnification.

7. <u>Access Easement</u>. If Franchisor determines that it is necessary or advisable for Franchisee to secure one or more access easements across adjacent property to have the right to use driveways, drive aisles or sidewalks for pedestrian and vehicular ingress and egress, Franchisee agrees to (i) secure such easements (and the right to display signage approved by Franchisor directing traffic across the property that is subject to the easement) where indicated in the final Plans approved by Franchisor and (ii) maintain such easements and rights at all times during the Term. Franchisee also agrees to construct and maintain at all times during the Term the method of ingress and egress indicated in the final Plans, which will lead directly to the Hotel.

KUMAR 000858

**ATTACHMENT ONE**
**TO EXHIBIT C**

**AUTHORITY TO OPEN LETTER**

Date

[Franchisor]
10400 Fernwood Road
Bethesda, Maryland 20817

[Franchisee and address]

_____

_____
Attn:_____

      Re:    Authority to Open and Operate the [_____] Hotel located at [address] under the
Franchise Agreement dated _____ ("Franchise Agreement") between
[Franchisor] and _____.

Dear _____:

Congratulations! You are authorized and directed to open for business as a System Hotel at the Approved
Location as of _____, which date is the Opening Date.

The number of Guestrooms at the Hotel authorized by Franchisor as of the Opening Date is _____.
[The number of Guestrooms at the Hotel has increased by _____ Guestrooms since the date of the
Franchise Agreement, and Franchisee must pay an expansion fee in the amount of $_____. Please
send a check payable to [Franchisor] at the address above to the attention of:  Franchise Development,
Dept._____.]

[The Hotel has not been completed to Franchisor's specifications. However, based on your agreement to
complete the work in Attachment A (the "work") by the date(s) in that Attachment, Franchisor is willing
to establish the Opening Date as an accommodation to you. The work must be completed to the
satisfaction of Franchisor by no later than _____, or you will be in breach of the Franchise
Agreement, which may result in suspending the Hotel from the Reservation System or termination of the
Franchise Agreement.]

All terms used and not defined in this Letter have the meanings stated in the Franchise Agreement.

We wish you much success and thank you for your ongoing commitment to Marriott brands.

Respectfully submitted,                AGREED AND ACCEPTED:

FOR [FRANCHISOR]:           FOR FRANCHISEE:

By: _____(SEAL)    By: _____(SEAL)
Name:                               Name:
Title:                                Title:

**ATTACHMENT TWO**
**TO EXHIBIT C**

**ADA CERTIFICATION**

(to be completed by Franchisee's licensed architect, engineer or ADA consultant)

In connection with the [NAME AND LOCATION OF HOTEL] (the "Hotel"), I hereby certify to [FRANCHISEE] and to [FRANCHISOR] that:

**[For an "historic hotel" insert: The Hotel [is eligible for listing in the National Register of Historic Places under the National Historic Preservation Act] [has been designated as historic under State or local law] [is a qualified historic building under the Uniform Federal Accessibility Standards] (an "historic hotel");]**

I have used professionally reasonable efforts to ensure that the Hotel complies with the requirements of the Americans with Disabilities Act ("ADA") **[For an "historic hotel" insert: as applicable to an historic hotel]**, and all other related or similar state and local laws, regulations, and other requirements governing public accommodations for persons with disabilities in effect at the time that this certification is made; and

In my professional judgment, the Hotel does in fact comply with such requirements.

By: _____

Print Name: _____

Firm: _____

Date: _____

**ATTACHMENT THREE**
**TO EXHIBIT C**

**FIRE & LIFE SAFETY CERTIFICATION**

(to be completed by Franchisee's third-party licensed fire protection engineer, engineer or fire and life safety consultant)[1]

In connection with the [NAME AND LOCATION OF HOTEL] (the "Hotel"), I hereby certify to [FRANCHISEE] and to [FRANCHISOR] that:

I have used professionally reasonable efforts to ensure that the Hotel complies with Marriott International, Inc.'s Fire Protection and Life Safety Standards in effect as of the [EFFECTIVE DATE OF FRANCHISE AGREEMENT] ; and

In my professional judgment, the Hotel does in fact comply with such standards and the fire protection and life safety systems of the Hotel are operational.

By: _____

Print Name: _____

Firm: _____

Date: _____

---

[1] Franchisor may require that this certification be issued by a party that has not participated in the design of the fire protection and life safety systems of the Hotel.

KUMAR 000861